Barry I. Levy
Michael A. Sirignano
Jennifer Abreu
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE
COMPANY and GEICO CASUALTY COMPANY,                                    Docket No.:

                                        Plaintiffs,

                    -against-                                    **Plaintiff Demands a Trial**
                                                                 **by Jury**
HARBOR MEDICAL GROUP, P.C., CONFIDENT MEDICAL
SERVICES, P.C., COASTAL MEDICAL, P.C., ALEXANDR
ALEXEEVICH ZAITSEV, M.D., MARK KAMINAR, ANTHONY
BENEVENGA, FINANCIAL VISION GROUP, LLC, FINANCIAL
VISION GROUP II, LLC FORMERLY KNOWN AS ADF
EQUITIES, LLC, FINANCIAL VISION GROUP III, LLC,
FINANCIAL VISION GROUP IV, LLC, DANIEL KANDHOROV,
AND JOHN DOE DEFENDANTS NOS. 1-5.

                                        Defendants.
-----------------------------------------------------------------------------------X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, Harbor Medical Group, P.C.

("Harbor Medical"), Confident Medical Services, P.C. ("Confident Medical"), Coastal Medical,

P.C. ("Coastal Medical"), Alexandr Alexeevich Zaitsev, M.D. ("Zaitsev"), Mark Kaminar

("Kaminar"), Anthony Benevenga ("Benevenga"), Financial Vision Group, LLC ("FVG"), Financial Vision Group II, LLC formerly known as ADF Equities, LLC ("FVG II"), Financial Vision Group III, LLC ("FVG III"), Financial Vision Group IV, LLC ("FVG IV"), Daniel Kandhorov ("Kandhorov") and John Doe Defendants Nos. "1" through "5" (the "John Doe Defendants") (collectively, the "Defendants") hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $1,000,000.00 that Defendants wrongfully obtained from GEICO by submitting, or causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services, including illegitimate initial and follow-up examinations, outcome assessment testing, physical therapy services, diagnostic tests, and nerve conduction velocity ("NCV") testing and electromyography ("EMG") studies (the NCV/EMG tests are herein referred to as "EDX tests")(collectively, the "Fraudulent Services"), allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      Specifically, the Defendants associated and combined to fraudulently and illegally incorporate, own and control three medical professional corporations, Harbor Medical, Confident Medical and Coastal Medical (collectively, the "Provider Defendants"), which they used to bill GEICO and the New York automobile industry for a laundry list of excessive and medically unnecessary healthcare treatments rendered – or purportedly rendered – at multi-disciplinary "medical mills" that housed a revolving door of numerous other purported healthcare providers all geared towards exploiting New York's No-Fault insurance system.

3.      To effectuate the fraudulent scheme, the Defendants recruited and "purchased" the medical license of Robert Brian Kelly, D.O. ("Kelly") in order to allow them to fraudulently

incorporate, own and control the Provider Defendants.  The Defendants then caused the Provider Defendants to operate on a transient basis at forty-eight (48) separate clinic locations in the New York metropolitan area (hereinafter, the "Clinics") that almost exclusively treated No-Fault insurance patients. Kelly served as the record owner of the Provider Defendants but in truth, his purported ownership was a "sham" as he performed none of the Fraudulent Services, had no genuine ownership interest in the Provider Defendants, and did not operate, manage, or control the Provider Defendants.  Indeed, Kelly was completely unaware that the Defendants started using Confident Medical and Coastal Medical, in addition to Harbor Medical, to bill GEICO and other New York automobile insurers.

4.      To further carry out and conceal their fraudulent scheme, the Defendants devised and implemented a series of financial arrangements between Kelly, the Provider Defendants and FVG, FVG II, FVG III, and FVG IV (the "Funding Defendants") and their members, which included Zaitsev, Kandhorov and various other individuals. Though the Funding Defendants purport to specialize in the funding and financing of medical receivables they actually acted as a conduit for purposes of allowing the Defendants to own, operate and control the Provider Defendants by controlling the flow of money related to the insurance payments that were to be realized from the fraudulent scheme.

5.      In furtherance of the fraudulent scheme, Zaitsev, Kaminar, Benevenga, Kandhorov (collectively, the "Management Defendants") and the Funding Defendants partnered with a New York based collection law firm (the "Law Firm") that agreed to:

(i)      provide legal representation to Kelly and the Provider Defendants;

(ii)     provide for or arrange for "funding" (i.e., financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York automobile insurers in connection with the unlawful scheme through

3

companies that the law firm/attorneys either held an ownership interest in and/or with whom they had relationships;

(iii)    pursue payment and collection against GEICO and other New York automobile insurers by (a) knowingly submitting fraudulent bills to the insurers for the Fraudulent Services and (b) pursing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid as needed; and

(iv)    accept the insurance payments received from insurers and then distribute the payments amongst the Defendants and third parties at the direction of the Management Defendants.

6.     The Management Defendants and the Funding Defendants were familiar with the Law Firm because it - in addition to purporting to represent Kelly and the Provider Defendants – also served as counsel for the Funding Defendants.  Moreover, various members of the Law Firm simultaneously held an ownership interest in the Funding Defendants through entities that they owned and controlled.

7.     Once the Provider Defendants were fraudulently incorporated and the financial agreements arranged, the Funding Defendants began issuing "advances" against the Provider Defendants' bills for the Fraudulent Services, and those payments were used for the benefit of the Defendants and to siphon monies to individuals and/or entities that had no legitimate purpose other than further facilitating the fraudulent scheme.

8.     As discussed herein, the Defendants, at all relevant times, have known that:

(i)    the Fraudulent Services were allegedly provided and billed through the Provider Defendants, which were fraudulently incorporated and secretly and unlawfully owned, operated and controlled by the Management Defendants and the John Doe Defendants rather than Kelly, for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    the Fraudulent Services were provided – to the extent they were provided at all – pursuant to the dictates of the Management Defendants and the John Doe Defendants, not based upon legitimate decisions by licensed healthcare

providers, and as a result of unlawful referral, illegal kickback and/or fee-splitting arrangements amongst the Defendants and the Clinics;

(iii)    the Fraudulent Services were provided – to the extent they were provided at all – pursuant to predetermined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)    the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, and necessity of the services that were purportedly provided to Insureds;

(v)    the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors, rather than by the Provider Defendants' employees, and none of the services were performed by Kelly, who did not practice through the Provider Defendants;

(vi)    the Provider Defendants were owned on paper by a physician who has never engaged in the practice of medicine through the professional corporations, thus rendering the Provider Defendants ineligible to seek or recover No-Fault benefits; and

(vii)    Harbor Medical and Confident Medical were not registered with the New York State Education Department at the time that the Fraudulent Services were purportedly provided to Insureds.

9.      The charts annexed hereto as Exhibits "1" through "3" set forth a representative sample of the fraudulent claims that the Defendants submitted, or caused to be submitted, on behalf of the Provider Defendants to GEICO.

10.     The Defendants never had any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO through the Provider Defendants.

11.     The Defendants' fraudulent scheme began in the middle of 2018.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,000,000.00.

## THE PARTIES

**I.**     **Plaintiffs**

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.**     **Defendants**

13.     Defendant Harbor Medical is a New Jersey professional corporation that was incorporated on June 1, 2018, with its principal place of business in New York.  Harbor Medical has never been registered with the New York State Department of Education.  Accordingly, Harbor Medical has never been licensed or authorized to provide medical services or to operate as a medical practice in New York State.

14.     Defendant Confident Medical is a New Jersey professional corporation that was incorporated on October 1, 2018, with its principal place of business in New York. On December 13, 2019, Coastal Medical was registered with the New York State Department of Education and New York State Department of State.

15.     However, Confident Medical was not licensed or authorized to provide medical services or operate as a medical practice in New York State at the time that the medical services were purportedly provided to Insureds and for which it billed GEICO.

16.     Defendant Coastal Medical is a New York professional corporation that was incorporated on April 12, 2019, with its principal place of business in New York.

17.     Defendant Zaitsev resides in and is a citizen of New Jersey. Zaitsev was licensed to practice medicine in New York on December 21, 2001 and in New Jersey on April 10, 2002.

Zaitsev is a physician who at all times has conspired and participated in the fraudulent scheme described herein, including (i) secretly and unlawfully owning, controlling and deriving economic benefit from the Provider Defendants; and (ii) establishing and implementing a predetermined fraudulent treatment and billing protocol to support the excessive rendering and billing of the medically unnecessary Fraudulent Services pursuant to illegal financial arrangements and kickback schemes.

18.     While Zaitsev is a licensed physician who participated in the secret ownership and control of the Provider Defendants, he was never listed or registered as an owner of the professional corporations and never practiced medicine or performed any medical services through the Provider Defendants.

19.     Zaitsev also is a managing member of the Funding Defendants.

20.     Defendant Kaminar resides in and is a citizen of New Jersey. Kaminar is an accountant to professional and non-professional entities and individuals, including professional corporations owned and controlled by both Zaitsev and Benevenga.

21.     Kaminar is a non-physician who at all times conspired and participated in the fraudulent scheme alleged herein.

22.     Defendant Benevenga resides in and is a citizen of New Jersey. Benevenga is a non-physician who at all times conspired and participated in the fraudulent scheme alleged herein.

23.     Defendant Kandhorov resides in and is a citizen of New York. Kandhorov is a managing member of the Funding Defendants.

24.     Kandhorov is a non-physician who at all times has conspired and participated in the fraudulent scheme alleged herein.

25.     Defendant FVG is a Delaware limited liability company that was formed on or about April 6, 2018 and registered with the New York State Department of State on or about September 1, 2021, with its principal place of business at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey.  All the members of FVG are residents of New York and/or New Jersey.

26.     Defendant FVG II is a Delaware limited liability company that was formed on or about August 8, 2018, with its principal place of business at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey.  FVG II was originally formed under the name of "ADF Equities, LLC".  On September 26, 2018, a certificate of amendment was filed with the Secretary of State of the State of Delaware and the entity's name was changed from ADF Equities, LLC to FVG II. All the members of FVG II are residents of New York and/or New Jersey.

27.     Defendant FVG III is a Delaware limited liability company that was formed on or about September 24, 2018, with its principal place of business at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey. All the members of FVG III are residents of New York and/or New Jersey.

28.     Defendant FVG IV is a Delaware limited liability company that was formed on or about February 28, 2019, with its principal place of business at 506 Hamburg Turnpike, Ste 204A, Wayne, New Jersey. All the members of FVG IV are residents of New York and/or New Jersey.

29.     The John Doe Defendants are citizens of New York and/or New Jersey. The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Defendants and derived financial benefit from the fraudulent scheme by: (i) aiding in unlawfully operating, managing and controlling the Provider Defendants; and (ii) siphoning monies derived from the fraudulent scheme described herein.

III.     **The Relevant Non-Parties**

30.     Kelly resides in and is a citizen of New Jersey. Kelly became licensed to practice in New Jersey on May 9, 1996 and in New York on January 22, 1991. Kelly's medical license in New York is currently not active.

31.     Kelly falsely purported to be the sole owner of the Provider Defendants.

32.     Kelly also purported to perform many of the Fraudulent Services billed through the Provider Defendants to GEICO and other insurers when in fact, Kelly did not perform any of the Fraudulent Services.

**JURISDICTION AND VENUE**

33.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

34.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

35.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Amended Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

I.     **An Overview of the No-Fault Laws and Licensing Statutes**

36.     GEICO underwrites automobile insurance in New York.

37.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that

they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

38.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

39.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

40.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

41.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

42.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….  (Emphasis added).

43.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv)

absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

44.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

45.     Healthcare services may be rendered in New York through a professional service corporation only if every shareholder of that professional service corporation is both licensed and registered in New York to practice the professional service corporation's authorized profession. N.Y. Bus. Corp. Law § 1503; N.Y. Educ. Law § 6502.

46.     Professional corporations operating in New York must have a certificate of authority from the New York State Department of Education and must be properly incorporated and registered in New York.  See, e.g., N.Y. Bus. Corp. Law §§ 1503, 1514, N.Y. Educ. Law §§ 6509, 6530.  Out-of-state professional corporations are required to apply before doing business in New York State.  See e.g., N.Y. Bus. Corp. Law §§ 1530.

47.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

48.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

49.     Furthermore, pursuant to Education Law §6512, §6530 (11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice

11

medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

50.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.  Further, pursuant to 8 N.Y.C.R.R. §29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services. Pursuant to Education Law §6530(19), it is professional misconduct under certain circumstances for a licensee to permit any person to share in fees for professional services.

51.     New York law also prohibits anyone from engaging in for profit, any business or service which in whole or in part includes the referring or recommending of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment.  See New York Public Health Law §4501.

52.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is unlawfully incorporated and/or licensed, if it engages in unlawful fee-splitting, or if it pays or receives unlawful kickbacks in exchange for patient referrals.

53.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits; and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

54.     Additionally, New York law requires that the shareholders of a medical professional corporation be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed.  Under the No-Fault Laws, professional service corporations are not eligible to receive No-Fault Benefits if they are owned by physicians who do not engage in the practice of medicine through the professional corporation. See e.g., Business Corporation Law §1507.

55.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

56.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

57.     New York law requires that the shareholders of a professional corporation be engaged in the practice of the profession through the professional corporation in order for it to be lawfully licensed.  Under the No-Fault Laws, professional corporations are not eligible to receive No-Fault Benefits if they are owned by physicians who do not engage in the practice of their profession through the professional corporation.

58.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

59.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

60.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Relevant Background Information

61.     Zaitsev has a substantial history of engaging in various no-fault insurance fraud schemes.

62.     In or around 2007, Zaitsev began practicing medicine in the fields of anesthesiology and pain management through a New Jersey medical practice called Comprehensive Multi-Specialty Medical Group, PC ("Comprehensive"), which was owned and operated by Richard Lipsky M.D. ("Lipsky") .

63.     In 2010, Lipsky informed Zaitsev that he no longer wished to continue Comprehensive's operations and offered him the opportunity to take over the practice.  Zaitsev

accepted Lipsky's offer and began operating Highland Medical Group, P.C. a/k/a Highland Medical Group of New Jersey, P.C. ("Highland"), a New Jersey medical professional corporation that was incorporated on or about May 26, 2010.

64.     Zaitsev stepped into what was essentially a turnkey operation with Highland operating in substantially the same manner as Comprehensive, including operating from the same clinic locations, employing the same individuals and providing similar healthcare services.  In addition to operating at various clinics, Zaitsev and Highland performed procedures at some hospitals. At some point, Highland's reputation with chiropractors and attorneys – who were referral sources for Highland – was damaged due to large fees charged by hospitals at which Highland rendered services.

65.     As a result, in 2013, Zaitsev caused the formation of Interstate Multi-Specialty Medical Group, P.C. ("Interstate") as a replacement to take over the operations of Highland under a new name. Interstate was a New Jersey medical professional corporation that was incorporated on or about August 27, 2013.

66.     Between 2010 and 2015, Zaitsev used Highland and Interstate to submit massive amounts of fraudulent no-fault insurance billing to automobile insurers in New Jersey, including GEICO.

67.     Highland and Interstate purported to provide examinations, diagnostic tests, pain management injections, and anesthesia services to Insureds at clinics and some hospitals. However, Interstate and Highland's ability to bill GEICO and other New Jersey automobile insurers for medical services depended on Interstate and Highland's ability to gain access to patients.

68.     Accordingly, Zaitsev devised a fraudulent kickback and referral scheme whereby he and the professional corporations i.e., Highland and Interstate would pay unlawful kickbacks to healthcare providers in exchange for patient referrals to Interstate and Highland.

69.     In keeping with the fact that Highland, Interstate and Zaitsev paid illegal kickbacks in exchange for patient referrals, on or about May 20, 2016, in a criminal case entitled State of New Jersey v. Alexander Dimeo, Docket Nos. 16-05-000251 and 16-05-000252, a chiropractor named Alexander Dimeo, D.C. ("Dimeo") pleaded guilty to various insurance fraud-related crimes. As part of his plea agreement, Dimeo provided sworn testimony regarding his receipt of massive amounts of kickbacks from various healthcare providers in New Jersey, including Zaitsev.

70.     In particular, as part of Dimeo's plea allocution, Dimeo provided sworn testimony to the effect that Zaitsev – through an intermediary – paid him kickbacks in exchange for patient referrals to Highland. In particular, Dimeo testified that beginning in 2012, Zaitsev directed an intermediary to provide between $150.00 to $250.00 per patient to Dimeo in exchange for patient referrals to Zaitsev and Highland.

71.     All told, Dimeo testified that he accepted substantial amounts of money in kickbacks from Zaitsev in exchange for patient referrals to Zaitsev and Highland between 2012 and 2015.  Then, in an April 2018 affidavit, Dimeo swore – among other things – that when he would refer patients to Highland pursuant to the kickbacks from Zaitsev, he would often notice that the resulting healthcare services were performed through Interstate, which he understood was also owned by Zaitsev.

72.     In early 2016, Zaitsev grew concerned that his kickback payments to Dimeo and other healthcare providers would come to light and would limit his ability to continue to submit fraudulent billing through Interstate and Highland.

73.     In addition, several insurance fraud lawsuits filed against Zaitsev and his medical practices negatively impacted Zaitsev's reputation in the medical community, the name recognition of Highland and Interstate and Zaitsev's business.

74.     Specifically, between 2014 and 2019, Zaitsev and his medical practices were named as defendants in five separate insurance fraud lawsuits brought by several insurers, including Allstate Insurance Company, Travelers Insurance, GEICO, New Jersey Property Liability Guaranty Association and 21st Century Insurance Company. See NJ Property Liability v. Highland Medical Group, P.C. et al., Case No. L-001010-14 (N.J. Super. Ct. 7/22/2014); Travelers Indemnity Co. v.  Highland Medical Group, P.C. et al., Case No. L-002987-15 (N.J. Super. Ct. 12/18/2015); GEICO et al. v. Interstate Multi-Specialty Medical Group, P.C. et al., Docket No. 2:17-cv-05725 (D.N.J. 8/3/2017); Allstate New Jersey Ins. Co. et al. v. Samuel S. David et al., Case No. L-00021-18 (N.J. Super. Ct. 1/18/2018); 21st Century Ins. Co. et al. v. Interstate Multi-Specialty Group et al., Case No. L-000061-19 (N.J. Super. Ct. 1/9/2019).

75.     Zaitsev sought out another means by which he could continue to submit a large volume of fraudulent and unlawful billing to GEICO and other insurers.

76.     Thereafter, Zaitsev, in association with other individuals, used other professional corporations that were formed to serve as vehicles for the continued submission of a large amount of fraudulent and unlawful billing to GEICO and other insurers and to avoid further detection by automobile insurers or the government. For example, Zaitsev is a named defendant in a federal No-Fault insurance fraud action commenced by GEICO captioned, Gov't Employees Ins. Co. et al. v. Alexandr Zaitsev, M.D. et al., Docket No. 1:20-cv-03495 (FB)(SJB) (hereinafter, the "Zaitsev matter").

77.     In the Zaitsev matter, GEICO credibly alleges that as part of a complex no-fault fraudulent scheme, Zaitsev and other defendants submitted, or caused to be submitted thousands of fraudulent no-fault insurance charges through Metropolitan Interventional Medical Services, P.C. ("Metropolitan"), Riverside Medical Services, P.C. ("Riverside"), Tri-State Multi-Specialty Medical Services, P.C. ("Tristate") and Ridgewood Diagnostic Laboratory, LLC ("Ridgewood"). Benevenga is also a named defendant in the Zaitsev matter for his participation in the fraudulent scheme and as co-owner of Ridgewood.

78.     In addition to owning Metropolitan and Ridgewood, Zaitsev secretly owned and controlled Tri-State and Riverside.  In order to conceal his involvement, Zaitsev recruited Allan Weissman, M.D. ("Weissman") to serve as the sole record owner of Tri-State and Riverside. Zaitsev was familiar with Weissman since they both worked for Comprehensive and thereafter, Weissman worked for Zaitsev through Highland and Integrated.  Despite the fact that Weissman was the record owner, Zaitsev was in fact the true owner of Tri-State and Riverside and controlled their operations and finances.

79.     Moreover, in addition to the professional entities referenced herein, Zaitsev also secretly owned and controlled an entity known as Crosstown Medical, P.C. "("Crosstown"), a New York professional corporation that was incorporated on or about February 15, 2018. William Focazio, M.D. ("Focazio"), a New Jersey gastroenterologist, falsely purported to be Crosstown's sole owner.  Both were named as defendants in the Zaitsev matter.

80.     Not surprisingly, several licensed healthcare professionals associated with Riverside, Tri-State and Crosstown, including Stella Amanze, P.A. ("Amanze"), Melissa  Evans, N.P. ("Evans"), Mini Mathew, N.P. ("Mathew"), Angela Pullock, N.P. ("Pullock") and Heoeeun Kwon, F.N.P. ("Kwon") were also "employees" of and purportedly rendered medical services

through Harbor Medical.  Notably, Amanze, Evans, Mathew and Pullock are all named defendants in the Zaitsev matter.

**III.**   **The Defendants' Fraudulent Scheme**

81.     The Defendants' fraudulent scheme began in early to mid-2018.

82.     At that time, the Defendants developed and executed a complex fraudulent scheme wherein the Provider Defendants – owned on paper by Kelly, but actually unlawfully owned and controlled by Management Defendants – were used to bill GEICO and the New York automobile insurance industry for millions of dollars in No-Fault insurance benefits that they were never entitled to receive.

83.     To effectuate the scheme, the Management Defendants formed the Provider Defendants – using Kelly as the "sham" owner of those practices – to implement a fraudulent, predetermined billing and treatment protocol that was established by the Management Defendants and designed solely to maximize profits without regard to genuine patient care.

84.     The Management Defendants' fraudulent scheme included: (i) "purchasing" the license of Kelly; (ii) using Kelly's license and information to illegally incorporate, own, and/or control the Provider Defendants; (iii) engaging in unlawful referral, illegal kickback and/or fee splitting arrangements; (iv) implementing a fraudulent billing and treatment protocol designed to maximize profits in which the Management Defendants, through the Provider Defendants, subjected Insureds to a predetermined, fraudulent treatment protocol; and (v) using the Provider Defendants as conduits to submit fraudulent No-Fault billing to GEICO and other New York automobile insurers pursuant to a predetermined, fraudulent treatment protocol and kickback schemes.

**A.     The Unlawful Incorporation, Ownership and Operation of the Provider Defendants**

85.     Kelly is a licensed physician who resides in and practiced medicine in New Jersey for at least 21 years.

86.     Between 2012 and 2017, Kelly – with the assistance of Benevenga – established relationships with and worked for a series of chiropractic offices and ambulatory surgical centers in New Jersey.

87.     Kelly understood Benevenga to be involved in the management of medical and chiropractic professional corporations.

88.     In late 2017, Kelly's health started to deteriorate to the point where he could no longer treat patients. At the same time, Kelly was facing significant financial hardships.

89.     Kelly informed Benevenga that he could no longer treat patients and instead was interested in an administrative position.

90.     Thereafter, in the spring of 2018, Benevenga approached Kelly and offered him an opportunity to work at a New York medical clinic in an administrative capacity. Benevenga indicated that the administrative position was available at a new medical practice that was taking over Crosstown's practice at 110 Pennsylvania Ave, Brooklyn, New York (the "Pennsylvania Avenue Clinic").

91.     Notably, Zaitsev secretly held a secret ownership interest in Crosstown, but grew concerned that his involvement in prior fraudulent schemes, and the payment of kickbacks would come to light. As such, Zaitsev and other Defendants sought to continue to submit fraudulent billing through a new professional corporation.

92.     Kelly came to learn that Zaitsev worked with Benevenga but was directed to speak to Kaminar in connection with what was characterized to be an "administrative" employment opportunity.

93.     Upon meeting Kaminar, Kelly learned that he was being recruited to serve as a "sham" owner of a professional corporation that would operate at the Pennsylvania Avenue Clinic.

94.     The Defendants already had a scheme devised but the success of the scheme required a licensed physician like Kelly.

95.     The scheme to unlawfully incorporate, operate and control a new healthcare professional corporation would include, among other things: (i) funding of up to $2.6 million in receivables that would be provided through the Funding Defendants; (ii) a billing agreement with a company known as GreenBills, LLC ("GreenBills"), a company controlled by the John Doe Defendants, to generate and prepare all the billing submitted to insurers; and (iii) a retainer agreement with the Law Firm to handle all legal and collections related matters.

96.     Kelly's responsibilities would be limited to occasionally visiting the clinics to review and co-sign medical records.  He would not be expected or required to treat any patients or hire, fire or supervise medical staff.

97.     Kelly was also expected to re-activate his medical license in New York State, which had at the time been dormant for some time.

98.     Once agreed upon, the Management Defendants used Kelly's license and information to form Harbor Medical.

99.     Specifically, in exchange for a designated monthly salary in the amount of $8,000.00 from the Management Defendants, Kelly agreed to falsely represent in the certificate of incorporation and related filings with New Jersey that he was the true shareholder, director, officer, or owner of Harbor Medical, and that he truly owned, controlled, and practiced through it.

100.    Thereafter, the Management Defendants caused Harbor Medical to operate at fifteen (15) separate clinic locations in New York, including the Pennsylvania Avenue Clinic.

However, Harbor Medical was never registered with the New York Department of Education and therefore, was not authorized to practice medicine in New York.

101.    Between July 2018 and September 2019, the Management Defendants and the Funding Defendants submitted, or caused to be submitted over $1.9 million in fraudulent billing to GEICO through Harbor Medical.

102.    Moreover, the Management Defendants also unlawfully incorporated, owned and controlled two additional professional entities placed in the name of Kelly, namely Confident Medical and Coastal Medical.

103.    Specifically, in or around September 2018, Kaminar suggested to Kelly that a "management" company should be formed to oversee Harbor Medical's operations at the various clinic locations, which Kelly agreed to.

104.    Unbeknownst to Kelly, in October 2018, the Management Defendants instead began to use his license and information to unlawfully form another professional corporation, Confident Medical, in the State of New Jersey.

105.    Thereafter, the Management Defendants caused Confident Medical to operate at thirty-four (34) separate clinic locations in New York.

106.    Between October 2018 and May 2019, the Management Defendants and the Funding Defendants submitted, or caused to be submitted more than $1.5 million in fraudulent billing to GEICO through Confident Medical.  However, at all times during which medical services were purportedly being performed and billed through Confident Medical, the professional entity was never registered with the New York Department of Education and therefore, was not authorized to practice medicine in New York.

107.    In April 2019, the Management Defendants again recruited Kelly to serve as the sham owner of Coastal Medical, which operated for about two months.

108.    Kelly once again agreed to falsely represent in the certificate of incorporation and related filings with New York State that he was the true shareholder, director, officer or owner of Coastal Medical.

109.    However, other than opening a corporate bank account at Kaminar's request, Kelly had no involvement in Coastal Medical's ownership and/or control and was even unaware that the Management Defendants submitted billing to GEICO and other insurers through Coastal Medical for Fraudulent Services purportedly rendered to Insureds.

110.    Between August 2019 and October 2019, the Management Defendants and the Funding Defendants submitted, or caused to be submitted about $143,000.00 in fraudulent billing to GEICO through Coastal Medical.

111.    The Management Defendants used Kelly's license, information and signature (without Kelly's permission) to generate fraudulent documents, including NF-3 forms (i.e., bills), assignment of benefit ("AOB") forms and medical records that were submitted in support of the Defendants' billing through Confident Medical and Coastal Medical.

112.    Though Kelly was listed as the record owner of the Provider Defendants on the certificates of incorporation, or otherwise identified as the licensed professional controlling the professional practices, Kelly exercised no genuine ownership or control over the Provider Defendants or the profits that were generated from it.

113.    Kelly has never been the true shareholder, director, officer, or owner of the Provider Defendants, and never had any true ownership interest in or control over the professional corporations and practices.

114.     True ownership and control over the Provider Defendants and their assets have always rested entirely with the Management Defendants and the Funding Defendants, who used the facade of the Provider Defendants to do indirectly what they are forbidden from doing directly, namely: (i) secretly own and control the medical professional practices; (ii) control those medical professionals' practices; (iii) employ medical professionals; and/or (iii) charge for and derive an economic benefit from their services, including control over the professional entities' assets.

115.     Kelly did not establish his own practices at the Clinics and did not practice medicine or perform any medical services through the Provider Defendants.

116.     Kelly, instead, served as the sham owner of the Provider Defendants, which simply "opened up" and began billing from the Clinics with their own pre-existing patient base and administrative and medical staff.

117.     Kelly did not advertise or market his association with the Clinics to the general public.

118.     The Provider Defendants did not advertise or market their services at the Clinics to the general public.

119.     Kelly and the Provider Defendants did nothing to attract patients or create a patient base for their alleged "practices" at the Clinics.

120.     The Management Defendants, rather than Kelly, created and/or controlled the Clinics, the Provider Defendants, and the patient base at the Clinics.

121.     Throughout the course of Kelly's relationship with the Management Defendants, all decision-making authority relating to the operation and management of the Provider Defendants was vested entirely with the Management Defendants.

122.    The Management Defendants' decision-making authority relating to the operation and management of the Provider Defendants at the Clinics included control over the treatment protocols, including what treatments, testing and other services the Insureds received, what referrals and prescriptions the Insureds received, and which healthcare provider or professional corporation would render or provide those services.

123.    The Management Defendants decision-making authority also included the hiring and firing of all employees, including the healthcare professionals and technicians who allegedly performed the Fraudulent Services on behalf of the Provider PCs and the administrative employees.

124.    The Management Defendants' decision-making authority also included control over how the Fraudulent Services were billed to insurers, including GEICO; who performed the billing services on behalf of the Provider Defendants; and how the profits of the Provider Defendants were disbursed.

125.    Moreover, Kelly did not control or maintain the Provider Defendants' books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the Provider Defendants' financial affairs; never controlled the Provider Defendants' accounts receivables; and was unaware of fundamental aspects of how the Provider Defendants operated.

126.    In reality, Kelly was never anything more than a de facto employee of the Management Defendants who at all times remained firmly in control of the Provider Defendants, healthcare services, patients and profits generated at the Clinics.

127.    The Management Defendants used each of the Provider Defendants as a means to illegally profit from professional healthcare services by engaging in kickback schemes, unlawful

fee splitting and funneling large sums of money to themselves and others in contravention of New York law.

128.    The Management Defendants, in an effort to conceal their illegal fee-splitting and referral relationships, while simultaneously effectuating pervasive total control over the Provider Defendants' operation and management, arranged to have Kelly and the Provider PCs enter into a series of "funding", "consulting," "management," "billing," "collection," "transportation," "lease," and/or "marketing" agreements or other financial arrangements.

129.    These agreements and financial arrangements called for exorbitant payments from the Provider Defendants to the Management Defendants and other entities and/or individuals.

130.    The agreements and financial arrangements were purportedly for the performance of certain designated services including "funding", "consulting," "management," "marketing," "billing," "collections," "leasing," and/or "transportation," among others.  However, these were actually sham agreements and arrangements which exceeded fair market value for the services allegedly provided and which were meant to conceal the Management Defendants' illegal ownership and control over the Provider Defendants.

131.    In fact, the agreements and financial arrangements were created, dictated, and imposed by the Management Defendants upon the Provider Defendants to create the illusion that the Provider Defendants were paying legitimate fees for "funding", "consulting," "management," "billing," "collection," "transportation," "marketing" services and/or for facility space and equipment, but they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own and control the Provider Defendants, and (ii) siphon away the profits that were generated by the fraudulent billing submitted to GEICO and other insurers through the Provider Defendants.

132.    The net effect of these "funding", "consulting," "management," "billing," "collection," "transportation," "marketing," "lease," and/or other agreements and financial arrangements, was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling them to maintain total control over the professional corporations and healthcare practices, their alleged owner, their accounts receivables, and any revenues that might be generated therefrom.

133.    In fact, the Management Defendants and the Funding Defendants controlled all financial and operational aspects of the Provider Defendants' assets, including the use and distribution of the "advances" and the collection of all insurance payments.  Other than the salary that Kelly received, he never received any additional funds despite the millions of dollars that flowed through the Provider Defendants and were collected on behalf of the Provider Defendants.

**B.      The Fraudulent Financial and Funding Arrangements**

134.    Once the Management Defendants were provided with Kelly's license and the Provider Defendants' information, they used the information to set up the financial framework of the fraudulent scheme.

135.    At the direction of Kaminar, Kelly opened Harbor Medical and Coastal Medical's corporate bank account at JP Morgan Chase Bank and designated Kaminar as an authorized signatory, thereby, granting Kaminar direct access and control over the monies of the medical practices. Further, without Kelly's knowledge or consent, the Management Defendants used Kelly's signature and information to open Confident Medical's corporate bank account at the same bank.

136.    Because Kaminar also served as the accountant to the Management Defendants, Kaminar's responsibilities allowed the Management Defendants to exercise total financial control over the assets belonging to the Provider Defendants.

137.    Critical to the success of the fraudulent scheme, the Management Defendants arranged – with the Law Firm's assistance – to have Kelly and the Provider Defendants enter into a series of "funding" agreements with FVG, FVG II, FVG III and FVG IV (i.e., the Funding Defendants) that allowed the Management Defendants to maintain ownership and control over the Provider Defendants and the profits generated by the fraudulent billing submitted to GEICO and other New York automobile insurers.

138.    The Funding Defendants were the perfect partners for the Management Defendants in terms of financing the fraudulent scheme because despite knowing that Kelly did not own, operate or control the Provider Defendants and was not involved in the performance of the Fraudulent Services, they were willing to facilitate the fraudulent scheme (i) by engaging in financial transactions with the Management Defendants and the Provider Defendants, (ii) by making advances on the Fraudulent Services in exchange for being paid a significant return on their "investment", and (iii) through the funding advances and the collection efforts, by concealing the Management Defendants' participation through the use of shadow ownership using limited liability companies.

139.    The Law Firm was the perfect partner for the Management Defendants and the Funding Defendants, to provide legal representation to Kelly and the Provider Defendants and seek payment and collection against GEICO and other New York automobile insurers, in connection with the fraudulent claims. At that time, Zaitsev and other Management Defendants were familiar with the Law Firm because: (i) the Law Firm had acted as counsel for medical practices owned

and/or controlled by Zaitsev, including Ridgewood, Tri-State, Riverside and Crosstown; (ii) some members of the Law Firm, along with Zaitsev and Kandhorov, held an ownership interest in the Funding Defendants and stood to gain from "funding" agreements arranged and entered; and (iii) during all relevant times, the Law Firm acted as counsel for the Funding Defendants.

140.    Indeed, because Zaitsev, Kandhorov and some members of the Law Firm held an ownership interest in the Funding Defendants, they were in a perfect position to exercise complete control over the accounts receivables and the flow of all insurance payments made as a result of the fraudulent scheme.

141.    From a more global perspective, the Management Defendants, the Funding Defendants and the Law Firm had historically worked in tandem.

142.    As part of the fraudulent scheme, Kelly and the Provider Defendants entered funding agreements with the Funding Defendants, which provided up to $2.6 million in "advances" to each of the Provider Defendants against the account receivables for the medical practices.

143.    The purpose of the funding agreements was to create the appearance that there were legitimate financing or factoring agreements associated with the account receivables when, in fact, the true purpose was (i) to allow the Management Defendants to get paid up front; (ii) to fund the activities that would be necessary to effectuate the fraudulent scheme, including gaining access to patients at the Clinics, and (iii) to allow the Funding Defendants to financially benefit from their agreement to fund the fraudulent scheme and ensure that all monies paid by GEICO and other insurers as a result of the billing for the Fraudulent Services could be retained by the Management Defendants, minus what they would need to pay the Law Firm.

144.    Notably, the funding agreements allowed the Funding Defendants to charge exorbitant interest rates against the "advances" that were to be made against the account

receivables as a financial reward for funding the fraudulent scheme. Specifically, the Funding Defendants charged 150% of the amount of each advance made (the "Receivable Fee"), in addition to the full amount advanced.

145.    The funding agreements between the Provider Defendants and the Funding Defendants also included other terms and conditions intended to allow the Management Defendants to exercise complete control over all material financial, operational and legal aspects of the practices.

146.    The Management Defendants and the Funding Defendants arranged to have the Provider Defendants engage GreenBills to generate and prepare all the billing submitted to GEICO and other insurers.

147.    The Management Defendants and the Funding Defendants also arranged for the Law Firm to handle the billing submitted to GEICO and other insurers, and to act as an escrow agent for purposes of clearing the funds through their IOLA/Attorney Trust Account that GEICO paid as a result of the fraudulent claims.

148.    Contemporaneously to entering the funding agreements, Kelly and the Provider Defendants were directed to enter a retention agreement with the Law Firm, which would handle all collections, arbitrations and/or litigations relating to the Provider Defendants' account receivables.

149.    As a result, the Law Firm simultaneously served as counsel to Kelly, the Provider Defendants, and the Funding Defendants, while some of its members also held an ownership interest in the Funding Defendants.

150. By design, the Management Defendants and the Funding Defendants would be in total control of the Provider Defendants' account receivables and would profit off and distribute the payments received from GEICO and other automobile insurers.

151. Once the agreements were all in place, the Funding Defendants began transferring large sums of monies to the Provider Defendants as "advances" against the claims for the Fraudulent Services, and the payments were used for the benefit of the Defendants, and to pay individuals and entities to perpetuate their fraudulent scheme. Contemporaneously, the Management Defendants arranged to have the documents sent to the Funding Defendants and to GreenBills so that the fraudulent billing could be generated and submitted to automobile insurers, including GEICO.

152. In contrast to legitimate funding agreements, where the money advanced against the accounts receivables is actually used by the healthcare provider (i.e., Kelly or the Provider Defendants in this case) to facilitate the operation of the medical practices and the performance of the healthcare services, the Management Defendants arranged for the "advances" to be paid to themselves and to other third parties despite having no legitimate or identifiable relationship to Kelly or the Provider Defendants.

153. Notably, the flow of funds between the Defendants illustrates a money laundering scheme. The Defendants used a series of shell companies to (i) allow unlicensed laypersons to profit from their participation in the fraudulent scheme while hiding their identities and involvement; and (ii) launder the "advances" paid in connection to the performance of the Fraudulent Services.

154.   GEICO identified large amounts of payments that were funneled to the Management Defendants and others, in connection with the "advances" by the Funding Defendants.

155.   To conceal their identities and involvement, the Management Defendants arranged for the advances to be first deposited into the Provider Defendants' bank accounts. Thereafter, Kaminar – who controlled the bank accounts –  then issued "payments" to shell companies to launder and funnel illicit monies to the Management Defendants and other unlicensed laypersons and entities.

156.   For example, GEICO has identified the following substantial payments, all in connection with the "advances" by the Funding Defendants:

- Payments totaling at least $782,020.00 from Harbor Medical to various entities, including: (i) $453,400.00 to AMG Management Inc.; (ii) $173,640.00 to GMO Consulting LLC; (iii) $107,000.00 to Olimp Marketing Group Corp.; and (iv) $47,980.00 to Xpert Consulting Corp.

- Payments totally at least $871,579.00 from Confident Medical to various entities including: (i) $252,280.00 to Nordlon Inc.; (ii) $199,673.00 to AMG Management Inc.; (iii) $196,526.00 to Lexton LLC; (iv) $132,300.00 to Pvbr Services Inc.; and (v) $90,800.00 to GMO Consulting LLC.

157.   Theses "illicit" payments were typically concealed as "marketing," "consulting," and/or "management" payments even though these entities have no legitimate relationship with Kelly or the Provider Defendants.

158.   The "flow of funds," which was facilitated by the advances made by the Funding Defendants, is what allowed the Management Defendants to conceal their identity and participation in the fraudulent scheme, as well as the illegal financial arrangements amongst the Defendants.

159.    The "advances" made were used by the Management Defendants for their own benefit and to generate the cash or other funds needed to operate and maintain the fraudulent scheme, including kickbacks paid to the Clinics.

160.    The advances were a critical part to the success of the fraudulent scheme because: (i) the Management Defendants were able to realize an immediate financial benefit and fund the fraudulent scheme because they were paid a percentage on the face value of the billings that were submitted to automobile insurers, including GEICO, for the Fraudulent Services without any individual risk because they were not signatory to the funding agreements; and (ii) the advances (a) provided the necessary cash needed to establish and maintain the illegal relationships with the Clinics in order to gain access to Insureds for purposes of providing the Fraudulent Services, and (b) gave the Defendants the ability to hide from automobile insurers, such as GEICO, the flow of funds that was needed to operate the fraudulent scheme and financially benefit and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

161.    The Law Firm (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

162.    As further part of the Defendants' scheme, the payments made on the Provider Defendants' account receivables were first deposited into the Law Firm's IOLA account and then disbursed among the Defendants and other entities and individuals. Kelly never received any of the monies generated from the collections, and other than the $8,000 per monthly salary, never was paid any monies through the Provider Defendants.

163.     Kelly, despite being the record owner, did not manage or oversee the Provider Defendants' monies and was actually unaware of how or to whom their advances and/or insurance payment receipts were distributed.

164.     In fact, Kelly's signature was fraudulently used on various documents, including (i) checks issued to various entities and/or individuals; (ii) scripts and/or referrals for durable medical equipment; (iii) medical records pertaining to services purportedly provided to Insureds; and (iv) bills submitted to insurers, including GEICO.

165.     The fraudulent funding arrangements and the money laundering aspect of the scheme implemented by the Management Defendants, the Funding Defendants, and the John Doe Defendants was designed to hide from New York automobile insurers their participation and control over the Provider Defendants and the existence of the illegal financial arrangements between the Defendants and other individuals who owned and/or managed the Clinics.

**C.     Gaining Access to Insureds**

166.     The Fraudulent Services billed through the Provider Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

167.     The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

168.     The Management Defendants operated the fraudulent scheme on an itinerant basis from about forty-eight (48) separate Clinics.

169.     Those Clinics included the following:

| Harbor Medical Clinic Locations | City | State |
|---|---|---|
| 205-16 Jamaica Ave | Hollis | NY |
| 1110 Pennsylvania Ave, Ste 14-15 | Brooklyn | NY |
| 90-16 Sutphin Blvd. | Jamaica | NY |
| 240-19 Jamaica Ave | Bellerose | NY |
| 625 E Fordham Road | Bronx | NY |
| 3910 Church Ave | Brooklyn | NY |
| 5506 Avenue N | Brooklyn | NY |
| 1122a Coney Island Ave | Brooklyn | NY |
| 172-17 Jamaica Ave | Jamaica | NY |
| 107-48 Guy R Brewer Blvd. Ste 206 | Jamaica | NY |
| 1552 Ralph Ave | Brooklyn | NY |
| 2598 3rd Avenue | Bronx | NY |
| 2426 Eastchester Rd Ste 204 | Bronx | NY |
| 2363 Ralph Ave | Brooklyn | NY |
| 3058 East Tremont Ave | Bronx | NY |

| Confident Medical Clinic Locations | City | State |
|---|---|---|
| 1975 Linden Blvd. Ste 111 | Elmont | NY |
| 550 Remsen Ave | Brooklyn | NY |
| 108 Kenilworth Place | Brooklyn | NY |
| 80-12 Jamaica Ave | Jamaica | NY |
| 546 Howard Ave | Brooklyn | NY |
| 2451 E Tremont Ave | Bronx | NY |
| 205-16 Jamaica Ave | Hollis | NY |
| 5127 Queens Blvd | Woodside | NY |
| 97-01 101 Ave | Ozone Park | NY |
| 1122A Coney Island Ave | Brooklyn | NY |
| 9801 Foster Ave | Brooklyn | NY |
| 176 Wilson Ave | Brooklyn | NY |
| 955 Yonkers Ave | Yonkers | NY |
| 10825 Merrick Blvd | Jamaica | NY |
| 615 Seneca Ave | Ridgewood | NY |
| 3041 Avenue U | Brooklyn | NY |
| 1849 Utica Ave | Brooklyn | NY |
| 79-45 Metropolitan Ave | Flushing | NY |
| 552 180st Street | Bronx | NY |
| 160-59 Rockaway Blvd | Jamaica | NY |
| 2940 Grand Concourse | Bronx | NY |
| 79-09 Northern Blvd | Jackson Heights | NY |
| 4009 Church Ave | Brooklyn | NY |

| 1835 Bay Ridge Pkwy | Brooklyn | NY |
| 3209 Fulton Street | Brooklyn | NY |
| 9208 Jamaica Ave | Woodhaven | NY |
| 1786 Flatbush Ave | Brooklyn | NY |
| 280 Broadway | Newburgh | NY |
| 1 Fulton Ave | Hempstead | NY |
| 2510 Westchester Ave, Ste 102 | Bronx | NY |
| 1894 Eastchester Rd | Bronx | NY |
| 4226 3rd Ave Ste 1 | Bronx | NY |
| 611 E 76th Street | Brooklyn | NY |
| 460 Grand Street | New York | NY |

| Coastal Medical Clinic Locations | City | State |
| --- | --- | --- |
| 282-284 Avenue X | Brooklyn | NY |

170.   To obtain access to the Clinics' patient base (i.e., the Insureds), the Management Defendants entered into illegal financial and kickback arrangements with unlicensed persons who controlled the Clinics, and who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

171.   In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

172.    For example, GEICO has received billing for purported healthcare services rendered at the 3910 Church Ave, Brooklyn, New York location (the "Church Ave Clinic") from a revolving door of more than 125 purportedly different healthcare providers.

173.    Similarly, GEICO has received billing for purported healthcare services rendered at the 1552 Ralph Ave, Brooklyn, New York location from a revolving door of more than 105 purportedly different healthcare providers.

174.    Similarly, GEICO has received billing for purported healthcare services rendered at the 2363 Ralph Ave, Brooklyn, New York location from a revolving door of more than 100 purportedly different healthcare providers.

175.    Unlicensed laypersons, rather any healthcare professionals working at the Clinics, developed and controlled the patient base at the Clinics. Once they were given access to the Clinics, the Management Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services.

176.    Upon information and belief, patients were delivered to the Clinics by paid drivers, using monies that the Management Defendants illegally siphoned from the Provider Defendants and/or obtained from them in the form of unlawful payments for referrals.

177.    Once Insureds arrived at the Clinics for treatment, they were subjected to predetermined treatment protocols. The Management Defendants established predetermined treatment protocols in order to bill for voluminous, unnecessary, and excessive treatments that were provided – or purported to be provided – regardless of the actual medical needs of each individual Insured.

178.    In keeping with the fact that the Clinics are "one-stop" shops for no-fault insurance fraud, affidavits obtained in other federal actions revealed that at least two Clinics from where

37

Harbor Medical and Confident Medical operated were the source of forged and/or fraudulent medical reports, prescriptions and referrals that were submitted to no-fault insurers in support of fraudulent billing.

179.    For example, Ataul H. Chowdhury M.D. ("Chowdhury") stated under oath that he resigned from the Church Ave Clinic after discovering that his personal tax identification number and a stamp of his signature was being used on medical reports without his knowledge or consent to bill for medical services that he never performed, authorized, or supervised. Chowdhury further stated that the stamped signature was also used to issue referrals and prescriptions that he did not authorize or determine were medically necessary and were thereafter submitted to insurers in support of fraudulent charges for other healthcare goods and services.

180.    As further example, Phelan Clancy, NP. stated under oath that she resigned from the No-Fault Clinic located at 1975 Linden Boulevard, Elmont after discovering that her name, license, and tax identification number were being used to bill for services that she never performed, authorized, or supervised; that she was constantly put under pressure to issue certain prescriptions and referrals for various healthcare goods and/or services regardless of whether the patient's condition warranted the prescription or referral; that a stamped, forged and/or unauthorized copy of her signature was used to issue referrals for healthcare goods without her knowledge or consent; and that during a period of time there was a written list on the wall at the clinic that outlined the prescribing/referral protocol and the quotas that had to be met.

**D.    Defendants' Fraudulent Billing and Treatment Protocols**

181.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants implemented a scheme whereby the Provider Defendants purported to subject

virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

182.    Virtually all of the Insureds whom the Provider Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, virtually none of the Insureds whom the Provider Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

183.    Even so, as part of this fraudulent scheme, the Provider Defendants, at the direction of the Management Defendants, caused each Insured who received treatment at the Clinics to be subjected to a host of illusory and bogus medical services.

184.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

185.    No legitimate physician or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

186.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants' focus was on exploiting the Insureds for profit rather than on legitimate patient care, and the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

187.    Not surprisingly, many of the healthcare professionals who purportedly provided Fraudulent Services through the Provider Defendants have a substantial history of healthcare fraud

schemes. For example, Sonia Armengol, M.D. ("Armengol") was previously sued for allegedly providing healthcare services pursuant to pre-determined treatment protocols and engaging in improper financial and illegal kickback and/or referral arrangements. See Gov't Employees Ins. Co. et al. v. Sonia Armengol, M.D., et al., Docket No. 1:20-cv-06052 (RPK)(SJB); State Farm Mut. Auto. Ins. Co., et al., v. Lexington Medical Diagnostic Services, P.C., et al., Docket No. 18-cv-03312 (DLI)(PK).  Armengol was also previously sued for providing healthcare services as an independent contractor pursuant to pre-determined treatment protocols. See Gov't Employees Ins. Co. et al. v. Mark Filstein, M.D., et al., Docket No. 13-cv-05353 (ILG)(VMS).

188.    As further example, Hadassah Orenstein, M.D., Jean-Baptiste Simeon, M.D., Lily Zarhin, M.D., and Yong Chi, M.D. were named defendants in multiple no-fault fraud litigations for their involvement in the performance of medically unnecessary EDX testing, misrepresenting and exaggerating the level of services provided in order to inflate the charges for the EDX testing and performing the EDX testing as independent contractors of various medical professional corporations. See Gov't Employees Ins. Co. et al. v. Badia, M.D., et al., Docket No. 13-cv-01720 (CBA)(VMS); Gov't Employees Ins. Co. et al. v. LLJ Therapeutic Services, P.T., et al., Docket No. 15-cv-4818 (KAM)(RLM); Gov't Employees Ins. Co. et al. v. Prescott, et al., Docket No. 14-cv-00057 (BMC); State Farm Mut. Auto. Ins. Co. et al. v. Cecile I. Fray M.D., P.L.L.C. et al., 1:19-cv-04765 (NGG)(JO); Allstate Ins. Co. et al .v. Tapper, M.D. et al., 14-cv-05410 (BMC); Liberty Mut. Ins. Co. et al. v. Noel Blackman, M.D. et al., 609667/2016 (Sup. Ct. Nassau County). Additionally, Paul Hannan, M.D. – who was purportedly an "employee" of Confident Medical – ended up surrendering his New York State medical license in 2020 based on not disclosing information related to discipline on his Florida medical license.

**i.    The Fraudulent Initial Examinations**

189.   Pursuant to the Defendants' pre-determined treatment and billing protocols, Harbor Medical and Coastal Medical purported to provide Insureds with initial examinations which resulted in strikingly similar diagnoses and caused the examining provider to recommend nearly identical, predetermined treatment plans for virtually all Insureds.  These predetermined treatment protocols required the Insureds to return to the Clinics several times per week for months on end for a litany of spurious healthcare services including outcome assessment testing, physical therapy services, diagnostic tests, and/or EDX tests.

190.   From 2018 to 2019, medical professionals associated with Harbor Medical and Coastal Medical performed, or purported to perform, the initial examinations at the Clinics.  The initial examinations were performed – to the extent that that they were performed at all – to provide Insureds with predetermined diagnoses to allow the Defendants to then further subject Insureds to a host of medically unnecessary or illusory services.

191.   The initial examinations, in fact, were form documents with check boxes and pre-printed choices which the examining doctor would circle, with few other comments or narration beyond the markings in boxes or circling of pre-printed diagnoses/symptoms.

192.   Harbor Medical, at the direction of the Management Defendants, typically billed GEICO for initial examinations under current procedural terminology ("CPT") code 99205, representing a 60-minute examination, which Harbor Medical billed at $200.68 per examination. Likewise, Coastal Medical, also at the direction of the Management Defendants, typically billed GEICO for initial examinations under CPT code 99204, representing a 45-minute examination, and resulting in a charge of $148.70.

193.    CPT code 99205 at the time was described in the New York State Workers'
Compensation Medical Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-
Fault Benefits, as:

> Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A <u>comprehensive</u> history; A <u>comprehensive</u> examination; Medical decision making of <u>high complexity</u>. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the <u>presenting problem(s) are of moderate to high severity</u>. Physicians typically spend <u>60 minutes</u> face-to-face with the patient and/or family. (Emphasis added).

194.    CPT code 99204 was described in the "Fee Schedule as:

> Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A <u>comprehensive</u> history; A <u>comprehensive</u> examination; Medical decision making of <u>moderate</u> complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting <u>problem(s) are of moderate to high severity</u>. Physicians typically spend <u>45 minutes</u> face-to-face with the patient and/or family. (Emphasis added).

195.    The Defendants' charges for initial examinations were fraudulent in that: (i) the
initial examinations were medically unnecessary and were performed pursuant to the Management
Defendants' direction and control; (ii) the CPT codes billed misrepresented the extent of the initial
examinations and the nature of the underlying service; (iii) the initial examination reports
misrepresented the nature, extent and complexity of the Insureds' injuries; and (iv) the initial
examinations virtually never took 45-60 minutes to perform, and should not have taken that long,
to the extent that they were performed at all.

196.    According to the Fee Schedule, the use of CPT codes 99205 and 99204 requires
that the Insured present with problems of moderate-to-high severity.

197.    By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems were virtually always low severity soft tissue injuries such as sprains and strains.

198.    Even so, the Defendants routinely billed for the initial examinations under CPT codes 99204 and 99205, and thereby falsely represented that the Insureds present with problems of moderate-to-high severity.

199.    The Defendants routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for their charges for the initial examinations under CPT codes  99204 and 99205, because examinations billable under these CPT codes are reimbursable at higher rates than examinations involving presenting problems of low severity.

200.    The Defendants also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including physical therapy services, diagnostic tests, and EDX tests.

201.    What is more, even though the Insureds almost never presented with problems of moderate-to-high severity as a result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

202.    In addition, the use of CPT codes 99204 and 99205 typically requires that the physician spend 45 or 60 minutes, respectively, of face-to-face time with the Insured or the Insured's family. Though the Defendants routinely billed for the initial examinations under these

CPT codes, none of the medical professionals associated with Harbor Medical or Coastal Medical spent 45-60 minutes with any Insureds or their families during the initial examinations.

203.    In keeping with the fact that the initial examinations allegedly provided by Harbor Medical and Coastal Medical did not entail 45-60 minutes of face-to-face time with the Insureds or their families, the template examination forms used by examining healthcare professional in purporting to conduct the initial examinations set forth a limited range of history and physical examination parameters.

204.    The only face-to-face time between the examining medical professional and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems. These brief interviews and cursory examinations did not entail 45-60 minutes of face-to-face time with the Insureds or their families.

205.    In their claims for initial examinations, the Defendants falsely represented that the examinations involved at least 45-60 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99204 and 99205 because examinations billable under these CPT codes are reimbursable at a higher rate than examinations that require less time to perform.

206.    Further, when the Defendants billed for the initial examinations under CPT codes 99204 and 99205, they falsely represented that Harbor Medical and Coastal Medical took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

207.    Pursuant to the Fee Schedule, a "comprehensive" patient history requires – among other things – that the healthcare provider take a history of virtually all body systems, not only the

body systems that are related to the patient's present complaint. A "comprehensive" patient history also requires that the healthcare provider take a complete past, family, and social history from the patient.

208.    Rather, after purporting to provide the initial examinations, the Defendants prepared reports designed solely to support the laundry-list of Fraudulent Services that the Defendants purported to provide and then billed to GEICO and other insurers through Harbor Medical and Coastal Medical.

209.    Furthermore, the Defendants routinely falsely represented that their initial examinations involved "complex" medical decision-making. In actuality, the initial examinations did not involve any such decision-making because the Insureds never presented with injuries or symptoms that would necessitate "complex" decision-making.

210.    In the unlikely event that an Insured did present with injuries or symptoms that required "complex" decision-making, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

211.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

212.    First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the

Insureds presented to Harbor Medical and Coastal Medical for "treatment," they did so without any medical records.

213.    Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints – to the extent that they ever had any complaints arising from automobile accidents at all. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying them.

214.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the healthcare services provided by the medical professionals associated with Harbor Medical and Coastal Medical, to the extent that any such services or treatment options were provided in the first instance.

215.    Third, in virtually every case, none of the examining medical professionals associated with Harbor Medical or Coastal Medical considered any significant number of diagnoses or treatment options for Insureds during the initial examinations. Rather, to the extent that the initial examinations were conducted in the first instance, Harbor Medical and Coastal Medical made routine, predetermined "diagnoses" for every Insured, and prescribed a substantially identical course of treatment for every Insured – which included physical therapy and diagnostic testing rendered at the Clinics – without regard to any individual Insured's actual medical condition or needs.

216.    In keeping with the fact that Harbor Medical and Coastal Medical never considered any significant number of diagnoses or treatment options for the patients, virtually every Insured that treated with them, was recommended a diagnostic and therapeutic plan that included the following:

- PHYSICAL THERAPY

- MRIs

- DURABLE MEDICAL EQUIPMENT ("DMEs").

217.    Likewise, for virtually every Insured that treated with Harbor Medical and Coastal Medical, the following recommendations were made:

- "PATIENT IS TO RECEIVE PHYSICAL THERAPY TREATMENT AND REHABILITATION PROGRAM"

- OUTCOME ASSESSMENT TEST

- RANGE OF MOTION AND MUSCLE STRENGTH TESTING

- ACTIVITY LIMITATION MEASUREMENT IN TRAINING ("ALM").

218.    Additionally, Harbor Medical and Coastal Medical's examination reports contained pre-printed language that the Insured should receive two to four sessions of physical therapy treatment per week which included the following:

- ULTRASOUND

- HOT PACKS

- HIGH VOLT ELECTRIC STIMULATION

- MASSAGE

- MANUAL THERAPY

- THERAPEUTIC EXERCISES

- RANGE OF MOTION EXERCISES.

219.    Despite the fact that Harbor Medical and Coastal Medical, at the direction of the Management Defendants, routinely billed for their putative initial examinations using CPT codes 99204 and 99205, and thereby falsely represented that the initial examinations involved "complex"

medical decision-making, the initial examinations did not involve any legitimate medical decision-making at all.

220.    Rather, to the extent that the initial examinations were conducted in the first instance, medical professionals associated with Harbor Medical and Coastal Medical made boilerplate, predetermined "diagnosis" for Insureds, and prescribed a virtually identical course of extensive and unnecessary treatment for each Insured.

221.    In the claims for initial examinations, the Defendants falsely represented that the initial examinations involved "complex" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT code 99204 and 99205, because these CPT codes are reimbursable at a higher rate than examinations that do not require "complex" medical decision-making.

### ii.    The Fraudulent Follow-Up Examinations

222.    In addition to the fraudulent initial examinations, the Defendants purported to subject Insureds to one or more fraudulent follow-up examinations pursuant to the fraudulent treatment protocol implemented by the Management Defendants. The Defendants primarily billed for the fraudulent follow-up examinations through Harbor Medical, and at times, also through Coastal Medical.

223.    Harbor Medical, at the direction and control of the Management Defendants, virtually always billed follow-up examinations using CPT code 99215, representing a 40-minute examination and resulting in a charge of $148.69.

224.    Further, Coastal Medical, also at the direction and control of the Management Defendants, virtually always billed follow-up examinations using CPT code 99214, representing a 25-minute examination and resulting in a charge of $92.98.

225.    Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the fraudulent treatment protocol established by the Management Defendants.

226.    The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

227.    According to the Fee Schedule, the use of CPT codes 99215 and 99214 typically requires that the Insured present with problems of "moderate-to-high severity." As previously stated, the Insureds never presented with problems of this severity, and if they did, the deficient follow-up examinations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

228.    In the claims for follow-up examinations, Harbor Medical and Coastal Medical, at the direction of the Management Defendants, routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for their charges under CPT codes 99215 and 99214, because follow-up examinations billable under CPT codes 99215 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity.

229.    Harbor Medical and Coastal Medical also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis to continue referring Insureds for the laundry list of other Fraudulent Services that the Defendants and other healthcare providers purported to provide to the Insureds.

230.    Notably, CPT code 99215 typically requires that the physician spend 40 minutes of face-to-face time with the Insured or the Insured's family. Though the Defendants routinely billed

through Harbor Medical for follow-up examinations under CPT code 99215, none of the medical professionals associated with Harbor Medical spent 40 minutes with any Insureds or their families during the follow-up examinations.

231.    Likewise, CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family. Though the Defendants routinely billed through Coastal Medical for follow-up examinations under CPT code 99214, none of the medical professionals associated with Coastal Medical spent 25 minutes with any Insureds or their families during the follow-up examinations.

232.    In keeping with the fact that none of the medical professionals associated with Harbor Medical and Coastal Medical ever spent 40 or 25 minutes of face-to-face time with the Insureds and/or the Insureds' families, as with the fraudulent initial examinations, Harbor Medical and Coastal Medical used pre-printed checklist or template forms in conducting the follow-up examinations.

233.    As with the initial examinations template forms, the pre-printed checklist and template forms that Harbor Medical and Coastal Medical used in conducting the follow-up examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

234.    All that was required to complete the pre-printed checklist and template forms was a brief patient history and a very brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and cursory neurological testing.

235.    These histories and examinations did not require any medical professionals associated with the Harbor Medical and Coastal Medical to spend more than 10 minutes of face-to-face time with the Insureds during the putative follow-up examinations.

236.    In their claims for follow-up examinations, Harbor Medical and Coastal Medical, at the direction of the Management Defendants, falsely represented that the examinations involved 40 or at least 25 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99215 and 99214, because examinations billable under CPT codes 99215 and 99214 are reimbursable at a higher rate than examinations that require less time to perform.

237.    In addition, when Harbor Medical and Coastal Medical submitted charges for the follow-up examinations under CPT codes 99215 and 99214, they falsely represented that the medical professionals associated with Harbor Medical and Coastal Medical performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity."

238.    In performing the follow-up examinations, the physicians associated with the Harbor Medical and Coastal Medical did not take a "comprehensive" history; did not conduct a "comprehensive" examination; nor did they engage in decision making of "moderate complexity."

239.    In the claims for follow-up examinations, Harbor Medical and Coastal Medical falsely represented that the examinations included a comprehensive patient history, a comprehensive physical examination, and medical-decision making of moderate complexity because follow-up examinations billable under CPT codes 99215 and 99214 are reimbursable at higher rates than less-comprehensive examinations.

240.     Based on the follow-up examination reports, Insureds were directed to return to the Clinics to continue treatment several times per week for additional medically unnecessary healthcare services, including follow-up examinations and/or physical therapy – all pursuant to the predetermined treatments protocols established and imposed by the Management Defendants.

241.     In keeping with the fact that Harbor Medical and Coastal Medical never considered any significant number of diagnoses or treatment options for the patients treating at the Clinics, upon each follow-up examination, Harbor Medical and Coastal Medical typically recommended a diagnostic and therapeutic plan that included the following:

- PHYSICAL THERAPY
- OUTCOME ASSESSMENT TESTING
- DIAGNOSTIC TESTING
- MRIS/X-RAYS/CTS
- DMES

242.     Moreover, in keeping with the fact that the follow-up examinations were performed pursuant to fraudulent, predetermined billing and treatment protocols designed to maximize profit without regard to individual patient care, at times, the foregoing treatment plan included a recommendation that the Insured receive a neurological and an orthopedic consultation, as well as pain management treatment.

**iii.     The Fraudulent "Outcome Assessment Testing"**

243.     In addition to the other Fraudulent Services, the Defendants, pursuant to fraudulent billing and treatment protocols, caused bills to be submitted to GEICO through Harbor Medical and Coastal Medical for medically useless "outcome assessment tests" performed on or about the same dates they purported to subject the Insureds to initial or follow-up examinations.

244.   At the Management Defendants' direction, the Defendants submitted bills to GEICO through Harbor Medical and Coastal Medical for the "outcome assessment tests" using CPT code 99358, generally resulting in a charge of $204.41 for each round of "testing."

245.   Like the Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to the fraudulent billing and treatment protocol established by the Management Defendants.

246.   The "outcome assessment tests" that Harbor Medical and Coastal Medical purportedly provided to Insureds – to the extent provided at all – were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their daily lives.

247.   Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that Harbor Medical and Coastal Medical purportedly provided were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial and follow-up examinations.

248.   In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination and then bill separately for contemporaneously-provided "outcome assessment testing."

249.   In the event that Harbor Medical and Coastal Medical did perform the "outcome assessment tests" for which GEICO was billed, the information gained through the use of these tests would not have been significantly different from the information that they purported to obtain

during virtually every Insured's initial examination or follow-up examination. In fact, Harbor Medical and Costal Medical, in billing for fraudulent initial and follow-up examinations, represented they took at least a "detailed" if not "comprehensive" patient history and performed at least a "detailed" if not "comprehensive" physical examination.

250.    Under the circumstances employed by the Defendants, the "outcome assessment tests" represented purposeful and unnecessary duplication of the patients' histories purportedly conducted during the Insureds' initial examinations and follow-up examinations. The "outcome assessment tests" were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

251.    The Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

252.    Though the Defendants routinely submitted billing under CPT Code 99358 for "outcome assessment tests" allegedly provided through Harbor Medical and Coastal Medical, no physician associated with Harbor Medical and Coastal Medical spent an hour reviewing or administering the tests, or communicating with the Insureds or their families.

253.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

254.    Nonetheless, the Defendants submitted tens of thousands of dollars of fraudulent billing to GEICO under CPT code 99358.

255.    In keeping with the fact that the Management Defendants exercised complete ownership and control over the Provider Defendants and that the "outcome assessment tests" were just another medically unnecessary service used as a means to generate billing, the results of the "outcome assessment tests" like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

### iv.    The Fraudulent Physical Therapy Treatment

256.    Consistent with the excessive and fraudulent provision of the healthcare services the Defendants purported to provide to Insureds at the Clinics, Harbor Medical and Coastal Medical, at the direction of the Management Defendants, purported to subject virtually every Insured to a predetermined physical therapy regimen.

257.    Like the Defendants' charges for the other Fraudulent Services, the charges for physical therapy were fraudulent in that the services were performed – to the extent performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocols designed solely to maximize profits.

258.    Specifically, as a result of the bogus diagnoses in the fraudulent initial examinations performed by Harbor Medical and Coastal Medical, virtually every Insured was referred for a course of physical therapy that involved nearly identical treatment plans consisting of the same physical therapy modalities being rendered three to four times per week for months.

259.    Through this boilerplate treatment and billing protocol, Harbor Medical and Coastal Medical, at the direction of the Management Defendants, purported to provide many Insureds with an initial physical therapy evaluation billed under CPT code 97001 and resulting in

a charge of between $79.92 and $80.02. At times, Harbor Medical and Coastal Medical also purported to perform follow-up evaluations which were billed under CPT code 97002 and resulted in a charge of $33.80.

260.    In keeping with the fact that Harbor Medical and Coastal Medical treated Insureds pursuant to a fraudulent treatment and billing protocol, the physical therapy evaluations were boilerplate, cursory, and repetitive, and indicated that the Insureds presented with nearly identical problems that resulted in the same treatment goals and treatment plans.

261.    For example, Insureds evaluated by Harbor Medical and Coastal Medical were typically provided with treatment goals upon initial evaluation that included the following:

- INCREASE RANGE OF MOTION

- INCREASE STRENGTH

- DECREASE PAIN

262.    Pursuant to the fraudulent billing and treatment protocol implemented by the Management Defendants and the boilerplate physical therapy evaluations, Harbor Medical and Coastal Medical submitted virtually the same charges for every date on which every Insured purportedly received physical therapy services.

263.    Specifically, Harbor Medical and Coastal Medical purported to render and submitted bills to GEICO for the following modalities for virtually every Insured on every date of service: (i) application of hot or cold packs, billed under CPT code 97010; (ii) 15 minutes of therapeutic exercises, billed under CPT code 97110 and/or 15 minutes of massage treatment billed under CPT code 97124; and (iii) electrical stimulation therapy, billed under CPT code 97014.

264.    Harbor Medical and Coastal Medical purported to provide this identical physical therapy treatment plan to virtually every Insured in order to submit as much billing as possible for physical therapy services.

**v.    The Fraudulent Diagnostic Testing**

265.    Consistent with the excessive and fraudulent provision of the healthcare services purportedly provided to Insureds at the Clinics, the Provider Defendants, at the direction of the Management Defendants, purported to subject many Insureds to a predetermined diagnostic testing protocol.

266.    The Defendants routinely subjected Insureds to duplicative, illusory, and medically unnecessary range of motion and muscle tests – regardless of their individual medical needs – in order to maximize the fraudulent billing submitted for each Insured.

267.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the movement at the joint in comparison with an unimpaired, healthy joint.  In a traditional range of motion test, the limb is moved passively by the examiner or actively by the patient.  Evaluation of the patient's range of motion of various joints is measured either by sight or through the use of a manual inclinometer and/or a goniometer (i.e., devices used to measure angles).

268.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move a particular joint in a particular motion against manual resistance applied by the evaluating practitioner.  For example, if the evaluating practitioner wanted to measure muscle strength in the muscles that flex or surround a patient's knee, he/she would apply resistance against the appropriate motion.

269.     Thorough physical evaluations performed on patients with soft-tissue trauma include range of motion and muscle strength tests, inasmuch as these tests provide information  for joint motion, injury assessment, and treatment planning. Unless the evaluating practitioner knows the extent of a given patient's joint mobility or muscle strength impairment, the evaluating practitioner will be substantially limited in his/her ability to properly diagnose or treat the patient's injuries and assess their response to treatment. Evaluation of range of motion and muscle strength are essential components of the thorough evaluation of a patient.

270.     Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during virtually all follow-up examinations, the Fee Schedule provides that the range of motion and muscle tests are to be reimbursed as a component of the initial and follow-up examinations.

271.     Alternatively stated, healthcare practitioners cannot conduct and bill for initial examinations and follow-up examinations which include range of motion and muscle strength tests, then bill separately for duplicative, contemporaneously provided range of motion and muscle strength tests.

>              a.      The Fraudulent Computerized Range of Motion Test, Computerized Muscle
>                      Test

272.     To the extent that the Insureds actually received the initial examinations and follow-up examinations at the Clinics that were billed to GEICO, the Insureds received manual range of motion tests and manual muscle strength tests during those examinations.

273.     The charges submitted to GEICO for the manual range of motion and manual muscle strength tests were part and parcel of the charges that the healthcare practitioners at the Clinics routinely submitted or caused to be submitted for initial examinations and follow-up examinations.

274.     Despite the fact that the Defendants knew that the Insureds had already undergone manual range of motion testing and manual muscle strength testing during their initial examinations and follow-up examinations, the Defendants systematically billed for, and subjected Insureds to computerized range of motion and muscle testing as directed by the Management Defendants.

275.     The charges for the computerized range of motion and muscle tests were fraudulent in that the tests were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent billing and treatment protocols.

276.     The charges for the computerized range of motion tests and muscle tests were also fraudulent in that the tests were performed – to the extent they were performed at all – at the direction of the Management Defendants, rather than licensed healthcare professionals, and as a result of illegal financial and kickback arrangements amongst the Defendants and the Clinics.

277.     In keeping with the fact that Defendants' fraudulent treatment protocol was controlled by the Management Defendants, the computerized range of motion and muscle testing was typically performed on or near initial or follow-up examinations performed by the Provider Defendants or other providers at the Clinics.

278.     Despite the fact that every Insured already received manual range of motion and manual muscle testing during their initial examinations and follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already was paid by GEICO as a component of reimbursement for the initial examinations and follow-up examinations, the Defendants regularly billed for a series of computerized range of motion and muscle tests that were purportedly performed on many of the patients.

279.    Under the direction and control of the Management Defendants, the range of motion and muscle tests represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations.

280.    The Defendants also unbundled the charges for the range of motion tests and muscle tests.

281.    Under the Fee Schedule, if range of motion and muscle testing are performed on the same date, all the testing should be reported and billed using CPT code 97750.

282.    CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed. For example, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71, resulting in total charges of $91.42, and so on.

283.    To the extent the Provider Defendants actually provided the range of motion tests and muscle tests to Insureds, the tests were routinely provided on the same dates of service and never took more than 15 minutes to perform. Thus, even if the range of motion tests and muscle tests that the Provider Defendants purported to perform were medically necessary and performed in the first instance, they would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

284.    However, in order to maximize their fraudulent billing for the range of motion and muscle tests, the Defendants unbundled what should have been – at most – a single charge of

$45.71 under CPT code 97750 for both computerized range of motion and muscle testing into multiple charges under CPT codes 95831 or 95833 for the muscle tests, and multiple charges under CPT code 95851 for the range of motion tests.

285.    In so doing, the Defendants generally submitted charges inflated by hundreds of dollars per round of range of motion and muscle testing that the Provider Defendants purported to provide, thereby exponentially increasing the billing submitted to GEICO and other insurers.

            b.    The Fraudulent Activity Limitation Measurement Tests

286.    In an effort to further maximize the amount of fraudulent billing they could submit to GEICO and other insurers, the Defendants subjected many Insureds to activity limitation measurement ("ALM") tests.

287.    The charges for the ALM tests were fraudulent in that the tests were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocol.

288.    The charges for the ALM tests were also fraudulent in that the tests were performed – to the extent they were performed at all – at the direction of the Management Defendants, rather than licensed healthcare professionals, and as a result of illegal financial and kickback arrangements amongst the Defendants and the Clinics.

289.    The Defendants submitted, or caused to be submitted, bills to GEICO for the ALM tests under CPT code 97799, generally resulting in a charge of $475.00, for each date of service on which the test was supposedly performed.

290.    The Provider Defendants purported to provide ALM tests to Insureds despite their actual knowledge that the ALM tests, to the extent that they were performed at all, were duplicative of both: (1) the manual muscle testing that was part and parcel of the initial examination and

follow-up examinations performed by Provider Defendants at the Clinics; and (2) the muscle testing the Provider Defendants themselves purported to provide to Insureds and then billed to GEICO under CPT codes 95831 or 95833.

291.    Specifically, virtually every bill for ALM testing submitted to GEICO contained the following verbatim statements, including the same idiosyncratic grammar:

(i)     "Purpose of the Activity Limitation Test is to accurately determine individual's ability to perform meaningful tasks safely and dependably. It is based on objective performance measurements that are analyzed and recorded by state of the art computer technology. It is not an observation or subjective determination of an individual's self report of abilities."

(ii)    "Results of the test will serve three valuable purposes: (1) Test will identify functional weakness and strength deficits, allowing for proper treatment and rehabilitation; (2) Test aids in establishing an impartial and objective measurement of the patient's capabilities, daily activities and work-limitations, necessary for judicial resolution, disability determination and treatment progress determination; (3) Test provides the patient with objective and quantifiable limitations he/she faces as a result of the injury. Establishing safe activity limits and training are aimed at determination of limitation and outlining the precautions to be taken not to aggravate the injury."

(iii)   "The patient was tested using JTech computerized evaluation system. Coefficient of Variation and difference between successive reps of 14% or less indicates validity, reproducibility, and consistency of effort."

(iv)    "Depending on the level of patient's compliance, the examination takes 40-55 minutes. In addition to testing patient received a comprehensive training as to how to deal with the limitation in both work and home environments. Patient received written and verbal instructions as to how to avoid aggravating the injury and what steps need to be taken outside of formal medical setting in order to facilitate recovery."

c.    The Fraudulent Billing for Diagnostic Tests Provided by Unlicensed Technicians

292.    Not only were the Provider Defendants' charges for the diagnostic tests fraudulent in that they were unbundled, inflated, and billed pursuant to a predetermined billing and treatment

protocol, and as a result of illegal financial and kickback arrangements, but the charges also misrepresented the identity of the individuals who actually performed the tests.

293.    Pursuant to the Fee Schedule, when the Defendants submitted charges to GEICO for computerized range of motion and muscle testing, and ALM testing, they represented that the underlying service was performed by a physician or other licensed healthcare provider.

294.    However, to the extent that the Fraudulent Services were provided in the first instance, they were performed by unlicensed technicians, rather than any licensed healthcare provider.

295.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge under CPT code 95831, 95851, or 97799, the provider represents that it has prepared a written report interpreting the data obtained from the test.

296.    In keeping with the fact that the diagnostic test were provided – to the extent that they were provided at all – by unlicensed technicians rather than licensed healthcare providers, the test reports generated by the Provider Defendants all consisted solely of raw data and pre-printed boilerplate language, and contained no interpretation of the data by Kelly, or any other licensed healthcare provider.

**vi.    The Fraudulent Consultations for EDX Testing**

297.    Pursuant to the Defendants' profit driven fraudulent scheme, the Provider Defendants also purported to subject Insureds to a series of medically unnecessary and useless EDX tests.

298.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and performed pursuant to predetermined billing and treatment protocol, and illegal financial and kickback arrangements, not to treat or otherwise benefit the Insureds.

299.    Indeed, the Defendants routinely billed for medically unnecessary and bogus initial consultations that virtually always resulted in a determination that that the Insured was a suitable candidate for EDX tests.

300.    The initial consultations were performed – to the extent they were performed at all – to provide Insureds with predetermined diagnoses to justify the Provider Defendants subsequently providing and billing for medically unnecessary or illusory EDX tests.

301.    The Defendants typically billed the initial consultations using CPT code 99245, resulting in a charge of $299.26.

302.    CPT code 99245 is described in the New York State Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, as:

> [O]ffice consultation for a new or established patient; which requires these 3 components: A <u>comprehensive</u> history; A <u>comprehensive</u> examination; and Medical decision making of <u>high complexity</u>. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.  Usually, the presenting <u>problem(s) are of moderate to high severity</u>. Physicians typically spend <u>80 minutes</u> face-to-face with the patient and/or family. (Emphasis added).

303.    The charges for the initial consultations were fraudulent in that: (i) the initial consultations were medically unnecessary and were performed pursuant to the Management Defendants' direction and control; (ii) the charges billed by the Defendants misrepresented the extent of the initial consultations and the nature of the underlying service; (iii) the initial consultation reports misrepresented the nature, extent and complexity of the Insureds' injuries; and (iv) the initial consultations virtually never took 80 minutes to perform, to the extent that they were performed at all.

304.    Additionally, according to the Fee Schedule, the use of CPT code 99245 represents that the physicians performed consultations at the request of another physician or other appropriate

source.  The Provider Defendants did not provide their initial consultations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources.  Rather, to the extent that the initial consultations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent billing and treatment protocol.

305.    Further, to the extent that the initial consultations were performed at the "request" of another physician, they were not performed pursuant to legitimate "requests" but instead, were prompted by requests elicited from the illegal financial and kickback arrangements amongst the Defendants and the Clinics.

306.    Furthermore, the Defendants' use of CPT code 99245 represented that the physicians who purportedly conducted the consultations submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

307.    Though the Defendants routinely billed for the initial consultations under CPT code 99245, they never submitted any written consultation report to any physician or other referring healthcare provider, because the initial consultations were not conducted pursuant to any genuine, legitimate request from any referring healthcare provider.

308.    Furthermore, according to the Fee Schedule, the use of CPT code 99245 typically requires that the Insured present with problems of moderate-to-high severity.

309.    Though the Defendants routinely billed for the initial consultations under CPT code 99245, the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident.  In the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial consultations performed – to the extent they were performed at all – could not properly assess and/or diagnose problems of such severity.

310. In addition, the use of CPT code 99245 typically requires that the physician spend 80 minutes of face-to-face time with the Insured or the Insured's family.

311. Though the Defendants routinely billed for the initial consultations under CPT code 99245, none of the medical professionals associated with the Provider Defendants spent 80 minutes with any Insureds or their families during the initial consultations.

312. Furthermore, the Defendants routinely falsely represented that their initial consultations involved medical decision-making of "moderate to high complexity." In actuality the initial consultations did not involve any such decision-making because (i) the Insureds never presented with injuries or symptoms that would necessitate decision making of moderate to high complexity; and (ii) in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial consultations were incapable of assessing and/or diagnosing them as such.

313. First, in virtually every case, the initial consultations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Provider Defendants for "treatment," they did so without any medical records. Furthermore, prior to the initial consultations, no medical professional associated with the Provider Defendants requested any medical records from any other providers, or reviewed or inquired about any diagnostic tests that may have already been performed.

314. Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints to the extent that they ever had any complaints arising from automobile accidents at all.   In the unlikely event that such risks did exist, the deficient initial consultations were incapable of identifying them.

315.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the treatment options (assuming the treatment was properly performed) provided by the medical professionals associated with the Provider Defendants or the independent contractors working on behalf of the Provider Defendants, to the extent that any such treatment options were provided in the first instance.

316.    Third, in virtually every case, none of the medical professionals or independent contractors working on behalf of the Provider Defendants considered any significant number of diagnoses or treatment options for Insureds during the initial consultations.  Rather, to the extent that the initial consultations were conducted in the first instance, the medical professionals and/or independent contractors working on behalf of the Provider Defendants, made routine, pre-determined "diagnoses" for every Insured, and prescribed a course of treatment for every Insured without regard to any individual Insured's actual medical condition or needs.

317.    In  keeping with the fact that the EDX tests were medically unnecessary and performed pursuant to the illegal financial and kickback arrangements, the Provider Defendants routinely performed the EDX tests on the same day as the initial consultations, suggesting that it was pre-ordained that the examination would result in "findings" that lead to the EDX tests.

318.    For example:

(i)    On August 10, 2018, an Insured named K.L. was allegedly involved in a motor vehicle accident. On November 7, 2018, K.L. underwent an initial consultation with Harbor Medical at a Clinic located at 240-19 Jamaica Ave, Bellerose, New York. On the same day, K.L. received EDX tests from Harbor Medical.

(ii)    On November 29, 2018, an Insured named T.C. was allegedly involved in a motor vehicle accident. On February 14, 2019, T.C. underwent an initial consultation with Harbor Medical at a Clinic located at 1110 Pennsylvania Ave, Brooklyn, New York. On the same day, T.C. received EDX tests from Harbor Medical.

(iii)   On August 29, 2019, an Insured named S.M. was allegedly involved in a motor vehicle accident. On September 29, 2019, S.M. underwent an initial consultation with Coastal Medical at a Clinic located at 282-284 Avenue X, Brooklyn, New York. On the same day, S.M. received EDX tests from Coastal Medical.

(iv)   On July 1, 2019, an Insured named T.T. was allegedly involved in a motor vehicle accident. On August 21, 2019, T.T. underwent an initial examination with Coastal Medical at a Clinic located at 282-284 Avenue X, Brooklyn, New York. On the same day, T.T. received EDX tests from Coastal Medical.

(v)   On November 10, 2019, an Insured named B.B. was allegedly involved in a motor vehicle. On January 21, 2019, B.B. underwent an initial examination with Confident Medical at a Clinic located at 108 Kenilworth Place, Brooklyn, New York. On the same day, B.B. received EDX tests from Coastal Medical.

(vi)   On August 22, 2018, an Insured named S.W. was allegedly involved in a motor vehicle accident. On October 24, 2018, S.W. underwent an initial examination with Confident Medical at a Clinic located at 205-16 Jamaica Ave, Hollis, New York.  On the same day, S.W. received EDX tests from Coastal Medical.

a.   The Human Nervous System and Electrodiagnostic Testing

319.   The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

320.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the

body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

321.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes and loss of muscle control.

322.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

323.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

324.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

b.      The Fraudulent NCVs

325.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin.

326.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

327.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

328.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

329.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

330.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy (along with a properly performed EMG) in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

331.    In attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Defendants routinely purported to test far more nerves than recommended by the Recommended Policy.

332.    Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform: (i) NCV tests of eight or more motor nerves; (ii) NCV tests of eight or more sensory nerves; and (iii) two H-reflex studies.

333.    Therefore, where the Fee Schedule and Recommended Policy would limit billing by the Defendants for NCV testing of one Insured to approximately $950.00, representing NCVs of three motor nerves, NCVs of two sensory nerves and two H-reflex studies, the Defendants routinely submitted NCV billing to GEICO for more than $2,000.00 per Insured.

334.    For example:

(i)      On January 16, 2019, Harbor Medical purported to provide an Insured named S.S.: (i) NCV tests of eight sensory nerves; (ii) NCV tests of eight motor nerves; and (iii) two H-reflex studies. The Defendants then submitted two bills to GEICO through Harbor Medical for a total of $2,423.50 worth of billing for NCV tests.

(ii)     On October 17, 2018, Harbor Medical purported to provide an Insured named E.M.: (i) NCV tests of fifteen (15) sensory nerves; (ii) NCV tests of twelve (12) motor nerves; and (iii) two H-reflex studies. The Defendants then submitted two bills to GEICO through Harbor Medical for a total of $2,636.44 worth of billing for NCV tests.

(iii)    On February 5, 2019, Confident Medical purported to provide an Insured named J.E.: (i) NCV tests of ten (10) sensory nerves; (ii) NCV tests of eight (8) motor nerves; and (iii) two H-reflex studies. The Defendants then submitted a bill to GEICO through Confident Medical for a total of $2,636.44 worth of billing for NCV tests.

(iv)     On March 6, 2019, Confident Medical purported to provide an Insured named R.E.: (i) NCV tests of ten (10) sensory nerves; (ii) NCV tests of eight (8) motor nerves; and (iii) two H-reflex studies. The Defendants then submitted a bill to GEICO through Confident Medical for a total of $2,636.44 worth of billing for NCV tests.

(v)      On August 21, 2019, Coastal Medical purported to provide an Insured named L.P.: (i) NCV tests of ten (10) sensory nerves; (ii) NCV tests of eight (8) motor nerves; and (iii) two H-reflex studies. The Defendants then submitted a bill to GEICO through Coastal Medical for a total of $2,636.44 worth of billing for NCV tests.

(vi)　On August 21, 2019, Coastal Medical purported to provide an Insured named R.P.: (i) NCV tests of ten (10) sensory nerves; (ii) NCV tests of eight (8) motor nerves; and (iii) two H-reflex studies. The Defendants then submitted a bill to GEICO through Coastal Medical for a total of $2,636.44 worth of billing for NCV tests.

335.　Specifically, the Defendants often submitted: (a) multiple charges using CPT code 95903 for NCV tests with F-wave studies of eight motor nerves; (b) multiple charges using CPT code 95904 for NCV tests of ten sensory nerves; and (c) one charge using CPT code 95934 for H-reflex studies of two nerves.

336.　What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

337.　In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real–time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

338.　As a result, the nature and number of peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient–to–patient.

339.　This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

340.　This concept is also emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

341.　Even so, the Provider Defendants did not tailor the NCV tests they purported to perform to the unique circumstances of each patient.  Instead, they routinely purported to test the same peripheral nerves and nerve fibers, without regard to individual patients' presentation.

342.     Specifically, the Provider Defendants purported to test some combination of the following peripheral nerves and nerve fibers – and in many cases, all of them:

        (i)      left and right median sensory nerves;

        (ii)     left and right superficial peroneal sensory nerves;

        (iii)    left and right sural sensory nerves;

        (iv)    left and right ulnar sensory nerves;

        (v)     left and right radial sensory nerves;

        (vi)    left and right median motor nerves;

        (vii)   left and right ulnar motor nerves;

        (viii)  left and right peroneal motor nerves;

        (ix)    left and right tibial motor nerves.

343.     The Provider Defendants purported to test these identical peripheral nerves and nerve fibers in many of the NCV claims identified in Exhibits "1"-"3", despite the fact that the Insureds were differently situated, because their objective was to charge for as many NCV tests as possible, and not to treat or otherwise benefit the Insureds.

344.     Irrespective of the Insureds' individual symptoms and presentation, the Provider Defendants performed an excessive number of medically unnecessary NCV tests – to the extent they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured and to support other Fraudulent Services and healthcare services provided by healthcare providers at the Clinics where the Provider Defendants operated.

345.     The Defendants' cookie–cutter approach did not reflect individual care towards any patient and often failed to discuss and report on technically deficient NCV studies, which would

make it virtually impossible to assist in determining a radiculopathy diagnosis and rendered the testing of such poor quality that they were medically unnecessary.

346.    The poor quality of these NCV tests suggests that contrary to the AANEM's position on proper performance and interpretation of Electrodiagnostic Studies, the Provider Defendants were not reviewing the NCV test results in "real time," as they are performing the test and/or prior to finishing the NCV portion of the testing.  Without such contemporaneous review, there can be no determination as to the actual quality of test and the necessity of the testing is therefore suspect. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

> c.    The Fraudulent EMGs Tests

347.    As part of the pre-determined fraudulent treatment and billing protocol, the Provider Defendants also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.

348.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each such muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

349.    The Provider Defendants purported to provide and/or perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies. However, the Provider Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms, signs or any other medical problems arising from any automobile accidents.

350.     In actuality, the EMGs were provided – to the extent they were provided at all – pursuant illegal kickback and financial schemes and pre-determined fraudulent treatment protocols designed to maximize the Defendants' billing, not to treat or otherwise benefit the Insureds.

351.     There are many different muscles in the arms and legs that can be tested using EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of muscles tested through EMGs should vary patient-to-patient.

352.     Even so, the Provider Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each patient.  Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

353.     Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that the Provider Defendants purported to provide and/or perform often grossly exceeded the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

354.     Nevertheless, the Provider Defendants routinely purported to provide and/or perform EMGs on all four limbs on virtually every Insured, in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that they could reap from each Insured.

355.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the Provider Defendants' EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

356.    In keeping with the fact that the Provider Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the Provider Defendants always performed (or purported to perform) the EMG and NCV tests immediately following the initial examination.  A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the Provider Defendants to spend at least two hours with each patient.  The fact that each of the patients purportedly subjected to the fraudulent EMG and NCV tests set aside two hours to receive a neurological examination and EMG and NCV tests indicates that either: (i) the patients knew in advance that they were to receive the EMG and NCV tests because the EMG and NCV tests are rendered pursuant to a pre-determined treatment protocol, or (ii) the Fraudulent Services were not actually performed as billed.

**E.    The Fraudulent Billing for Services Provided by Independent Contractors**

357.    The Defendants were able to conduct their fraudulent scheme by submitting claims to GEICO, and other automobile insurers, using Kelly's name and license and the Provider Defendants, seeking payment for services that he never provided, and were provided by individuals that were never employed by him or the medical "practices", to the extend any services were provided at all.

358.    Under New York's no-fault insurance laws, billing entities are ineligible to bill for or receive payment for goods or services provided by independent contractors.  The healthcare services must be provided by the billing provider itself, or by its employees.

359.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

360.     Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the Provider Defendants for the Fraudulent Services provided – to the extent they were provided at all – by independent contractors.

361.     To the extent they were performed in the first instance, many of the Fraudulent Services were performed by per diem physicians, physical therapists, and technicians (the "Treating Providers") whom the Defendants treated as independent contractors.

362.     The Defendants – through the Provider Defendants – submitted, or caused to be submitted more than 6,400 bills GEICO using the United States mails and seeking payment for the Fraudulent Services purportedly provided to hundreds of Insureds at forty-eight (48) different clinic locations between July 2018 and October 2019, while falsely representing that Kelly owned,

operated, managed and controlled the Provider Defendants and that the Treating Providers who purportedly performed the Fraudulent Services were employed and/or supervised by Kelly.

363.    In fact, every NF-3 form submitted to GEICO were false and fraudulent in that the individuals who purportedly performed the Fraudulent Services were never (i) employed by Kelly or the Provider Defendants, (ii) under Kelly's direction and/or control, or (iii) paid by Kelly.  Upon information and belief, the healthcare professionals and technicians who performed the services were paid by the Management Defendants and the John Doe Defendants without regard to Kelly's ownership, direction or control of the "practices" that were operated using his name and license.

364.    The Treating Providers that purported to render the Fraudulent Services on behalf of the Provider Defendants operated on a non-exclusive basis and followed irregular schedules based on their own availability and individual desires to perform the Fraudulent Services for the Provider Defendants.

365.    In fact, many of the alleged "employees" of the Provider Defendants submitted billing on behalf of multiple healthcare service providers operating at several multidisciplinary clinics.  For example.

> (i)    at least eight different professional corporations, including Harbor Medical, have submitted billing to GEICO for services rendered by Evans as an alleged employee;
>
> (ii)   at least seven different professional corporations, including Harbor Medical, have submitted billing to GEICO for services rendered by Yong Chi, M.D.  as an alleged employee;
>
> (iii)  at least seven different professional corporations, including Harbor Medical and Confident Medical, have submitted billing to GEICO for services rendered by Lily Zarhin, M.D. as an alleged employee;
>
> (iv)   at least five different professional corporations, including Harbor Medical, have submitted billing to GEICO for services rendered by Amanze as an alleged employee;

     (v)    at least seven different professional corporations, including Confident Medical, have submitted billing to GEICO for services rendered by Paul John Hannan, M.D.; and

     (vi)   at least seven different professional corporations, including Confident Medical, have submitted billing to GEICO for services rendered by Hadassah Orenstein, M.D. as an alleged employee.

366.    Because the Treating Providers were independent contractors, the Defendants never had any right to bill for or to collect No-Fault Benefits in connection with the services performed by them on behalf of the Provider Defendants.

367.    The Defendants, however, billed for the services performed by the Treating Providers as if they were provided by actual employees of Kelly and/or the Provider Defendants to make it appear as if the services were eligible for reimbursement.

368.    The Defendants' misrepresentations and acts of fraudulent concealment were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services, when in fact GEICO was not.

## IV.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

369.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, medical reports/records and other supporting documentation through the Provider Defendants to GEICO seeking payment for services for which the Defendants were not entitled to receive payment.

370.    The NF-3 forms, medical reports/records and other supporting documentation submitted to GEICO by and on behalf of the Provider Defendants were false and misleading in the following material respects:

     (i)    The NF-3 forms, medical reports/records and other supporting documentation uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R.

§ 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in that they were professional healthcare corporations that were fraudulently incorporated and secretly and unlawfully owned, operated and controlled by, and split fees with, the Management Defendants and John Doe Defendants;

(ii)     The NF-3 forms, medical reports/records and other supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iii)    The NF-3 forms, medical reports/records and other supporting documentation submitted by and on behalf of the Provider Defendants uniformly concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of the Management Defendants and unlawful referral, illegal kickback and/or fee-splitting arrangements between the Defendants and the Clinics;

(iv)     The NF-3 forms, medical reports/records and other supporting documentation submitted by and on behalf of the Provider Defendants misrepresented and exaggerated the level, nature, and necessity of the services that purportedly were provided to Insureds;

(v)      The NF-3 forms, medical reports/records and other supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that purportedly were performed because the services were rendered by independent contractors as opposed to Kelly or the Provider Defendants' employees;

(vi)     The NF-3 forms, medical reports/records and other supporting documentation submitted by and on behalf of the Provider Defendants uniformly misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that purportedly were performed because the Provider Defendants were owned on paper by

a physician who has never engaged in the practice of medicine through the professional corporations; and

(vii)   The NF-3 forms, medical reports/records and other supporting documentation submitted by and on behalf of Harbor Medical and Confident Medical uniformly concealed the fact that they were not registered with the New York State Education Department at the time that the Fraudulent Services were purportedly provided to Insureds.

## V.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

371.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

372.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically made material representations, concealed their fraud and underlying fraudulent scheme and went to great lengths to accomplish this concealment.

373.   The Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were fraudulently incorporated and secretly and unlawfully owned, operated and controlled, and unlawfully split fees with the Management Defendants and John Doe Defendants, and other unlicensed persons, and therefore are ineligible to bill for or collect No-Fault Benefits. Additionally, the Defendants entered into complex financial arrangements with one another and others that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

374.   Further, the Defendants knowingly misrepresented and concealed facts related to the participation of Kelly in the performance of the Fraudulent Services and Kelly's ownership, control and/or management of the Provider Defendants. Further, the Defendants knowingly concealed the fact that Harbor Medical and Confident Medical were not registered with the New

81

York State Education Department at the time that the medical services were purportedly provided to Insureds, thereby, rendering it ineligible to bill for or collect No-Fault benefits.

375.    The billing and supporting documentation submitted by the Defendants on behalf of the Provider Defendants for the Fraudulent Services, when viewed in isolation, does not reveal its fraudulent nature.

376.    Nevertheless, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services. In every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly concealed the fact that the Defendants misrepresented and exaggerated the level, nature and necessity of the services purportedly provided and inflated the billing to insurers.

377.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the healthcare professionals and technicians who purportedly performed the Fraudulent Services to prevent GEICO from discovering that the services were not eligible for reimbursement because they were not provided by individuals that were employed or supervised by the Provider Defendants or Kelly.

378.    The Defendants billed for the Fraudulent Services through multiple entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

379.     In furtherance of the fraudulent scheme, the Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitrations and/or civil court suits against GEICO and other insurers if the charges were not promptly paid in full.  The arbitrations and civil court suits that the Defendants commenced to collect on their fraudulent PIP claims were commenced in New York, seeking to collect PIP Benefits under GEICO's New York automobile insurance policies for Fraudulent Services that they purported to provide to GEICO's New York-based Insureds.

380.     GEICO takes steps to timely respond to all claims and to ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,000,000.00 based upon the fraudulent charges.

381.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Harbor Medical, the Management Defendants,**
**the Funding Defendants, and the John Doe Defendants**
**(Common Law Fraud)**

382.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

383.    Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

384.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Harbor Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and secretly and illegally owned, operated, and controlled by the Management Defendants, the Funding Defendants, and the John Doe Defendants; (ii) in every claim, the representation that Harbor Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in unlawful referral, illegal kickback and/or fee-splitting arrangements with the Management Defendants, the Funding Defendants, the John Doe Defendants and the Clinics in contravention of New York law; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not provided for genuine patient care, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the charges for the billed-for services were appropriate and consistent with the service provided, when in fact the charges exaggerated the level, nature and necessity of the service that purportedly was provided; (v) in every claim, the representation that the billed-for services were eligible for payment when in fact the services were provided – to the extent provided at all – by independent contractors,

rather than by Kelly or Harbor Medical's employees; (vi) in every claim, the representation that the billed-for services were eligible for payment when in fact Harbor Medical was owned on paper by a physician who has never engaged in the practice of medicine through the professional corporation; and (vii) Harbor Medical is a professional corporation that was not registered with the New York State Education Department at time that the Fraudulent Services were purportedly provided to Insureds. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of fraudulent activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

385.    Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Harbor Medical that were not compensable under the No-Fault Laws.

386.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $721,300.00 pursuant to the fraudulent bills submitted by the Defendants through Harbor Medical.

387.    Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

388.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Against Harbor Medical, the Management Defendants,**
**the Funding Defendants, and the John Doe Defendants**
**(Unjust Enrichment)**

389.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

390.    As set forth above, Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

391.    When GEICO paid the bills and charges submitted by or on behalf of Harbor Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

392.    Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

393.    Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

394.    By reason of the above, Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $721,300.00.

**THIRD CAUSE OF ACTION**
**Against Confident Medical, the Management Defendants,**
**the Funding Defendants, and the John Doe Defendants**
**(Common Law Fraud)**

395.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

396.    Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

397.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Confident Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and secretly and illegally owned, operated, and controlled by the Management Defendants, the Funding Defendants, and the John Doe Defendants; (ii) in every claim, the representation that Confident Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in unlawful referral, illegal kickback and/or fee-splitting arrangements with the Management Defendants, the Funding Defendants, the John Doe Defendants and the Clinics in contravention of New York law; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not provided for genuine patient care, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the charges for the billed-for services were appropriate and consistent with the service provided, when in fact the charges exaggerated the level, nature and necessity of the service that purportedly was provided;

(v) in every claim, the representation that the billed-for services were eligible for payment when in fact the services were provided – to the extent provided at all - by independent contractors, rather than by Kelly or Confident Medical's employees; (vi) in every claim, the representation that the billed-for services were eligible for payment when in fact Confident Medical was owned on paper by a physician who has never engaged in the practice of medicine through the professional corporation; and (vii) Confident Medical is a professional corporation that was not registered with the New York State Education Department at time that the Fraudulent Services were purportedly provided to Insureds. The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of fraudulent activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

398.    Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Confident Medical that were not compensable under the No-Fault Laws.

399.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $197,100.00 pursuant to the fraudulent bills submitted by the Defendants through Confident Medical.

400.    Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

401.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Confident Medical, the Management Defendants,**
**the Funding Defendants, and the John Doe Defendants**
**(Unjust Enrichment)**

402.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

403.     As set forth above, Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

404.     When GEICO paid the bills and charges submitted by or on behalf of Confident Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

405.     Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

406.     Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

407.     By reason of the above, Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $197,100.00.

**FIFTH CAUSE OF ACTION**
**Against Coastal Medical, the Management Defendants,**
**the Funding Defendants, and the John Doe Defendants**
**(Common Law Fraud)**

408.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

409.    Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

410.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Coastal Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully incorporated and secretly and illegally owned, operated, and controlled by the Management Defendants, the Funding Defendants, and the John Doe Defendants; (ii) in every claim, the representation that Coastal Medical was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in unlawful referral, illegal kickback and/or fee-splitting arrangements with the Management Defendants, the Funding Defendants, the John Doe Defendants and the Clinics in contravention of New York law; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were not medically necessary, were not provided for genuine patient care, and were performed and billed pursuant to a predetermined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the charges for the

billed-for services were appropriate and consistent with the service provided, when in fact the charges exaggerated the level, nature and necessity of the service that purportedly was provided; (v) in every claim, the representation that the billed-for services were eligible for payment when in fact the services were provided – to the extent provided at all - by independent contractors, rather than by Kelly or Coastal Medical's employees; and (vi) in every claim, the representation that the billed-for services were eligible for payment when in fact Coastal Medical was owned on paper by a physician who has never engaged in the practice of medicine through the professional corporation.

411.     The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of fraudulent activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

412.     Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Coastal Medical that were not compensable under the No-Fault Laws.

413.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $93,900.00 pursuant to the fraudulent bills submitted by the Defendants through Coastal Medical.

414.     Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

415.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Coastal Medical, the Management Defendants,**
**the Funding Defendants and the John Doe Defendants**
**(Unjust Enrichment)**

416.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

417.    As set forth above, Coastal Medical, the Management Defendants, the Funding Defendants and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

418.    When GEICO paid the bills and charges submitted by or on behalf of Coastal Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Coastal Medical, the Management Defendants, the Funding Defendants and the John Doe Defendants' improper, unlawful, and/or unjust acts.

419.    Coastal Medical, the Management Defendants, the Funding Defendants and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

420.    Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

421.     By reason of the above, Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than least $93,900.00.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**Against All Defendants**
**(Conspiracy to Commit Fraud)**

422.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

423.     Defendants participated in a scheme to defraud GEICO as described above.

424.     Defendants had actual knowledge that the other Defendants in this action were committing fraud against GEICO.

425.     Defendants provided substantial assistance to one another to perpetuate the scheme to defraud described above by partnering with one another to: (i) use the  name, professional license, personal information and signature of Kelly, as well as the tax identification number of the Provider Defendants to perpetuate a fraudulent scheme; (ii) illegally own, operate, and control the Provider Defendants and their assets for their own financial benefit; (iii) generate false and fraudulent billing and supporting documents and submitting them to GEICO through the Provider Defendants; (iv) engage in illegal kickback arrangements to gain patient access and arrange to have independent contractors perform services pursuant to those illegal arrangements; (v) arrange for "funding" agreements between the Funding Defendants and the Provider Defendants; (vi) arrange for the Law Firm to represent Kelly and the Provider Defendant in regard to the submission of billing and collection, as needed, on the fraudulent claims submitted to GEICO (vii) arrange to launder the "advances" to fund the illegal kickback arrangements and for their own financial benefit; (viii) conceal payments from the "advances" to one another and to the Clinics and their

93

operators/managers to gain access to Insureds for purpose of providing the Fraudulent Services; and (ix) arrange to launder the insurance proceeds through the IOLA/Trust Accounts of the Collection Law Firm for purposes of distributing the insurance payments to themselves and to third-parties.

426. The conspiratorial conduct of the Defendants to commit fraud against GEICO and the New York automobile insurance industry caused GEICO to pay more than $1,000,000.00 pursuant to the fraudulent bills submitted to GEICO through the Provider Defendants.

427. This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

428. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages against the Defendants, together with interest and costs, and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A. On the First Cause of Action against Harbor Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $721,300.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

B. On the Second Cause of Action against Harbor Medical, the Management Defendants, the Funding Defendants and the John Doe Defendants, more than $721,300.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

C.     On the Third Cause of Action against Confident Medical, the Management Defendants, the Funding Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $197,100.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

D.     On the Fourth Cause of Action against Confident Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants, more than $197,100.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $93,900.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

F.     On the Sixth Cause of Action against Coastal Medical, the Management Defendants, the Funding Defendants, and the John Doe Defendants, more than $93,900.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper; and

G.     On the Seventh Cause of Action against all the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $1,000,000.00, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper.

Dated: December 8, 2023

RIVKIN RADLER LLP


By: /s/ *Michael A. Sirignano*
    Michael A. Sirignano, Esq.
    Barry I. Levy, Esq.
    Jennifer Abreu, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and GEICO*
*Casualty Company*