FILED
CLERK
8/18/2025 9:35 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, et al., | Case No. 23-CV-9038(NCM) |
| Plaintiffs, | Long Island Federal Courthouse<br>100 Federal Plaza<br>Central Islip, NY 11722 |
| v. | |
| HARBOR MEDICAL GROUP, P.C., et al., | August 12, 2025 |
| Defendants. | |

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JENNIFER ABREU, ESQ.<br>Rivkin Radler LLP<br>929 RXR Plaza<br>Uniondale, NY 11556 |
| For the Defendants, Alexandr Alexevich Zaitsev, M.D., Anthony Benevenga and Mark Kaminar: | MATTHEW J. CONROY, ESQ.<br>Schwartz, Conroy & Hack, PC<br>666 Old Country Road, Suite 900<br>Garden City, NY 11530 |
| For the Defendant, Daniel Kandhorov: | MARIA VILLAVICENCIO FRANCO, ESQ.<br>Jacobs P.C.<br>717 Fifth Avenue<br>New York, NY 10022 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES: (Cont'd)

For Non-Party, Abrams Fensterman:

ALEX LEIBSON, ESQ.
Abrams Fensterman
3 Dakota Drive
Suite 300
Lake Success, NY 11042

(Proceedings commenced 11:44 a.m.)

THE CLERK: Calling 23-CV-9038, GEICO, et al. vs. Harbor Medical Group, P.C., et al.

Please state your appearances for the record.

MS. ABREU: Good morning, Your Honor. Jennifer Abreu on behalf of plaintiffs, from Rivkin Radler, LLP.

THE COURT: Good morning.

MR. CONROY: Good morning, Your Honor. Matthew Conroy, Schwartz, Conroy and Hack, for the defendants, Alex Zaitsev, Mark Kaminar and Anthony Benevenga.

THE COURT: Good morning

MS. VILLAVICENCIO: Good morning, Your Honor. Maria Villavicencio, from Jacobs P.C., for defendant. Daniel Kandhorov.

THE COURT: Good morning.

MR. LIEBSON: And good morning, Your Honor. Alex Liebsman, from Abrams Fensterman, for the non-party, Abrams Fensterman.

THE COURT: Good morning to you too.

So Abrams Fensterman is the person with skin in this game. We're talking about a subpoena, right?

MR. LIEBSON: That's correct, Your Honor.

THE COURT: All right. Everybody can stay seated when you're talking. The important thing is that everything gets picked up by the mic, because there's not a court

reporter, but everything's recorded. Okay?

MR. LIEBSON: Okay, Your Honor.

THE COURT: So however you're comfortable speaking.

So we have here a subpoena that was served on Abrams Fensterman by GEICO. And it's my understanding -- I do have the letters on the subpoena. Fensterman says they can't comply with it.

Let's take a look at the subpoena itself. So what you're looking for generally are documents from the Abrams Fensterman escrow account showing payments made to the PC defendants. And those defendants are Harbor and Confident? Is that the other one?

MS. ABREU: Your Honor, just a few things.

So we are seeking any IOLA records pertaining specifically to Harbor Medical Group, P.C. and Confident Medical Services, P.C.

THE COURT: Right.

MS. ABREU: All insurance payments that were issued to those two PC defendants were deposited to Abrams Fensterman's IOLA account.

THE COURT: Right.

MS. ABREU: They were then thereafter disbursed from that account. None of the profits that the PCs received in this case were ever deposited into the corporate bank account. So all that information, what money was received, what was

disbursed and to whom and to what amounts, that's within the possession of Abrams Fensterman.

THE COURT: Understood. But on Abrams Fensterman's part your position is that you collect for insurance -- not for insurance companies, but you collected to PC defendants payments due from various insurance companies. Is that right?

MR. LIEBSON: That's correct, Your Honor, and I -- just out of habit I stand, Your Honor.

THE COURT: I understand.

MR. LIEBSON: But, yes, Your Honor, and I think you articulated it perfectly well, but just to make it clear, the monies that are collected by Abrams Fensterman on behalf of the provider defendants are pooled into the same escrow account. And they're classified by provider, not by insurance company.

THE COURT: Right.

MR. LIEBSON: So in other words, monies from GEICO, Allstate, Liberty, Progressive, all having to do with that provider, are dumped into the same escrow account.

So monies can be determined -- or monies can be shown, or checks can be shown coming into the account from the various insurance carriers, but it can't be shown -- that money cannot be showing going out.

In other words, there's -- let's say there's a $17.36 reimbursement from GEICO. I can show that money coming into the escrow account. I can't show a reciprocal $17.36 disbursement

to an individual, or an entity.

THE COURT: And the interest on GEICO's part is they want to find out where the money went, right?

MS. ABREU: Correct.

THE COURT: Okay. But that money, as articulated, can't be separated out as to GEICO money, right?

MR. LIEBSON: That's right, Your Honor.

THE COURT: Because you're a collections firm in one sense, collecting money on behalf of clients. It gets pulled into your escrow account. You take fees or whatever out of it and then you pay over, right?

MR. LIEBSON: That's right, Your Honor.

And there's no way to determine whether or not the receiver of the funds received GEICO monies, received Allstate monies, received Liberty monies, received Progressive monies. It's all pooled into one escrow account and disbursed in that way.

THE COURT: And if you were to give all the information, that's how it would be overly broad and that's how it would implicate other client funds, right?

MR. LIEBSON: That's exactly right, Your Honor. And from our many meet and confers with plaintiff's counsel, we've had a good relationship going forward.

It is my understanding that the reason why they want this information is to identify the identities of the receivers

of those funds so they could potentially add them in as defendants to the lawsuit.

Regardless of whether or not they received funds from GEICO, they want to add these individuals that received funds from us into the lawsuit. That's my understanding.

THE COURT: Okay. I mean, that was mine as well. Let me give GEICO a chance to articulate their position on why it's relevant.

MS. ABREU: Your Honor, with respect to the Abrams Fensterman argument that the -- it's overly broad because it cannot separate those payments, our position is that that has no merit for reasons.

As the court is aware, the complaint allegations are that GEICO defrauded into paying over a million dollars to the PC defendants, in this case being Harbor Medical, Confident Medical and Coastal.

All the allegations and the discovery that we received thus far support the claims in our complaint, specifically that Dr. Robert Kelly was never the true owner or the beneficial owner --

THE COURT: No, I get all of that.

I want to know why these documents -- how will they assist you in pursuing this litigation? Is it to identify the John Doe defendants, to show GEICO's damages? What's it for?

MS. ABREU: So there's a couple of things that it

would go for.

First, counsel just stated that we were only seeking these records to identify John Doe defendants. That's incorrect.

These records, all of them, whether it was a State Farm, a GEICO, whatever insurer made these payments, all of those records are relevant to the main claim in this case, which is that these PC defendants were never under the control, management and ownership of Dr. Kelly.

THE COURT: Well, the complaint in this case is that GEICO was defrauded. The facts about Dr. Kelly, those are all facts supporting that GEICO was defrauded.

You're not pursuing this case on behalf of five different insurance companies. It's that GEICO was defrauded, right?

MS. ABREU: Correct. But the basis of that claim is -- and why GEICO was defrauded and one of the reasons that the medical services that we paid for are not reimbursable is because the PC's themselves were never under control, ownership or management of the actual record doctor.

THE COURT: Right. I get that.

But why are the documents that you're seeking relevant to Dr. Kelly or any of these, you already know about Dr. Kelly?

You've taken Dr. Kelly's deposition. You have all

that information. Why are these records relevant to your claim? Why do you need these records?

MS. ABREU: Well, it goes to the overarching scheme in this case, the fact that all the profits that came from these PC's went to other individuals that were not Kelly, without receiving the full picture of what actually occurred, what profits were received by the firm and who they were disbursed to. It doesn't present a full picture of this scheme, which includes, but is not limited to the identification of the John Doe defendants.

And, Your Honor, I would say that this is very similar to say a traditional corporate account for a PC, right? If you had a corporate account that was receiving the profits, this case -- the insurance payment, we would be entitled to the entire account. We wouldn't be limited to just whatever payments were connected to the GEICO insured.

We would receive the entirety of every insurance payment and any money that came in and out of those corporate accounts.

The way that the defendants designed this set up in this case --

THE COURT: You mean the corporate account. You're talking about the account of the PC defendants.

MS. ABREU: Correct.

THE COURT: This is a lawyer's escrow account. It's a

little different.

MS. ABREU: But it was used in that same manner, Your Honor. That's our position, because we're not seeking -- it was mentioned that we're seeking other client funds. The insurance companies aren't the clients of Abrams Fensterman. The only client on paper was the PC defendants, and those are the only records we're receiving.

The way that those -- that individual account was set up and designed by the firm, along with the defendants, was that it would operate in the same exact manner as if it were a corporate account for those PC's.

They received all the profits. They disbursed all the payments. And they're the only ones in possession of that information.

We could have -- and there is case law that supports the plaintiff seeking the actual IOLA accounts. And, Your Honor, I could provide that after this hearing or at the end of the hearing.

But we are entitled to that information, especially because, as I said, they operated and designed this to function this way.

THE COURT: When you say they, who's they? Is it the law firm?

MS. ABREU: The defendants, as well as the law firm. It was set up in a way where all the profits of the PC

defendants would be deposited into that IOLA account.

THE COURT: Are the law firms defendants here?

MS. ABREU: They are not, Your Honor.

THE COURT: Is there any allegation of wrongdoing on behalf of the law firm?

MS. ABREU: We have not filed anything.

THE COURT: You refer to a law firm in your complaint.

MS. ABREU: Correct.

THE COURT: Is that this law firm?

MS. ABREU: Correct. And there's --

THE COURT: And they're not alleging any wrongdoing.

MS. ABREU: At this time, no. So our position is that they shouldn't be able to hide behind something that they did by design.

The defendants would not have been able to operate in this manner without Abrams Fensterman willingly setting up this account for the PC defendants, willingly accepting the insurance payments and then willingly disbursing and acting as an agent.

THE COURT: Is that just them acting as a collection firm or are they acting as funding defendants there?

Is there a difference here, or are they just operating according to you -- I mean they are collections lawyers. Is that how they operate?

Are you saying there's something wrong with it, because I feel like there's an undertone here that you're saying there's something wrong with the way they're doing it.

MS. ABREU: Well, in this case Abrams Fensterman serves several roles.

One, they obviously, as you said, they served as collections counsel for Dr. Kelly, as well as the PC defendants. They also served as counsel for the funding defendants. And several partners at the firm also held an ownership interest in the funding defendants.

THE COURT: You're asking for records of them when they were acting as collections counsel. That's what these records are, right?

MS. ABREU: Correct.

THE COURT: Okay. So they collect money. They put it in an account and you're saying you're entitled to information as to all money paid from their IOLA account that went to the defendants in this case to show what?

How would that show John Doe defendants -- what does that show for you?

MS. ABREU: Well, Your Honor, the money didn't go back to the PC defendants. We actually don't know where that money went, because the way it was set up, as I mentioned that money went out to -- whether it individuals or entities --

THE COURT: Wait. I'm sorry to interrupt.

Have they already given you information showing you monies paid to the PC defendants?

MS. ABREU: No.

THE COURT: What have they given you, because it sounded like when I read the letters that there was cooperation and that Abrams Fensterman had provided documents to them and that you've been -- you were getting along. What have they given you?

MS. ABREU: We've receive funding agreements. We've received retainer letters. We received some advances. So there's requests for advances that were a part of the funding arrangements that were provided.

We received some miscellaneous communications. We did receive some wires that went to the funding defendants. But with respect to all the other insurance payments, we have no information as to who received that money and where it went or how much was received by any party.

THE COURT: So is it for you to say give us all the money you collected and then we'll parse out the GEICO ones?

MS. ABREU: Well, our position --

THE COURT: Are you looking to be able to do that?

MS. ABREU: Well, Judge, our position is that we don't need to parse out what the payments -- because all the payments, whether it came from one insurer to another, it goes to prove the claims in this case. The fact --

THE COURT: No, it doesn't because it's way broader. The claims in this case are GEICO's damages. You would get information on behalf of I don't know how many other insurance companies that may have been defrauded. But that's not --

MS. ABREU: Well, Your Honor --

THE COURT: That's not your damage.

MS. ABREU: I would argue that we would receive that if we would have been able -- if all that money would have been deposited into the PC defendant's corporate bank account, we would have been entitled to that.

That bank wouldn't have separated what GEICO paid to those PC's, nor would a defendant be here moving to -- not a defendant, but a non-party wouldn't be here, or a defendant wouldn't have argued that we couldn't receive those corporate accounts.

THE COURT: Let me hear from Abrams Fensterman on that.

MR. LIEBSON: So, Your Honor, there was a lot of information exchanged just now.

I think Your Honor's questions were astute and ultimately what I -- I think what counsel is -- what plaintiffs are trying to do here is they're trying to put the cart before the horse and get post-judgment discovery prior to receiving a judgment. They're trying to chase the money prior to having received a judgment of any wrongdoing whatsoever.

There are parties here that can -- let me take a step back. There are defendants that plaintiff is seeking remedies from.

Why is it relevant who the non-parties, who may or may not have received GEICO monies have to do with that underlying issue? If there is a finding of liability on the part of the defendants, the plaintiff is free to execute on whatever judgment they have as it relates to those defendants.

THE COURT: Let me ask you this. So let's just focus on your firm being collections lawyers, right, for the other defendants, for the PC defendants.

MR. LIEBSON: Yes, Your Honor.

THE COURT: So when you do that you try to collect from an insurance company, right?

MR. LIEBSON: Yes.

THE COURT: From various different insurance companies and just hypothetically walk me through what that practice looks like.

MR. LIEBSON: There are -- each claim -- however small they are -- there are claims that are for $5.36, $100. Whatever they are --

THE COURT: So what do you do?

MR. LIEBSON: They get litigated through arbitration and an arbitrator will determine whether or not it's a valid claim. And they're done in bundles.

So once -- if an arbitrator approves the claim, then we get paid out from GEICO, from Allstate, from Liberty, from Progressive in accordance with the arbitrator's rulings.

The arbitrator -- GEICO will then send the monies in bundles, or Allstate, or Liberty, or Progressive, whichever insurance company, will send the money to Abrams Fensterman.

We'll put it into our escrow account and we'll disburse it how the clients of our firm and whose monies it may or may not be, how they deem it should be distributed.

THE COURT: And the clients are the PC defendants.

MR. LIEBSON: Sometimes. It depends on which insurance carrier we're getting monies from. It could be the PC defendants, it could be investors in the underlying entities. In this case members of the defendants. It could be a whole host of things.

THE COURT: In terms of proving plaintiff's -- the allegation of the schemes and the fraudulent billings, what's relevant would be your litigation of each claim, right? Each of those claims that they're claiming are -- it wouldn't be the money you collect.

MR. LIEBSON: I think so, Your Honor.

THE COURT: It could be how they're litigated and you would say -- say to the arbitrator, for example, somebody got an MRI and this was medically necessary and, therefore, the arbitrator says yeah, you're right. We'll give you X amount of

dollars. You take your fee and you give the money.

MR. LIEBSON: That's right.

THE COURT: But you're litigating it.

MR. LIEBSON: It does not matter where the money went. It matters whether or not it's --

THE COURT: Right. Where the money went I don't think goes to the scheme.

MS. ABREU: Your Honor, I just want to clarify one thing because there's been a lot of discussions about collections.

They didn't just, you know, receive money as a result of collections. There was a significant amount of money that was voluntarily paid by GEICO to both the Harbor Medical PC and the Confident Medical PC.

With respect to Harbor Medical, PC, they received about -- a little over $721,000 in voluntary payments, which were never litigated and were not a subject to collections.

Similarly, with Confident Medical, they received almost $200,000.

So I just want to make sure --

THE COURT: So how do you know? I mean --

MS. ABREU: We know that --

THE COURT: I mean, they're talking about them acting as collections attorneys, right? You know, that AF made payments to the PC defendants, right? You already know that.

MS. ABREU: They didn't receive -- the PC defendants never received money from Abrams Fensterman. None of the money ever went back to the PC's.

The money went outward to other individuals and entities, none of which we know. Partly that is why we had John Doe defendants in this case, because we know that there are other individuals who were part of the scheme, along with the defendants, the identities of which we don't know.

The PC defendants defaulted in this case. The funding defendants are defunct. So the information that Abrams Fensterman has is only within their possession.

Dr. Kelly very clearly testified he was never in control of any of the finances. He has no clue who received any of the money, how much the PC defendants received in payments from any insurer, who it was issued to, how much was issued to an individual or an entity.

None of that information is information that Dr. Kelly has and we don't have the PC defendants appearing, and we don't have the funding defendants. That's information that Abrams Fensterman had.

They never provided Dr. Kelly with any records pertaining to any insurance payments --

THE COURT: But you used the doctor defendants?

MS. ABREU: I'm sorry?

THE COURT: You have defendants here. You have other

defendants.

MS. ABREU: Correct. Yes. We have not had the opportunity to -- we haven't gone to depositions at this point, but based on what they've already said in their interrogatories and their written responses, they're claiming they had nothing to do with this scheme.

But we don't even have the records that show who was receiving the money or --

THE COURT: Well, let's stop there. They're claiming everything they did was medically appropriate, right?

MS. ABREU: Well, no, Your Honor.

They're claiming -- the defendants and counsel -- Mr. Conroy can correct me if I'm wrong, but they're claiming that they didn't have an involvement, which is directly -- contrasts what -- is inconsistent with what Dr. Kelly said.

Dr. Kelly said in 2018 he was facing financial hardships and serious health issues. He then accepted an offer from Zaitsev and Kaminar, Benevenga or he agreed to be just the record owner (indiscernible) in exchange for his salary. After that he had no involvement.

THE COURT: I'm talking about these defendants. I'm not talking about Dr. Kelly.

MS. ABREU: I understand, but the defendants are claiming they had no role whatsoever.

So we don't have any way of finding out who these

additional John Doe's are, what kickbacks were paid, how much was paid to whom and how without the records.

And I'll note that Abrams Fensterman did turn over wire transfers which were payments to the funding companies, none of which explained what those payments were in connection to. None of them.

So I don't understand the argument now that well, we can't separate insurance payments, but they were paid, giving us wire transfer records that don't actually separate what those were in connection to, whether they were wire transfers on advances dealing with State Farm claims, GEICO claims or any other insurer.

THE COURT: But were those transfers to the funding defendants?

MS. ABREU: Correct.

THE COURT: Who were defendants in this case.

MS. ABREU: Correct.

THE COURT: So that they were able to separate because they know who those funding entities are.

MS. ABREU: I understand, Your Honor, but if their argument is that the only thing that is relevant is GEICO claims and money that was received in connection to GEICO claims, I don't know how you then argue we are entitled to that. They're specifically allegations and claims in our complaint as to John Doe defendants.

The only person that has that information would be Abrams Fensterman. They didn't --

THE COURT: So let me ask

MR. LIEBSON: We don't have -- that's what the -- I think -- I'm trying to listen to what counsel is saying and it appears as if counsel does not understand fundamentally the nature of how Abrams Fensterman operated with it clients.

There is no information that we can give them that's going to help them determine what counsel is articulating here.

THE COURT: Let me ask you this.

Would someone from Abrams Fensterman be in a position to sit for a deposition to attest to how this operates?

MR. LIEBSON: To how Abrams Fensterman operated --

THE COURT: With respect to, you know, where sort of -- I have your letters and your letters are saying we operate this way, we have a pool of money. We don't do that.

MR. LIEBSON: In general, yes, Your Honor.

THE COURT: Right.

MR. LIEBSON: There is --

THE COURT: That's what I'm asking.

MR. LIEBSON: In general --

THE COURT: So that there's a deposition of either a managing partner, or somebody at the firm, not even necessarily a lawyer.

But someone who can explain to the plaintiffs in this

case and put a little more meat on the bones of this letter, so that would put me in a better position to really understand the records that are sought and why it is that you say you can't comply with it.

MR. LIEBSON: Right. So there is somebody that can do that, Your Honor, and we -- and if that is Your Honor's pejorative we can accommodate that.

THE COURT: I would like that. I think that would give me more information.

MR. LIEBSON: Okay. However, I would just like to say, Your Honor, I think that whatever deposition there may or may not be would have to have certain parameters that we can -- in other words, we can talk about what the general processes are --

THE COURT: Yes.

MR. LIEBSON: But I don't want this to turn into --

THE COURT: What are the documents and client confidences. Absolutely. This is a -- this would be a deposition in the nature of a 30(b)(6) to attest to the practices with respect to how collections are made and I think it would be that.

Let me ask plaintiff what you would ask. And it wouldn't be, as counsel is saying, a back door to getting documents, or a back door to the subpoena. It would be to give me more information than what's in these letters to be clear.

MS. ABREU: Your Honor, before I get to that, if you could just give me one moment to just respond to something that counsel just stated.

Counsel made a comment on how I clearly don't understand how the firm operates. It's incredulous to say --

THE COURT: I'm the one that doesn't understand how the law firm operates.

MS. ABREU: I understand, but I want to respond because there's something specifically represented by counsel.

They stated that we don't understand how they operate and that they don't have the information that we believe that they have. And I believe it defies logic.

If you have an IOLA account, you have to maintain certain records. You cannot come here and state that you don't know how much money was disbursed from the account or to whom it was disbursed.

As a law firm they clearly know and understand, and I'm sure they do keep records as to how much was disbursed and to whom and when.

So I just want to point that out because I don't believe that is -- and said in good faith in any way.

THE COURT: So let me ask if those questions raised would be within the scope of the types of questions that you would respond to.

MR. LIEBSON: I think that that's outside the scope

but to respond to that, that's exactly -- I think counsel's articulating exactly what I'm saying.

There is a clear misunderstanding of how it operates, of how the operation operates.

THE COURT: Yes, but those questions are, I think, relevant to this. Not with respect to clients in particular but in general how it operates.

I don't know this because I don't run an IOLA account but I'm guessing that there are rules under New York State law right?

MR. LIEBSON: Of course there are.

THE COURT: And you comply with those. But I'd like to see a deposition that would give me more information about how the firm operates with respect to these documents, because part of what you're saying is it's impossible to comply with it.

MR. LIEBSON: Right, Your Honor. But whatever rules and regulations do government escrow management, they don't -- we understand how much money came out of our escrow account. That's not what we're saying.

What we're saying is there is no obligation for us to maintain records showing this how much of GEICO's money went out.

THE COURT: Right, but they're saying they -- you don't have to do that. That they're entitled to all of it.

And I would like to get a better sense of what all of it is.

MR. LIEBSON: And then I'm curious, Your Honor -- I don't know the answer to this though. How is Abrams Fensterman telling them what the process is going to further their endeavor of trying to --

THE COURT: It will further my understanding.

MR. LIEBSON: Then I am more than happy to do that, Your Honor.

THE COURT: That's what it's for.

MS. ABREU: Your Honor, I just -- just so I can understand --

THE COURT: And I don't want interrogatories, by the way. A deposition.

MR. LIEBSON: Understood.

MS. ABREU: And, Your Honor, just so that I understand the limits of this, you know, it's our position that we should be able to not only ask about what the process is, but exactly what the process was with respect to these defendants. I don't believe it should be limited to just in general --

THE COURT: Yes, but not with respect with particular claims.

MS. ABREU: So would plaintiffs be permitted to ask, you know, Abrams Fensterman, how did you receive payment, who did you speak to with respect to how these payments should be

disbursed.

I want to just make sure that I understand the scope of what we're going to be --

THE COURT: Well, let me ask, would you answer a question like that?

MR. LIEBSON: No, Your Honor. That's trying to back door this. And how what they're doing is trying to find information about clients and --

THE COURT: Give me one minute, because I think I have somebody on the phone that was supposed to be at 12 o'clock. Let me do this very quickly.

MR. LIEBSON: Sure, Your Honor.

THE COURT: Stay where you are.

(Off the record from 12:13 p.m. until 12:24 p.m.)

THE COURT: When we broke to do the other matter we were talking about a deposition and here's what I want in this case, because I do think I need more to decide it, and I also need more than just the letters to really flesh out what the issues are here.

So I will order a deposition, and you're agreeing to a deposition of Abrams Fensterman. It will be a lawyer, it will be whoever has knowledge of really just procedures.

And it's going to be limited to procedures with respect to how funds go -- how the funds go into this IOLA account that we've been talking about and how they are

maintained and how they are disbursed. Not the who, but how, just to put a little bit more bones on what's in the letter, and -- which is put forth in support of the we can't comply because. So it's just really procedures.

I'll give you -- I'm hoping you can do this in a one-hour deposition within 30 days of today. I'd like you to do that.

After that I would like you to fully brief the motion and I believe this is a motion to compel by GEICO. So it would be your motion. Figure out a briefing schedule. Brief it as a full motion, citations and everything.

And then I think after all this I will be in a much better position to decide this. I'll have more information. Everything will be clearer. This is so, you know, so I can have more information. So that's what it's limited to.

I think you understand what it's limited to. Memos of law no more than ten pages on something like this. So ten pages memo and then affidavits, anything from that is obviously -- those are exhibits. They don't count in the ten pages. And you'll figure out your own briefing schedule. But do it quickly.

So this motion before me denied without prejudice to renewing on re-briefing.

MR. LIEBSON: Thank you, Your Honor, and Abrams Fensterman understands clearly what the parameters are. I

appreciate your articulation.

THE COURT: All right. I'm sure everybody understands.

MS. ABREU: Your Honor, I know you've made it -- I just want to put it on the record and make it clear, I don't -- you know, my concern is that only asking about the procedures in general for Abrams Fensterman clients is not going to give us sufficient information.

We know from Dr. Kelly's testimony that there was no meaningful --

THE COURT: It should be sufficient information to go forward with more on your motion to compel.

MS. ABREU: Okay.

THE COURT: I'm not telling you I'm denying the motion to compel. I'm saying I want a little bit more information from their side as to why it's inappropriate.

MS. ABREU: So we are not permitted with respect to procedure as to the defendants.

THE COURT: I don't understand what your question is.

MS. ABREU: I don't -- our position is that the way that the --

THE COURT: Don't ask them where money went. Ask them the procedure of how things are done.

MS. ABREU: No, I understand that, Your Honor, but I want -- when we're asking about how things were done, are we

allowed to ask how things were done specifically with respect --

THE COURT: With respect to these defendants.

MS. ABREU: Okay. Thank you, Your Honor.

THE COURT: Yes, but not identifying the people, because that's --

MS. ABREU: Right.

THE COURT: Because it may be -- I don't know this, but it may be that there's a separate IOLA account for these defendants. I don't know.

MS. ABREU: Okay.

THE COURT: There may be just one. I don't know.

MS. ABREU: Okay. Thank you, Your Honor.

THE COURT: So those are fine. Those questions are fine. All right. Thank you.

MR. LIEBSON: Thank you, Your Honor.

(Proceedings concluded at 12:28 p.m.)

I, CHRISTINE FIORE, court-approved transcriber and certified electronic reporter and transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Christine Fiore

August 16, 2025

Christine Fiore, CERT
Transcriber