UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Action No. 2:23-cv-09038(NCM)(AYS)
----------------------------------------x

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
COMPANY,

                    Plaintiffs,

        -against-

HARBOR MEDICAL GROUP, P.C., CONFIDENT
MEDICAL SERVICES, P.C., COASTAL MEDICAL,
P.C., ALEXANDR ALEXEEVICH ZAITSEV, M.D.,
MARK KAMINAR, ANTHONY BENEVENGA,
FINANCIAL VISION GROUP, LLC, FINANCIAL
VISION GROUP II,LLC, FORMERLY KNOWN AS
ADF EEQUITIES, LLC, FINANCIAL VISION
GROUP III, LLC, FINANCIAL VISION GROUP
IV, LLC, DANIEL KANDHOROV AND JOHN DOE
DEFENDANTS NOS. 1-5,

                    Defendants.
----------------------------------------x

                  March 25, 2025
                  10:17 a.m.


    DEPOSITION OF YEVSEY TSEYTELMAN, a
Nonparty Witness herein, taken by the
Plaintiffs, pursuant to Subpoena, before
Pennie Erickson, a Notary Public of the
State of New York.

Page 2

```
 1
 2      A P P E A R A N C E S :
 3
 4      RIVKIN RADLER, LLP
 5      926 RXR Plaza
 6      Uniondale, New York 11556-0926
 7      Attorney for Plaintiffs
 8      BY:      JOANNA ROSENBLATT, ESQ.
 9
10
11      SCHWARTZ CONROY & HACK, P.C.
12      666 Old Country Road, Suite 900
13      Garden City, New York 11530
14      Attorneys for Defendants
15      Zaitsev, Kaminar and Benevenga
16      BY:      ROBERT E. HEWITT, III, ESQ.
17
18
19      LAW OFFICE OF OLGA SKLYUT, P.C.
20      2309 Avenue Z
21      Brooklyn, New York 11235
22      Attorney for Nonparty Witness
23      Yevsey Tseytelman
24      BY:      OLGA SKLYUT, ESQ
25
```

Page 3

1

2     ALSO PRESENT:

3     Stas Rabinovich, Russian Interpreter

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1

2          S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED

5     by and between the attorneys for the

6     respective parties hereto that the filing

7     and sealing be and the same are hereby

8     waived.

9          IT IS FURTHER STIPULATED AND AGREED

10    that all objections except as to the form

11    of the question, shall be reserved to the

12    time of the trial.

13         IT IS FURTHER STIPULATED AND AGREED

14    that the within deposition may be signed

15    and sworn to before any notary public

16    with the same force and effect as though

17    signed and sworn to before this Court.

18

19

20

21

22

23

24

25

```
                                          Page 5
 1                  Yevsey Tseytelman
 2      S T A S   R A B I N O V I C H , the
 3      Interpreter herein, having been duly
 4      affirmed to translate from English to
 5      Russian and Russian to English, by a
 6      Notary Public in and for the State of New
 7      York, translates as follows:
 8
 9      Y E V S E Y   T S E Y T E L M A N , after
10      having first been duly sworn by a Notary
11      Public of the State of New York, was
12      examined and testified as follows:
13                  THE REPORTER:  Please state
14          your name for the record.
15                  THE WITNESS:  Yevsey
16          Tseytelman.
17                  THE REPORTER:  What is your
18          present home address?
19                  THE WITNESS:  8206 Falston
20          Circle, Old Bridge, New Jersey 08857.
21      EXAMINATION BY
22      MS. ROSENBLATT:
23          Q.      Good morning.  My name is
24      Joanna Rosenblatt, and I'm an attorney at
25      Rivkin Radler LLP.  We represent
```

Page 6

```
 1              Yevsey Tseytelman
 2    plaintiffs collectively known as GEICO in
 3    connection with a lawsuit that's
 4    currently pending in the Eastern District
 5    of New York captioned Government
 6    Employees Insurance Company, et al,
 7    versus Harbor Medical Group, P.C., et al.
 8              We're here to take your
 9    deposition pursuant to a subpoena that
10    was served.
11              MS. ROSENBLATT:  I ask that
12         a copy of the subpoena be marked as
13         Exhibit 1.
14              THE INTERPRETER:  That
15         wasn't a question, was it?
16              MS. ROSENBLATT:  No.  I'm
17         telling him I'm marking a copy of the
18         subpoena.
19              THE INTERPRETER:  Okay.
20              (The above-referred-to
21         document was marked as Plaintiff's
22         Exhibit 1 for identification as of
23         this date.)
24         Q.      I'm going to display it on
25    my screen at this time.  Do you see the
```

Page 7

```
 1                 Yevsey Tseytelman
 2    subpoena on the screen?
 3          A.      Yes, yes.
 4          Q.      The subpoena initially
 5    noticed your deposition for January 9th
 6    of 2025.  But pursuant to communications
 7    with your counsel, we agreed upon today's
 8    date.
 9                  Did you receive a copy of
10    the subpoena?
11          A.      Yes.
12          Q.      I'm scrolling down to page 4
13    of Exhibit 1.
14                  Did you review this document
15    in preparation for your deposition?
16          A.      Yes.
17          Q.      Scrolling down to the bottom
18    of page 4 and the beginning of page 5, it
19    requests production of documents.
20                  Did you bring any documents
21    with you today?
22          A.      No.
23          Q.      Do documents responsive to
24    this rider exist?
25                  MS. SKLYUT:  For the record,
```

Page 8

1                    Yevsey Tseytelman
2         I'd like to state that my client will
3         be invoking their Fifth Amendment
4         right against self-incrimination as
5         to any questions relating to payments
6         made by the defendants, including but
7         not limited to the purpose of such
8         payments, communications regarding
9         the payments, services rendered and
10        any related records.
11                    MS. ROSENBLATT:  Okay.
12                    I'm going to stop sharing
13        the screen for just one minute.
14                    Can we just go off the
15        record briefly?
16                    MS. SKLYUT:  Sure.
17                    (A discussion was held off
18        the record.).
19                    MS. ROSENBLATT:  Pursuant to
20        agreement with counsel, when the
21        witness indicates that he's pleading
22        the fifth, the record will read as
23        follows.
24                    Ms. Sklyut, if you'd like to
25        step in.

```
                                          Page 9
 1                    Yevsey Tseytelman
 2                    MS. SKLYUT:  On the advice
 3         of counsel, I invoke my Fifth
 4         Amendment right and respectfully
 5         decline to answer.
 6                    Could we just briefly
 7         explain to him what happened because
 8         I'm not sure he got that
 9         conversation.
10                    MS. ROSENBLATT:  Yes.
11                    THE INTERPRETER:  Okay.
12                    MS. SKLYUT:  He doesn't need
13         to say the whole phrase.  He needs to
14         say -- when he wants to invoke the
15         fifth, that he can just say fifth and
16         that will count.
17         Q.      Mr. Tseytelman, you
18     indicated that you are invoking your
19     Fifth Amendment privilege against
20     self-incrimination in response to my last
21     question?
22         A.      Yes.
23         Q.      Are you invoking your
24     personal Fifth Amendment privilege
25     against self-incrimination and refusing
```

```
                                          Page 10
 1                Yevsey Tseytelman
 2     to answer my question?
 3           A.      Yes.
 4           Q.      Are you invoking your
 5     Fifth Amendment privilege against
 6     self-incrimination because you reasonably
 7     believe the answer --
 8                   THE INTERPRETER:  What?
 9                   MS. ROSENBLATT:  I'm trying
10          to break the question down so it's
11          easier for you to interpret.  Do you
12          want me to ask a full question?
13                   THE INTERPRETER:  No.  Just
14          say it.
15           Q.      Are you invoking your
16     Fifth Amendment privilege against
17     self-incrimination because you reasonably
18     believe the answer could tend to
19     incriminate you or subject you to
20     prosecution?
21           A.      Yes.
22           Q.      Given what we just
23     discussed, are you still invoking your
24     Fifth Amendment privilege against
25     self-incrimination in response to my
```

```
                                              Page 11
 1                 Yevsey Tseytelman
 2     question?
 3           A.      Yes.
 4           Q.      Please state your name and
 5     address for the record.
 6           A.      Yevsey, Y-E-V-S-E-Y,
 7     Tseytelman, T-S-E-Y-T-E-L-M AN.
 8                   8206 Falston Circle, Old
 9     Bridge, New Jersey.
10           Q.      Before we begin, I'm just
11     going to go through some rules to help
12     today go more smoothly.
13                   As you can see, we have a
14     court reporter present.  So, it's
15     important that you give verbal answers
16     and speak clearly and loudly.
17           A.      Yes.
18           Q.      Do not nod or shake your
19     head in response to my questions.  And if
20     you don't understand a question, or can't
21     hear it, please let me know.  I'm happy
22     to rephrase or reask.
23           A.      Got it.
24           Q.      Please allow me to finish my
25     question before you give an answer so the
```

```
                                          Page 12
 1                Yevsey Tseytelman
 2      reporter can take down the full question
 3      and the full answer.
 4                Although we're not in a
 5      courtroom, the oath you just took is the
 6      same as if you were sitting in a
 7      courtroom and has the same effect.
 8                Do you understand that?
 9          A.     Got it.
10          Q.     If you need to take a break,
11      we can take a break at any time.  But if
12      I've asked you a question, I'll ask that
13      you answer the question prior to taking a
14      break.
15          A.     Yeah.  I got it.
16          Q.     Have you consumed any drugs,
17      alcohol, or any medication within the
18      last 24 hours that would affect your
19      memory or your ability to testify
20      truthfully today?
21          A.     No.
22          Q.     Are you prepared to proceed?
23          A.     Yes.
24          Q.     When did you first learn
25      about this lawsuit?
```

Page 13

```
 1              Yevsey Tseytelman
 2       A.       When I received the
 3   subpoena.
 4       Q.       After receiving the
 5   subpoena, what did you do next?
 6       A.       Came to see the lawyer.
 7       Q.       Did you discuss the subpoena
 8   with anyone other than your lawyer?
 9       A.       No.
10       Q.       Did you discuss your
11   testimony today with anyone other than
12   your lawyer?
13       A.       No.
14       Q.       Are you familiar with the
15   allegations in the lawsuit?
16       A.       No.
17       Q.       Are you paying any legal
18   fees for Alexandr Zaitsev?
19              MS. SKLYUT:  Just answer the
20       question.
21       A.       I don't know who that is.
22       Q.       Do you know a person --
23   withdrawn.
24              Are you paying any legal
25   fees for a person named Mark Kaminar?
```

```
                                            Page 14

 1                   Yevsey Tseytelman

 2        A.        Mark Kaminar?

 3        Q.        Right.

 4        A.        I don't know that person.

 5        Q.        Are you paying any legal

 6   fees for a person named Anthony

 7   Benevenga?

 8        A.        I don't know who that is.

 9             MS. SKLYUT:  Just answer yes

10        or no to the question.

11             THE WITNESS:  Okay.

12        Q.        Are you paying any legal

13   fees for a person named Daniel Kandhorov?

14        A.        No.

15        Q.        Did you review any documents

16   or records in preparation for your

17   deposition?

18             MS. SKLYUT:  Objection.

19             I instruct the witness not

20        to answer on the ground of the Fifth

21        Amendment.

22             MS. ROSENBLATT:  Okay.

23        Q.        Mr. Tseytelman, are you

24   taking advice of counsel and asserting

25   your Fifth Amendment right?
```

Page 15

1              Yevsey Tseytelman
2        A.        Yes.
3        Q.        Aside from your speaking
4    with your attorney, did you do anything
5    else in preparation for your deposition
6    today?
7        A.        No.
8        Q.        Have you ever gone by any
9    other names?
10        A.        I don't get the question.
11        Q.        Have you ever used any other
12    names?
13        A.        No.
14        Q.        For how long have you lived
15    at your current address?
16        A.        A year-and-a-half.
17        Q.        Do you own that property?
18        A.        No.
19        Q.        Do you own any properties in
20    the United States?
21        A.        No.
22        Q.        Are you familiar with the
23    address 199 Union Hill Road in Manalapan?
24              THE INTERPRETER:  Union
25        what?

```
                                              Page 16

 1                    Yevsey Tseytelman
 2                        MS. ROSENBLATT:  Union Hill
 3         Road.
 4          A.      That was my house that was
 5      foreclosed, the one when I declared
 6      bankruptcy.
 7          Q.      When did you declare
 8      bankruptcy?
 9          A.      2020.
10          Q.      What's the status of that
11      proceeding?
12          A.      It's over.
13          Q.      Are you familiar with an
14      address 2079 East 23rd Street, Suite B,
15      in Brooklyn?
16                        THE INTERPRETER:  What was
17         that?
18                        MS. ROSENBLATT:  You want
19         the address again?
20                        THE INTERPRETER:  Yes,
21         please.
22                        MS. ROSENBLATT:  2079 East
23         23rd Street, Suite B, Brooklyn.
24          A.      No.
25          Q.      Do you own property through
```

```
                                          Page 17

 1                  Yevsey Tseytelman
 2    any companies?
 3         A.        No.
 4         Q.        Were you born in the United
 5    States?
 6         A.        No.
 7         Q.        Where were you born?
 8         A.        Ukraine.
 9         Q.        When did you come to the
10    states?
11         A.        '89.
12         Q.        Are you a citizen?
13         A.        Yes.
14         Q.        What's your date of birth?
15         A.        April 17, '59.
16         Q.        What are the last four
17    digits of your Social Security number?
18         A.        0839.
19         Q.        What's your highest level of
20    education?
21         A.        I graduated from high school
22    in Ukraine, and I have a degree from a
23    junior college.
24         Q.        What's your degree in?
25         A.        Radio electronics.
```

```
                                            Page 18

 1                   Yevsey Tseytelman
 2         Q.        Did you obtain that degree
 3    in Ukraine?
 4         A.        Yes.
 5         Q.        Do you have any professional
 6    licenses or certifications?
 7         A.        No.
 8         Q.        Do you have a personal
 9    e-mail address?
10         A.        Yes.
11         Q.        What is it?
12         A.        Seva59@yahoo.com.
13         Q.        Is there a business -- well,
14    withdrawn.
15                   Do you have any business
16    e-mail addresses?
17         A.        No.
18         Q.        Have you ever used your
19    personal e-mail address -- well,
20    withdrawn.
21                   From January 2018 to the
22    present, have you had any business e-mail
23    addresses?
24                   MS. SKLYUT:   Objection.
25                   I instruct my client not to
```

```
                                              Page 19
 1                Yevsey Tseytelman
 2        answer based on the Fifth Amendment
 3        privilege against self-incrimination.
 4           Q.       From January 2018 to the
 5     present, have you ever used an e-mail
 6     address to communicate with a person
 7     named Robert Kelly, M.D.?
 8                   MS. SKLYUT:  Objection.
 9                   I instruct the witness not
10        to answer based on Fifth Amendment.
11                   MS. ROSENBLATT:  Okay.
12           Q.       Mr. Tseytelman, are you
13     taking counsel's advice and asserting
14     your Fifth Amendment right against
15     self-incrimination?
16           A.       Yes.
17                   MS. ROSENBLATT:  Can we just
18        go off the record for one second?
19                   MS. SKLYUT:  Sure.
20                   (A discussion was held off
21        the record.)
22           Q.       Mr. Tseytelman, from
23     January 2018 to the present, did you
24     communicate via e-mail with anyone
25     associated with Harbor Medical Group,
```

```
                                    Page 20

 1              Yevsey Tseytelman

 2    P.C.?

 3                   MS. SKLYUT:  Objection.

 4                   I instruct the witness not

 5         to answer on the grounds of the

 6         Fifth Amendment privilege against

 7         self-incrimination.

 8         A.       On the advice of counsel, I

 9    invoke my Fifth Amendment right and

10    respectfully decline to answer.

11         Q.       From January 2018 to the

12    present, have you communicated with

13    anyone affiliated with Confident Medical

14    Services, P.C. via e-mail?

15                   MS. SKLYUT:  Objection.

16                   I instruct the witness not

17         to answer on the grounds of the

18         Fifth Amendment privilege against

19         self-incrimination.

20         A.       On the advice of counsel, I

21    invoke my Fifth Amendment right and

22    respectfully decline to answer.

23         Q.       From January 2018 to

24    present, did you communicate with anyone

25    affiliated with Coastal Medical, P.C. via
```

```
                                              Page 21

 1                    Yevsey Tseytelman

 2     e-mail?

 3                    MS. SKLYUT:  Objection.

 4                    I instruct the witness not

 5          to answer on the grounds of the

 6          Fifth Amendment privilege against

 7          self-incrimination.

 8          A.        On the advice of counsel, I

 9     invoke my Fifth Amendment right and

10     respectfully decline to answer.

11          Q.        From January 2018 to

12     present, have you communicated with

13     anyone associated with Financial Vision

14     Group, LLC via e-mail?

15                    MS. SKLYUT:  Objection.

16                    I instruct the witness not

17          to answer on the grounds of the

18          Fifth Amendment privilege against

19          self-incrimination.

20          A.        On the advice of counsel, I

21     invoke my Fifth Amendment right and

22     respectfully decline to answer.

23          Q.        From January 2018 to

24     present, have you communicated with

25     anyone affiliated with Financial Vision
```

```
                                    Page 22
 1                Yevsey Tseytelman
 2      Group II, LLC, formerly known as ADF
 3      Equities, LLC via e-mail?
 4                MS. SKLYUT:  Objection.
 5                I instruct the witness not
 6         to answer on the grounds of the
 7         Fifth Amendment privilege against
 8         self-incrimination.
 9                Off the record for a second.
10                (A discussion was held off
11         the record.)
12         A.      On the advice of counsel, I
13      invoke my Fifth Amendment right and
14      respectfully decline to answer.
15         Q.      From January 2018 to
16      present, did you communicate with anyone
17      affiliated with Financial Vision Group
18      III via e-mail?
19                MS. SKLYUT:  Objection.
20                I instruct the witness not
21         to answer on the grounds of the
22         Fifth Amendment privilege against
23         self-incrimination.
24         A.      On the advice of counsel, I
25      invoke my Fifth Amendment right and
```

Page 23

```
 1              Yevsey Tseytelman
 2      respectfully decline to answer.
 3           Q.        From January 2018 to
 4      present, did you communicate with anyone
 5      affiliated with Financial Vision Group
 6      IV, LLC via e-mail?
 7                   MS. SKLYUT:  Objection.
 8                   I instruct the witness not
 9         to answer on the grounds of the
10         Fifth Amendment privilege against
11         self-incrimination.
12           A.        On the advice of counsel, I
13      invoke my Fifth Amendment right and
14      respectfully decline to answer.
15           Q.        From January 2018 to
16      present, did you communicate with a
17      person named Howard Festerman via e-mail?
18                   MS. SKLYUT:  Objection.
19                   I instruct the witness not
20         to answer on the grounds of the
21         Fifth Amendment privilege against
22         self-incrimination.
23           A.        On the advice of counsel, I
24      invoke my Fifth Amendment right and
25      respectfully decline to answer.
```

Page 24

1                      Yevsey Tseytelman
2           Q.        From January 2018 to
3      present, did you communicate with a
4      person named Jordan Festerman via e-mail?
5                      MS. SKLYUT:  Objection.
6                      I instruct the witness not
7           to answer on the grounds of the
8           Fifth Amendment privilege against
9           self-incrimination.
10          A.        On the advice of counsel, I
11     invoke my Fifth Amendment right and
12     respectfully decline to answer.
13          Q.        From January 2018 to
14     present, did you communicate with a
15     person named Frank Carone via e-mail?
16                     MS. SKLYUT:  Objection.
17                     I instruct the witness not
18          to answer on the grounds of the
19          Fifth Amendment privilege against
20          self-incrimination.
21          A.        On the advice of counsel, I
22     invoke my Fifth Amendment right and
23     respectfully decline to answer.
24          Q.        From January 2018 to
25     present, did you communicate with anyone

```
                                          Page 25
 1              Yevsey Tseytelman
 2     affiliated with FBH Capital Group, LLC
 3     via e-mail?
 4                  MS. SKLYUT:  Objection.
 5                  I instruct the witness not
 6        to answer on the grounds of the
 7        Fifth Amendment privilege against
 8        self-incrimination.
 9        A.      On the advice of counsel, I
10     invoke my Fifth Amendment right and
11     respectfully decline to answer.
12        Q.      From January 2018 to
13     present, did you communicate with anyone
14     affiliated with FHJ Vision Partners, LLC
15     via e-mail?
16                  MS. SKLYUT:  Objection.
17                  I instruct the witness not
18        to answer on the grounds of the
19        Fifth Amendment privilege against
20        self-incrimination.  Of.
21        A.      On the advice of counsel, I
22     invoke my Fifth Amendment right and
23     respectfully decline to answer.
24        Q.      Do you have a cell phone?
25        A.      Yes.
```

```
                                        Page 26

 1                    Yevsey Tseytelman
 2         Q.         Have you used --
 3                    MS. SKLYUT:  Can we take a
 4         break for a minute?
 5                    MS. ROSENBLATT:  Sure.
 6                    MS. SKLYUT:  Thank you.
 7                    (A break was taken at this
 8         time.)
 9         Q.         What's your cell phone
10    number?
11         A.         (917)597-2229.
12         Q.         From January 2018 to the
13    present, has that always been your cell
14    phone number?
15         A.         Yes.
16         Q.         From January 2018 to
17    present, has anyone had access to that
18    cell phone aside from you?  Well,
19    withdrawn.
20                    From January 2018 to
21    present, did anyone make calls on that
22    cell phone aside from you?
23                    MS. SKLYUT:  Whatever the
24         answer is.
25         A.         I don't recall.  I don't
```

```
                                                Page 27
 1                 Yevsey Tseytelman
 2      think so.
 3           Q.       From January 2018 to
 4      present, have you had any business phone
 5      numbers?
 6           A.       No.
 7           Q.       From January 2018 to
 8      present, did you use your cell phone to
 9      communicate with Dr. Kelly, Robert Kelly,
10      M.D.?
11                    MS. SKLYUT:   Objection.
12                    I instruct the witness not
13          to answer on the grounds of the
14          Fifth Amendment privilege against
15          self-incrimination.
16           A.       On the advice of counsel, I
17      invoke my Fifth Amendment right and
18      respectfully decline to answer.
19           Q.       During that same time frame
20      from January 2018 to present, did you use
21      your cell phone to communicate with
22      anyone affiliated with Harbor Medical
23      Group?
24                    MS. SKLYUT:   Objection.
25                    I instruct the witness not
```

```
                                      Page 28

 1              Yevsey Tseytelman
 2         to answer on the grounds of the
 3         Fifth Amendment privilege against
 4         self-incrimination.
 5         A.      On the advice of counsel, I
 6    invoke my Fifth Amendment right and
 7    respectfully decline to answer.
 8         Q.      From January 2018 to
 9    present, did you use your cell phone to
10    communicate with anyone affiliated with
11    Confident Services?
12              MS. SKLYUT:  Objection.
13              I instruct the witness not
14         to answer on the grounds of the
15         Fifth Amendment privilege against
16         self-incrimination.
17         A.      On the advice of counsel, I
18    invoke my Fifth Amendment right and
19    respectfully decline to answer.
20         Q.      From January 2018 to
21    present, did you use your cell phone to
22    communicate with anyone affiliated with
23    Coastal Medical?
24              MS. SKLYUT:  Objection.
25              I instruct the witness not
```

```
                                        Page 29

 1               Yevsey Tseytelman
 2          to answer on the grounds of the
 3          Fifth Amendment privilege against
 4          self-incrimination.
 5          A.      On the advice of counsel, I
 6      invoke my Fifth Amendment right and
 7      respectfully decline to answer.
 8          Q.      From January 2018 to
 9      present, did you use your cell phone to
10      communicate with anyone affiliated with
11      Financial Vision Group, LLC?
12                  MS. SKLYUT:  Objection.
13                  I instruct the witness not
14          to answer on the grounds of the
15          Fifth Amendment privilege against
16          self-incrimination.
17          A.      On the advice of counsel, I
18      invoke my Fifth Amendment right and
19      respectfully decline to answer.
20          Q.      From January 2018 to
21      present, did you use your cell phone to
22      communicate with anyone affiliated with
23      Financial Vision Group II, LLC?
24                  MS. SKLYUT:  Objection.
25                  I instruct the witness not
```

```
                                              Page 30
 1                Yevsey Tseytelman
 2          to answer on the grounds of the
 3          Fifth Amendment privilege against
 4          self-incrimination.
 5          A.      On the advice of counsel, I
 6     invoke my Fifth Amendment right and
 7     respectfully decline to answer.
 8          Q.      From January 2018 to
 9     present, did you use your cell phone to
10     communicate with anyone affiliated with
11     Financial Vision Group III?
12                  MS. SKLYUT:  Objection.
13                  I instruct the witness not
14          to answer on the grounds of the
15          Fifth Amendment privilege against
16          self-incrimination.
17          A.      On the advice of counsel, I
18     invoke my Fifth Amendment right and
19     respectfully decline to answer.
20          Q.      From January 2018 to
21     present, did you use your cell phone to
22     communicate with anyone affiliated with
23     Financial Vision Group IV?
24                  MS. SKLYUT:  Objection.
25                  I instruct the witness not
```

```
                                    Page 31
 1             Yevsey Tseytelman
 2        to answer on the grounds of the
 3        Fifth Amendment privilege against
 4        self-incrimination.
 5        A.        On the advice of counsel, I
 6   invoke my Fifth Amendment right and
 7   respectfully decline to answer.
 8        Q.        From January 2018 to
 9   present, did you use your cell phone to
10   communicate with Jordan Fensterman?
11             MS. SKLYUT:  Objection.
12             I instruct the witness not
13        to answer on the grounds of the
14        Fifth Amendment privilege against
15        self-incrimination.
16        A.        On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19        Q.        From January 2018 to
20   present, did you use your cell phone to
21   communicate with Howard Fensterman?
22             MS. SKLYUT:  Objection.
23             I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against
```

```
                                        Page 32

 1                  Yevsey Tseytelman
 2          self-incrimination.
 3          A.        On the advice of counsel, I
 4     invoke my Fifth Amendment right and
 5     respectfully decline to answer.
 6          Q.        From January 2018 to
 7     present, did you use your cell phone to
 8     communicate with Frank Carone?
 9                  MS. SKLYUT:  Objection.
10                  I instruct the witness not
11          to answer on the grounds of the
12          Fifth Amendment privilege against
13          self-incrimination.
14          A.        On the advice of counsel, I
15     invoke my Fifth Amendment right and
16     respectfully decline to answer.
17          Q.        From January 2018 to
18     present, did you use your cell phone to
19     communicate with anyone affiliated with
20     FBH Capital Group LLC?
21                  MS. SKLYUT:  Objection.
22                  I instruct the witness not
23          to answer on the grounds of the
24          Fifth Amendment privilege against
25          self-incrimination.
```

```
                                              Page 33

 1                    Yevsey Tseytelman
 2        A.        On the advice of counsel, I
 3   invoke my Fifth Amendment right and
 4   respectfully decline to answer.
 5        Q.        From January 2018 to
 6   present, did you use your cell phone to
 7   communicate with anyone affiliated with
 8   FHJ Vision Partners?
 9                  MS. SKLYUT:  Objection.
10                  I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination.
14        A.        On the advice of counsel, I
15   invoke my Fifth Amendment right and
16   respectfully decline to answer.
17        Q.        Other than this lawsuit,
18   have you ever had any lawsuits or claims
19   brought against you?
20        A.        No.
21        Q.        Isn't it true you were
22   previously sued by GEICO?
23                  THE INTERPRETER:  I'm sorry?
24        Q.        Isn't it true you were
25   previously sued by GEICO?
```

```
                                        Page 34

 1              Yevsey Tseytelman
 2              MS. SKLYUT:  You have to
 3      answer the question.  Yes or no.  You
 4      can say yes or no.  So, answer the
 5      question.
 6       A.      Don't recall.
 7              MS. SKLYUT:  Let me have a
 8      minute with my client.
 9              MS. ROSENBLATT:  Okay.
10              (A break was taken at this
11      time.)
12       Q.      I'll just reask the
13      question.
14              Isn't it true that you were
15      previously sued by GEICO?
16       A.      Not that I recall.  I don't
17      think so.
18       Q.      Isn't it true that you were
19      previously sued by Allstate?
20       A.      Don't recall.
21              MS. ROSENBLATT:  I'm going
22      to circulate two additional exhibits,
23      and I'm going to display them on my
24      screen.
25              I'm showing what I'm asking
```

```
                                        Page 35

 1                 Yevsey Tseytelman
 2          to be marked as Plaintiff's Exhibit
 3          2.   It's a 34-page document.   It's a
 4          Complaint, GEICO against Leomax
 5          Supplies, Inc., Yevsey Tseytelman and
 6          some other defendants.
 7                  (The above-referred-to
 8          document was marked as Plaintiff's
 9          Exhibit 2 for identification as of
10          this date.)
11          A.     What year is this?
12          Q.     It was filed in 2019.
13          A.     It's possible, seeing that
14     there's a document to that.   It's been
15     six years.
16          Q.     Okay.   The Yevsey Tseytelman
17     identified in this caption is you, right?
18          A.     Yes.
19          Q.     GEICO alleged in this
20     Complaint that you were involved in a
21     scheme to defraud them, correct?
22                  MS. SKLYUT:   Answer the
23          question.
24          A.     Well, probably, if it says
25     so.
```

```
                                              Page 36

 1                    Yevsey Tseytelman

 2          Q.        Okay.

 3                    MS. ROSENBLATT:  I'm

 4          displaying on the screen what's being

 5          marked as Plaintiff's Exhibit 3.

 6          This is a 303-page document.

 7                    It's a Complaint filed by

 8          Allstate Insurance Company against

 9          Mr. Tseytelman and others.

10                    (The above-referred-to

11          document was marked as Plaintiff's

12          Exhibit 3 for identification as of

13          this date.)

14          Q.        Do you see this document on

15     your screen?

16          A.        Yeah.

17          Q.        Is Yevsey Tseytelman named

18     in this Complaint is also you, right?

19          A.        Yes.

20                    MS. ROSENBLATT:  I'm going

21          to stop sharing the screen.

22          Q.        You were previously sued by

23     GEICO and Allstate?

24          A.        Yes.

25          Q.        Have you ever testified
```

```
                                              Page 37

 1                    Yevsey Tseytelman

 2     before?

 3          A.       No.

 4          Q.       Have you ever pled guilty to

 5     a crime?

 6          A.       No.

 7          Q.       To your knowledge, have you

 8     ever been the subject of a criminal

 9     investigation?

10                   MS. SKLYUT:  If you know.

11          A.       No.

12          Q.       Have any of your companies

13     ever filed for bankruptcy?

14          A.       I filed for personal

15     bankruptcy.

16          Q.       Okay.  Have you filed for

17     bankruptcy on behalf of any of your

18     companies?

19          A.       No.

20          Q.       Where did you file for

21     bankruptcy?

22          A.       New Jersey.

23          Q.       Have you ever had any tax

24     liens issued against you?

25                   THE INTERPRETER:  Did you
```

```
                                            Page 38
 1              Yevsey Tseytelman
 2       say tax liens?
 3                  MS. ROSENBLATT:  Right.
 4                  THE INTERPRETER:  Okay.
 5       A.        No.
 6       Q.        Have you ever had any tax
 7   liens filed against any companies you
 8   owned?
 9       A.        No.
10       Q.        Are you currently employed?
11       A.        No.
12       Q.        When were you last employed?
13       A.        I don't recall.
14                  MS. SKLYUT:  Whatever the
15         question is, answer it.  You already
16         answered it.
17       A.        If it could be more specific
18   as to being employed.  I'm self-employed.
19       Q.        Are you currently
20   self-employed?
21       A.        Yes.
22       Q.        What kind of work do you do
23   now?
24                  MS. SKLYUT:  Answer.
25                  THE INTERPRETER:  I don't
```

Page 39

                    Yevsey Tseytelman

1          know what they're saying.  I can't

2          hear a word.

3                  MS. ROSENBLATT:  I don't

4          think he's answered yet.  I think

5          they're just talking to each other.

6                  THE INTERPRETER:  Okay.

7                  MS. SKLYUT:  You have to

8          answer the question.  Just explain,

9          just general.  Just give an answer

10         what you do.

11         A.     A consulting company.

12                 MS. SKLYUT:  Let me speak to

13         my client.  We need a break.

14                 MS. ROSENBLATT:  Okay.

15                 (A break was taken at this

16         time.)

17                 MS. ROSENBLATT:  Is the last

18         answer on the record?

19                 (The requested portion was

20         read back by the Court Reporter.)

21         Q.     What's the name of the

22    consulting company?

23         A.     GMO Consulting, LLC.

24         Q.     Are you self-employed

```
                                              Page 40

 1                    Yevsey Tseytelman
 2      working for any companies other than GMO
 3      Consulting currently?
 4           A.        No.  No other companies.
 5      Even this company, I'm on the verge of
 6      closing down.  I'm retiring.
 7           Q.        From 2018 to present, did
 8      you own any other companies?
 9           A.        Well, there was this company
10      Leomax, but it's been closed a while and
11      there's nothing else.
12           Q.        Did you previously own a
13      company called Ezra Supply, Inc.?
14           A.        No.  Never heard of them.
15           Q.        What about a company called
16      AMG Management, Inc.?
17           A.        Yes.  I owned the company.
18      It's not been around since 2019.
19           Q.        Aside from GMO Consulting,
20      Leomax, and AMG Management, did you own
21      any other companies from 2018 to present?
22                    THE INTERPRETER:  What's the
23          third one?
24                    MS. ROSENBLATT:  AMG
25          Management.
```

```
                                              Page 41

  1                 Yevsey Tseytelman

  2        A.      No.

  3        Q.      Were you a member of any

  4   LLCs, aside from GMO Consulting, from

  5   January 2018 to present?

  6        A.      No.

  7        Q.      Did you have a financial

  8   interest in any other companies?

  9        A.      No.

 10        Q.      Are you the sole member of

 11   GMO Consulting, LLC?

 12        A.      Yes.

 13        Q.      Did you form the company?

 14        A.      Yes.

 15        Q.      Did you file the paperwork

 16   to form the company yourself or did

 17   someone assist you?

 18        A.      I don't recall.  It has been

 19   a while.

 20        Q.      When was the company formed?

 21        A.      2018 or 2019.  I don't

 22   remember.

 23        Q.      Does it have a business

 24   address?

 25        A.      Yes.  I don't recall the
```

```
                                           Page 42
 1                    Yevsey Tseytelman
 2      address off the top of my head.  I have a
 3      PO box there.  It's on Coney Island
 4      Avenue in Brooklyn.
 5           Q.      What kind of work do you do
 6      at the business address?
 7           A.      This address is only for my
 8      correspondence, bills and statements.
 9           Q.      What type of company is GMO
10      Consulting?
11           A.      I don't get the question.
12           Q.      What kind of work does it --
13      well, withdrawn.
14                   Does it provide any goods or
15      services?
16                   MS. SKLYUT:  Answer the
17         question.
18           A.      Well, yeah.  We provide
19      consulting services, particularly
20      concerning supplies.  I used to own a
21      supply company.
22           Q.      From 2018 to present, who
23      were GMO Consulting's clients?
24                   MS. SKLYUT:  Objection.
25                   I instruct the witness not
```

```
                                          Page 43

 1              Yevsey Tseytelman
 2          to answer on the grounds of the
 3          Fifth Amendment privilege against
 4          self-incrimination.  Instruct my
 5          witness not to answer.
 6          A.        On the advice of counsel, I
 7      invoke my Fifth Amendment right and
 8      respectfully decline to answer.
 9          Q.        From January 2018 to
10      present, has GMO Consulting had any
11      employees?
12                    MS. SKLYUT:  Objection.
13                    I instruct the witness not
14          to answer on the grounds of the
15          Fifth Amendment privilege against
16          self-incrimination.
17          A.        On the advice of counsel, I
18      invoke my Fifth Amendment right and
19      respectfully decline to answer.
20          Q.        From January 2018 to
21      present, has GMO Consulting maintained
22      any business records?
23                    MS. SKLYUT:  Objection.
24                    I instruct the witness not
25          to answer on the grounds of the
```

```
                                         Page 44

 1                   Yevsey Tseytelman
 2          Fifth Amendment privilege against
 3          self-incrimination.
 4          A.        On the advice of counsel, I
 5      invoke my Fifth Amendment right and
 6      respectfully decline to answer.
 7          Q.        From January 2018 to
 8      present, has GMO Consulting had a
 9      business phone number?
10          A.        On the advice of counsel, I
11      invoke my Fifth Amendment right and
12      respectfully decline to answer.
13          Q.        From January 2018 to
14      present, has GMO Consulting had a
15      business e-mail address?
16                   MS. SKLYUT:  Objection.
17                   I instruct the witness not
18          to answer on the grounds of the
19          Fifth Amendment privilege against
20          self-incrimination.
21          A.        On the advice of counsel, I
22      invoke my Fifth Amendment right and
23      respectfully decline to answer.
24          Q.        Are you familiar with a
25      person named Robert Kelly?
```

Page 45

```
 1              Yevsey Tseytelman
 2                   MS. SKLYUT:  Objection.
 3                   I instruct the witness not
 4        to answer on the grounds of the
 5        Fifth Amendment privilege against
 6        self-incrimination.
 7        A.        On the advice of counsel, I
 8   invoke my Fifth Amendment right and
 9   respectfully decline to answer.
10        Q.        From January 2018 to
11   present, did GMO Consulting provide any
12   legitimate goods or services to
13   Dr. Kelly?
14                   MS. SKLYUT:  Objection.
15                   I instruct the witness not
16        to answer on the grounds of the
17        Fifth Amendment privilege against
18        self-incrimination.
19        A.        On the advice of counsel, I
20   invoke my Fifth Amendment right and
21   respectfully decline to answer.
22        Q.        From January 2018 to
23   present, did GMO Consulting provide any
24   legitimate goods or services to Harbor
25   Medical Group, P.C.?
```

```
                                              Page 46

 1                  Yevsey Tseytelman

 2                  MS. SKLYUT:  Objection.

 3                  I instruct the witness not

 4           to answer on the grounds of the

 5           Fifth Amendment privilege against

 6           self-incrimination.

 7           A.      On the advice of counsel, I

 8      invoke my Fifth Amendment right and

 9      respectfully decline to answer.

10           Q.      From January 2018 to

11      prepare, did GMO Consulting provide any

12      legitimate goods or services to Confident

13      Medical Services, P.C.?

14                  MS. SKLYUT:  Objection.

15                  I instruct the witness not

16           to answer on the grounds of the

17           Fifth Amendment privilege against

18           self-incrimination.

19           A.      On the advice of counsel, I

20      invoke my Fifth Amendment right and

21      respectfully decline to answer.

22           Q.      From January 2018 to

23      present, did GMO Consulting provide any

24      legitimate goods or services to Confident

25      Medical Services, P.C.?
```

Page 47

```
 1                    Yevsey Tseytelman
 2               MS. SKLYUT:  Objection.
 3               I instruct the witness not
 4          to answer on the grounds of the
 5          Fifth Amendment privilege against
 6          self-incrimination.
 7      A.        On the advice of counsel, I
 8      invoke my Fifth Amendment right and
 9      respectfully decline to answer.
10               (Reporter clarification.)
11      Q.        Did GMO Consulting provide
12      any legitimate goods or services to
13      Coastal Medical, P.C.?
14               MS. SKLYUT:  Objection.
15               I instruct the witness not
16          to answer on the grounds of the
17          Fifth Amendment privilege against
18          self-incrimination.
19      A.        On the advice of counsel, I
20      invoke my Fifth Amendment right and
21      respectfully decline to answer.
22               MS. ROSENBLATT:  I'm going
23          to circulate another exhibit.  I'm
24          sharing my screen with what I'm
25          asking to have marked as Plaintiff's
```

Page 48

1                    Yevsey Tseytelman

2         Exhibit 4.  This is a 4-page

3         document.  It's the formation records

4         for GMO Consulting.

5                    (The above-referred-to

6         document was marked as Plaintiff's

7         Exhibit 4 for identification as of

8         this date.)

9         Q.        I'm scrolling down to the

10   bottom of page 1.

11         A.        Uh-huh.

12         Q.        You're identified as the

13   agent for the service of process,

14   correct?

15         A.        Well, yes.

16         Q.        And this address, 199 Union

17   Hill Road, Manalapan, what is that

18   location used for in connection with GMO

19   Consulting?

20         A.        That was my residence at the

21   time, meaning the house that was

22   foreclosed.

23         Q.        Did you operate GMO

24   Consulting from that address?

25         A.        Yes.

```
                                                    Page 49

 1                 Yevsey Tseytelman
 2         Q.        What did you use it for in
 3     connection with GMO Consulting?
 4                   THE INTERPRETER:  The
 5         address?
 6                   MS. ROSENBLATT:  Right.
 7                   THE INTERPRETER:  Okay.
 8         A.        Well, I had an office there
 9     complete with a computer station.
10         Q.        Did you use that location
11     for any legitimate business purpose?
12                   MS. SKLYUT:  Objection.
13                   I instruct the witness not
14         to answer on the grounds of the
15         Fifth Amendment privilege against
16         self-incrimination.
17         A.        On the advice of counsel, I
18     invoke my Fifth Amendment right and
19     respectfully decline to answer.
20                   MS. ROSENBLATT:  I'm going
21         to stop sharing the screen.
22         Q.        From January 2018 to the
23     present, has GMO Consulting had a bank
24     account?
25                   MS. SKLYUT:  Objection.
```

```
                                          Page 50

 1              Yevsey Tseytelman

 2                   I instruct the witness not

 3         to answer on the grounds of the

 4         Fifth Amendment privilege against

 5         self-incrimination.

 6         A.      On the advice of counsel, I

 7    invoke my Fifth Amendment right and

 8    respectfully decline to answer.

 9         Q.      How many bank accounts has

10    GMO Consulting had from January 2018 to

11    the present?

12                   MS. SKLYUT:  Objection.

13                   I instruct the witness not

14         to answer on the grounds of the

15         Fifth Amendment privilege against

16         self-incrimination.

17         A.      On the advice of counsel, I

18    invoke my Fifth Amendment right and

19    respectfully decline to answer.

20         Q.      Where was the corporate bank

21    account opened?

22                   MS. SKLYUT:  Objection.

23                   I instruct the witness not

24         to answer on the grounds of the

25         Fifth Amendment privilege against
```

```
                                         Page 51
 1                Yevsey Tseytelman
 2        self-incrimination.
 3        A.        On the advice of counsel, I
 4     invoke my Fifth Amendment right and
 5     respectfully decline to answer.
 6        Q.        Isn't it true there was at
 7     least one corporate account for GMO
 8     Consulting opened at Wells Fargo?
 9                MS. SKLYUT:  Objection.
10                I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination.
14        A.        On the advice of counsel, I
15     invoke my Fifth Amendment right and
16     respectfully decline to answer.
17        Q.        Who opened the account?
18                MS. SKLYUT:  Objection.
19                I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.        On the advice of counsel, I
24     invoke my Fifth Amendment right and
25     respectfully decline to answer.
```

```
                                          Page 52

 1                    Yevsey Tseytelman
 2         Q.        Who's listed as the
 3    signatory on the GMO Consulting corporate
 4    account at Wells Fargo?
 5                   MS. SKLYUT:  Objection.
 6                   I instruct the witness not
 7         to answer on the grounds of the
 8         Fifth Amendment privilege against
 9         self-incrimination.
10         A.        On the advice of counsel, I
11    invoke my Fifth Amendment right and
12    respectfully decline to answer.
13         Q.        Are you listed as a
14    signatory on that account?
15                   MS. SKLYUT:  Objection.
16                   I instruct the witness not
17         to answer on the grounds of the
18         Fifth Amendment privilege against
19         self-incrimination.
20         A.        On the advice of counsel, I
21    invoke my Fifth Amendment right and
22    respectfully decline to answer.
23         Q.        Who is authorized to make
24    withdrawals from that account?
25                   MS. SKLYUT:  Objection.
```

Page 53

1              Yevsey Tseytelman
2                   I instruct the witness not
3          to answer on the grounds of the
4          Fifth Amendment privilege against
5          self-incrimination.
6          A.      On the advice of counsel, I
7      invoke my Fifth Amendment right and
8      respectfully decline to answer.
9          Q.      Who's authorized to issue
10     checks from that account?
11                  MS. SKLYUT:  Objection.
12                  I instruct the witness not
13         to answer on the grounds of the
14         Fifth Amendment privilege against
15         self-incrimination.
16         A.      On the advice of counsel, I
17     invoke my Fifth Amendment right and
18     respectfully decline to answer.
19         Q.      Who's authorized to issue
20     wire transfers from the corporate bank
21     account for GMO Consulting?
22                  MS. SKLYUT:  Objection.
23                  I instruct the witness not
24         to answer on the grounds of the
25         Fifth Amendment privilege against

```
                                              Page 54

 1                    Yevsey Tseytelman
 2          self-incrimination.
 3          A.        On the advice of counsel, I
 4     invoke my Fifth Amendment right and
 5     respectfully decline to answer.
 6          Q.        Who's authorized to issue
 7     electronic payments from that account?
 8                    MS. SKLYUT:  Objection.
 9                    I instruct the witness not
10          to answer on the grounds of the
11          Fifth Amendment privilege against
12          self-incrimination.
13          A.        On the advice of counsel, I
14     invoke my Fifth Amendment right and
15     respectfully decline to answer.
16          Q.        From January 2018 to the
17     present, who has withdrawn money from
18     that account?
19                    MS. SKLYUT:  Objection.
20                    I instruct the witness not
21          to answer on the grounds of the
22          Fifth Amendment privilege against
23          self-incrimination.
24          A.        On the advice of counsel, I
25     invoke my Fifth Amendment right and
```

Page 55

1          Yevsey Tseytelman
2     respectfully decline to answer.
3          Q.      From January 2018 to
4     present, who has written checks out of
5     the account?
6               MS. SKLYUT:  Objection.
7               I instruct the witness not
8          to answer on the grounds of the
9          Fifth Amendment privilege against
10         self-incrimination.
11         A.      On the advice of counsel, I
12    invoke my Fifth Amendment right and
13    respectfully decline to answer.
14         Q.      From January 2018 to
15    present, who has issued wire transfers
16    from that account?
17              MS. SKLYUT:  Objection.
18              I instruct the witness not
19         to answer on the grounds of the
20         Fifth Amendment privilege against
21         self-incrimination.
22         A.      On the advice of counsel, I
23    invoke my Fifth Amendment right and
24    respectfully decline to answer.
25         Q.      From January 2018 to

Page 56

```
 1              Yevsey Tseytelman
 2     present, who has issued electronic
 3     payments from that account?
 4              MS. SKLYUT:  Objection.
 5              I instruct the witness not
 6        to answer on the grounds of the
 7        Fifth Amendment privilege against
 8        self-incrimination.
 9        A.      On the advice of counsel, I
10     invoke my Fifth Amendment right and
11     respectfully decline to answer.
12        Q.      Who controls that bank
13     account?
14              MS. SKLYUT:  Objection.
15              I instruct the witness not
16        to answer on the grounds of the
17        Fifth Amendment privilege against
18        self-incrimination.
19        A.      On the advice of counsel, I
20     invoke my Fifth Amendment right and
21     respectfully decline to answer.
22        Q.      Isn't it true that you
23     control the corporate bank account for
24     GMO Consulting?
25              MS. SKLYUT:  Objection.
```

```
                                                    Page 57

1              Yevsey Tseytelman

2                   I instruct the witness not

3         to answer on the grounds of the

4         Fifth Amendment privilege against

5         self-incrimination.

6         A.        On the advice of counsel, I

7    invoke my Fifth Amendment right and

8    respectfully decline to answer.

9                   MS. ROSENBLATT:  I'm

10        circulating another exhibit.  I'm

11        sharing my screen with what I'm

12        asking to be marking as Plaintiff's

13        Exhibit 5.  It's a one-page document.

14        It's the business account application

15        for GMO Consulting account at Wells

16        Fargo.

17                  (The above-referred-to

18        document was marked as Plaintiff's

19        Exhibit 5 for identification as of

20        this date.)

21        Q.        This is the application for

22    the account ending in 7062.  Do you see

23    that?

24        A.        Yes.

25        Q.        Customer one name is GMO
```

Page 58

```
 1              Yevsey Tseytelman
 2    Consulting?
 3         A.      Yes.
 4         Q.      Customer two is Yevsey
 5    Tseytelman.  That's you, right?
 6         A.      Yes.
 7         Q.      This statement address, 2661
 8    Coney Island Avenue, was that the address
 9    you couldn't recall earlier?
10         A.      Yes, yes, yes.
11              MS. ROSENBLATT:  Okay.  All
12         right.  I'm going to stop sharing the
13         screen.
14         Q.      From January 2018 to
15    present, who has decided what payments
16    were issued from that account?
17              MS. SKLYUT:  Objection.
18              I instruct the witness not
19         to answer on the grounds of the
20         Fifth Amendment privilege against
21         self-incrimination.
22         A.      On the advice of counsel, I
23    invoke my Fifth Amendment right and
24    respectfully decline to answer.
25         Q.      From January 2018 to
```

```
                                              Page 59
 1                  Yevsey Tseytelman
 2      present, who has decided how much money
 3      was distributed from that account?
 4                  MS. SKLYUT:  Objection.
 5                      I instruct the witness not
 6          to answer on the grounds of the
 7          Fifth Amendment privilege against
 8          self-incrimination.
 9          A.      On the advice of counsel, I
10      invoke my Fifth Amendment right and
11      respectfully decline to answer.
12          Q.      Did you distribute money
13      from that account at the direction of
14      another individual?
15                  MS. SKLYUT:  Objection.
16                      I instruct the witness not
17          to answer on the grounds of the
18          Fifth Amendment privilege against
19          self-incrimination.
20          A.      On the advice of counsel, I
21      invoke my Fifth Amendment right and
22      respectfully decline to answer.
23          Q.      Did you issue payments from
24      that account at the direction of another
25      individual?
```

```
                                        Page 60
1              Yevsey Tseytelman
2                 MS. SKLYUT:  Objection.
3                 I instruct the witness not
4        to answer on the grounds of the
5        Fifth Amendment privilege against
6        self-incrimination.
7        A.      On the advice of counsel, I
8   invoke my Fifth Amendment right and
9   respectfully decline to answer.
10       Q.      Did you issue payments from
11  that account at Alexandr Zaitsev's
12  direction?
13                MS. SKLYUT:  Objection.
14                I instruct the witness not
15       to answer on the grounds of the
16       Fifth Amendment privilege against
17       self-incrimination.
18       A.      On the advice of counsel, I
19  invoke my Fifth Amendment right and
20  respectfully decline to answer.
21       Q.      Did you distribute money
22  from that account at Alexandr Zaitsev's
23  direction?
24                MS. SKLYUT:  Objection.
25                I instruct the witness not
```

Page 61

1              Yevsey Tseytelman
2         to answer on the grounds of the
3         Fifth Amendment privilege against
4         self-incrimination.
5         A.      On the advice of counsel, I
6    invoke my Fifth Amendment right and
7    respectfully decline to answer.
8         Q.      Did you issue payments from
9    that account at Daniel Kandhorov's
10   direction?
11              MS. SKLYUT:  Objection.
12              I instruct the witness not
13         to answer on the grounds of the
14         Fifth Amendment privilege against
15         self-incrimination.
16         A.      On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19         Q.      Did you distribute money
20   from that account at Daniel Kandhorov's
21   direction?
22              MS. SKLYUT:  Objection.
23              I instruct the witness not
24         to answer on the grounds of the
25         Fifth Amendment privilege against

Page 62

1              Yevsey Tseytelman
2        self-incrimination.
3        A.      On the advice of counsel, I
4    invoke my Fifth Amendment right and
5    respectfully decline to answer.
6        Q.      Did you issue payments from
7    that accounts at Mark Kaminar's
8    direction?
9              MS. SKLYUT:  Objection.
10             I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination.
14        A.      On the advice of counsel, I
15    invoke my Fifth Amendment right and
16    respectfully decline to answer.
17        Q.      Did you distribute money
18    from that account at Mark Kaminar's
19    direction?
20             MS. SKLYUT:  Objection.
21             I instruct the witness not
22        to answer on the grounds of the
23        Fifth Amendment privilege against
24        self-incrimination.
25        A.      On the advice of counsel, I

```
                                      Page 63
 1                Yevsey Tseytelman
 2      invoke my Fifth Amendment right and
 3      respectfully decline to answer.
 4           Q.      Did you issue payments from
 5      that account at Frank Carone's direction?
 6                   MS. SKLYUT:  Objection.
 7                   I instruct the witness not
 8         to answer on the grounds of the
 9         Fifth Amendment privilege against
10         self-incrimination.
11           A.      On the advice of counsel, I
12      invoke my Fifth Amendment right and
13      respectfully decline to answer.
14           Q.      Did you distribute money
15      from that account at Frank Carone's
16      direction?
17                   MS. SKLYUT:  Objection.
18                   I instruct the witness not
19         to answer on the grounds of the
20         Fifth Amendment privilege against
21         self-incrimination.
22           A.      On the advice of counsel, I
23      invoke my Fifth Amendment right and
24      respectfully decline to answer.
25           Q.      Did you issue payments from
```

```
                                        Page 64
 1                  Yevsey Tseytelman
 2      that account at Jordan Fensterman's
 3      direction?
 4                  MS. SKLYUT:  Objection.
 5                  I instruct the witness not
 6          to answer on the grounds of the
 7          Fifth Amendment privilege against
 8          self-incrimination.
 9          A.      On the advice of counsel, I
10      invoke my Fifth Amendment right and
11      respectfully decline to answer.
12          Q.      Did you distribute money
13      from that account at Jordan Fensterman's
14      direction?
15                  MS. SKLYUT:  Objection.
16                  I instruct the witness not
17          to answer on the grounds of the
18          Fifth Amendment privilege against
19          self-incrimination.
20          A.      On the advice of counsel, I
21      invoke my Fifth Amendment right and
22      respectfully decline to answer.
23          Q.      Did you issue payments from
24      that account at Howard Fensterman's
25      direction?
```

```
                                              Page 65

 1                    Yevsey Tseytelman

 2                    MS. SKLYUT:  Objection.

 3                    I instruct the witness not

 4          to answer on the grounds of the

 5          Fifth Amendment privilege against

 6          self-incrimination.

 7          A.        On the advice of counsel, I

 8    invoke my Fifth Amendment right and

 9    respectfully decline to answer.

10          Q.        Did you distribute money

11    from that account at Howard Fensterman's

12    direction?

13                    MS. SKLYUT:  Objection.

14                    I instruct the witness not

15          to answer on the grounds of the

16          Fifth Amendment privilege against

17          self-incrimination.

18          A.        On the advice of counsel, I

19    invoke my Fifth Amendment right and

20    respectfully decline to answer.

21          Q.        Did you distribute money

22    from this account at Anthony Benevenga's

23    direction?

24                    MS. SKLYUT:  Objection.

25                    I instruct the witness not
```

Page 66

```
 1              Yevsey Tseytelman
 2        to answer on the grounds of the
 3        Fifth Amendment privilege against
 4        self-incrimination.
 5         A.      On the advice of counsel, I
 6    invoke my Fifth Amendment right and
 7    respectfully decline to answer.
 8         Q.      Did you issue payments from
 9    that account at Anthony Benevenga's
10    direction?
11              MS. SKLYUT:  Objection.
12              I instruct the witness not
13        to answer on the grounds of the
14        Fifth Amendment privilege against
15        self-incrimination.
16         A.      On the advice of counsel, I
17    invoke my Fifth Amendment right and
18    respectfully decline to answer.
19         Q.      Isn't it true GMO Consulting
20    did not provide any legitimate goods or
21    services to Harbor Medical Group, P.C.?
22              MS. SKLYUT:  Objection.
23              I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against
```

Page 67

```
 1              Yevsey Tseytelman
 2         self-incrimination.
 3         A.       On the advice of counsel, I
 4    invoke my Fifth Amendment right and
 5    respectfully decline to answer.
 6         Q.       Isn't it true GMO Consulting
 7    did not provide any legitimate goods or
 8    services to Confident Medical Services,
 9    P.C.?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12         to answer on the grounds of the
13         Fifth Amendment privilege against
14         self-incrimination.
15         A.       On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18         Q.       Isn't it true that GMO
19    Consulting did not provide any legitimate
20    goods or services to Coastal Medical,
21    P.C.?
22              MS. SKLYUT:  Objection.
23              I instruct the witness not
24         to answer on the grounds of the
25         Fifth Amendment privilege against
```

Page 68

```
 1                Yevsey Tseytelman
 2         self-incrimination.
 3         A.        On the advice of counsel, I
 4    invoke my Fifth Amendment right and
 5    respectfully decline to answer.
 6         Q.        Was GMO Consulting, LLC
 7    formed for the sole purpose of laundering
 8    money as part of numerous no-fault fraud
 9    schemes?
10                   MS. SKLYUT:  Objection.
11                   I instruct the witness not
12         to answer on the grounds of the
13         Fifth Amendment privilege against
14         self-incrimination.
15         A.        On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18         Q.        Was GMO Consulting, LLC used
19    to launder the proceeds of a no-fault
20    fraud scheme involving Harbor Medical
21    Group, P.C., Confident Medical Services,
22    P.C. and Coastal Medical, P.C.?
23                   MS. SKLYUT:  Objection.
24                   I instruct the witness not
25         to answer on the grounds of the
```

```
                                        Page 69
 1              Yevsey Tseytelman
 2         Fifth Amendment privilege against
 3         self-incrimination.
 4         A.        On the advice of counsel, I
 5    invoke my Fifth Amendment right and
 6    respectfully decline to answer.
 7         Q.        For the purposes of the
 8    deposition, I'll refer to Harbor Medical
 9    Group, P.C., Confident Medical Services,
10    P.C., and Coastal Medical, P.C. as the PC
11    defendants.  But if you're unsure what
12    I'm talking about, just let me know and
13    I'll clarify.
14              MS. SKLYUT:  Can you clarify
15         what you meant because I don't think
16         he understood.
17              MS. ROSENBLATT:  Sure.
18         Q.        During the deposition, if I
19    say the PC defendants, what I'm referring
20    to is Harbor Medical Group, P.C.,
21    Confident Medical Services, P.C., and
22    Coastal Medical, P.C.
23         A.        Got it.  Fine.
24         Q.        I believe you previously
25    testified that you owned AMG Management,
```

```
                                          Page 70

 1                  Yevsey Tseytelman

 2      Inc.; is that accurate?

 3            A.        Say again.

 4            Q.        Sure.  I think you

 5      previously testified that you own AMG or

 6      owned AMG Management, Inc.; is that

 7      accurate?

 8            A.        Yes.

 9            Q.        Are you the sole owner of

10      AMG Management, Inc.?

11            A.        Yes.

12            Q.        Are you familiar with a

13      person named Lioudmila Kouperman?

14            A.        No.

15            Q.        When did you incorporate

16      AMG Management?

17            A.        Don't recall.

18            Q.        Where did you incorporate

19      it, in what state?

20            A.        In New Jersey, if I'm not

21      mistaken.

22            Q.        I'm sorry.  Say that again.

23            A.        In New Jersey, if I'm not

24      mistaken.

25            Q.        Did you incorporate it on
```

```
                                        Page 71

 1                  Yevsey Tseytelman
 2     your own or did someone assist you?
 3            A.      Don't recall.
 4            Q.      When did you incorporate it,
 5     approximately?
 6            A.      I don't recall.  2017 or
 7     2018.
 8            Q.      What type of company is AMG
 9     Management, Inc.?
10            A.      It's not there anymore.
11            Q.      During the time that it was
12     operating, what type of company was AMG
13     Management?
14                  MS. SKLYUT:  Objection.
15                  I instruct the witness not
16        to answer on the grounds of the
17        Fifth Amendment privilege against
18        self-incrimination.
19            A.      On the advice of counsel, I
20     invoke my Fifth Amendment right and
21     respectfully decline to answer.
22            Q.      When did AMG Management stop
23     operating?
24            A.      If I'm not mistaken, 2019.
25     Maybe 2020.  But most probably 2019.
```

```
                                            Page 72
 1              Yevsey Tseytelman
 2       Q.       Why did it stop operating?
 3              MS. SKLYUT:  Objection.
 4              I instruct the witness not
 5       to answer on the grounds of the
 6       Fifth Amendment privilege against
 7       self-incrimination.
 8       A.       On the advice of counsel, I
 9   invoke my Fifth Amendment right and
10   respectfully decline to answer.
11       Q.       From January 2018 to
12   present, did AMG Management serve any
13   legitimate business purpose?
14              MS. SKLYUT:  Objection.
15              I instruct the witness not
16       to answer on the grounds of the
17       Fifth Amendment privilege against
18       self-incrimination.
19       A.       On the advice of counsel, I
20   invoke my Fifth Amendment right and
21   respectfully decline to answer.
22       Q.       From January 2018 to
23   present, did AMG Management, Inc.,
24   provide any legitimate goods or services?
25              MS. SKLYUT:  Objection.
```

Page 73

```
 1              Yevsey Tseytelman
 2                   I instruct the witness not
 3         to answer on the grounds of the
 4         Fifth Amendment privilege against
 5         self-incrimination.
 6         A.        On the advice of counsel, I
 7    invoke my Fifth Amendment right and
 8    respectfully decline to answer.
 9         Q.        From January 2018 to
10    present, was there a business address
11    associated with AMG Management?
12                   MS. SKLYUT:  Objection.
13                   I instruct the witness not
14         to answer on the grounds of the
15         Fifth Amendment privilege against
16         self-incrimination.
17         A.        On the advice of counsel, I
18    invoke my Fifth Amendment right and
19    respectfully decline to answer.
20         Q.        From January 2018 to
21    present, has AMG Management had any
22    employees?
23                   MS. SKLYUT:  Objection.
24                   I instruct the witness not
25         to answer on the grounds of the
```

Page 74

1                   Yevsey Tseytelman
2           Fifth Amendment privilege against
3           self-incrimination.
4           A.        On the advice of counsel, I
5       invoke my Fifth Amendment right and
6       respectfully decline to answer.
7           Q.        From January 2018 to
8       present, has AMG Management maintained
9       any business records?
10                  MS. SKLYUT:  Objection.
11                  I instruct the witness not
12          to answer on the grounds of the
13          Fifth Amendment privilege against
14          self-incrimination.
15          A.        On the advice of counsel, I
16      invoke my Fifth Amendment right and
17      respectfully decline to answer.
18          Q.        From January 2018 to
19      present, has AMG Management had a
20      business telephone number?
21                  MS. SKLYUT:  Objection.
22                  I instruct the witness not
23          to answer on the grounds of the
24          Fifth Amendment privilege against
25          self-incrimination.

```
                                              Page 75
 1                    Yevsey Tseytelman
 2          A.        On the advice of counsel, I
 3     invoke my Fifth Amendment right and
 4     respectfully decline to answer.
 5          Q.        From January 2018 to
 6     present, has AMG Management had a
 7     business e-mail address?
 8                    MS. SKLYUT:  Objection.
 9                    I instruct the witness not
10          to answer on the grounds of the
11          Fifth Amendment privilege against
12          self-incrimination.
13          A.        On the advice of counsel, I
14     invoke my Fifth Amendment right and
15     respectfully decline to answer.
16          Q.        From January 2018 to
17     present, has AMG Management provided any
18     legitimate goods or services to Robert
19     Kelly, M.D.?
20                    MS. SKLYUT:  Objection.
21                    I instruct the witness not
22          to answer on the grounds of the
23          Fifth Amendment privilege against
24          self-incrimination.
25          A.        On the advice of counsel, I
```

```
                                              Page 76

 1                  Yevsey Tseytelman

 2      invoke my Fifth Amendment right and

 3      respectfully decline to answer.

 4                  MS. ROSENBLATT:  And moving

 5          forward, I'll just refer to him as

 6          Dr. Kelly.

 7          Q.      Has AMG Management, Inc.

 8      ever provided any legitimate -- well,

 9      withdrawn.

10                  Has AMG Management ever

11      provided any legitimate goods or services

12      to the PC defendants?

13                  MS. SKLYUT:  Objection.

14                  I instruct the witness not

15          to answer on the grounds of the

16          Fifth Amendment privilege against

17          self-incrimination.

18          A.      On the advice of counsel, I

19      invoke my Fifth Amendment right and

20      respectfully decline to answer.

21          Q.      From January 2018 to

22      present, has AMG Management had a

23      corporate bank account?

24                  MS. SKLYUT:  Objection.

25                  I instruct the witness not
```

```
                                    Page 77
 1              Yevsey Tseytelman
 2        to answer on the grounds of the
 3        Fifth Amendment privilege against
 4        self-incrimination.
 5        A.       On the advice of counsel, I
 6   invoke my Fifth Amendment right and
 7   respectfully decline to answer.
 8        Q.       Who's listed on the
 9   signature for the corporate bank account
10   for AMG Management?
11                MS. SKLYUT:  Objection.
12                I instruct the witness not
13        to answer on the grounds of the
14        Fifth Amendment privilege against
15        self-incrimination.
16        A.       On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19        Q.       Are you listed as a
20   signatory on the corporate account for
21   AMG Management?
22                MS. SKLYUT:  Objection.
23                I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against
```

```
                                          Page 78

 1                Yevsey Tseytelman

 2          self-incrimination.

 3          A.        On the advice of counsel, I

 4     invoke my Fifth Amendment right and

 5     respectfully decline to answer.

 6          Q.        Isn't it true at least one

 7     corporate bank account for AMG Management

 8     was held at Northfield Bank?

 9                MS. SKLYUT:  Objection.

10                I instruct the witness not

11          to answer on the grounds of the

12          Fifth Amendment privilege against

13          self-incrimination.

14          A.        On the advice of counsel, I

15     invoke my Fifth Amendment right and

16     respectfully decline to answer.

17          Q.        Who's authorized to make

18     withdrawals from the AMG Management

19     corporate bank account?

20                MS. SKLYUT:  Objection.

21                I instruct the witness not

22          to answer on the grounds of the

23          Fifth Amendment privilege against

24          self-incrimination.

25          A.        On the advice of counsel, I
```

Page 79

```
 1              Yevsey Tseytelman
 2    invoke my Fifth Amendment right and
 3    respectfully decline to answer.
 4         Q.      Who's authorized to issue
 5    checks from the corporate bank account
 6    for AMG Management?
 7                 MS. SKLYUT:  Objection.
 8                 I instruct the witness not
 9         to answer on the grounds of the Fifth
10         Amendment privilege against
11         self-incrimination.
12         A.      On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15         Q.      Who's authorized to issue
16    wire transfers from the corporate bank
17    account for AMG management?
18                 MS. SKLYUT:  Objection.
19                 I instruct the witness not
20         to answer on the grounds of the Fifth
21         Amendment privilege against
22         self-incrimination.
23         A.      On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.
```

Page 80

```
 1                    Yevsey Tseytelman
 2         Q.        Who's authorized to issue
 3    electronic payments from the corporate
 4    bank account for AMG Management?
 5                    MS. SKLYUT:  Objection.
 6                    I instruct the witness not
 7         to answer on the grounds of the
 8         Fifth Amendment privilege against
 9         self-incrimination.
10         A.        On the advice of counsel, I
11    invoke my Fifth Amendment right and
12    respectfully decline to answer.
13         Q.        Who's authorized to withdraw
14    money from the corporate bank account for
15    AMG Management?
16                    MS. SKLYUT:  Objection.
17                    I instruct the witness not
18         to answer on the grounds of the
19         Fifth Amendment privilege against
20         self-incrimination.
21         A.        On the advice of counsel, I
22    invoke my Fifth Amendment right and
23    respectfully decline to answer.
24         Q.        Who issues checks from the
25    corporate bank accounts for AMG
```

```
                                    Page 81
 1              Yevsey Tseytelman
 2   Management?
 3              MS. SKLYUT:  Objection.
 4              I instruct the witness not
 5         to answer on the grounds of the
 6         Fifth Amendment privilege against
 7         self-incrimination?
 8         A.      On the advice of counsel, I
 9   invoke my Fifth Amendment right and
10   respectfully decline to answer.
11         Q.      From January 2018 to
12   present, who has issued wire transfers
13   from the corporate bank account for AMG
14   Management?
15              MS. SKLYUT:  Objection.
16              I instruct the witness not
17         to answer on the grounds of the
18         Fifth Amendment privilege against
19         self-incrimination.
20         A.      On the advice of counsel, I
21   invoke my Fifth Amendment right and
22   respectfully decline to answer.
23         Q.      From January 2018 to
24   present, who has issued electronic
25   bank -- withdrawn.
```

```
                                          Page 82

1               Yevsey Tseytelman
2                    From January 2018 to
3       present, who has issued electronic
4       payments from the corporate bank account
5       for AMG Management?
6                    MS. SKLYUT:  Objection.
7                    I instruct the witness not
8           to answer on the grounds of the
9           Fifth Amendment privilege against
10          self-incrimination.
11          A.        On the advice of counsel, I
12      invoke my Fifth Amendment right and
13      respectfully decline to answer.
14          Q.        Who controls the corporate
15      bank accounts for AMG Management?
16                   MS. SKLYUT:  Objection.
17                   I instruct the witness not
18          to answer on the grounds of the
19          Fifth Amendment privilege against
20          self-incrimination.
21          A.        On the advice of counsel, I
22      invoke my Fifth Amendment right and
23      respectfully decline to answer.
24          Q.        Isn't it true that you were
25      a signatory on the corporate bank account
```

```
                                         Page 83

 1                  Yevsey Tseytelman

 2     for AMG Management?

 3                  MS. SKLYUT:  Objection.

 4                  I instruct the witness not

 5          to answer on the grounds of the

 6          Fifth Amendment privilege against

 7          self-incrimination.

 8          A.      On the advice of counsel, I

 9     invoke my Fifth Amendment right and

10     respectfully decline to answer.

11          Q.      Who decides what payments

12     are issued -- well, withdrawn.

13                  From January 2018 to

14     present, who has decided what payments

15     were issued from the corporate bank

16     account for AMG Management?

17                  MS. SKLYUT:  Objection.

18                  I instruct the witness not

19          to answer on the grounds of the

20          Fifth Amendment privilege against

21          self-incrimination.

22          A.      On the advice of counsel, I

23     invoke my Fifth Amendment right and

24     respectfully decline to answer.

25          Q.      From January 2018 to
```

Page 84

1              Yevsey Tseytelman

2    present, whose decided how money was

3    distributed from the corporate bank

4    account for AMG Management?

5              MS. SKLYUT:  Objection.

6              I instruct the witness not

7         to answer on the grounds of the

8         Fifth Amendment privilege against

9         self-incrimination.

10        A.      On the advice of counsel, I

11   invoke my Fifth Amendment right and

12   respectfully decline to answer.

13        Q.      Did you distribute money

14   from the corporate bank account for AMG

15   Management at the direction of another

16   individual?

17              MS. SKLYUT:  Objection.

18              I instruct the witness not

19        to answer on the grounds of the

20        Fifth Amendment privilege against

21        self-incrimination.

22        A.      On the advice of counsel, I

23   invoke my Fifth Amendment right and

24   respectfully decline to answer.

25        Q.      From January 2018 to

```
                                          Page 85
 1              Yevsey Tseytelman
 2     present, did you issue payments from the
 3     corporate bank account for AMG Management
 4     at the direction of another individual?
 5                   MS. SKLYUT:  Objection.
 6                   I instruct the witness not
 7          to answer on the grounds of the
 8          Fifth Amendment privilege against
 9          self-incrimination.
10          A.      On the advice of counsel, I
11     invoke my Fifth Amendment right and
12     respectfully decline to answer.
13          Q.      Did you issue payments from
14     the corporate bank account for AMG
15     Management at Alexandr Zaitsev's
16     direction?
17                   MS. SKLYUT:  Objection.
18                   I instruct the witness not
19          to answer on the grounds of the
20          Fifth Amendment privilege against
21          self-incrimination.
22          A.      On the advice of counsel, I
23     invoke my Fifth Amendment right and
24     respectfully decline to answer.
25                   MS. ROSENBLATT:  As we move
```

```
                                              Page 86
 1                Yevsey Tseytelman
 2         forward, for the purposes of the
 3         deposition I'll just refer to him as
 4         Zaitsev.
 5         Q.      Did you distribute money
 6    from this account at Zaitsev's direction?
 7                 MS. SKLYUT:  Objection.
 8                 I instruct the witness not
 9         to answer on the grounds of the
10         Fifth Amendment privilege against
11         self-incrimination.
12         A.      On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15         Q.      Did you issue payments from
16    this account at Daniel Kandhorov's
17    direction?
18                 MS. SKLYUT:  Objection.
19                 I instruct the witness not
20         to answer on the grounds of the
21         Fifth Amendment privilege against
22         self-incrimination.
23         A.      On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.
```

```
                                          Page 87
 1                Yevsey Tseytelman
 2                    MS. ROSENBLATT:  As we
 3          proceed, I'll just refer to him as
 4          Kandhorov.
 5          Q.       Did you distribute money
 6     from this account at Kandharov's
 7     direction?
 8                    MS. SKLYUT:  Objection.
 9                    I instruct the witness not
10          to answer on the grounds of the
11          Fifth Amendment privilege against
12          self-incrimination.
13          A.       On the advice of counsel, I
14     invoke my Fifth Amendment right and
15     respectfully decline to answer.
16          Q.       Did you issue payments from
17     this account at Mark Kaminar's direction?
18                    MS. SKLYUT:  Objection.
19                    I instruct the witness not
20          to answer on the grounds of the
21          Fifth Amendment privilege against
22          self-incrimination.
23          A.       On the advice of counsel, I
24     invoke my Fifth Amendment right and
25     respectfully decline to answer.
```

```
                                              Page 88

  1                   Yevsey Tseytelman

  2                   MS. ROSENBLATT:  And again,

  3          as we proceed with the deposition

  4          I'll refer to him as Kaminar.

  5          Q.      Did you distribute money

  6      from this account at Kaminar's direction?

  7                   MS. SKLYUT:  Objection.

  8                   I instruct the witness not

  9          to answer on the grounds of the

 10          Fifth Amendment privilege against

 11          self-incrimination.

 12          A.      On the advice of counsel, I

 13      invoke my Fifth Amendment right and

 14      respectfully decline to answer.

 15          Q.      Did you issue payments from

 16      this account at Anthony Benevenga's

 17      direction?

 18                   MS. SKLYUT:  Objection.

 19                   I instruct the witness not

 20          to answer on the grounds of the

 21          Fifth Amendment privilege against

 22          self-incrimination.

 23          A.      On the advice of counsel, I

 24      invoke my Fifth Amendment right and

 25      respectfully decline to answer.
```

```
                                           Page 89

 1                Yevsey Tseytelman
 2                     MS. ROSENBLATT:  And as we
 3            proceed, I'll refer to him as
 4            Benevenga.
 5            Q.       Did you district money from
 6      this account at Benevenga's direction?
 7                     MS. SKLYUT:  Objection.
 8                     I instruct the witness not
 9            to answer on the grounds of the
10            Fifth Amendment privilege against
11            self-incrimination.
12            A.       On the advice of counsel, I
13      invoke my Fifth Amendment right and
14      respectfully decline to answer.
15            Q.       Did you issue payments from
16      this account at Frank Carone's direction?
17                     MS. SKLYUT:  Objection.
18                     I instruct the witness not
19            to answer on the grounds of the
20            Fifth Amendment privilege against
21            self-incrimination.
22            A.       On the advice of counsel, I
23      invoke my Fifth Amendment right and
24      respectfully decline to answer.
25                     MS. ROSENBLATT:  As we
```

```
                                              Page 90
 1                    Yevsey Tseytelman
 2          proceed with the deposition, I'll
 3          refer to him as Carone.
 4          Q.      Did you distribute money
 5      from this account at Carone's direction?
 6                    MS. SKLYUT:  Objection.
 7                    I instruct the witness not
 8          to answer on the grounds of the
 9          Fifth Amendment privilege against
10          self-incrimination.
11          A.      On the advice of counsel, I
12      invoke my Fifth Amendment right and
13      respectfully decline to answer.
14          Q.      Did you issue payments from
15      this account at Jordan Fensterman's
16      direction?
17                    MS. SKLYUT:  Objection.
18                    I instruct the witness not
19          to answer on the grounds of the
20          Fifth Amendment privilege against
21          self-incrimination.
22          A.      On the advice of counsel, I
23      invoke my Fifth Amendment right and
24      respectfully decline to answer.
25          Q.      Did you distribute money
```

```
                                        Page 91

 1                  Yevsey Tseytelman

 2     from this account at Jordan Fensterman's

 3     direction?

 4                  MS. SKLYUT:  Objection.

 5                  I instruct the witness not

 6          to answer on the grounds of the

 7          Fifth Amendment privilege against

 8          self-incrimination.

 9          A.      On the advice of counsel, I

10     invoke my Fifth Amendment right and

11     respectfully decline to answer.

12          Q.      Did you issue payments from

13     this account at Howard Fensterman's

14     direction?

15                  MS. SKLYUT:  Objection.

16                  I instruct the witness not

17          to answer on the grounds of the

18          Fifth Amendment privilege against

19          self-incrimination.

20          A.      On the advice of counsel, I

21     invoke my Fifth Amendment right and

22     respectfully decline to answer.

23          Q.      Did you distribute money

24     from this account at Howard Fensterman's

25     direction?
```

Page 92

1              Yevsey Tseytelman
2                 MS. SKLYUT:  Objection.
3                 I instruct the witness not
4          to answer on the grounds of the
5          Fifth Amendment privilege against
6          self-incrimination.
7          A.      On the advice of counsel, I
8      invoke my Fifth Amendment right and
9      respectfully decline to answer.
10         Q.      Was AMG Management, Inc.
11     formed for the purpose of laundering
12     money as part of numerous no-fault fraud
13     schemes?
14                MS. SKLYUT:  Objection.
15                I instruct the witness not
16         to answer on the grounds of the
17         Fifth Amendment privilege against
18         self-incrimination.
19         A.      On the advice of counsel, I
20     invoke my Fifth Amendment right and
21     respectfully decline to answer.
22         Q.      Was AMG Management, Inc.
23     used to launder the proceeds of a
24     no-fault fraud scheme involving the PC
25     defendants?

```
                                               Page 93

 1                    Yevsey Tseytelman

 2                    MS. SKLYUT:   Objection.

 3                    I instruct the witness not

 4        to answer on the grounds of the

 5        Fifth Amendment privilege against

 6        self-incrimination.

 7        A.        On the advice of counsel, I

 8   invoke my Fifth Amendment right and

 9   respectfully decline to answer.

10        Q.        Do you know a person named

11   Robert Kelly, M.D.?

12        A.        No.

13                    MS. ROSENBLATT:   For the

14        purposes of the deposition, I'll just

15        refer to him as -- I think I said

16        this already -- Dr. Kelly.

17        Q.        To your knowledge, have you

18   ever met Dr. Kelly?

19        A.        No.

20        Q.        To your knowledge, have you

21   ever spoken to Dr. Kelly?

22        A.        No.

23        Q.        Have you ever communicated

24   with Dr. Kelly in any way?

25        A.        No.
```

Page 94

```
 1              Yevsey Tseytelman
 2        Q.        Have you provided any goods
 3    or services to Dr. Kelly?
 4                  THE INTERPRETER:  What
 5        services?
 6                  MS. ROSENBLATT:  Any goods
 7        or services.
 8                  MS. SKLYUT:  Objection.
 9                  I instruct the witness not
10        to answer on the grounds of the
11        Fifth Amendment privilege against
12        self-incrimination.
13        A.        On the advice of counsel, I
14    invoke my Fifth Amendment right and
15    respectfully decline to answer.
16        Q.        Have any of your companies
17    provided goods or services to Dr. Kelly?
18                  MS. SKLYUT:  Objection.
19                  I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.        On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.
```

```
                                        Page 95

 1                 Yevsey Tseytelman
 2         Q.        Are you familiar with Harbor
 3    Medical Group, P.C.?
 4                   MS. SKLYUT:  Objection.
 5                   I instruct the witness not
 6         to answer on the grounds of the
 7         Fifth Amendment privilege against
 8         self-incrimination.
 9         A.        On the advice of counsel, I
10    invoke my Fifth Amendment right and
11    respectfully decline to answer.
12         Q.        Are you familiar with
13    Confident Medical Services, P.C.?
14                   MS. SKLYUT:  Objection.
15                   I instruct the witness not
16         to answer on the grounds of the
17         Fifth Amendment privilege against
18         self-incrimination.
19         A.        On the advice of counsel, I
20    invoke my Fifth Amendment right and
21    respectfully decline to answer.
22         Q.        Are you familiar with
23    Coastal Medical, P.C.?
24                   MS. SKLYUT:  Objection.
25                   I instruct the witness not
```

Page 96

1              Yevsey Tseytelman
2         to answer on the grounds of the
3         Fifth Amendment privilege against
4         self-incrimination.
5         A.      On the advice of counsel, I
6    invoke my Fifth Amendment right and
7    respectfully decline to answer.
8         Q.      Who owns the PC defendants?
9              MS. SKLYUT:  I'm sorry.
10        Could you repeat the question?
11        Q.      Who owns the PC defendants?
12             THE INTERPRETER:  The PC
13        defendant?
14             MS. ROSENBLATT:  Right.
15        Q.      So, who owns Harbor Medical
16   Group, P.C., Confident Medical Services,
17   P.C. and Coastal Medical, P.C.?
18             MS. SKLYUT:  Objection.
19             I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.      On the advice of counsel, I
24   invoke my Fifth Amendment right and
25   respectfully decline to answer.

```
                                    Page 97

 1                  Yevsey Tseytelman
 2         Q.        Who controls the PC
 3    defendants?
 4                   MS. SKLYUT:  Objection.
 5                   I instruct the witness not
 6         to answer on the grounds of the
 7         Fifth Amendment privilege against
 8         self-incrimination.
 9         A.        On the advice of counsel, I
10    invoke my Fifth Amendment right and
11    respectfully decline to answer.
12         Q.        Who derived a financial
13    benefit from the PC defendants?
14                   MS. SKLYUT:  Objection.
15                   I instruct the witness not
16         to answer on the grounds of the
17         Fifth Amendment privilege against
18         self-incrimination.
19         A.        On the advice of counsel, I
20    invoke my Fifth Amendment right and
21    respectfully decline to answer.
22         Q.        Did you derive any financial
23    benefit from the PC defendants?
24                   MS. SKLYUT:  Objection.
25                   I instruct the witness not
```

```
                                              Page 98

 1                    Yevsey Tseytelman
 2            to answer on the grounds of the
 3            Fifth Amendment privilege against
 4            self-incrimination.
 5            A.      On the advice of counsel, I
 6       invoke my Fifth Amendment right and
 7       respectfully decline to answer.
 8            Q.      Have you ever provided any
 9       goods or services to the PC defendants?
10                    MS. SKLYUT:  Objection.
11                    I instruct the witness not
12            to answer on the grounds of the
13            Fifth Amendment privilege against
14            self-incrimination.
15            A.      On the advice of counsel, I
16       invoke my Fifth Amendment right and
17       respectfully decline to answer.
18            Q.      Have any of your companies
19       provided goods or services to the PC
20       defendants?
21                    MS. SKLYUT:  Objection.
22                    I instruct the witness not
23            to answer on the grounds of the
24            Fifth Amendment privilege against
25            self-incrimination.
```

```
                                        Page 99

 1                Yevsey Tseytelman
 2        A.        On the advice of counsel, I
 3   invoke my Fifth Amendment right and
 4   respectfully decline to answer.
 5        Q.        Were you involved in a
 6   no-fault fraud scheme involving the PC
 7   defendants?
 8                  MS. SKLYUT:  Objection.
 9                  I instruct the witness not
10        to answer on the grounds of the
11        Fifth Amendment privilege against
12        self-incrimination.
13        A.        On the advice of counsel, I
14   invoke my Fifth Amendment right and
15   respectfully decline to answer.
16        Q.        How did you get involved in
17   the scheme?
18                  MS. SKLYUT:  Objection.
19                  I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.        On the advice of counsel, I
24   invoke my Fifth Amendment right and
25   respectfully decline to answer.
```

```
                                        Page 100
 1                  Yevsey Tseytelman
 2        Q.        Who recruited you?
 3                  MS. SKLYUT:  Objection.
 4                  I instruct the witness not
 5        to answer on the grounds of the
 6        Fifth Amendment privilege against
 7        self-incrimination.
 8        A.        On the advice of counsel, I
 9     invoke my Fifth Amendment right and
10     respectfully decline to answer.
11        Q.        Did Zaitsev recruit you?
12                  MS. SKLYUT:  Objection.
13                  I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.        On the advice of counsel, I
18     invoke my Fifth Amendment right and
19     respectfully decline to answer.
20        Q.        Did Carone recruit you?
21                  MS. SKLYUT:  Objection.
22                  I instruct the witness not
23        to answer on the grounds of the
24        Fifth Amendment privilege against
25        self-incrimination.
```

```
                                         Page 101
 1                  Yevsey Tseytelman
 2          A.        On the advice of counsel, I
 3     invoke my Fifth Amendment right and
 4     respectfully decline to answer.
 5          Q.        Did Kandhorov recruit you?
 6                    MS. SKLYUT:  Objection.
 7                    I instruct the witness not
 8          to answer on the grounds of the
 9          Fifth Amendment privilege against
10          self-incrimination.
11          A.        On the advice of counsel, I
12     invoke my Fifth Amendment right and
13     respectfully decline to answer.
14          Q.        Did Kaminar recruit you?
15                    MS. SKLYUT:  Objection.
16                    I instruct the witness not
17          to answer on the grounds of the
18          Fifth Amendment privilege against
19          self-incrimination.
20          A.        On the advice of counsel, I
21     invoke my Fifth Amendment right and
22     respectfully decline to answer.
23          Q.        Did Benevenga recruit you?
24                    MS. SKLYUT:  Objection.
25                    I instruct the witness not
```

```
                                        Page 102

 1              Yevsey Tseytelman
 2        to answer on the grounds of the
 3        Fifth Amendment privilege against
 4        self-incrimination.
 5         A.      On the advice of counsel, I
 6    invoke my Fifth Amendment right and
 7    respectfully decline to answer.
 8         Q.      Did Jordan Fensterman
 9    recruit you?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12        to answer on the grounds of the
13        Fifth Amendment privilege against
14        self-incrimination.
15         A.      On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18         Q.      Did Howard Fensterman
19    recruit you?
20              MS. SKLYUT:  Objection.
21              I instruct the witness not
22        to answer on the grounds of the
23        Fifth Amendment privilege against
24        self-incrimination.
25         A.      On the advice of counsel, I
```

Page 103

```
 1              Yevsey Tseytelman
 2     invoke my Fifth Amendment right and
 3     respectfully decline to answer.
 4          Q.      You were recruited as part
 5     of a no-fault fraud scheme involving the
 6     PC defendants, correct?
 7                  MS. SKLYUT:  Objection.
 8                  I instruct the witness not
 9          to answer on the grounds of the
10          Fifth Amendment privilege against
11          self-incrimination.
12          A.      On the advice of counsel, I
13     invoke my Fifth Amendment right and
14     respectfully decline to answer.
15          Q.      You were aware that the PC
16     defendants were owned and controlled by
17     unlicensed individuals?
18                  MS. SKLYUT:  Objection.
19                  I instruct the witness not
20          to answer on the grounds of the
21          Fifth Amendment privilege against
22          self-incrimination.
23          A.      On the advice of counsel, I
24     invoke my Fifth Amendment right and
25     respectfully decline to answer.
```

Page 104

1                      Yevsey Tseytelman
2          Q.        Zaitsev was also involved in
3     the ownership and operation of the PC
4     defendants, correct?
5                    MS. SKLYUT:  Objection.
6                    I instruct the witness not
7          to answer on the grounds of the
8          Fifth Amendment privilege against
9          self-incrimination.
10         A.        On the advice of counsel, I
11    invoke my Fifth Amendment right and
12    respectfully decline to answer.
13         Q.        You were aware that
14    unlicensed individuals derived a
15    financial benefit from the PC defendants?
16                   MS. SKLYUT:  Objection.
17                   I instruct the witness not
18         to answer on the grounds of the
19         Fifth Amendment privilege against
20         self-incrimination.
21         A.        On the advice of counsel, I
22    invoke my Fifth Amendment right and
23    respectfully decline to answer.
24         Q.        You're aware that Zaitsev
25    also derived a financial benefit from the

```
                                          Page 105
 1              Yevsey Tseytelman
 2    PC defendants?
 3                  MS. SKLYUT:  Objection.
 4                  I instruct the witness not
 5          to answer on the grounds of the
 6          Fifth Amendment privilege against
 7          self-incrimination.
 8          A.      On the advice of counsel, I
 9    invoke my Fifth Amendment right and
10    respectfully decline to answer.
11          Q.      You're aware that Kandhorov
12    derived a financial benefit from the PC
13    defendants?
14                  MS. SKLYUT:  Objection.
15                  I instruct the witness not
16          to answer on the grounds of the
17          Fifth Amendment privilege against
18          self-incrimination.
19          A.      On the advice of counsel, I
20    invoke my Fifth Amendment right and
21    respectfully decline to answer.
22          Q.      You're aware that Kaminar
23    derived a financial benefit from the PC
24    defendants?
25                  MS. SKLYUT:  Objection.
```

Page 106

1              Yevsey Tseytelman

2                    I instruct the witness not

3          to answer on the grounds of the

4          Fifth Amendment privilege against

5          self-incrimination.

6          A.        On the advice of counsel, I

7      invoke my Fifth Amendment right and

8      respectfully decline to answer.

9          Q.        You're aware that Benevenga

10     derived a financial benefit from the PC

11     defendants?

12                    MS. SKLYUT:  Objection.

13                    I instruct the witness not

14         to answer on the grounds of the

15         Fifth Amendment privilege against

16         self-incrimination.

17         A.        On the advice of counsel, I

18     invoke my Fifth Amendment right and

19     respectfully decline to answer.

20         Q.        You're aware that Carone

21     derived a financial benefit from the PC

22     defendants?

23                    MS. SKLYUT:  Objection.

24                    I instruct the witness not

25         to answer on the grounds of the

Page 107

1              Yevsey Tseytelman

2         Fifth Amendment privilege against

3         self-incrimination.

4         A.       On the advice of counsel, I

5     invoke my Fifth Amendment right and

6     respectfully decline to answer.

7         Q.       You're aware that Jordan

8     Fensterman derived a financial benefit

9     from the PC defendants?

10                 MS. SKLYUT:  Objection.

11                 I instruct the witness not

12         to answer on the grounds of the

13         Fifth Amendment privilege against

14         self-incrimination.

15        A.       On the advice of counsel, I

16    invoke my Fifth Amendment right and

17    respectfully decline to answer.

18        Q.       You're aware that Howard

19    Fensterman also derived a financial

20    benefit from the PC defendants?

21                 MS. SKLYUT:  Objection.

22                 I instruct the witness not

23         to answer on the grounds of the

24         Fifth Amendment privilege against

25         self-incrimination.

```
                                          Page 108

 1               Yevsey Tseytelman
 2        A.        On the advice of counsel, I
 3    invoke my Fifth Amendment right and
 4    respectfully decline to answer.
 5        Q.        You were recruited to
 6    launder money, correct?
 7                  MS. SKLYUT:  Objection.
 8                  I instruct the witness not
 9        to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12        A.        On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15        Q.        And you did, in fact,
16    launder money in furtherance of the
17    no-fault fraud scheme involving the PC
18    defendants?
19                  MS. SKLYUT:  Objection.
20                  I instruct the witness not
21        to answer on the grounds of the
22        Fifth Amendment privilege against
23        self-incrimination.
24        A.        On the advice of counsel, I
25    invoke my Fifth Amendment right and
```

```
                                          Page 109
 1                  Yevsey Tseytelman
 2      respectfully decline to answer.
 3           Q.         You did so using several
 4      companies that you owned or controlled,
 5      correct?
 6                  MS. SKLYUT:  Could you
 7           repeat the question?
 8           Q.         You laundered money using
 9      the companies that you owned or
10      controlled?
11                  MS. SKLYUT:  Objection.
12                  I instruct the witness not
13           to answer on the grounds of the
14           Fifth Amendment privilege against
15           self-incrimination.
16           A.         On the advice of counsel, I
17      invoke my Fifth Amendment right and
18      respectfully decline to answer.
19           Q.         That includes --
20                  MS. SKLYUT:  He's asking to
21           translate the last question.  Can you
22           please translate the last question.
23                  THE INTERPRETER:  Read it to
24           me.
25           Q.         You laundered money using
```

```
                                        Page 110

 1                  Yevsey Tseytelman

 2      several companies you owned or

 3      controlled?

 4                  MS. SKLYUT:  Objection.

 5                  I instruct the witness not

 6          to answer on the grounds of the

 7          Fifth Amendment privilege against

 8          self-incrimination.

 9          A.      On the advice of counsel, I

10      invoke my Fifth Amendment right and

11      respectfully decline to answer.

12          Q.      That includes AMG

13      Management, Inc.?

14                  MS. SKLYUT:  Objection.

15                  I instruct the witness not

16          to answer on the grounds of the

17          Fifth Amendment privilege against

18          self-incrimination

19          A.      On the advice of counsel, I

20      invoke my Fifth Amendment right and

21      respectfully decline to answer.

22          Q.      That also includes GMO

23      Consulting, LLC?

24                  MS. SKLYUT:  Objection.

25                  I instruct the witness not
```

Page 111

1              Yevsey Tseytelman

2         to answer on the grounds of the

3         Fifth Amendment privilege against

4         self-incrimination.

5         A.       On the advice of counsel, I

6    invoke my Fifth Amendment right and

7    respectfully decline to answer.

8         Q.       That includes Leomax

9    Supplies, Inc.?

10                 MS. SKLYUT:  Objection.

11                 I instruct the witness not

12        to answer on the grounds of the

13        Fifth Amendment privilege against

14        self-incrimination.

15        A.       On the advice of counsel, I

16   invoke my Fifth Amendment right and

17   respectfully decline to answer.

18        Q.       You laundered money by

19   issuing payments from GMO Consulting to

20   other companies you owned and converting

21   those payments to cash?

22                 MS. SKLYUT:  Objection.

23                 I instruct the witness not

24        to answer on the grounds of the

25        Fifth Amendment privilege against

Page 112

1          Yevsey Tseytelman
2      self-incrimination.
3      A.      On the advice of counsel, I
4  invoke my Fifth Amendment right and
5  respectfully decline to answer.
6      Q.      You also laundered money by
7  issuing payments from AMG Management to
8  other companies you owned and converting
9  those payments to cash?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12      to answer on the grounds of the
13      Fifth Amendment privilege against
14      self-incrimination.
15      A.      On the advice of counsel, I
16  invoke my Fifth Amendment right and
17  respectfully decline to answer.
18      Q.      In exchange for laundering
19  money, you were paid a sum of money,
20  correct?
21              MS. SKLYUT:  Objection.
22              I instruct the witness not
23      to answer on the grounds of the
24      Fifth Amendment privilege against
25      self-incrimination.

```
                                      Page 113
 1                  Yevsey Tseytelman
 2          A.        On the advice of counsel, I
 3    invoke my Fifth Amendment right and
 4    respectfully decline to answer.
 5          Q.        You received money to
 6    launder from numerous entities, correct?
 7                    MS. SKLYUT:  Objection.
 8                    I instruct the witness not
 9        to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12          A.        On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15          Q.        Isn't it true that numerous
16    other individuals and entities were
17    involved in the scheme?
18                    MS. SKLYUT:  Objection.
19                    I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23          A.        On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.
```

Page 114

```
 1                    Yevsey Tseytelman
 2         Q.        That includes Dr. Kelly?
 3                   MS. SKLYUT:  Objection.
 4                   I instruct the witness not
 5          to answer on the grounds of the
 6          Fifth Amendment privilege against
 7          self-incrimination.
 8          A.        On the advice of counsel, I
 9      invoke my Fifth Amendment right and
10      respectfully decline to answer.
11         Q.        That includes Harbor Medical
12      Group, P.C.?
13                   MS. SKLYUT:  Objection.
14                   I instruct the witness not
15          to answer on the grounds of the
16          Fifth Amendment privilege against
17          self-incrimination.
18          A.        On the advice of counsel, I
19      invoke my Fifth Amendment right and
20      respectfully decline to answer.
21         Q.        That includes Confident
22      Medical Services, P.C.?
23                   MS. SKLYUT:  Objection.
24                   I instruct the witness not
25          to answer on the grounds of the
```

Page 115

1              Yevsey Tseytelman
2        Fifth Amendment privilege against
3        self-incrimination.
4        A.      On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7        Q.      That includes Coastal
8    Medical, P.C.?
9                MS. SKLYUT:  Objection.
10               I instruct the witness not
11       to answer on the grounds of the
12       Fifth Amendment privilege against
13       self-incrimination.
14       A.      On the advice of counsel, I
15   invoke my Fifth Amendment right and
16   respectfully decline to answer.
17       Q.      That involves Zaitsev?
18               MS. SKLYUT:  Objection.
19               I instruct the witness not
20       to answer on the grounds of the
21       Fifth Amendment privilege against
22       self-incrimination.
23       A.      On the advice of counsel, I
24   invoke my Fifth Amendment right and
25   respectfully decline to answer.

Page 116

1                    Yevsey Tseytelman

2          Q.        That includes Kaminar?

3                    MS. SKLYUT:  Objection.

4                    I instruct the witness not

5          to answer on the grounds of the

6          Fifth Amendment privilege against

7          self-incrimination.

8          A.        On the advice of counsel, I

9      invoke my Fifth Amendment right and

10     respectfully decline to answer.

11         Q.        That includes Benevenga?

12                   MS. SKLYUT:  Objection.

13                   I instruct the witness not

14         to answer on the grounds of the

15         Fifth Amendment privilege against

16         self-incrimination.

17         A.        On the advice of counsel, I

18     invoke my Fifth Amendment right and

19     respectfully decline to answer.

20         Q.        That includes Financial

21     Vision Group, LLC?

22                   MS. SKLYUT:  Objection.

23                   I instruct the witness not

24         to answer on the grounds of the

25         Fifth Amendment privilege against

Page 117

1                    Yevsey Tseytelman
2          self-incrimination.
3          A.      On the advice of counsel, I
4    invoke my Fifth Amendment right and
5    respectfully decline to answer.
6          Q.      That includes Financial
7    Vision Group II, LLC?
8                  MS. SKLYUT:  Objection.
9                  I instruct the witness not
10       to answer on the grounds of the
11       Fifth Amendment privilege against
12       self-incrimination.
13         A.      On the advice of counsel, I
14   invoke my Fifth Amendment right and
15   respectfully decline to answer.
16         Q.      That involves Financial
17   Vision Group III, LLC?
18                 MS. SKLYUT:  Objection.
19                 I instruct the witness not
20       to answer on the grounds of the
21       Fifth Amendment privilege against
22       self-incrimination.
23         A.      On the advice of counsel, I
24   invoke my Fifth Amendment right and
25   respectfully decline to answer.

Page 118

1            Yevsey Tseytelman

2        Q.        That includes Financial

3    Vision Group IV, LLC?

4                MS. SKLYUT:  Objection.

5                I instruct the witness not

6        to answer on the grounds of the

7        Fifth Amendment privilege against

8        self-incrimination.

9        A.        On the advice of counsel, I

10    invoke my Fifth Amendment right and

11    respectfully decline to answer.

12        Q.        That includes Kandhorov?

13                MS. SKLYUT:  Objection.

14                I instruct the witness not

15        to answer on the grounds of the

16        Fifth Amendment privilege against

17        self-incrimination.

18        A.        On the advice of counsel, I

19    invoke my Fifth Amendment right and

20    respectfully decline to answer.

21        Q.        That includes Howard

22    Fensterman?

23                MS. SKLYUT:  Objection.

24                I instruct the witness not

25        to answer on the grounds of the

1                    Yevsey Tseytelman

2          Fifth Amendment privilege against

3          self-incrimination.

4          A.         On the advice of counsel, I

5     invoke my Fifth Amendment right and

6     respectfully decline to answer.

7          Q.         That includes Jordan

8     Fensterman?

9                    MS. SKLYUT:   Objection.

10                   I instruct the witness not

11        to answer on the grounds of the

12        Fifth Amendment privilege against

13        self-incrimination.

14         A.         On the advice of counsel, I

15    invoke my Fifth Amendment right and

16    respectfully decline to answer.

17         Q.         That includes Frank Carone?

18                   MS. SKLYUT:   Objection.

19                   I instruct the witness not

20        to answer on the grounds of the

21        Fifth Amendment privilege against

22        self-incrimination.

23         A.         On the advice of counsel, I

24    invoke my Fifth Amendment right and

25    respectfully decline to answer.

```
                                              Page 120

  1                  Yevsey Tseytelman

  2         Q.        That includes FBH Capital

  3     Group, LLC?

  4                  MS. SKLYUT:  Objection.

  5                  I instruct the witness not

  6         to answer on the grounds of the

  7         Fifth Amendment privilege against

  8         self-incrimination.

  9         A.        On the advice of counsel, I

 10     invoke my Fifth Amendment right and

 11     respectfully decline to answer.

 12         Q.        And that includes FHJ Vision

 13     Partners?

 14                  MS. SKLYUT:  Objection.

 15                  I instruct the witness not

 16         to answer on the grounds of the

 17         Fifth Amendment privilege against

 18         self-incrimination.

 19         A.        On the advice of counsel, I

 20     invoke my Fifth Amendment right and

 21     respectfully decline to answer.

 22         Q.        What was each of the

 23     defendants' role with respect to the

 24     scheme involving the PC defendants?

 25                  MS. SKLYUT:  Objection.
```

Page 121

1              Yevsey Tseytelman
2                   I instruct the witness not
3         to answer on the grounds of the
4         Fifth Amendment privilege against
5         self-incrimination.
6         A.        On the advice of counsel, I
7    invoke my Fifth Amendment right and
8    respectfully decline to answer.
9         Q.        How did you communicate with
10   each of the defendants?
11                  MS. SKLYUT:  Objection.
12                  I instruct the witness not
13        to answer on the grounds of the
14        Fifth Amendment privilege against
15        self-incrimination.
16        A.        On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19        Q.        Who else did you communicate
20   with with respect to the scheme involving
21   the PC defendants?
22                  MS. SKLYUT:  Objection.
23                  I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against

Page 122

1              Yevsey Tseytelman
2         self-incrimination.
3         A.        On the advice of counsel, I
4    invoke my Fifth Amendment right and
5    respectfully decline to answer.
6         Q.        Who profited from the scheme
7    involving the PC defendants?
8                   MS. SKLYUT:  Objection.
9                   I instruct the witness not
10        to answer on the grounds of the
11        Fifth Amendment privilege against
12        self-incrimination.
13        A.        On the advice of counsel, I
14   invoke my Fifth Amendment right and
15   respectfully decline to answer.
16        Q.        Mr. Tseytelman, you used GMO
17   Consulting to launder money, correct?
18                  MS. SKLYUT:  Objection.
19                  I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.        On the advice of counsel, I
24   invoke my Fifth Amendment right and
25   respectfully decline to answer.

```
                                        Page 123
 1                    Yevsey Tseytelman
 2          Q.        You also used AMG Management
 3     Inc. to launder money, correct?
 4                    MS. SKLYUT:  Objection.
 5                    I instruct the witness not
 6          to answer on the grounds of the
 7          Fifth Amendment privilege against
 8          self-incrimination.
 9          A.        On the advice of counsel, I
10     invoke my Fifth Amendment right and
11     respectfully decline to answer.
12          Q.        Are you familiar with an
13     individual named Alexandr Zaitsev?
14                    MS. SKLYUT:  Objection.
15                    I instruct the witness not
16          to answer on the grounds of the
17          Fifth Amendment privilege against
18          self-incrimination.
19          A.        On the advice of counsel, I
20     invoke my Fifth Amendment right and
21     respectfully decline to answer.
22          Q.        How do you know Zaitsev?
23                    MS. SKLYUT:  Objection.
24                    I instruct the witness not
25          to answer on the grounds of the
```

Page 124

1                    Yevsey Tseytelman

2         Fifth Amendment privilege against

3         self-incrimination.

4         A.       On the advice of counsel, I

5    invoke my Fifth Amendment right and

6    respectfully decline to answer.

7         Q.       How did you first meet?

8                  MS. SKLYUT:  Objection.

9                  I instruct the witness not

10        to answer on the grounds of the

11        Fifth Amendment privilege against

12        self-incrimination.

13        A.       On the advice of counsel, I

14   invoke my Fifth Amendment right and

15   respectfully decline to answer.

16        Q.       Have you ever provided any

17   legitimate goods or services Zaitsev?

18                 MS. SKLYUT:  Objection.

19                 I instruct the witness not

20        to answer on the grounds of the

21        Fifth Amendment privilege against

22        self-incrimination.

23        A.       On the advice of counsel, I

24   invoke my Fifth Amendment right and

25   respectfully decline to answer.

```
                                      Page 125
 1                 Yevsey Tseytelman
 2        Q.        Have you ever provided any
 3   legitimate goods or services to any
 4   company owned by Zaitsev?
 5                 MS. SKLYUT:  Objection.
 6                 I instruct the witness not
 7        to answer on the grounds of the
 8        Fifth Amendment privilege against
 9        self-incrimination.
10        A.        On the advice of counsel, I
11   invoke my Fifth Amendment right and
12   respectfully decline to answer.
13        Q.        Have any of your companies
14   provided any legitimate goods or services
15   to Zaitsev?
16                 MS. SKLYUT:  Objection.
17                 I instruct the witness not
18        to answer on the grounds of the
19        Fifth Amendment privilege against
20        self-incrimination.
21        A.        On the advice of counsel, I
22   invoke my Fifth Amendment right and
23   respectfully decline to answer.
24        Q.        Have any of your companies
25   provided any legitimate goods or services
```

Page 126

1              Yevsey Tseytelman
2      to any company owned by Zaitsev?
3                  MS. SKLYUT:  Objection.
4                  I instruct the witness not
5          to answer on the grounds of the
6          Fifth Amendment privilege against
7          self-incrimination.
8          A.      On the advice of counsel, I
9      invoke my Fifth Amendment right and
10      respectfully decline to answer.
11          Q.      Did you participate with
12      Zaitsev in a no-fault fraud scheme
13      involving Dr. Kelly and the PC
14      defendants?
15                  MS. SKLYUT:  Objection.
16                  I instruct the witness not
17          to answer on the grounds of the
18          Fifth Amendment privilege against
19          self-incrimination.
20          A.      On the advice of counsel, I
21      invoke my Fifth Amendment right and
22      respectfully decline to answer.
23          Q.      Are you familiar with an
24      individual named Daniel Kandhorov?
25                  MS. SKLYUT:  Objection.

```
                                        Page 127
 1              Yevsey Tseytelman
 2                   I instruct the witness not
 3          to answer on the grounds of the
 4          Fifth Amendment privilege against
 5          self-incrimination.
 6          A.       On the advice of counsel, I
 7      invoke my Fifth Amendment right and
 8      respectfully decline to answer.
 9          Q.       How do you know Kandhorov?
10                   MS. SKLYUT:  Objection.
11                   I instruct the witness not
12          to answer on the grounds of the
13          Fifth Amendment privilege against
14          self-incrimination.
15          A.       On the advice of counsel, I
16      invoke my Fifth Amendment right and
17      respectfully decline to answer.
18          Q.       How did you first meet?
19                   MS. SKLYUT:  Objection.
20                   I instruct the witness not
21          to answer on the grounds of the
22          Fifth Amendment privilege against
23          self-incrimination.
24          A.       On the advice of counsel, I
25      invoke my Fifth Amendment right and
```

```
                                                    Page 128
 1                    Yevsey Tseytelman
 2         respectfully decline to answer.
 3              Q.        Have you ever provided any
 4         legitimate goods or services to
 5         Kandhorov?
 6                        MS. SKLYUT:  Objection.
 7                        I instruct the witness not
 8             to answer on the grounds of the
 9             Fifth Amendment privilege against
10             self-incrimination.
11              A.        On the advice of counsel, I
12         invoke my Fifth Amendment right and
13         respectfully decline to answer.
14              Q.        Have you ever provided any
15         legitimate goods or services to any
16         company owned by Kandhorov?
17                        MS. SKLYUT:  Objection.
18                        I instruct the witness not
19             to answer on the grounds of the
20             Fifth Amendment privilege against
21             self-incrimination.
22              A.        On the advice of counsel, I
23         invoke my Fifth Amendment right and
24         respectfully decline to answer.
25              Q.        Have any of your companies
```

Page 129

```
 1              Yevsey Tseytelman
 2    provided any legitimate goods or services
 3    to Kandhorov?
 4              MS. SKLYUT:  Objection.
 5              I instruct the witness not
 6         to answer on the grounds of the
 7         Fifth Amendment privilege against
 8         self-incrimination.
 9    A.        On the advice of counsel, I
10    invoke my Fifth Amendment right and
11    respectfully decline to answer.
12    Q.        Have any of your companies
13    provided any legitimate goods or services
14    to any company owned by Kandhorov?
15              MS. SKLYUT:  Objection.
16              I instruct the witness not
17         to answer on the grounds of the
18         fifth Amendment privilege against
19         self-incrimination.
20    A.        On the advice of counsel, I
21    invoke my Fifth Amendment right and
22    respectfully decline to answer.
23    Q.        Did you participate with
24    Kandhorov in a no-fault fraud scheme
25    involving Kelly and the PC defendants?
```

```
                                          Page 130

 1                Yevsey Tseytelman
 2                   MS. SKLYUT:  Objection.
 3                   I instruct the witness not
 4        to answer on the grounds of the
 5        Fifth Amendment privilege against
 6        self-incrimination.
 7        A.       On the advice of counsel, I
 8   invoke my Fifth Amendment right and
 9   respectfully decline to answer.
10        Q.       Are you familiar with an
11   individual named Anthony Benevenga?
12                   MS. SKLYUT:  Objection.
13                   I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.       On the advice of counsel, I
18   invoke my Fifth Amendment right and
19   respectfully decline to answer.
20        Q.       How do you know Benevenga?
21                   MS. SKLYUT:  Objection.
22                   I instruct the witness not
23        to answer on the grounds of the
24        Fifth Amendment privilege against
25        self-incrimination.
```

```
                                        Page 131

 1                   Yevsey Tseytelman
 2          A.        On the advice of counsel, I
 3     invoke my Fifth Amendment right and
 4     respectfully decline to answer.
 5          Q.        How did you first meet?
 6                    MS. SKLYUT:  Objection.
 7                    I instruct the witness not
 8          to answer on the grounds of the
 9          Fifth Amendment privilege against
10          self-incrimination.
11          A.        On the advice of counsel, I
12     invoke my Fifth Amendment right and
13     respectfully decline to answer.
14          Q.        Have you ever provided any
15     legitimate goods or services to
16     Benevenga?
17                    MS. SKLYUT:  Objection.
18                    I instruct the witness not
19          to answer on the grounds of the
20          Fifth Amendment privilege against
21          self-incrimination.
22          A.        On the advice of counsel, I
23     invoke my Fifth Amendment right and
24     respectfully decline to answer.
25          Q.        Have you ever provided any
```

Page 132

```
 1              Yevsey Tseytelman
 2    legitimate goods or services to any
 3    company owned by Benevenga?
 4              MS. SKLYUT:  Objection.
 5              I instruct the witness not
 6        to answer on the grounds of the
 7        Fifth Amendment privilege against
 8        self-incrimination.
 9        A.      On the advice of counsel, I
10    invoke my Fifth Amendment right and
11    respectfully decline to answer.
12        Q.      Have any of your companies
13    provided any legitimate goods or services
14    to Benevenga?
15              MS. SKLYUT:  Objection.
16              I instruct the witness not
17        to answer on the grounds of the
18        Fifth Amendment privilege against
19        self-incrimination.
20        A.      On the advice of counsel, I
21    invoke my Fifth Amendment right and
22    respectfully decline to answer.
23        Q.      Have any of your companies
24    provided any legitimate goods or services
25    to any company owned by Benevenga?
```

```
                                    Page 133

 1                  Yevsey Tseytelman

 2              MS. SKLYUT:  Objection.

 3              I instruct the witness not

 4       to answer on the grounds of the

 5       Fifth Amendment privilege against

 6       self-incrimination.

 7       A.      On the advice of counsel, I

 8  invoke my Fifth Amendment right and

 9  respectfully decline to answer.

10       Q.      Did you participate with

11  Benevenga in a no-fault fraud scheme

12  involving Dr. Kelly and the PC

13  defendants?

14              MS. SKLYUT:  Objection.

15              I instruct the witness not

16       to answer on the grounds of the

17       Fifth Amendment privilege against

18       self-incrimination.

19       A.      On the advice of counsel, I

20  invoke my Fifth Amendment right and

21  respectfully decline to answer.

22       Q.      Are you familiar with an

23  individual named Mark Kaminar?

24              MS. SKLYUT:  Objection.

25              I instruct the witness not
```

```
                                            Page 134
 1              Yevsey Tseytelman
 2         to answer on the grounds of the
 3         Fifth Amendment privilege against
 4         self-incrimination.
 5         A.       On the advice of counsel, I
 6    invoke my Fifth Amendment right and
 7    respectfully decline to answer.
 8         Q.       How do you know Kaminar?
 9              MS. SKLYUT:  Objection.
10              I instruct the witness not
11         to answer on the grounds of the
12         Fifth Amendment privilege against
13         self-incrimination.
14         A.       On the advice of counsel, I
15    invoke my Fifth Amendment right and
16    respectfully decline to answer.
17         Q.       How did you first meet?
18              MS. SKLYUT:  Objection.
19              I instruct the witness not
20         to answer on the grounds of the
21         Fifth Amendment privilege against
22         self-incrimination.
23         A.       On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.
```

```
                                        Page 135
 1                 Yevsey Tseytelman
 2        Q.         Have you ever provided any
 3     legitimate goods or services to Kaminar?
 4                 MS. SKLYUT:  Objection.
 5                 I instruct the witness not
 6          to answer on the grounds of the
 7          Fifth Amendment privilege against
 8          self-incrimination.
 9        A.         On the advice of counsel, I
10     invoke my Fifth Amendment right and
11     respectfully decline to answer.
12                 MS. SKLYUT:  Could we take a
13          five-minute break?
14                 MS. ROSENBLATT:  Sure.
15                 MS. SKLYUT:  Thank you.
16                 (A break was taken at this
17          time.)
18        Q.         Have you ever provided any
19     legitimate goods or services to Kaminar?
20                 MS. SKLYUT:  Objection.
21                 I instruct the witness not
22          to answer on the grounds of the
23          Fifth Amendment privilege against
24          self-incrimination.
25        A.         On the advice of counsel, I
```

Page 136

1              Yevsey Tseytelman
2    invoke my Fifth Amendment right and
3    respectfully decline to answer.
4         Q.      Have you ever provided any
5    legitimate goods or services to any
6    company owned by Kaminar?
7                 MS. SKLYUT:  Objection.
8                 I instruct the witness not
9         to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12        A.      On the advice of counsel, I
13   invoke my Fifth Amendment right and
14   respectfully decline to answer.
15        Q.      Have any of your companies
16   provided any legitimate goods or services
17   to Kaminar?
18                MS. SKLYUT:  Objection.
19                I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.      On the advice of counsel, I
24   invoke my Fifth Amendment right and
25   respectfully decline to answer.

Page 137

1                    Yevsey Tseytelman
2         Q.        Have any of your companies
3    provided any legitimate goods or services
4    to any company owned by Kaminar?
5                    MS. SKLYUT:  Objection.
6                    I instruct the witness not
7         to answer on the grounds of the
8         Fifth Amendment privilege against
9         self-incrimination.
10        A.        On the advice of counsel, I
11   invoke my Fifth Amendment right and
12   respectfully decline to answer.
13        Q.        Did you participate with
14   Kaminar in a no-fault fraud scheme
15   involving Dr. Kelly and the PC
16   defendants?
17                    MS. SKLYUT:  Objection.
18                    I instruct the witness not
19        to answer on the grounds of the
20        Fifth Amendment privilege against
21        self-incrimination.
22        A.        On the advice of counsel, I
23   invoke my Fifth Amendment right and
24   respectfully decline to answer.
25        Q.        Are you familiar with an

```
                                            Page 138

 1                    Yevsey Tseytelman

 2      individual named Frank Carone?

 3                    MS. SKLYUT:  Objection.

 4                    I instruct the witness not

 5           to answer on the grounds of the

 6           Fifth Amendment privilege against

 7           self-incrimination.

 8           A.        On the advice of counsel, I

 9      invoke my Fifth Amendment right and

10      respectfully decline to answer.

11           Q.        How do you know Carone?

12                    MS. SKLYUT:  Objection.

13                    I instruct the witness not

14           to answer on the grounds of the

15           Fifth Amendment privilege against

16           self-incrimination.

17           A.        On the advice of counsel, I

18      invoke my Fifth Amendment right and

19      respectfully decline to answer.

20           Q.        How did you first meet?

21                    MS. SKLYUT:  Objection.

22                    I instruct the witness not

23           to answer on the grounds of the

24           Fifth Amendment privilege against

25           self-incrimination.
```

```
                                        Page 139

 1                  Yevsey Tseytelman
 2         A.        On the advice of counsel, I
 3    invoke my Fifth Amendment right and
 4    respectfully decline to answer.
 5         Q.        Have you ever had a business
 6    relationship with Carone?
 7                   MS. SKLYUT:  Objection.
 8                   I instruct the witness not
 9        to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12         A.        On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15         Q.        Have you ever entered a
16    business agreement with Carone?
17                   MS. SKLYUT:  Objection.
18                   I instruct the witness not
19        to answer on the grounds of the
20        Fifth Amendment privilege against
21        self-incrimination.
22         A.        On the advice of counsel, I
23    invoke my Fifth Amendment right and
24    respectfully decline to answer.
25         Q.        Have any of your companies
```

```
                                                Page 140
 1              Yevsey Tseytelman
 2      had a business relationship with Carone?
 3                   MS. SKLYUT:  Objection.
 4                   I instruct the witness not
 5           to answer on the grounds of the
 6           Fifth Amendment privilege against
 7           self-incrimination.
 8           A.      On the advice of counsel, I
 9      invoke my Fifth Amendment right and
10      respectfully decline to answer.
11           Q.      Have any of your companies
12      entered a business agreement with Carone?
13                   MS. SKLYUT:  Objection.
14                   I instruct the witness not
15           to answer on the grounds of the
16           Fifth Amendment privilege against
17           self-incrimination.
18           A.      On the advice of counsel, I
19      invoke my Fifth Amendment right and
20      respectfully decline to answer.
21           Q.      Did you participate with
22      Carone in a no-fault fraud scheme
23      involving Dr. Kelly and the PC
24      defendants?
25                   MS. SKLYUT:  Objection.
```

Page 141

1              Yevsey Tseytelman

2                   I instruct the witness not

3          to answer on the grounds of the

4          Fifth Amendment privilege against

5          self-incrimination.

6          A.        On the advice of counsel, I

7     invoke my Fifth Amendment right and

8     respectfully decline to answer.

9          Q.        Are you familiar with an

10    individual named Jordan Fensterman?

11                   MS. SKLYUT:  Objection.

12                   I instruct the witness not

13         to answer on the grounds of the

14         Fifth Amendment privilege against

15         self-incrimination.

16         A.        On the advice of counsel, I

17    invoke my Fifth Amendment right and

18    respectfully decline to answer.

19         Q.        How do you know Jordan

20    Fensterman?

21                   MS. SKLYUT:  Objection.

22                   I instruct the witness not

23         to answer on the grounds of the

24         Fifth Amendment privilege against

25         self-incrimination.

Page 142

1                    Yevsey Tseytelman

2          A.        On the advice of counsel, I

3     invoke my Fifth Amendment right and

4     respectfully decline to answer.

5          Q.        How did you first meet?

6                    MS. SKLYUT:  Objection.

7                    I instruct the witness not

8          to answer on the grounds of the

9          Fifth Amendment privilege against

10         self-incrimination.

11         A.        On the advice of counsel, I

12    invoke my Fifth Amendment right and

13    respectfully decline to answer.

14         Q.        Have you ever had a business

15    relationship with Jordan Fensterman?

16                   MS. SKLYUT:  Objection.

17                   I instruct the witness not

18         to answer on the grounds of the

19         Fifth Amendment privilege against

20         self-incrimination.

21         A.        On the advice of counsel, I

22    invoke my Fifth Amendment right and

23    respectfully decline to answer.

24         Q.        Have you ever entered a

25    business agreement with Jordan

Page 143

1              Yevsey Tseytelman

2    Fensterman?

3                    MS. SKLYUT:  Objection.

4                    I instruct the witness not

5         to answer on the grounds of the

6         Fifth Amendment privilege against

7         self-incrimination.

8         A.        On the advice of counsel, I

9    invoke my Fifth Amendment right and

10   respectfully decline to answer.

11        Q.        Have any of your companies

12   had a business relationship with Jordan

13   Fensterman?

14                   MS. SKLYUT:  Objection.

15                   I instruct the witness not

16        to answer on the grounds of the

17        Fifth Amendment privilege against

18        self-incrimination.

19        A.        On the advice of counsel, I

20   invoke my Fifth Amendment right and

21   respectfully decline to answer.

22        Q.        Have any of your companies

23   entered a business agreement with Jordan

24   Fensterman?

25                   MS. SKLYUT:  Objection.

Page 144

1                    Yevsey Tseytelman

2                    I instruct the witness not

3            to answer on the grounds of the

4            Fifth Amendment privilege against

5            self-incrimination.

6        A.        On the advice of counsel, I

7    invoke my Fifth Amendment right and

8    respectfully decline to answer.

9        Q.        Did you participate with

10   Jordan Fensterman in a no-fault fraud

11   scheme involving Dr. Kelly and the PC

12   defendants?

13                   MS. SKLYUT:  Objection.

14                   I instruct the witness not

15           to answer on the grounds of the

16           Fifth Amendment privilege against

17           self-incrimination.

18       A.        On the advice of counsel, I

19   invoke my Fifth Amendment right and

20   respectfully decline to answer.

21       Q.        Are you familiar with an

22   individual named Howard Fensterman?

23                   MS. SKLYUT:  Objection.

24                   I instruct the witness not

25           to answer on the grounds of the

```
                                                Page 145
 1                Yevsey Tseytelman
 2          Fifth Amendment privilege against
 3          self-incrimination.
 4              A.       On the advice of counsel, I
 5     invoke my Fifth Amendment right and
 6     respectfully decline to answer.
 7              Q.       How do you know Howard
 8     Fensterman?
 9                    MS. SKLYUT:  Objection.
10                    I instruct the witness not
11          to answer on the grounds of the
12          Fifth Amendment privilege against
13          self-incrimination.
14              A.       On the advice of counsel, I
15     invoke my Fifth Amendment right and
16     respectfully decline to answer.
17              Q.       How did you first meet
18     Howard Fensterman?
19                    MS. SKLYUT:  Objection.
20                    I instruct the witness not
21          to answer on the grounds of the
22          Fifth Amendment privilege against
23          self-incrimination.
24              A.       On the advice of counsel, I
25     invoke my Fifth Amendment right and
```

Page 146

1              Yevsey Tseytelman

2     respectfully decline to answer.

3         Q.      Have you ever had a business

4     relationship with Howard Fensterman?

5              MS. SKLYUT:  Objection.

6              I instruct the witness not

7         to answer on the grounds of the

8         Fifth Amendment privilege against

9         self-incrimination

10        A.      On the advice of counsel, I

11    invoke my Fifth Amendment right and

12    respectfully decline to answer.

13        Q.      Have you ever entered a

14    business agreement with Howard

15    Fensterman?

16             MS. SKLYUT:  Objection.

17             I instruct the witness not

18        to answer on the grounds of the

19        Fifth Amendment privilege against

20        self-incrimination.

21        A.      On the advice of counsel, I

22    invoke my Fifth Amendment right and

23    respectfully decline to answer.

24        Q.      Have any of your companies

25    had a business relationship with Howard

Page 147

1           Yevsey Tseytelman

2    Fensterman?

3               MS. SKLYUT:  Objection.

4               I instruct the witness not

5         to answer on the grounds of the

6         Fifth Amendment privilege against

7         self-incrimination.

8         A.     On the advice of counsel, I

9    invoke my Fifth Amendment right and

10   respectfully decline to answer.

11        Q.     Have any of your companies

12   entered a business agreement with Howard

13   Fensterman?

14              MS. SKLYUT:  Objection.

15              I instruct the witness not

16        to answer on the grounds of the

17        Fifth Amendment privilege against

18        self-incrimination.

19        A.     On the advice of counsel, I

20   invoke my Fifth Amendment right and

21   respectfully decline to answer.

22        Q.     Did you participate with

23   Howard Fensterman in a no-fault fraud

24   scheme involving Dr. Kelly and the PC

25   defendants?

Page 148

1              Yevsey Tseytelman
2                   MS. SKLYUT:  Objection.
3                   I instruct the witness not
4         to answer on the grounds of the
5         Fifth Amendment privilege against
6         self-incrimination.
7         A.       On the advice of counsel, I
8     invoke my Fifth Amendment right and
9     respectfully decline to answer.
10        Q.       Are you familiar a company
11    called Financial Vision Group, LLC?
12                  MS. SKLYUT:  Objection.
13                  I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.       On the advice of counsel, I
18    invoke my Fifth Amendment right and
19    respectfully decline to answer.
20                  MS. ROSENBLATT:  For the
21        purposes of this deposition, I'll
22        refer to it as FVG.
23        Q.       Who are the members of FVG?
24                  MS. SKLYUT:  Objection.
25                  I instruct the witness not

Page 149

1            Yevsey Tseytelman
2        to answer on the grounds of the
3        Fifth Amendment privilege against
4        self-incrimination.
5        A.       On the advice of counsel, I
6    invoke my Fifth Amendment right and
7    respectfully decline to answer.
8        Q.       What type of company is FVG?
9                 MS. SKLYUT:  Objection.
10                I instruct the witness not
11       to answer on the grounds of the
12       Fifth Amendment privilege against
13       self-incrimination.
14       A.       On the advice of counsel, I
15   invoke my Fifth Amendment right and
16   respectfully decline to answer
17       Q.       Did FVG serve any legitimate
18   business purpose?
19                MS. SKLYUT:  Objection.
20                I instruct the witness not
21       to answer on the grounds of the
22       Fifth Amendment privilege against
23       self-incrimination.
24       A.       On the advice of counsel, I
25   invoke my Fifth Amendment right and

```
                                    Page 150

 1              Yevsey Tseytelman

 2     respectfully decline to answer.

 3          Q.       Does FVG provide any

 4     legitimate goods or services?

 5                   MS. SKLYUT:  Objection.

 6                   I instruct the witness not

 7          to answer on the grounds of the

 8          Fifth Amendment privilege against

 9          self-incrimination.

10          A.       On the advice of counsel, I

11     invoke my Fifth Amendment right and

12     respectfully decline to answer.

13          Q.       Have you ever had any

14     legitimate business with FVG?

15                   MS. SKLYUT:  Objection.

16                   I instruct the witness not

17          to answer on the grounds of the

18          Fifth Amendment privilege against

19          self-incrimination.

20          A.       On the advice of counsel, I

21     invoke my Fifth Amendment right and

22     respectfully decline to answer.

23          Q.       Have any of your companies

24     ever had any legitimate business with

25     FVG?
```

```
                                      Page 151

 1                  Yevsey Tseytelman

 2                      MS. SKLYUT:  Objection.

 3                      I instruct the witness not

 4          to answer on the grounds of the

 5          Fifth Amendment privilege against

 6          self-incrimination.

 7          A.      On the advice of counsel, I

 8      invoke my Fifth Amendment right and

 9      respectfully decline to answer.

10          Q.      Have you ever provided any

11      legitimate goods or services to FVG?

12                      MS. SKLYUT:  Objection.

13                      I instruct the witness not

14          to answer on the grounds of the

15          Fifth Amendment privilege against

16          self-incrimination.

17          A.      On the advice of counsel, I

18      invoke my Fifth Amendment right and

19      respectfully decline to answer.

20          Q.      Have any of your companies

21      provided any legitimate goods or services

22      to FVG?

23                      MS. SKLYUT:  Objection.

24                      I instruct the witness not

25          to answer on the grounds of the
```

Page 152

1              Yevsey Tseytelman
2         Fifth Amendment privilege against
3         self-incrimination.
4         A.      On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7         Q.      Are you familiar with a
8    company called Financial Vision Group II,
9    LLC, formerly known as ADF Equities, LLC?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12         to answer on the grounds of the
13         Fifth Amendment privilege against
14         self-incrimination.
15         A.      On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18              MS. ROSENBLATT:  For the
19         purposes of this deposition, I'll
20         refer to it as FVG II.
21         Q.      Who are the members of
22    FVG II?
23              MS. SKLYUT:  Objection.
24              I instruct the witness not
25         to answer on the grounds of the

```
                                          Page 153

 1                    Yevsey Tseytelman

 2          Fifth Amendment privilege against

 3          self-incrimination.

 4          A.        On the advice of counsel, I

 5    invoke my Fifth Amendment right and

 6    respectfully decline to answer.

 7          Q.        What type of company is

 8    FVG II?

 9                    MS. SKLYUT:  Objection.

10                    I instruct the witness not

11          to answer on the grounds of the

12          Fifth Amendment privilege against

13          self-incrimination.

14          A.        On the advice of counsel, I

15    invoke my Fifth Amendment right and

16    respectfully decline to answer.

17          Q.        Does FVG II serve any

18    legitimate business purpose?

19                    MS. SKLYUT:  Objection.

20                    I instruct the witness not

21          to answer on the grounds of the

22          Fifth Amendment privilege against

23          self-incrimination.

24          A.        On the advice of counsel, I

25    invoke my Fifth Amendment right and
```

Page 154

1              Yevsey Tseytelman
2    respectfully decline to answer.
3         Q.        Does FVG II provide any
4    legitimate goods or services?
5                   MS. SKLYUT:  Objection.
6                   I instruct the witness not
7         to answer on the grounds of the
8         Fifth Amendment privilege against
9         self-incrimination.
10        A.        On the advice of counsel, I
11   invoke my Fifth Amendment right and
12   respectfully decline to answer.
13        Q.        Have you ever had any
14   legitimate business with FVG II?
15                  MS. SKLYUT:  Objection.
16                  I instruct the witness not
17        to answer on the grounds of the
18        Fifth Amendment privilege against
19        self-incrimination.
20        A.        On the advice of counsel, I
21   invoke my Fifth Amendment right and
22   respectfully decline to answer.
23        Q.        Have any of your companies
24   ever had any legitimate business with
25   FVG II?

Page 155

1              Yevsey Tseytelman

2              MS. SKLYUT:  Objection.

3              I instruct the witness not

4        to answer on the grounds of the

5        Fifth Amendment privilege against

6        self-incrimination.

7        A.      On the advice of counsel, I

8    invoke my Fifth Amendment right and

9    respectfully decline to answer.

10        Q.      Have you ever provided any

11    legitimate goods or services to FVG II?

12              MS. SKLYUT:  Objection.

13              I instruct the witness not

14        to answer on the grounds of the

15        Fifth Amendment privilege against

16        self-incrimination.

17        A.      On the advice of counsel, I

18    invoke my Fifth Amendment right and

19    respectfully decline to answer.

20        Q.      Have any of your companies

21    provided any legitimate goods or services

22    to FVG II?

23              MS. SKLYUT:  Objection.

24              I instruct the witness not

25        to answer on the grounds of the Fifth

Page 156

1              Yevsey Tseytelman
2         Amendment privilege against
3         self-incrimination.
4         A.      On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7         Q.      Are you familiar with a
8    company called Financial Vision Group
9    III, LLC?
10                MS. SKLYUT:  Objection.
11                I instruct the witness not
12         to answer on the grounds of the
13         Fifth Amendment privilege against
14         self-incrimination.
15         A.      On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18                MS. ROSENBLATT:  For the
19         purposes of the deposition, I'll
20         refer it to FVG III.
21         Q.      Who are the members of the
22    FVG III?
23                MS. SKLYUT:  Objection.
24                I instruct the witness not
25         to answer on the grounds of the

Page 157

```
 1              Yevsey Tseytelman
 2        Fifth Amendment privilege against
 3        self-incrimination.
 4        A.      On the advice of counsel, I
 5   invoke my Fifth Amendment right and
 6   respectfully decline to answer.
 7        Q.      What type of company is
 8   FVG III?
 9              MS. SKLYUT:  Objection.
10              I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination.
14        A.      On the advice of counsel, I
15   invoke my Fifth Amendment right and
16   respectfully decline to answer.
17        Q.      Does FVG III serve any
18   legitimate business purpose?
19              MS. SKLYUT:  Objection.
20              I instruct the witness not
21        to answer on the grounds of the
22        Fifth Amendment privilege against
23        self-incrimination.
24        A.      On the advice of counsel, I
25   invoke my Fifth Amendment right and
```

```
                                        Page 158

  1                    Yevsey Tseytelman

  2        respectfully decline to answer.

  3              Q.        Does FVG III provide any

  4        legitimate goods or services?

  5                    MS. SKLYUT:  Objection.

  6                    I instruct the witness not

  7           to answer on the grounds of the

  8           Fifth Amendment privilege against

  9           self-incrimination.

 10              A.        On the advice of counsel, I

 11        invoke my Fifth Amendment right and

 12        respectfully decline to answer

 13              Q.        Have you ever had any

 14        legitimate business with FVG III?

 15                    MS. SKLYUT:  Objection.

 16                    I instruct the witness not

 17           to answer on the grounds of the

 18           Fifth Amendment privilege against

 19           self-incrimination.

 20              A.        On the advice of counsel, I

 21        invoke my Fifth Amendment right and

 22        respectfully decline to answer.

 23              Q.        Have any of your companies

 24        ever had any legitimate business with

 25        FVG III?
```

Page 159

1                    Yevsey Tseytelman
2                    MS. SKLYUT:  Objection.
3                    I instruct the witness not
4          to answer on the grounds of the
5          Fifth Amendment privilege against
6          self-incrimination.
7          A.        On the advice of counsel, I
8      invoke my Fifth Amendment right and
9      respectfully decline to answer.
10         Q.        Have you ever provided any
11     legitimate goods or services to FVG III?
12                   MS. SKLYUT:  Objection.
13                   I instruct the witness not
14         to answer on the grounds of the
15         Fifth Amendment privilege against
16         self-incrimination.
17         A.        On the advice of counsel, I
18     invoke my Fifth Amendment right and
19     respectfully decline to answer.
20         Q.        Have any of your companies
21     provided any legitimate goods or services
22     to FVG III?
23                   MS. SKLYUT:  Objection.
24                   I instruct the witness not
25         to answer on the grounds of the

```
                                            Page 160
 1                Yevsey Tseytelman
 2         Fifth Amendment privilege against
 3         self-incrimination.
 4          A.        On the advice of counsel, I
 5     invoke my Fifth Amendment right and
 6     respectfully decline to answer.
 7          Q.        Are you familiar with a
 8     company called Financial Vision Group IV,
 9     LLC?
10               MS. SKLYUT:  Objection.
11               I instruct the witness not
12          to answer on the grounds of the
13          Fifth Amendment privilege against
14          self-incrimination.
15          A.        On the advice of counsel, I
16     invoke my Fifth Amendment right and
17     respectfully decline to answer.
18               MS. ROSENBLATT:  For the
19          purposes of the deposition, I'll
20          refer to it as FVG IV.
21          Q.        Who are the members of
22     FVG IV?
23               MS. SKLYUT:  Objection.
24               I instruct the witness not
25          to answer on the grounds of the
```

Page 161

```
 1              Yevsey Tseytelman
 2        Fifth Amendment privilege against
 3        self-incrimination.
 4        A.      On the advice of counsel, I
 5   invoke my Fifth Amendment right and
 6   respectfully decline to answer.
 7        Q.      Does FVG IV serve any
 8   legitimate business purpose?
 9              MS. SKLYUT:  Objection.
10              I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination.
14        A.      On the advice of counsel, I
15   invoke my Fifth Amendment right and
16   respectfully decline to answer.
17        Q.      Does FVG IV provide any
18   legitimate goods or services?
19              MS. SKLYUT:  Objection.
20              I instruct the witness not
21        to answer on the grounds of the
22        Fifth Amendment privilege against
23        self-incrimination.
24        A.      On the advice of counsel, I
25   invoke my Fifth Amendment right and
```

Page 162

1           Yevsey Tseytelman
2    respectfully decline to answer.
3        Q.       Have you ever had any
4    legitimate business with FVG IV?
5                 MS. SKLYUT:  Objection.
6                 I instruct the witness not
7          to answer on the grounds of the
8          Fifth Amendment privilege against
9          self-incrimination.
10       A.       On the advice of counsel, I
11   invoke my Fifth Amendment right and
12   respectfully decline to answer.
13       Q.       Have any of your companies
14   had any legitimate business with FVG IV?
15                MS. SKLYUT:  Objection.
16                I instruct the witness not
17         to answer on the grounds of the
18         Fifth Amendment privilege against
19         self-incrimination.
20       A.       On the advice of counsel, I
21   invoke my Fifth Amendment right and
22   respectfully decline to answer.
23       Q.       Have you ever provided any
24   legitimate goods or services to FVG IV?
25                MS. SKLYUT:  Objection.

Page 163

```
 1                    Yevsey Tseytelman
 2                        I instruct the witness not
 3           to answer on the grounds of the
 4           Fifth Amendment privilege against
 5           self-incrimination.
 6       A.        On the advice of counsel, I
 7    invoke my Fifth Amendment right and
 8    respectfully decline to answer.
 9       Q.        Have any of your companies
10    provided any legitimate goods or services
11    to FVG IV?
12                    MS. SKLYUT:  Objection.
13                        I instruct the witness not
14           to answer on the grounds of the
15           Fifth Amendment privilege against
16           self-incrimination?
17       A.        On the advice of counsel, I
18    invoke my Fifth Amendment right and
19    respectfully decline to answer.
20       Q.        Are you familiar with a
21    company called FVH Capital Group, LLC?
22                    MS. SKLYUT:  Objection.
23                        I instruct the witness not
24           to answer on the grounds of the
25           Fifth Amendment privilege against
```

Page 164

```
 1              Yevsey Tseytelman
 2         self-incrimination.
 3         A.        On the advice of counsel, I
 4     invoke my Fifth Amendment right and
 5     respectfully decline to answer.
 6                   MS. ROSENBLATT:  For the
 7            purposes of the deposition, I'll
 8            refer to it as FVH Capital.
 9         Q.        Who are the members of FVH
10     Capital?
11                   MS. SKLYUT:  Objection.
12                   I instruct the witness not
13            to answer on the grounds of the
14            Fifth Amendment privilege against
15            self-incrimination.
16         A.        On the advice of counsel, I
17     invoke my Fifth Amendment right and
18     respectfully decline to answer.
19         Q.        What type of company is FVH
20     Capital?
21                   MS. SKLYUT:  Objection.
22                   I instruct the witness not
23            to answer on the grounds of the
24            Fifth Amendment privilege against
25            self-incrimination.
```

```
                                            Page 165

 1                  Yevsey Tseytelman
 2        A.        On the advice of counsel, I
 3   invoke my Fifth Amendment right and
 4   respectfully decline to answer.
 5        Q.        Does FVH Capital serve any
 6   legitimate business purpose?
 7                  MS. SKLYUT:  Objection.
 8                  I instruct the witness not
 9        to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12        A.        On the advice of counsel, I
13   invoke my Fifth Amendment right and
14   respectfully decline to answer.
15        Q.        Does FVH Capital provide any
16   legitimate goods or services?
17                  MS. SKLYUT:  Objection.
18                  I instruct the witness not
19        to answer on the grounds of the
20        Fifth Amendment privilege against
21        self-incrimination.
22        A.        On the advice of counsel, I
23   invoke my Fifth Amendment right and
24   respectfully decline to answer
25        Q.        Have you ever had any
```

Page 166

1              Yevsey Tseytelman
2     legitimate business with FVH Capital?
3              MS. SKLYUT:  Objection.
4              I instruct the witness not
5         to answer on the grounds of the
6         Fifth Amendment privilege against
7         self-incrimination
8         A.      On the advice of counsel, I
9     invoke my Fifth Amendment right and
10    respectfully decline to answer.
11             MS. SKLYUT:  Can we take a
12        break for one minute?
13             MS. ROSENBLATT:  Yes.
14             (A break was taken at this
15        time.)
16        Q.      Have any of your companies
17    had any legitimate business with FVH
18    Capital?
19             MS. SKLYUT:  Objection.
20             I instruct the witness not
21        to answer on the grounds of the
22        Fifth Amendment privilege against
23        self-incrimination.
24        A.      On the advice of counsel, I
25    invoke my Fifth Amendment right and

Page 167

```
 1            Yevsey Tseytelman
 2     respectfully decline to answer.
 3          Q.        Have you ever provided any
 4     legitimate goods or services to FVH
 5     Capital?
 6                    MS. SKLYUT:  Objection.
 7                    I instruct the witness not
 8          to answer on the grounds of the
 9          Fifth Amendment privilege against
10          self-incrimination.
11          A.        On the advice of counsel, I
12     invoke my Fifth Amendment right and
13     respectfully decline to answer.
14          Q.        Have any of your companies
15     provided any legitimate goods or services
16     to FVH Capital?
17                    MS. SKLYUT:  Objection.
18                    I instruct the witness not
19          to answer on the grounds of the
20          Fifth Amendment privilege against
21          self-incrimination.
22          A.        On the advice of counsel, I
23     invoke my Fifth Amendment right and
24     respectfully decline to answer.
25          Q.        Are you familiar with a
```

```
                                           Page 168
 1                    Yevsey Tseytelman
 2      company called FHJ Vision Partners, LLC?
 3                    MS. SKLYUT:  Objection.
 4                    I instruct the witness not
 5           to answer on the grounds of the
 6           Fifth Amendment privilege against
 7           self-incrimination.
 8           A.      On the advice of counsel, I
 9      invoke my Fifth Amendment right and
10      respectfully decline to answer.
11                    MS. ROSENBLATT:  For the
12           purposes of the deposition, I'll
13           refer to it as FHJ Vision.
14           Q.      Who are the members of FHJ
15      Vision?
16                    MS. SKLYUT:  Objection.
17                    I instruct the witness not
18           to answer on the grounds of the
19           Fifth Amendment privilege against
20           self-incrimination.
21           A.      On the advice of counsel, I
22      invoke my Fifth Amendment right and
23      respectfully decline to answer.
24           Q.      What type of company is
25      FHJ Vision?
```

Page 169

```
1                    Yevsey Tseytelman
2                    MS. SKLYUT:  Objection.
3                    I instruct the witness not
4         to answer on the grounds of the
5         Fifth Amendment privilege against
6         self-incrimination.
7         A.       On the advice of counsel, I
8    invoke my Fifth Amendment right and
9    respectfully decline to answer.
10        Q.       Does FHJ Vision serve any
11   legitimate business purpose?
12                   MS. SKLYUT:  Objection.
13                   I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.       On the advice of counsel, I
18   invoke my Fifth Amendment right and
19   respectfully decline to answer.
20        Q.       Does FHJ Vision provide any
21   legitimate goods or services?
22                   MS. SKLYUT:  Objection.
23                   I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against
```

Page 170

1           Yevsey Tseytelman

2        self-incrimination.

3        A.      On the advice of counsel, I

4    invoke my Fifth Amendment right and

5    respectfully decline to answer.

6        Q.      Have you ever had any

7    legitimate business with FHJ Vision?

8                MS. SKLYUT:  Objection.

9                I instruct the witness not

10       to answer on the grounds of the

11       Fifth Amendment privilege against

12       self-incrimination.

13       A.      On the advice of counsel, I

14   invoke my Fifth Amendment right and

15   respectfully decline to answer.

16       Q.      Have any of your companies

17   had any legitimate business with FHJ

18   Vision?

19                MS. SKLYUT:  Objection.

20                I instruct the witness not

21       to answer on the grounds of the

22       Fifth Amendment privilege against

23       self-incrimination.

24       A.      On the advice of counsel, I

25   invoke my Fifth Amendment right and

Page 171

1              Yevsey Tseytelman
2      respectfully decline to answer.
3          Q.        Have you ever provided any
4      legitimate goods or services to FHJ
5      Vision?
6                    MS. SKLYUT:  Objection.
7                    I instruct the witness not
8          to answer on the grounds of the
9          Fifth Amendment privilege against
10         self-incrimination.
11         A.        On the advice of counsel, I
12     invoke my Fifth Amendment right and
13     respectfully decline to answer.
14         Q.        Have any of your companies
15     provided any legitimate goods or services
16     to FHJ Vision?
17                   MS. SKLYUT:  Objection.
18                   I instruct the witness not
19         to answer on the grounds of the
20         Fifth Amendment privilege against
21         self-incrimination.
22         A.        On the advice of counsel, I
23     invoke my Fifth Amendment right and
24     respectfully decline to answer.
25                   MS. ROSENBLATT:  I'm going

Page 172

1                Yevsey Tseytelman

2        to circulate two additional exhibits.

3        First I'm going to share my screen

4        with what's being marked as

5        Plaintiff's Exhibit 6.  This is a 15

6        page document containing various

7        checks from the PC defendants to GMO

8        Consulting.

9                (The above-referred-to

10       document was marked as Plaintiff's

11       Exhibit 6 for identification as of

12       this date.)

13               MS. ROSENBLATT:  I'm now

14       displaying what's been marked as

15       Plaintiff's Exhibit 7.  This is an

16       11 page document containing checks

17       from the various PC defendants to AMG

18       Management, Inc.

19               (The above-referred-to

20       document was marked as Plaintiff's

21       Exhibit 7 for identification as of

22       this date.)

23               MS. ROSENBLATT:  I

24       circulated copies of both documents

25       via e-mail.

```
                                          Page 173
 1                  Yevsey Tseytelman
 2                  Ms. Sklyut, I'm going to be
 3         asking questions collectively about
 4         each of the checks.  Do you want to
 5         take a minute so Mr. Tseytelman can
 6         look at all of the checks and I can
 7         ask questions sort of in the
 8         collective?
 9                  MS. ROSENBLATT:  If we can
10         go by them individually.
11                  MS. ROSENBLATT:  You want to
12         go page by page?
13                  MS. SKLYUT:  Or if you want
14         to go through them.  Whatever is
15         faster.
16                  MS. ROSENBLATT:  I think it
17         will be faster if I can ask -- let's
18         just go off the record for a minute.
19                  (A discussion was held off
20         the record.)
21                  MS. ROSENBLATT:  I'll just
22         scroll through, and if I'm going too
23         fast, just let me know
24                  MS. SKLYUT:  Sure.
25                  MS. ROSENBLATT:  That was
```

1          Yevsey Tseytelman
2      Exhibit 6 and this is Exhibit 7.
3          Q.      Mr. Tseytelman, I have
4    displayed on my screen what's been marked
5    as Plaintiff's Exhibit 6.  Did you have a
6    chance to review each of the checks
7    contained in this exhibit?
8          A.      Yeah.
9          Q.      Who wrote out these checks?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12      to answer on the grounds of the
13      Fifth Amendment privilege against
14      self-incrimination.
15          A.      On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18          Q.      Who signed the checks?
19              MS. SKLYUT:  Objection.
20              I instruct the witness not
21      to answer on the grounds of the
22      Fifth Amendment privilege against
23      self-incrimination.
24          A.      On the advice of counsel, I
25    invoke my Fifth Amendment right and

Page 175

1           Yevsey Tseytelman

2    respectfully decline to answer.

3         Q.      Is Dr. Kelly's signature on

4    the checks?

5              MS. SKLYUT:  Objection.

6              I instruct the witness not

7         to answer on the grounds of the

8         Fifth Amendment privilege against

9         self-incrimination.

10        A.      On the advice of counsel, I

11   invoke my Fifth Amendment right and

12   respectfully decline to answer.

13        Q.      Aside from what's contained

14   in Plaintiff's Exhibit 6, did the PC

15   defendants issue any additional checks to

16   GMO Consulting?

17             MS. SKLYUT:  Objection.

18             I instruct the witness not

19        to answer on the grounds of the

20        Fifth Amendment privilege against

21        self-incrimination.

22        A.      On the advice of counsel, I

23   invoke my Fifth Amendment right and

24   respectfully decline to answer.

25        Q.      Why were these checks issued

Page 176

1              Yevsey Tseytelman
2       to GMO Consulting?
3                MS. SKLYUT:  Objection.
4                I instruct the witness not
5          to answer on the grounds of the
6          Fifth Amendment privilege against
7          self-incrimination.
8          A.        On the advice of counsel, I
9       invoke my Fifth Amendment right and
10      respectfully decline to answer.
11         Q.        Are there any invoices or
12      business records relating to these
13      payments?
14                MS. SKLYUT:  Objection.
15                I instruct the witness not
16         to answer on the grounds of the
17         Fifth Amendment privilege against
18         self-incrimination.
19         A.        On the advice of counsel, I
20      invoke my Fifth Amendment right and
21      respectfully decline to answer.
22         Q.        Why were these checks issued
23      to GMO Consulting?
24                MS. SKLYUT:  Objection.
25                I instruct the witness not

Page 177

```
 1              Yevsey Tseytelman
 2       to answer on the grounds of the Fifth
 3       Amendment privilege against
 4       self-incrimation.
 5       A.        On the advice of counsel, I
 6   invoke my Fifth Amendment right and
 7   respectfully decline to answer.
 8       Q.        Did GMO Consulting provide
 9   any legitimate business, services or
10   goods in connection with these payments?
11              MS. SKLYUT:  Objection.
12              I instruct the witness not
13       to answer on the grounds of the
14       Fifth Amendment privilege against
15       self-incrimation.
16       A.        On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19       Q.        Isn't it true GMO Consulting
20   did not provide any legitimate business,
21   services or goods in connection with
22   these payments?
23              MS. SKLYUT:  Objection.
24              I instruct the witness not
25       to answer on the grounds of the
```

Page 178

```
 1              Yevsey Tseytelman
 2       Fifth Amendment privilege against
 3       self-incrimination.
 4       A.      On the advice of counsel, I
 5  invoke my Fifth Amendment right and
 6  respectfully decline to answer.
 7       Q.      Did you deposit these checks
 8  into GMO Consulting's Wells Fargo bank
 9  account?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12       to answer on the grounds of the
13       Fifth Amendment privilege against
14       self-incrimination.
15       A.      On the advice of counsel, I
16  invoke my Fifth Amendment right and
17  respectfully decline to answer.
18       Q.      Now I'm displaying what's
19  been marked as Exhibit 7, Plaintiff's
20  Exhibit 7.
21              Mr. Tseytelman, did you
22  have a chance to review each of the
23  checks contained in Plaintiff's Exhibit
24  7?
25       A.      Yes.
```

Page 179

```
 1                Yevsey Tseytelman
 2        Q.       Who wrote out these checks?
 3                MS. SKLYUT:  Objection.
 4                I instruct the witness not
 5        to answer on the grounds of the
 6        Fifth Amendment privilege against
 7        self-incrimination.
 8        A.       On the advice of counsel, I
 9    invoke my Fifth Amendment right and
10    respectfully decline to answer.
11        Q.       Who signed these checks?
12                MS. SKLYUT:  Objection.
13                I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.       On the advice of counsel, I
18    invoke my Fifth Amendment right and
19    respectfully decline to answer.
20        Q.       Is Dr. Kelly's signature on
21    these checks?
22                MS. SKLYUT:  Objection.
23                I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against
```

```
                                      Page 180

 1              Yevsey Tseytelman

 2         self-incrimination.

 3         A.        On the advice of counsel, I

 4    invoke my Fifth Amendment right and

 5    respectfully decline to answer.

 6         Q.        Aside from what's contained

 7    in Plaintiff's Exhibit 7, did the PC

 8    defendants issue any additional payments

 9    to AMG Management, Inc?

10              MS. SKLYUT:  Objection.

11              I instruct the witness not

12         to answer on the grounds of the

13         Fifth Amendment privilege against

14         self-incrimination.

15         A.        On the advice of counsel, I

16    invoke my Fifth Amendment right and

17    respectfully decline to answer.

18         Q.        Why were these checks issued

19    to AMG Management, Inc.?

20              MS. SKLYUT:  Objection.

21              I instruct the witness not

22         to answer on the grounds of the

23         Fifth Amendment privilege against

24         self-incrimination.

25         A.        On the advice of counsel, I
```

Page 181

```
 1            Yevsey Tseytelman
 2    invoke my Fifth Amendment right and
 3    respectfully decline to answer.
 4        Q.      Are there any invoices or
 5    business records relating to these
 6    payments?
 7            MS. SKLYUT:  Objection.
 8            I instruct the witness not
 9        to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12        A.      On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15        Q.      Why were these checks issued
16    to AMG Management, Inc.?
17            MS. SKLYUT:  Objection.  I
18        instruct the witness not to answer on
19        the grounds of the Fifth Amendment
20        privilege against self-incrimination.
21        A.      On the advice of counsel, I
22    invoke my Fifth Amendment right and
23    respectfully decline to answer.
24        Q.      Did AMG Management, Inc.
25    provide any legitimate business, services
```

Page 182

1                    Yevsey Tseytelman

2      or goods in connection with these

3      payments?

4                    MS. SKLYUT:  Objection.

5                    I instruct the witness not

6           to answer on the grounds of the

7           Fifth Amendment privilege against

8           self-incrimination.

9           A.       On the advice of counsel, I

10     invoke my Fifth Amendment right and

11     respectfully decline to answer.

12          Q.       Isn't it true AMG

13     Management, Inc. did not provide any

14     legitimate business, services or goods in

15     connection with these payments?

16                   MS. SKLYUT:  Objection.

17                   I instruct the witness not

18          to answer on the grounds of the

19          Fifth Amendment privilege against

20          self-incrimination.

21          A.       On the advice of counsel, I

22     invoke my Fifth Amendment right and

23     respectfully decline to answer.

24          Q.       Did you deposit these checks

25     into AMG Management, Inc.'s Northfield

```
                                              Page 183
 1                  Yevsey Tseytelman
 2      bank account?
 3                  MS. SKLYUT:  Objection.
 4                       I instruct the witness not
 5            to answer on the grounds of the
 6            Fifth Amendment privilege against
 7            self-incrimination.
 8            A.        On the advice of counsel, I
 9      invoke my Fifth Amendment right and
10      respectfully decline to answer.
11            Q.        None of the payments issued
12      by the PC defendants to your companies
13      were for any legitimate purpose, correct?
14                  MS. SKLYUT:  Objection.
15                       I instruct the witness not
16            to answer on the grounds of the
17            Fifth Amendment privilege against
18            self-incrimination.
19            A.        On the advice of counsel, I
20      invoke my Fifth Amendment right and
21      respectfully decline to answer.
22            Q.        In fact, from January 2018
23      to present, GMO Consulting has never
24      served any legitimate business purpose?
25                  MS. SKLYUT:  Objection.
```

Page 184

1              Yevsey Tseytelman
2                   I instruct the witness not
3         to answer on the grounds of the
4         Fifth Amendment privilege against
5         self-incrimination.
6         A.        On the advice of counsel, I
7    invoke my Fifth Amendment right and
8    respectfully decline to answer.
9         Q.        From January 2018 to
10   present, GMO Consulting has not provided
11   any legitimate goods or services?
12                  MS. SKLYUT:  Objection.
13                  I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.        On the advice of counsel, I
18   invoke my Fifth Amendment right and
19   respectfully decline to answer.
20        Q.        During that same time frame,
21   AMG Management has never served any
22   legitimate purpose?
23                  MS. SKLYUT:  Objection.
24                  I instruct the witness not
25        to answer on the grounds of the

```
                                              Page 185
 1                    Yevsey Tseytelman
 2           Fifth Amendment privilege against
 3           self-incrimination.
 4              A.       On the advice of counsel, I
 5       invoke my Fifth Amendment right and
 6       respectfully decline to answer.
 7              Q.       During that same time frame,
 8       AMG Management did not provide any
 9       legitimate goods or services?
10                   MS. SKLYUT:  Objection.
11                   I instruct the witness not
12           to answer on the grounds of the
13           Fifth Amendment privilege against
14           self-incrimination.
15              A.       On the advice of counsel, I
16       invoke my Fifth Amendment right and
17       respectfully decline to answer.
18              Q.       Were the checks from the PC
19       defendants to GMO Consulting issued so
20       you could launder money to fund a
21       no-fault fraud scheme involving the PC
22       defendants?
23                   MS. SKLYUT:  Objection.
24                   I instruct the witness not
25           to answer on the grounds of the
```

Page 186

1              Yevsey Tseytelman
2         Fifth Amendment privilege against
3         self-incrimination.
4         A.      On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7         Q.      Were the checks from the PC
8    defendants to GMO Consulting issued so
9    you could funnel money to unlicensed
10   individuals that owned and controlled the
11   PC defendants?
12              MS. SKLYUT:  Objection.
13              I instruct the witness not
14        to answer on the grounds of the
15        Fifth Amendment privilege against
16        self-incrimination.
17        A.      On the advice of counsel, I
18   invoke my Fifth Amendment right and
19   respectfully decline to answer.
20        Q.      Were the checks from the PC
21   defendants to GMO Consulting issued in
22   order to conceal the identity of
23   unlicensed individuals who profited from
24   the scheme involving the PC defendants?
25              MS. SKLYUT:  Objection.

Page 187

```
 1              Yevsey Tseytelman
 2                  I instruct the witness not
 3          to answer on the grounds of the
 4          Fifth Amendment privilege against
 5          self-incrimination.
 6          A.        On the advice of counsel, I
 7      invoke my Fifth Amendment right and
 8      respectfully decline to answer.
 9          Q.        Were the checks from the PC
10      defendants to GMO Consulting issued to
11      pay for patient referrals at no-fault
12      clinics?
13                  MS. SKLYUT:  Objection.
14                  I instruct the witness not
15          to answer on the grounds of the
16          Fifth Amendment privilege against
17          self-incrimination.
18          A.        On the advice of counsel, I
19      invoke my Fifth Amendment right and
20      respectfully decline to answer.
21          Q.        Were those monies actually
22      used to pay for patient referrals at the
23      no-fault clinics?
24                  MS. SKLYUT:  Objection.
25                  I instruct the witness not
```

Page 188

1               Yevsey Tseytelman

2          to answer on the grounds of the

3          Fifth Amendment privilege against

4          self-incrimination.

5          A.     On the advice of counsel, I

6     invoke my Fifth Amendment right and

7     respectfully decline to answer.

8          Q.     Were the checks from the PC

9     defendants to GMO Consulting issued to

10    pay for patient referrals to the PC

11    defendants?

12                MS. SKLYUT:  Objection.

13                I instruct the witness not

14         to answer on the grounds of the

15         Fifth Amendment privilege against

16         self-incrimination.

17         A.     On the advice of counsel, I

18    invoke my Fifth Amendment right and

19    respectfully decline to answer.

20         Q.     Were those monies actually

21    used to pay for patient referrals to the

22    PC defendants?

23                MS. SKLYUT:  Objection.

24                I instruct the witness not

25         to answer on the grounds of the

Page 189

1                    Yevsey Tseytelman
2          Fifth Amendment privilege against
3          self-incrimination.
4          A.        On the advice of counsel, I
5     invoke my Fifth Amendment right and
6     respectfully decline to answer.
7          Q.        Were the checks from the PC
8     defendants to GMO Consulting issued to
9     pay kickbacks at no-fault clinics?
10                   MS. SKLYUT:  Objection.
11                   I instruct the witness not
12          to answer on the grounds of the
13          Fifth Amendment privilege against
14          self-incrimination.
15          A.        On the advice of counsel, I
16     invoke my Fifth Amendment right and
17     respectfully decline to answer.
18          Q.        Were those monies actually
19     used to pay kickbacks at no-fault
20     clinics?
21                   MS. SKLYUT:  Objection.
22                   I instruct the witness not
23          to answer on the grounds of the
24          Fifth Amendment privilege against
25          self-incrimination.

Page 190

1              Yevsey Tseytelman

2        A.        On the advice of counsel, I

3    invoke my Fifth Amendment right and

4    respectfully decline to answer.

5        Q.        Were the checks from the PC

6    defendants to GMO Consulting issued to

7    pay unlicensed individuals that control

8    no-fault clinics?

9              MS. SKLYUT:  Objection.

10              I instruct the witness not

11       to answer on the grounds of the

12       Fifth Amendment privilege against

13       self-incrimination.

14       A.        On the advice of counsel, I

15    invoke my Fifth Amendment right and

16    respectfully decline to answer.

17       Q.        Were the checks from the PC

18    defendants to AMG Management issued so

19    that you could launder money to fund the

20    no-fault fraud scheme involving the PC

21    defendant?

22              MS. SKLYUT:  Objection.

23              I instruct the witness not

24       to answer on the grounds of the

25       Fifth Amendment privilege against

Page 191

1              Yevsey Tseytelman
2         self-incrimination.
3         A.      On the advice of counsel, I
4    invoke my Fifth Amendment right and
5    respectfully decline to answer.
6         Q.      Were the checks from the PC
7    defendants to AMG Management issued so
8    you could funnel money to unlicensed
9    individuals that own and control the PC
10   defendants?
11              MS. SKLYUT:  Objection.
12              I instruct the witness not
13         to answer on the grounds of the
14         Fifth Amendment privilege against
15         self-incrimination.
16        A.      On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19        Q.      Were the check from the PC
20   defendants to AMG Management issued in
21   order to conceal the identity of
22   unlicensed individuals who profited from
23   the scheme involving the PC defendants?
24              MS. SKLYUT:  Objection.
25              I instruct the witness not

                                        Page 192

1                    Yevsey Tseytelman
2          to answer on the grounds of the
3          Fifth Amendment privilege against
4          self-incrimination.
5          A.      On the advice of counsel, I
6    invoke my Fifth Amendment right and
7    respectfully decline to answer.
8          Q.      Were the checks from the PC
9    defendants to AMG Management issued to
10   pay for patient referrals at no-fault
11   clinics?
12                 MS. SKLYUT:  Objection.
13                 I instruct the witness not
14         to answer on the grounds of the
15         Fifth Amendment privilege against
16         self-incrimination.
17         A.      On the advice of counsel, I
18   invoke my Fifth Amendment right and
19   respectfully decline to answer.
20         Q.      Were those monies actually
21   used to pay for patient referrals at the
22   no-fault clinics?
23                 MS. SKLYUT:  Objection.
24                 I instruct the witness not
25         to answer on the grounds of the

Page 193

```
 1              Yevsey Tseytelman
 2        Fifth Amendment privilege against
 3        self-incrimination.
 4        A.      On the advice of counsel, I
 5   invoke my Fifth Amendment right and
 6   respectfully decline to answer.
 7        Q.      Were the checks from the PC
 8   defendants to AMG Management issued to
 9   pay for patient referrals to the PC
10   defendants?
11              MS. SKLYUT:  Objection.
12              I instruct the witness not
13        to answer on the grounds of the
14        Fifth Amendment privilege against
15        self-incrimination.
16        A.      On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19        Q.      Were the checks from the PC
20   defendants to AMG issued to pay kickbacks
21   at no-fault clinics?
22              MS. SKLYUT:  Objection.
23              I instruct the witness not
24        to answer on the grounds of the
25        Fifth Amendment privilege against
```

Page 194

1                    Yevsey Tseytelman

2           self-incrimination.

3           A.        On the advice of counsel, I

4      invoke my Fifth Amendment right and

5      respectfully decline to answer.

6           Q.        Were those monies actually

7      used to pay kickbacks at no-fault

8      clinics?

9                    MS. SKLYUT:  Objection.

10                    I instruct the witness not

11          to answer on the grounds of the

12          Fifth Amendment privilege against

13          self-incrimination.

14          A.        On the advice of counsel, I

15      invoke my Fifth Amendment right and

16      respectfully decline to answer.

17          Q.        Were the checks from the PC

18      defendants to AMG Management issued to

19      pay unlicensed individuals that control

20      the no-fault clinics?

21                    MS. SKLYUT:  Objection.

22                    I instruct the witness not

23          to answer on the grounds of the

24          Fifth Amendment privilege against

25          self-incrimination.

```
                                          Page 195
 1                    Yevsey Tseytelman
 2         A.        On the advice of counsel, I
 3    invoke my Fifth Amendment right and
 4    respectfully decline to answer.
 5         Q.        Were the monies from the PC
 6    defendants used to pay unlicensed
 7    individuals that control the no-fault
 8    clinics?
 9                   MS. SKLYUT:  Objection.
10                   I instruct the witness not
11         to answer on the grounds of the
12         Fifth Amendment privilege against
13         self-incrimination.
14         A.        On the advice of counsel, I
15    invoke my Fifth Amendment right and
16    respectfully decline to answer.
17         Q.        What did you do with the
18    money you received from the PC
19    defendants?
20                   MS. SKLYUT:  Objection.
21                   I instruct the witness not
22         to answer on the grounds of the
23         Fifth Amendment privilege against
24         self-incrimination.
25         A.        On the advice of counsel, I
```

Page 196

1              Yevsey Tseytelman
2     invoke my Fifth Amendment right and
3     respectfully decline to answer.
4          Q.      Isn't it true you issued
5     checks to other companies you owned which
6     you converted to cash?
7                  MS. SKLYUT:  Objection.
8                  I instruct the witness not
9          to answer on the grounds of the
10         Fifth Amendment privilege against
11         self-incrimination.
12         A.      On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15                 MS. ROSENBLATT:  I'm going
16         to circulate another exhibit.  I'm
17         going to display it on my screen.
18                 I'm displaying Plaintiff's
19         Exhibit 8 on the screen.  This is a
20         101 page document.  I can represent
21         for the record that it contains
22         checks from GMO Consulting to Ezra,
23         Inc. and Leomax Inc., all of which
24         were cashed at Hao Yun Good Luck
25         Corp.

Page 197

1              Yevsey Tseytelman
2                    (The above-referred-to
3        document was marked as Plaintiff's
4        Exhibit 8 for identification as of
5        this date.)
6                    MS. ROSENBLATT:  Do you want
7        to go off the record to take a minute
8        for the witness to review the checks?
9                    MS. SKLYUT:  Okay.
10                    MS. ROSENBLATT:  I e-mailed
11        it to you.  Do you want to look at it
12        on your own or do you want me to
13        scroll through it again?
14                    MS. SKLYUT:  If you can
15        scroll through it, that's fine.
16                    MS. ROSENBLATT:  All right.
17                    MS. SKLYUT:  Off the record.
18                    (A discussion was held off
19        the record.)
20        Q.       Mr. Tseytelman, have you had
21    a chance to review the checks contained
22    in Plaintiff's Exhibit 8?
23        A.       Yes, yes, yes.
24        Q.       Do you recognize those
25    checks?

Page 198

1                    Yevsey Tseytelman
2          A.        Yes.
3          Q.        Plaintiff's Exhibit 8
4      contains checks that you issued from GMO
5      Consulting to various other entities,
6      correct?
7                    MS. SKLYUT:  Objection.
8                    I instruct the witness not
9          to answer on the grounds of the
10         Fifth Amendment privilege against
11         self-incrimination.
12         A.        On the advice of counsel, I
13     invoke my Fifth Amendment right and
14     respectfully decline to answer.
15         Q.        That includes checks that
16     you issued to Ezra, Inc.?
17                   MS. SKLYUT:  Objection.
18                   I instruct the witness not
19         to answer on the grounds of the
20         Fifth Amendment privilege against
21         self-incrimination.
22         A.        On the advice of counsel, I
23     invoke my Fifth Amendment right and
24     respectfully decline to answer.
25         Q.        That contains checks you

Page 199

1              Yevsey Tseytelman
2      issued to Leomax, Inc.?
3                  MS. SKLYUT:  Objection.
4                  I instruct the witness not
5          to answer on the grounds of the
6          Fifth Amendment privilege against
7          self-incrimination.
8          A.       On the advice of counsel, I
9      invoke my Fifth Amendment right and
10     respectfully decline to answer.
11         Q.       And that contains checks
12     that you issued to Okay Billing, Inc.?
13                 MS. SKLYUT:  Objection.
14                 I instruct the witness not
15         to answer on the grounds of the
16         Fifth Amendment privilege against
17         self-incrimination.
18         A.       On the advice of counsel, I
19     invoke my Fifth Amendment right and
20     respectfully decline to answer.
21         Q.       After issuing those checks,
22     you converted them to cash at Hao Yun
23     Good Luck Corp.?
24                 MS. SKLYUT:  Objection.
25                 I instruct the witness not

Page 200

```
 1              Yevsey Tseytelman
 2         to answer on the grounds of the
 3         Fifth Amendment privilege against
 4         self-incrimination.
 5         A.       On the advice of counsel, I
 6    invoke my Fifth Amendment right and
 7    respectfully decline to answer.
 8         Q.       You did so in furtherance of
 9    the no-fault fraud scheme involving the
10    PC defendants?
11              MS. SKLYUT:  Objection.
12              I instruct the witness not
13         to answer on the grounds of the
14         Fifth Amendment privilege against
15         self-incrimination.
16         A.       On the advice of counsel, I
17    invoke my Fifth Amendment right and
18    respectfully decline to answer.
19              MS. ROSENBLATT:  I'm going
20         to stop sharing my screen.
21         Q.       Are you familiar with a
22    company called Lexton, LLC?
23              MS. SKLYUT:  Objection.
24              I instruct the witness not
25         to answer on the grounds of the
```

Page 201

1              Yevsey Tseytelman
2         Fifth Amendment privilege against
3         self-incrimination.
4         A.       On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7         Q.       Are you familiar with a
8    person named Alex Fleyshmakher?
9                  MS. SKLYUT:  Objection.
10                 I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination
14        A.       On the advice of counsel, I
15   invoke my Fifth Amendment right and
16   respectfully decline to answer.
17        Q.       AMG management issued
18   payments to Lexton, correct?
19                 MS. SKLYUT:  Objection.
20                 I instruct the witness not
21        to answer on the grounds of the
22        Fifth Amendment privilege against
23        self-incrimination.
24        A.       On the advice of counsel, I
25   invoke my Fifth Amendment right and

Page 202

1              Yevsey Tseytelman
2    respectfully decline to answer.
3         Q.      GMO Consulting also issued
4    payments to Lexton?
5              MS. SKLYUT:  Objection.
6              I instruct the witness not
7         to answer on the grounds of the
8         Fifth Amendment privilege against
9         self-incrimination.
10        A.      On the advice of counsel, I
11   invoke my Fifth Amendment right and
12   respectfully decline to answer.
13        Q.      Lexton does not serve a
14   legitimate business purpose?
15             MS. SKLYUT:  Objection.
16             I instruct the witness not
17        to answer on the grounds of the
18        Fifth Amendment privilege against
19        self-incrimination.
20        A.      On the advice of counsel, I
21   invoke my Fifth Amendment right and
22   respectfully decline to answer.
23        Q.      Has Lexton provided any
24   legitimate goods or services?
25             MS. SKLYUT:  Objection.

Page 203

                    Yevsey Tseytelman

1                        I instruct the witness not
2          to answer on the grounds of the
3          Fifth Amendment privilege against
4          self-incrimination.
5       A.        On the advice of counsel, I
6    invoke my Fifth Amendment right and
7    respectfully decline to answer.
8       Q.        Has Lexton ever provided any
9    legitimate goods or services?
10                    MS. SKLYUT:  Objection.
11                    I instruct the witness not
12         to answer on the grounds of the Fifth
13         Amendment privilege against
14         self-incrimination.
15      A.        On the advice of counsel, I
16   invoke my Fifth Amendment right and
17   respectfully decline to answer.
18      Q.        You issued the payments to
19   Lexton because GMO Consulting and AMG
20   Management are used to funnel money
21   received relating to no-fault fraud
22   schemes?
23                    MS. SKLYUT:  Objection.
24                    I instruct the witness not

Page 204

1              Yevsey Tseytelman

2        to answer on the grounds of the

3        Fifth Amendment privilege against

4        self-incrimination

5        A.      On the advice of counsel, I

6    invoke my Fifth Amendment right and

7    respectfully decline to answer.

8        Q.      That includes funneling

9    money that you received as a result of

10   the no-fault fraud scheme involving the

11   PC defendants?

12              MS. SKLYUT:  Objection.

13              I instruct the witness not

14       to answer on the grounds of the

15       Fifth Amendment privilege against

16       self-incrimination.

17       A.      On the advice of counsel, I

18   invoke my Fifth Amendment right and

19   respectfully decline to answer.

20       Q.      GMO Consulting and AMG

21   Management are used to pay participants

22   in no-fault fraud schemes, correct?

23              MS. SKLYUT:  Objection.

24              I instruct the witness not

25       to answer on the grounds of the

Page 205

1              Yevsey Tseytelman
2         Fifth Amendment privilege against
3         self-incrimination.
4         A.      On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7         Q.      That includes paying
8    participants in the no-fault fraud scheme
9    involving the PC defendants?
10             MS. SKLYUT:  Objection.
11             I instruct the witness not
12        to answer on the grounds of the
13        Fifth Amendment privilege against
14        self-incrimination.
15        A.      On the advice of counsel, I
16   invoke my Fifth Amendment right and
17   respectfully decline to answer.
18        Q.      GMO Consulting and AMG
19   Management are also used to pay kickbacks
20   at no-fault clinics?
21             MS. SKLYUT:  Objection.
22             I instruct the witness not
23        to answer on the grounds of the
24        Fifth Amendment privilege against
25        self-incrimination.

Page 206

1              Yevsey Tseytelman
2        A.        On the advice of counsel, I
3    invoke my Fifth Amendment right and
4    respectfully decline to answer.
5        Q.        GMO Consulting and AMG
6    Management are also used to conceal the
7    identity of individuals who profited from
8    the no-fault fraud schemes?
9                  MS. SKLYUT:  Objection.
10                 I instruct the witness not
11        to answer on the grounds of the
12        Fifth Amendment privilege against
13        self-incrimination.
14        A.        On the advice of counsel, I
15    invoke my Fifth Amendment right and
16    respectfully decline to answer.
17        Q.        That includes concealing the
18    identities of individuals who profited
19    from the no-fault fraud scheme involving
20    the PC defendants?
21                 MS. SKLYUT:  Objection.
22                 I instruct the witness not
23        to answer on the grounds of the
24        Fifth Amendment privilege against
25        self-incrimination.

Page 207

1                   Yevsey Tseytelman

2          A.        On the advice of counsel, I

3     invoke my Fifth Amendment right and

4     respectfully decline to answer.

5          Q.        Are you familiar with a

6     company called Expert Consulting?

7                    MS. SKLYUT:  Objection.

8                    I instruct the witness not

9          to answer on the grounds of the

10         Fifth Amendment privilege against

11         self-incrimination.

12         A.        On the advice of counsel, I

13    invoke my Fifth Amendment right and

14    respectfully decline to answer.

15         Q.        Are you familiar with a

16    person named Egor Farbarov (phonetic)?

17                   MS. SKLYUT:  Objection.

18                   I instruct the witness not

19         to answer on the grounds of the Fifth

20         Amendment privilege against

21         self-incrimination.

22         A.        On the advice of counsel, I

23    invoke my Fifth Amendment right and

24    respectfully decline to answer.

25         Q.        GMO Consulting issued

Page 208

1                    Yevsey Tseytelman
2      payments to Expert Consulting?
3                    MS. SKLYUT:  Objection.
4                    I instruct the witness not
5         to answer on the grounds of the
6         Fifth Amendment privilege against
7         self-incrimination.
8         A.        On the advice of counsel, I
9      invoke my Fifth Amendment right and
10     respectfully decline to answer.
11        Q.        Expert Consulting also
12     issued payments to GMO Consulting?
13                   MS. SKLYUT:  Objection.
14                   I instruct the witness not
15        to answer on the grounds of the
16        Fifth Amendment privilege against
17        self-incrimination.
18        A.        On the advice of counsel, I
19     invoke my Fifth Amendment right and
20     respectfully decline to answer.
21        Q.        Did GMO Consulting serve any
22     legitimate business purpose?
23                   MS. SKLYUT:  Objection.
24                   I instruct the witness not
25        to answer on the grounds of the

Page 209

```
 1                    Yevsey Tseytelman
 2          Fifth Amendment privilege against
 3          self-incrimination.
 4          A.        On the advice of counsel, I
 5     invoke my Fifth Amendment right and
 6     respectfully decline to answer.
 7          Q.        Does GMO Consulting provide
 8     any legitimate goods or services?  I'm
 9     sorry.  Withdrawn.
10                    Does Expert Consulting
11     provide any legitimate goods or services?
12                    MS. SKLYUT:  Objection.
13                    I instruct the witness not
14          to answer on the grounds of the
15          Fifth Amendment privilege against
16          self-incrimination.
17          A.        On the advice of counsel, I
18     invoke my Fifth Amendment right and
19     respectfully decline to answer.
20          Q.        Has Expert Consulting ever
21     provided any legitimate goods or
22     services?
23                    MS. SKLYUT:  Objection.
24                    I instruct the witness not
25          to answer on the grounds of the
```

Page 210

```
 1              Yevsey Tseytelman
 2         Fifth Amendment privilege against
 3         self-incrimination.
 4         A.      On the advice of counsel, I
 5    invoke my Fifth Amendment right and
 6    respectfully decline to answer.
 7         Q.      You issued these payments in
 8    connection with the scheme involving the
 9    PC defendants, correct?
10              MS. SKLYUT:  Objection.
11              I instruct the witness not
12         to answer on the grounds of the
13         Fifth Amendment privilege against
14         self-incrimination.
15         A.      On the advice of counsel, I
16    invoke my Fifth Amendment right and
17    respectfully decline to answer.
18         Q.      And you received payments
19    from Expert Consulting in connection with
20    the fraudulent scheme involving the PC
21    defendants?
22              MS. SKLYUT:  Objection.
23              I instruct the witness not
24         to answer on the grounds of the
25         Fifth Amendment privilege against
```

Page 211

1                    Yevsey Tseytelman
2          self-incrimination.
3          A.       On the advice of counsel, I
4    invoke my Fifth Amendment right and
5    respectfully decline to answer.
6                    MS. ROSENBLATT:  I'm
7          circulating two more exhibits.
8                    Just before we get to that,
9          I'm going to share my screen again
10         with Exhibit 6.
11         Q.       You previously reviewed the
12   15 checks contained in this exhibit.
13   Whose handwriting is on the face of each
14   of these checks?
15                  MS. SKLYUT:  Objection.
16                  I instruct the witness not
17         to answer on the grounds of the
18         Fifth Amendment privilege against
19         self-incrimination.
20         A.       On the advice of counsel, I
21   invoke my Fifth Amendment right and
22   respectfully decline to answer.
23         Q.       Who endorsed each of these
24   checks?
25                  MS. SKLYUT:  Objection.

Page 212

1              Yevsey Tseytelman

2                   I instruct the witness not

3         to answer on the grounds of the

4         Fifth Amendment privilege against

5         self-incrimination.

6         A.         On the advice of counsel, I

7    invoke my Fifth Amendment right and

8    respectfully decline to answer.

9         Q.         I'm now displaying what was

10    previously marked as Plaintiff's Exhibit

11    7 again.

12                   You previously had an

13    opportunity to review these checks.

14    Whose handwriting is on the face of

15    each of these checks?

16                   MS. SKLYUT:  Objection.

17                   I instruct the witness not

18         to answer on the grounds of the

19         Fifth Amendment privilege against

20         self-incrimination.

21         A.         On the advice of counsel, I

22    invoke my Fifth Amendment right and

23    respectfully decline to answer.

24         Q.         Who signed the endorsements

25    of each of these checks?

```
                                        Page 213

 1               Yevsey Tseytelman

 2               MS. SKLYUT:  Objection.

 3               I instruct the witness not

 4        to answer on the grounds of the

 5        Fifth Amendment privilege against

 6        self-incrimination.

 7        A.      On the advice of counsel, I

 8    invoke my Fifth Amendment right and

 9    respectfully decline to answer.

10               MS. ROSENBLATT:  I'm going

11        to stop sharing the screen.

12        Q.      I'm sharing the screen once

13    against with Exhibit 8 which you

14    previously reviewed.

15               Whose handwriting is on the

16    face of each of these checks?

17               MS. SKLYUT:  Objection.

18               I instruct the witness not

19        to answer on the grounds of the

20        Fifth Amendment privilege against

21        self-incrimination.

22        A.      On the advice of counsel, I

23    invoke my Fifth Amendment right and

24    respectfully decline to answer.

25        Q.      Whose signature is on each
```

Page 214

                           Yevsey Tseytelman
1
2     of these checks?
3                       MS. SKLYUT:  Objection.
4                       I instruct the witness not
5             to answer on the grounds of the
6             Fifth Amendment privilege against
7             self-incrimination.
8             A.        On the advice of counsel, I
9     invoke my Fifth Amendment right and
10    respectfully decline to answer.
11            Q.        Did you issue these checks
12    at the direction of another?
13                      MS. SKLYUT:  Objection.
14                      I instruct the witness not
15            to answer on the grounds of the
16            Fifth Amendment privilege against
17            self-incrimination.
18            A.        On the advice of counsel, I
19    invoke my Fifth Amendment right and
20    respectfully decline to answer.
21                      MS. ROSENBLATT:  I'm now
22            displaying on my screen what was
23            marked as Plaintiff's Exhibit 9.
24            It's a two-page document.
25                      (The above-referred-to

Page 215

```
 1              Yevsey Tseytelman
 2         document was marked as Plaintiff's
 3         Exhibit 9 for identification as of
 4         this date.)
 5         Q.      Taking a look at the first,
 6    it's a check from AMG Management to
 7    Lexton in the amount of $22,000.  Do you
 8    see this check?
 9         A.      Yeah.
10         Q.      Whose handwriting is on the
11    face of this check?
12              MS. SKLYUT:  Objection.
13              I instruct the witness not
14         to answer on the grounds of the
15         Fifth Amendment privilege against
16         self-incrimination.
17         A.      On the advice of counsel, I
18    invoke my Fifth Amendment right and
19    respectfully decline to answer.
20         Q.      Whose signature is on the
21    face of this check?
22              MS. SKLYUT:  Objection.
23              I instruct the witness not
24         to answer on the grounds of the
25         Fifth Amendment privilege against
```

Page 216

1          Yevsey Tseytelman

2      self-incrimination.

3          A.      On the advice of counsel, I

4      invoke my Fifth Amendment right and

5      respectfully decline to answer.

6          Q.      Scrolling down to page 2,

7      this is a check from GMO Consulting to

8      Lexton in the amount of $22,000.  Whose

9      handwriting is on the face of this check?

10                 MS. SKLYUT:  Objection.

11                 I instruct the witness not

12          to answer on the grounds of the

13          Fifth Amendment privilege against

14          self-incrimination.

15          A.      On the advice of counsel, I

16      invoke my Fifth Amendment right and

17      respectfully decline to answer.

18          Q.      Whose signature is on the

19      face of this check?

20                 MS. SKLYUT:  Objection.

21                 I instruct the witness not

22          to answer on the grounds of the

23          Fifth Amendment privilege against

24          self-incrimination.

25          A.      On the advice of counsel, I

Page 217

```
 1              Yevsey Tseytelman
 2    invoke my Fifth Amendment right and
 3    respectfully decline to answer.
 4              MS. ROSENBLATT:  Now we're
 5         taking a look at Plaintiff's Exhibit
 6         10.  This is a four-page document.
 7         It's checks from GMO Consulting to
 8         Expert Consulting.
 9              (The above-referred-to
10         document was marked as Plaintiff's
11         Exhibit 10 for identification as of
12         this date.)
13         Q.      I'll just scroll down so you
14    can take a look and I'll ask questions
15    about them together.
16              Whose handwriting is on the
17    face of these checks?
18              MS. SKLYUT:  Objection.
19              I instruct the witness not
20         to answer on the grounds of the
21         Fifth Amendment privilege against
22         self-incrimination.
23         A.      On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.
```

Page 218

1                    Yevsey Tseytelman
2         Q.        Whose signature is on these
3      checks?
4                    MS. SKLYUT:  Objection.
5                    I instruct the witness not
6           to answer on the grounds of the
7           Fifth Amendment privilege against
8           self-incrimination.
9         A.        On the advice of counsel, I
10      invoke my Fifth Amendment right and
11      respectfully decline to answer.
12                    MS. ROSENBLATT:  Now we're
13           taking a look at Exhibit 11.  These
14           are checks from Expert Consulting to
15           GMO, LLC.  It's a two-page document.
16                    (The above-referred-to
17           document was marked as Plaintiff's
18           Exhibit 11 for identification as of
19           this date.)
20         Q.        Here's page 1.  And I'll
21      scroll down to page 2.  Whose handwriting
22      is on the face of these checks?
23                    MS. SKLYUT:  Objection.
24                    I instruct the witness not
25           to answer on the grounds of the

Page 219

1           Yevsey Tseytelman
2       Fifth Amendment privilege against
3       self-incrimination.
4           A.      On the advice of counsel, I
5    invoke my Fifth Amendment right and
6    respectfully decline to answer.
7           Q.      Who signed the endorsements
8    on these checks?
9               MS. SKLYUT:  Objection.
10               I instruct the witness not
11       to answer on the grounds of the
12       Fifth Amendment privilege against
13       self-incrimination.
14           A.      On the advice of counsel, I
15    invoke my Fifth Amendment right and
16    respectfully decline to answer.
17           Q.      Were these checks deposited
18    into the corporate bank account for GMO
19    Consulting?
20               MS. SKLYUT:  Objection.
21               I instruct the witness not
22       to answer on the grounds of the
23       Fifth Amendment privilege against
24       self-incrimination.
25           A.      On the advice of counsel, I

Page 220

```
 1              Yevsey Tseytelman
 2      invoke my Fifth Amendment right and
 3      respectfully decline to answer.
 4              MS. ROSENBLATT:  I'm going
 5          to stop sharing the screen.
 6          Q.      In total, you transferred
 7      more than $185,000 from GMO Consulting to
 8      Ezra Supply, Inc., correct?
 9              MS. SKLYUT:  Objection.
10              I instruct the witness not
11          to answer on the grounds of the
12          Fifth Amendment privilege against
13          self-incrimination.
14          A.      On the advice of counsel, I
15      invoke my Fifth Amendment right and
16      respectfully decline to answer.
17          Q.      And in total you transferred
18      more than $103,000 from AMG Consulting --
19      I'm sorry -- AMG Marketing to Ezra
20      Supply, correct?
21              MS. SKLYUT:  Objection.
22              I instruct the witness not
23          to answer on the grounds of the
24          Fifth Amendment privilege against
25          self-incrimination.
```

Page 221

1                         Yevsey Tseytelman
2           A.         On the advice of counsel, I
3      invoke my Fifth Amendment right and
4      respectfully decline to answer.
5           Q.         Similarly, you transferred
6      more than $109,000 from AMG Management
7      Inc.'s corporate bank account to Leomax,
8      Inc.?
9                         MS. SKLYUT:  Objection.
10                        I instruct the witness not
11          to answer on the grounds of the
12          Fifth Amendment privilege against
13          self-incrimination.
14          A.         On the advice of counsel, I
15     invoke my Fifth Amendment right and
16     respectfully decline to answer.
17          Q.         And in total, you
18     transferred more than $297,000 from GMO
19     Consulting to Leomax, Inc.?
20                        MS. SKLYUT:  Objection.
21                        I instruct the witness not
22          to answer on the grounds of the
23          Fifth Amendment privilege against
24          self-incrimination.
25          A.         On the advice of counsel, I

Page 222

```
 1                    Yevsey Tseytelman
 2      invoke my Fifth Amendment right and
 3      respectfully decline to answer.
 4           Q.        You then converted these
 5      payments to cash?
 6                     MS. SKLYUT:  Objection.
 7                     I instruct the witness not
 8           to answer on the grounds of the
 9           Fifth Amendment privilege against
10           self-incrimination.
11           A.        On the advice of counsel, I
12      invoke my Fifth Amendment right and
13      respectfully decline to answer.
14           Q.        You issued those payments to
15      Leomax and Ezra because Leomax and Ezra
16      are used to funnel money relating to
17      no-fault fraud schemes?
18                     MS. SKLYUT:  Objection.
19                     I instruct the witness not
20           to answer on the grounds of the
21           Fifth Amendment privilege against
22           self-incrimination.
23           A.        On the advice of counsel, I
24      invoke my Fifth Amendment right and
25      respectfully decline to answer.
```

Page 223

                      Yevsey Tseytelman

1

2        Q.        That includes funneling

3    money that you received as a result of

4    the no-fault fraud scheme involving the

5    PC defendants?

6                    MS. SKLYUT:  Objection.

7                    I instruct the witness not

8        to answer on the grounds of the

9        Fifth Amendment privilege against

10       self-incrimination.

11       A.        On the advice of counsel, I

12   invoke my Fifth Amendment right and

13   respectfully decline to answer.

14       Q.        That includes paying

15   participants in no-fault fraud scheme

16   involving the PC defendants?

17                   MS. SKLYUT:  Objection.

18                   I instruct the witness not

19       to answer on the grounds of the

20       Fifth Amendment privilege against

21       self-incrimination.

22       A.        On the advice of counsel, I

23   invoke my Fifth Amendment right and

24   respectfully decline to answer.

25       Q.        Ezra Supply and Leomax are

Page 224

1              Yevsey Tseytelman

2      used to convert checks into cash to pay

3      kickbacks at no-fault clinics?

4              MS. SKLYUT:  Objection.

5              I instruct the witness not

6          to answer on the grounds of the

7          Fifth Amendment privilege against

8          self-incrimination.

9          A.      On the advice of counsel, I

10     invoke my Fifth Amendment right and

11     respectfully decline to answer.

12         Q.      They're used to convert

13     checks to cash in order to conceal the

14     identity of individuals who profited from

15     no-fault fraud schemes?

16             MS. SKLYUT:  Objection.

17             I instruct the witness not

18         to answer on the grounds of the

19         Fifth Amendment privilege against

20         self-incrimination.

21         A.      On the advice of counsel, I

22     invoke my Fifth Amendment right and

23     respectfully decline to answer.

24         Q.      That includes concealing the

25     identity of individuals who profited from

Page 225

1              Yevsey Tseytelman

2      the no-fault fraud scheme involving the

3      PC defendants?

4                  MS. SKLYUT:  Objection.

5                  I instruct the witness not

6          to answer on the grounds of the

7          Fifth Amendment privilege against

8          self-incrimination.

9          A.      On the advice of counsel, I

10     invoke my Fifth Amendment right and

11     respectfully decline to answer.

12         Q.      Who gave you instructions on

13     how to distribute that money?

14                 MS. SKLYUT:  Objection.

15                 I instruct the witness not

16         to answer on the grounds of the

17         Fifth Amendment privilege against

18         self-incrimination.

19         A.      On the advice of counsel, I

20     invoke my Fifth Amendment right and

21     respectfully decline to answer.

22         Q.      Who gave you instructions to

23     convert that money to cash?

24                 MS. SKLYUT:  Objection.

25                 I instruct the witness not

Page 226

1              Yevsey Tseytelman
2         to answer on the grounds of the
3         Fifth Amendment privilege against
4         self-incrimination.
5         A.        On the advice of counsel, I
6    invoke my Fifth Amendment right and
7    respectfully decline to answer.
8         Q.        Who gave you instructions
9    with respect to how to distribute the
10   cash?
11                  MS. SKLYUT:  Objection.
12                  I instruct the witness not
13        to answer on the grounds of the
14        Fifth Amendment privilege against
15        self-incrimination.
16        A.        On the advice of counsel, I
17   invoke my Fifth Amendment right and
18   respectfully decline to answer.
19        Q.        You never communicated with
20   Dr. Kelly?
21                  MS. SKLYUT:  Objection.
22                  I instruct the witness not
23        to answer on the grounds of the
24        Fifth Amendment privilege against
25        self-incrimination.

Page 227

1            Yevsey Tseytelman
2        A.        On the advice of counsel, I
3    invoke my Fifth Amendment right and
4    respectfully decline to answer.
5        Q.        You never provided any goods
6    or services to Dr. Kelly?
7                  MS. SKLYUT:  Objection.
8                  I instruct the witness not
9        to answer on the grounds of the
10        Fifth Amendment privilege against
11        self-incrimination.
12        A.        On the advice of counsel, I
13    invoke my Fifth Amendment right and
14    respectfully decline to answer.
15        Q.        You never provided
16    legitimate goods or services to the PC
17    defendants?
18                  MS. SKLYUT:  Objection.
19                  I instruct the witness not
20        to answer on the grounds of the
21        Fifth Amendment privilege against
22        self-incrimination.
23        A.        On the advice of counsel, I
24    invoke my Fifth Amendment right and
25    respectfully decline to answer.

Page 228

1              Yevsey Tseytelman
2      Q.        No company you own has ever
3  provided legitimate goods or services to
4  Dr. Kelly?
5              MS. SKLYUT:  Objection.
6              I instruct the witness not
7         to answer on the grounds of the
8         Fifth Amendment privilege against
9         self-incrimination.
10     A.        On the advice of counsel, I
11  invoke my Fifth Amendment right and
12  respectfully decline to answer.
13     Q.        No company you own has ever
14  provided legitimate goods or services to
15  the PC defendants?
16              MS. SKLYUT:  Objection.
17              I instruct the witness not
18         to answer on the grounds of the
19         Fifth Amendment privilege against
20         self-incrimination.
21     A.        On the advice of counsel, I
22  invoke my Fifth Amendment right and
23  respectfully decline to answer.
24     Q.        At any point today did
25  anyone suggest an answer to you in

Page 229

```
 1              Yevsey Tseytelman
 2    response to any of my questions?
 3              THE INTERPRETER:  Say again.
 4        Q.      At any point today did
 5    anyone suggest an answer to you in
 6    response to any of my questions?
 7        A.      No.
 8        Q.      During this deposition, did
 9    you exchange any electronic
10    communications of any kind regarding your
11    testimony?
12        A.      No.
13        Q.      During any break, did you
14    communicate with anyone other than your
15    attorney?
16        A.      No.
17              MS. ROSENBLATT:  I have no
18      further questions.
19              MS. SKLYUT:  Thank you.
20              MR. HEWITT:  No questions.
21              (Continued on following page
22      to include jurat.)
23
24
25
```

Page 230

1

2                    MS. SKLYUT:  Thank you.

3                    MS. ROSENBLATT:  Thank you,

4        Mr. Interpreter.

5                    THE INTERPRETER:  Thank you.

6                    (Time noted:  12:40 p.m.)

7

8

9        ------------------------------

10                        YEVSEY TSEYTELMAN

11

         Subscribed and sworn to

12

         before me on this _____day

13

         of _____, 2025.

14

15

16

         _____

17                        NOTARY PUBLIC

18

19

20

21

22

23

24

25

Page 231

1
2                          INDEX
3                    INDEX TO TESTIMONY
4                               Page          Line
5    Examination by                             1
     Ms. Rosenblatt
6
7          INDEX TO PLAINTIFF'S EXHIBITS
8
      Description                  Page          Line
9
     Exhibit 1 Subpoena             6            20
10
     Exhibit 2 Complaint,          35             8
11      34 pages
12   Exhibit 3 Complaint,          36            12
        303 pages
13
     Exhibit 4 Formation          48             7
14      records for GMO
        Consulting, 4 pages
15
     Exhibit 5 Business           57            19
16      account application
        for GMO Consulting
17      account at Wells
        Fargo, 1 page
18
     Exhibit 6 Various           172            13
19      checks from the PC
        defendants to GMO
20      Consulting, 15 pages
21   Exhibit 7 Checks from       172            23
        the various PC
22      defendants to AMG
        Management, Inc.,
23      11 pages
24
25

Page 232

1

2    Exhibit 8 Checks from        197              6
        GMO Consulting to
3        Ezra, Inc. and Leomax
        Inc., 101 pages
4
    Exhibit 9 Checks,            215              5
5        2 pages
6    Exhibit 10 Checks from       217             13
        GMO Consulting to
7        Expert Consulting,
        4 pages
8
    Exhibit 11 Checks from       218             20
9        Expert Consulting to
        GMO, LLC, 2 pages
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 233

1

2                   C E R T I F I C A T I O N

3

4          I, PENNIE ERICKSON, a Notary Public,

5     do hereby certify that the foregoing

6     witness, YEVSEY TSEYTELMAN, was duly

7     sworn on the date indicated, and that the

8     foregoing is a true and accurate

9     transcription of my stenographic notes.

10          I further certify that I am not

11     employed by nor related to any party to

12     this action.

13

14

        *Pennie Erickson*

15        PENNIE ERICKSON

16

17

18

19

20

21

22

23

24

25

Page 234

```
 1
 2                    ERRATA SHEET
             VERITEXT/NEW YORK REPORTING, LLC
 3                    1-800-727-6396
 4     330 Old Country Road    1250 Broadway
       Mineola, NY 11501       New York, NY 10001
 5
       NAME OF CASE:  GEICO V Harbor Medical
 6     DATE OF DEPOSITION: March 25, 2025
       NAME OF DEPONENT:  Yevsey Tseytelman
 7
 8     PAGE LINE (S)  CHANGE          REASON
       ____|_____|_____|_____
 9
       ____|_____|_____|_____
10
       ____|_____|_____|_____
11
       ____|_____|_____|_____
12
       ____|_____|_____|_____
13
       ____|_____|_____|_____
14
       ____|_____|_____|_____
15
       ____|_____|_____|_____
16
       ____|_____|_____|_____
17
       ____|_____|_____|_____
18
       ____|_____|_____|_____
19
       ____|_____|_____|_____
20
                          _____
21                        YEVSEY TSEYTELMAN
22
       SUBSCRIBED AND SWORN TO BEFORE ME
23     THIS ____ DAY OF _____, 20__.
24
       _____  _____
25      (NOTARY PUBLIC)   MY COMMISSION EXPIRES:
```

**[& - 7]**                                                                                                   Page 1

| & | | | 3 |
|---|---|---|---|

**&**

**&**   2:11

**0**

**0839**   17:18
**08857**   5:20
**09038**   1:3

**1**

**1**   6:13,22 7:13
   48:10 218:20
   231:5,9,17
**1-5**   1:14
**1-800-727-6...**
   234:3
**10**   217:6,11
   232:6
**10001**   234:4
**101**   196:20
   232:3
**103,000**   220:18
**109,000**   221:6
**10:17**   1:18
**11**   172:16
   218:13,18
   231:23 232:8
**11235**   2:21
**11501**   234:4
**11530**   2:13
**11556-0926**   2:6
**12**   231:12
**1250**   234:4
**12:40**   230:6

**13**   231:18
   232:6
**15**   172:5
   211:12 231:20
**17**   17:15
**172**   231:18,21
**185,000**   220:7
**19**   231:15
**197**   232:2
**199**   15:23
   48:16

**2**

**2**   35:3,9 216:6
   218:21 231:10
   232:5,9
**20**   231:9 232:8
   234:23
**2017**   71:6
**2018**   18:21
   19:4,23 20:11
   20:23 21:11,23
   22:15 23:3,15
   24:2,13,24
   25:12 26:12,16
   26:20 27:3,7
   27:20 28:8,20
   29:8,20 30:8
   30:20 31:8,19
   32:6,17 33:5
   40:7,21 41:5
   41:21 42:22
   43:9,20 44:7
   44:13 45:10,22

46:10,22 49:22
50:10 54:16
55:3,14,25
58:14,25 71:7
72:11,22 73:9
73:20 74:7,18
75:5,16 76:21
81:11,23 82:2
83:13,25 84:25
183:22 184:9
**2019**   35:12
   40:18 41:21
   71:24,25
**2020**   16:9
   71:25
**2025**   1:17 7:6
   230:13 234:6
**2079**   16:14,22
**215**   232:4
**217**   232:6
**218**   232:8
**22,000**   215:7
   216:8
**23**   231:21
**2309**   2:20
**23rd**   16:14,23
**24**   12:18
**25**   1:17 234:6
**2661**   58:7
**297,000**   221:18
**2:23**   1:3

**3**

**3**   36:5,12
   231:12
**303**   36:6
   231:12
**330**   234:4
**34**   35:3 231:11
**35**   231:10
**36**   231:12
**3842**   233:14

**4**

**4**   7:12,18 48:2
   48:2,7 231:13
   231:14 232:7
**48**   231:13

**5**

**5**   7:18 57:13,19
   231:15 232:4
**57**   231:15
**59**   17:15
**597-2229**   26:11

**6**

**6**   172:5,11
   174:2,5 175:14
   211:10 231:9
   231:18 232:2
**666**   2:12

**7**

**7**   172:15,21
   174:2 178:19
   178:20,24
   180:7 212:11

[7 - advice]                                                                 Page 2

| | | | |
|---|---|---|---|
| 231:13,21 | 57:14,15,22 | **address**  5:18 | 61:16 62:3,14 |
| **7062**  57:22 | 58:16 59:3,13 | 11:5 15:15,23 | 62:25 63:11,22 |
| **8** | 59:24 60:11,22 | 16:14,19 18:9 | 64:9,20 65:7 |
| **8**  196:19 197:4 | 61:9,20 62:18 | 18:19 19:6 | 65:18 66:5,16 |
| 197:22 198:3 | 63:5,15 64:2 | 41:24 42:2,6,7 | 67:3,15 68:3 |
| 213:13 231:10 | 64:13,24 65:11 | 44:15 48:16,24 | 68:15 69:4 |
| 232:2 | 65:22 66:9 | 49:5 58:7,8 | 71:19 72:8,19 |
| **8206**  5:19 11:8 | 76:23 77:9,20 | 73:10 75:7 | 73:6,17 74:4 |
| **89**  17:11 | 78:7,19 79:5 | **addresses** | 74:15 75:2,13 |
| **9** | 79:17 80:4,14 | 18:16,23 | 75:25 76:18 |
| **9**  214:23 215:3 | 81:13 82:4,25 | **adf**  1:12 22:2 | 77:5,16 78:3 |
| 232:4 | 83:16 84:4,14 | 152:9 | 78:14,25 79:12 |
| **900**  2:12 | 85:3,14 86:6 | **advice**  9:2 | 79:23 80:10,21 |
| **917**  26:11 | 86:16 87:6,17 | 14:24 19:13 | 81:8,20 82:11 |
| **926**  2:5 | 88:6,16 89:6 | 20:8,20 21:8 | 82:21 83:8,22 |
| **9th**  7:5 | 89:16 90:5,15 | 21:20 22:12,24 | 84:10,22 85:10 |
| **a** | 91:2,13,24 | 23:12,23 24:10 | 85:22 86:12,23 |
| **a.m.**  1:18 | 178:9 183:2 | 24:21 25:9,21 | 87:13,23 88:12 |
| **ability**  12:19 | 219:18 221:7 | 27:16 28:5,17 | 88:23 89:12,22 |
| **above**  6:20 | 231:16,17 | 29:5,17 30:5 | 90:11,22 91:9 |
| 35:7 36:10 | **accounts**  50:9 | 30:17 31:5,16 | 91:20 92:7,19 |
| 48:5 57:17 | 62:7 80:25 | 32:3,14 33:2 | 93:7 94:13,23 |
| 172:9,19 197:2 | 82:15 | 33:14 43:6,17 | 95:9,19 96:5 |
| 214:25 217:9 | **accurate**  70:2,7 | 44:4,10,21 | 96:23 97:9,19 |
| 218:16 | 233:8 | 45:7,19 46:7 | 98:5,15 99:2 |
| **access**  26:17 | **action**  1:3 | 46:19 47:7,19 | 99:13,23 100:8 |
| **account**  49:24 | 233:12 | 49:17 50:6,17 | 100:17 101:2 |
| 50:21 51:7,17 | **actually**  187:21 | 51:3,14,23 | 101:11,20 |
| 52:4,14,24 | 188:20 189:18 | 52:10,20 53:6 | 102:5,15,25 |
| 53:10,21 54:7 | 192:20 194:6 | 53:16 54:3,13 | 103:12,23 |
| 54:18 55:5,16 | **additional** | 54:24 55:11,22 | 104:10,21 |
| 56:3,13,23 | 34:22 172:2 | 56:9,19 57:6 | 105:8,19 106:6 |
| | 175:15 180:8 | 58:22 59:9,20 | 106:17 107:4 |
| | | 60:7,18 61:5 | 107:15 108:2 |

108:12,24
109:16 110:9
110:19 111:5
111:15 112:3
112:15 113:2
113:12,23
114:8,18 115:4
115:14,23
116:8,17 117:3
117:13,23
118:9,18 119:4
119:14,23
120:9,19 121:6
121:16 122:3
122:13,23
123:9,19 124:4
124:13,23
125:10,21
126:8,20 127:6
127:15,24
128:11,22
129:9,20 130:7
130:17 131:2
131:11,22
132:9,20 133:7
133:19 134:5
134:14,23
135:9,25
136:12,23
137:10,22
138:8,17 139:2
139:12,22
140:8,18 141:6
141:16 142:2

142:11,21
143:8,19 144:6
144:18 145:4
145:14,24
146:10,21
147:8,19 148:7
148:17 149:5
149:14,24
150:10,20
151:7,17 152:4
152:15 153:4
153:14,24
154:10,20
155:7,17 156:4
156:15 157:4
157:14,24
158:10,20
159:7,17 160:4
160:15 161:4
161:14,24
162:10,20
163:6,17 164:3
164:16 165:2
165:12,22
166:8,24
167:11,22
168:8,21 169:7
169:17 170:3
170:13,24
171:11,22
174:15,24
175:10,22
176:8,19 177:5
177:16 178:4

178:15 179:8
179:17 180:3
180:15,25
181:12,21
182:9,21 183:8
183:19 184:6
184:17 185:4
185:15 186:4
186:17 187:6
187:18 188:5
188:17 189:4
189:15 190:2
190:14 191:3
191:16 192:5
192:17 193:4
193:16 194:3
194:14 195:2
195:14,25
196:12 198:12
198:22 199:8
199:18 200:5
200:16 201:4
201:14,24
202:10,20
203:6,16 204:5
204:17 205:4
205:15 206:2
206:14 207:2
207:12,22
208:8,18 209:4
209:17 210:4
210:15 211:3
211:20 212:6
212:21 213:7

213:22 214:8
214:18 215:17
216:3,15,25
217:23 218:9
219:4,14,25
220:14 221:2
221:14,25
222:11,23
223:11,22
224:9,21 225:9
225:19 226:5
226:16 227:2
227:12,23
228:10,21
**affect** 12:18
**affiliated** 20:13
20:25 21:25
22:17 23:5
25:2,14 27:22
28:10,22 29:10
29:22 30:10,22
32:19 33:7
**affirmed** 5:4
**agent** 48:13
**agreed** 4:4,9,13
7:7
**agreement** 8:20
139:16 140:12
142:25 143:23
146:14 147:12
**al** 6:6,7
**alcohol** 12:17
**alex** 201:8

**[alexandr - amendment]**                                                    Page 4

| | | | |
|---|---|---|---|
| **alexandr**  1:10 | 50:7,15,18,25 | 82:9,12,19,22 | 111:3,6,13,16 |
| 13:18 60:11,22 | 51:4,12,15,21 | 83:6,9,20,23 | 111:25 112:4 |
| 85:15 123:13 | 51:24 52:8,11 | 84:8,11,20,23 | 112:13,16,24 |
| **alexeevich**  1:10 | 52:18,21 53:4 | 85:8,11,20,23 | 113:3,10,13,21 |
| **allegations** | 53:7,14,17,25 | 86:10,13,21,24 | 113:24 114:6,9 |
| 13:15 | 54:4,11,14,22 | 87:11,14,21,24 | 114:16,19 |
| **alleged**  35:19 | 54:25 55:9,12 | 88:10,13,21,24 | 115:2,5,12,15 |
| **allow**  11:24 | 55:20,23 56:7 | 89:10,13,20,23 | 115:21,24 |
| **allstate**  34:19 | 56:10,17,20 | 90:9,12,20,23 | 116:6,9,15,18 |
| 36:8,23 | 57:4,7 58:20 | 91:7,10,18,21 | 116:25 117:4 |
| **amendment**  8:3 | 58:23 59:7,10 | 92:5,8,17,20 | 117:11,14,21 |
| 9:4,19,24 10:5 | 59:18,21 60:5 | 93:5,8 94:11 | 117:24 118:7 |
| 10:16,24 14:21 | 60:8,16,19 | 94:14,21,24 | 118:10,16,19 |
| 14:25 19:2,10 | 61:3,6,14,17,25 | 95:7,10,17,20 | 119:2,5,12,15 |
| 19:14 20:6,9 | 62:4,12,15,23 | 96:3,6,21,24 | 119:21,24 |
| 20:18,21 21:6 | 63:2,9,12,20,23 | 97:7,10,17,20 | 120:7,10,17,20 |
| 21:9,18,21 | 64:7,10,18,21 | 98:3,6,13,16,24 | 121:4,7,14,17 |
| 22:7,13,22,25 | 65:5,8,16,19 | 99:3,11,14,21 | 121:25 122:4 |
| 23:10,13,21,24 | 66:3,6,14,17,25 | 99:24 100:6,9 | 122:11,14,21 |
| 24:8,11,19,22 | 67:4,13,16,25 | 100:15,18,24 | 122:24 123:7 |
| 25:7,10,19,22 | 68:4,13,16 | 101:3,9,12,18 | 123:10,17,20 |
| 27:14,17 28:3 | 69:2,5 71:17 | 101:21 102:3,6 | 124:2,5,11,14 |
| 28:6,15,18 | 71:20 72:6,9 | 102:13,16,23 | 124:21,24 |
| 29:3,6,15,18 | 72:17,20 73:4 | 103:2,10,13,21 | 125:8,11,19,22 |
| 30:3,6,15,18 | 73:7,15,18 | 103:24 104:8 | 126:6,9,18,21 |
| 31:3,6,14,17,25 | 74:2,5,13,16,24 | 104:11,19,22 | 127:4,7,13,16 |
| 32:4,12,15,24 | 75:3,11,14,23 | 105:6,9,17,20 | 127:22,25 |
| 33:3,12,15 | 76:2,16,19 | 106:4,7,15,18 | 128:9,12,20,23 |
| 43:3,7,15,18 | 77:3,6,14,17,25 | 107:2,5,13,16 | 129:7,10,18,21 |
| 44:2,5,11,19,22 | 78:4,12,15,23 | 107:24 108:3 | 130:5,8,15,18 |
| 45:5,8,17,20 | 79:2,10,13,21 | 108:10,13,22 | 130:24 131:3,9 |
| 46:5,8,17,20 | 79:24 80:8,11 | 108:25 109:14 | 131:12,20,23 |
| 47:5,8,17,20 | 80:19,22 81:6 | 109:17 110:7 | 132:7,10,18,21 |
| 49:15,18 50:4 | 81:9,18,21 | 110:10,17,20 | 133:5,8,17,20 |

**[amendment - amg]**                                                    Page 5

| | | | |
|---|---|---|---|
| 134:3,6,12,15 | 159:5,8,15,18 | 187:4,7,16,19 | 215:15,18,25 |
| 134:21,24 | 160:2,5,13,16 | 188:3,6,15,18 | 216:4,13,16,23 |
| 135:7,10,23 | 161:2,5,12,15 | 189:2,5,13,16 | 217:2,21,24 |
| 136:2,10,13,21 | 161:22,25 | 189:24 190:3 | 218:7,10 219:2 |
| 136:24 137:8 | 162:8,11,18,21 | 190:12,15,25 | 219:5,12,15,23 |
| 137:11,20,23 | 163:4,7,15,18 | 191:4,14,17 | 220:2,12,15,24 |
| 138:6,9,15,18 | 163:25 164:4 | 192:3,6,15,18 | 221:3,12,15,23 |
| 138:24 139:3 | 164:14,17,24 | 193:2,5,14,17 | 222:2,9,12,21 |
| 139:10,13,20 | 165:3,10,13,20 | 193:25 194:4 | 222:24 223:9 |
| 139:23 140:6,9 | 165:23 166:6,9 | 194:12,15,24 | 223:12,20,23 |
| 140:16,19 | 166:22,25 | 195:3,12,15,23 | 224:7,10,19,22 |
| 141:4,7,14,17 | 167:9,12,20,23 | 196:2,10,13 | 225:7,10,17,20 |
| 141:24 142:3,9 | 168:6,9,19,22 | 198:10,13,20 | 226:3,6,14,17 |
| 142:12,19,22 | 169:5,8,15,18 | 198:23 199:6,9 | 226:24 227:3 |
| 143:6,9,17,20 | 169:25 170:4 | 199:16,19 | 227:10,13,21 |
| 144:4,7,16,19 | 170:11,14,22 | 200:3,6,14,17 | 227:24 228:8 |
| 145:2,5,12,15 | 170:25 171:9 | 201:2,5,12,15 | 228:11,19,22 |
| 145:22,25 | 171:12,20,23 | 201:22,25 | **amg**   40:16,20 |
| 146:8,11,19,22 | 174:13,16,22 | 202:8,11,18,21 | 40:24 69:25 |
| 147:6,9,17,20 | 174:25 175:8 | 203:4,7,14,17 | 70:5,6,10,16 |
| 148:5,8,15,18 | 175:11,20,23 | 204:3,6,15,18 | 71:8,12,22 |
| 149:3,6,12,15 | 176:6,9,17,20 | 205:2,5,13,16 | 72:12,23 73:11 |
| 149:22,25 | 177:3,6,14,17 | 205:24 206:3 | 73:21 74:8,19 |
| 150:8,11,18,21 | 178:2,5,13,16 | 206:12,15,24 | 75:6,17 76:7 |
| 151:5,8,15,18 | 179:6,9,15,18 | 207:3,10,13,20 | 76:10,22 77:10 |
| 152:2,5,13,16 | 179:25 180:4 | 207:23 208:6,9 | 77:21 78:7,18 |
| 153:2,5,12,15 | 180:13,16,23 | 208:16,19 | 79:6,17 80:4 |
| 153:22,25 | 181:2,10,13,19 | 209:2,5,15,18 | 80:15,25 81:13 |
| 154:8,11,18,21 | 181:22 182:7 | 210:2,5,13,16 | 82:5,15 83:2 |
| 155:5,8,15,18 | 182:10,19,22 | 210:25 211:4 | 83:16 84:4,14 |
| 156:2,5,13,16 | 183:6,9,17,20 | 211:18,21 | 85:3,14 92:10 |
| 157:2,5,12,15 | 184:4,7,15,18 | 212:4,7,19,22 | 92:22 110:12 |
| 157:22,25 | 185:2,5,13,16 | 213:5,8,20,23 | 112:7 123:2 |
| 158:8,11,18,21 | 186:2,5,15,18 | 214:6,9,16,19 | 172:17 180:9 |

**[amg - answer]**                                                                    Page 6

| | | | |
|---|---|---|---|
| 180:19 181:16 | 39:10,19 42:16 | 77:2,7,13,18,24 | 107:12,17,23 |
| 181:24 182:12 | 43:2,5,8,14,19 | 78:5,11,16,22 | 108:4,9,14,21 |
| 182:25 184:21 | 43:25 44:6,12 | 79:3,9,14,20,25 | 109:2,13,18 |
| 185:8 190:18 | 44:18,23 45:4 | 80:7,12,18,23 | 110:6,11,16,21 |
| 191:7,20 192:9 | 45:9,16,21 | 81:5,10,17,22 | 111:2,7,12,17 |
| 193:8,20 | 46:4,9,16,21 | 82:8,13,18,23 | 111:24 112:5 |
| 194:18 201:17 | 47:4,9,16,21 | 83:5,10,19,24 | 112:12,17,23 |
| 203:20 204:20 | 49:14,19 50:3 | 84:7,12,19,24 | 113:4,9,14,20 |
| 205:18 206:5 | 50:8,14,19,24 | 85:7,12,19,24 | 113:25 114:5 |
| 215:6 220:18 | 51:5,11,16,20 | 86:9,14,20,25 | 114:10,15,20 |
| 220:19 221:6 | 51:25 52:7,12 | 87:10,15,20,25 | 114:25 115:6 |
| 231:22 | 52:17,22 53:3 | 88:9,14,20,25 | 115:11,16,20 |
| **amount**   215:7 | 53:8,13,18,24 | 89:9,14,19,24 | 115:25 116:5 |
| 216:8 | 54:5,10,15,21 | 90:8,13,19,24 | 116:10,14,19 |
| **answer**   9:5 | 55:2,8,13,19,24 | 91:6,11,17,22 | 116:24 117:5 |
| 10:2,7,18 | 56:6,11,16,21 | 92:4,9,16,21 | 117:10,15,20 |
| 11:25 12:3,13 | 57:3,8 58:19 | 93:4,9 94:10 | 117:25 118:6 |
| 13:19 14:9,20 | 58:24 59:6,11 | 94:15,20,25 | 118:11,15,20 |
| 19:2,10 20:5 | 59:17,22 60:4 | 95:6,11,16,21 | 118:25 119:6 |
| 20:10,17,22 | 60:9,15,20 | 96:2,7,20,25 | 119:11,16,20 |
| 21:5,10,17,22 | 61:2,7,13,18,24 | 97:6,11,16,21 | 119:25 120:6 |
| 22:6,14,21 | 62:5,11,16,22 | 98:2,7,12,17,23 | 120:11,16,21 |
| 23:2,9,14,20,25 | 63:3,8,13,19,24 | 99:4,10,15,20 | 121:3,8,13,18 |
| 24:7,12,18,23 | 64:6,11,17,22 | 99:25 100:5,10 | 121:24 122:5 |
| 25:6,11,18,23 | 65:4,9,15,20 | 100:14,19,23 | 122:10,15,20 |
| 26:24 27:13,18 | 66:2,7,13,18,24 | 101:4,8,13,17 | 122:25 123:6 |
| 28:2,7,14,19 | 67:5,12,17,24 | 101:22 102:2,7 | 123:11,16,21 |
| 29:2,7,14,19 | 68:5,12,17,25 | 102:12,17,22 | 123:25 124:6 |
| 30:2,7,14,19 | 69:6 71:16,21 | 103:3,9,14,20 | 124:10,15,20 |
| 31:2,7,13,18,24 | 72:5,10,16,21 | 103:25 104:7 | 124:25 125:7 |
| 32:5,11,16,23 | 73:3,8,14,19,25 | 104:12,18,23 | 125:12,18,23 |
| 33:4,11,16 | 74:6,12,17,23 | 105:5,10,16,21 | 126:5,10,17,22 |
| 34:3,4 35:22 | 75:4,10,15,22 | 106:3,8,14,19 | 127:3,8,12,17 |
| 38:15,24 39:9 | 76:3,15,20 | 106:25 107:6 | 127:21 128:2,8 |

**[answer - anthony]**                                                                 Page 7

| | | | |
|---|---|---|---|
| 128:13,19,24 | 153:6,11,16,21 | 179:24 180:5 | 207:4,9,14,19 |
| 129:6,11,17,22 | 154:2,7,12,17 | 180:12,17,22 | 207:24 208:5 |
| 130:4,9,14,19 | 154:22 155:4,9 | 181:3,9,14,18 | 208:10,15,20 |
| 130:23 131:4,8 | 155:14,19,25 | 181:23 182:6 | 208:25 209:6 |
| 131:13,19,24 | 156:6,12,17,25 | 182:11,18,23 | 209:14,19,25 |
| 132:6,11,17,22 | 157:6,11,16,21 | 183:5,10,16,21 | 210:6,12,17,24 |
| 133:4,9,16,21 | 158:2,7,12,17 | 184:3,8,14,19 | 211:5,17,22 |
| 134:2,7,11,16 | 158:22 159:4,9 | 184:25 185:6 | 212:3,8,18,23 |
| 134:20,25 | 159:14,19,25 | 185:12,17,25 | 213:4,9,19,24 |
| 135:6,11,22 | 160:6,12,17,25 | 186:6,14,19 | 214:5,10,15,20 |
| 136:3,9,14,20 | 161:6,11,16,21 | 187:3,8,15,20 | 215:14,19,24 |
| 136:25 137:7 | 162:2,7,12,17 | 188:2,7,14,19 | 216:5,12,17,22 |
| 137:12,19,24 | 162:22 163:3,8 | 188:25 189:6 | 217:3,20,25 |
| 138:5,10,14,19 | 163:14,19,24 | 189:12,17,23 | 218:6,11,25 |
| 138:23 139:4,9 | 164:5,13,18,23 | 190:4,11,16,24 | 219:6,11,16,22 |
| 139:14,19,24 | 165:4,9,14,19 | 191:5,13,18 | 220:3,11,16,23 |
| 140:5,10,15,20 | 165:24 166:5 | 192:2,7,14,19 | 221:4,11,16,22 |
| 141:3,8,13,18 | 166:10,21 | 192:25 193:6 | 222:3,8,13,20 |
| 141:23 142:4,8 | 167:2,8,13,19 | 193:13,18,24 | 222:25 223:8 |
| 142:13,18,23 | 167:24 168:5 | 194:5,11,16,23 | 223:13,19,24 |
| 143:5,10,16,21 | 168:10,18,23 | 195:4,11,16,22 | 224:6,11,18,23 |
| 144:3,8,15,20 | 169:4,9,14,19 | 196:3,9,14 | 225:6,11,16,21 |
| 144:25 145:6 | 169:24 170:5 | 198:9,14,19,24 | 226:2,7,13,18 |
| 145:11,16,21 | 170:10,15,21 | 199:5,10,15,20 | 226:23 227:4,9 |
| 146:2,7,12,18 | 171:2,8,13,19 | 200:2,7,13,18 | 227:14,20,25 |
| 146:23 147:5 | 171:24 174:12 | 200:25 201:6 | 228:7,12,18,23 |
| 147:10,16,21 | 174:17,21 | 201:11,16,21 | 228:25 229:5 |
| 148:4,9,14,19 | 175:2,7,12,19 | 202:2,7,12,17 | **answered** |
| 149:2,7,11,16 | 175:24 176:5 | 202:22 203:3,8 | 38:16 39:5 |
| 149:21 150:2,7 | 176:10,16,21 | 203:13,18 | **answers**    11:15 |
| 150:12,17,22 | 177:2,7,13,18 | 204:2,7,14,19 | **anthony**    1:11 |
| 151:4,9,14,19 | 177:25 178:6 | 204:25 205:6 | 14:6 65:22 |
| 151:25 152:6 | 178:12,17 | 205:12,17,23 | 66:9 88:16 |
| 152:12,17,25 | 179:5,10,14,19 | 206:4,11,16,23 | 130:11 |

**anymore** 71:10
**application**
  57:14,21
  231:16
**approximately**
  71:5
**april** 17:15
**aside** 15:3
  26:18,22 40:19
  41:4 175:13
  180:6
**asked** 12:12
**asking** 34:25
  47:25 57:12
  109:20 173:3
**asserting** 14:24
  19:13
**assist** 41:17
  71:2
**associated**
  19:25 21:13
  73:11
**attorney** 2:7,22
  5:24 15:4
  229:15
**attorneys** 2:14
  4:5
**authorized**
  52:23 53:9,19
  54:6 78:17
  79:4,15 80:2
  80:13
**avenue** 2:20
  42:4 58:8

**aware** 103:15
  104:13,24
  105:11,22
  106:9,20 107:7
  107:18
**ays** 1:3

**b**

**b** 5:2 16:14,23
**back** 39:21
**bank** 49:23
  50:9,20 53:20
  56:12,23 76:23
  77:9 78:7,8,19
  79:5,16 80:4
  80:14,25 81:13
  81:25 82:4,15
  82:25 83:15
  84:3,14 85:3
  85:14 178:8
  183:2 219:18
  221:7
**bankruptcy**
  16:6,8 37:13
  37:15,17,21
**based** 19:2,10
**beginning** 7:18
**behalf** 37:17
**believe** 10:7,18
  69:24
**benefit** 97:13
  97:23 104:15
  104:25 105:12
  105:23 106:10

106:21 107:8
107:20
**benevenga** 1:11
  2:15 14:7 89:4
  101:23 106:9
  116:11 130:11
  130:20 131:16
  132:3,14,25
  133:11
**benevenga's**
  65:22 66:9
  88:16 89:6
**billing** 199:12
**bills** 42:8
**birth** 17:14
**born** 17:4,7
**bottom** 7:17
  48:10
**box** 42:3
**break** 10:10
  12:10,11,14
  26:4,7 34:10
  39:14,16
  135:13,16
  166:12,14
  229:13
**bridge** 5:20
  11:9
**briefly** 8:15 9:6
**bring** 7:20
**broadway**
  234:4
**brooklyn** 2:21
  16:15,23 42:4

**brought** 33:19
**business** 18:13
  18:15,22 27:4
  41:23 42:6
  43:22 44:9,15
  49:11 57:14
  72:13 73:10
  74:9,20 75:7
  139:5,16 140:2
  140:12 142:14
  142:25 143:12
  143:23 146:3
  146:14,25
  147:12 149:18
  150:14,24
  153:18 154:14
  154:24 157:18
  158:14,24
  161:8 162:4,14
  165:6 166:2,17
  169:11 170:7
  170:17 176:12
  177:9,20 181:5
  181:25 182:14
  183:24 202:14
  208:22 231:15

**c**

**c** 2:2 5:2 233:2
  233:2
**called** 40:13,15
  148:11 152:8
  156:8 160:8
  163:21 168:2

[called - companies]                                                     Page 9

200:22 207:6
**calls**  26:21
**capital**  25:2
  32:20 120:2
  163:21 164:8
  164:10,20
  165:5,15 166:2
  166:18 167:5
  167:16
**caption**  35:17
**captioned**  6:5
**carone**  24:15
  32:8 90:3
  100:20 106:20
  119:17 138:2
  138:11 139:6
  139:16 140:2
  140:12,22
**carone's**  63:5
  63:15 89:16
  90:5
**case**  234:5
**cash**  111:21
  112:9 196:6
  199:22 222:5
  224:2,13
  225:23 226:10
**cashed**  196:24
**casualty**  1:5
**cell**  25:24 26:9
  26:13,18,22
  27:8,21 28:9
  28:21 29:9,21
  30:9,21 31:9

31:20 32:7,18
  33:6
**certifications**
  18:6
**certify**  233:5,10
**chance**  174:6
  178:22 197:21
**change**  234:8
**check**  191:19
  215:6,8,11,21
  216:7,9,19
**checks**  53:10
  55:4 79:5
  80:24 172:7,16
  173:4,6 174:6
  174:9,18 175:4
  175:15,25
  176:22 178:7
  178:23 179:2
  179:11,21
  180:18 181:15
  182:24 185:18
  186:7,20 187:9
  188:8 189:7
  190:5,17 191:6
  192:8 193:7,19
  194:17 196:5
  196:22 197:8
  197:21,25
  198:4,15,25
  199:11,21
  211:12,14,24
  212:13,15,25
  213:16 214:2

214:11 217:7
  217:17 218:3
  218:14,22
  219:8,17 224:2
  224:13 231:19
  231:21 232:2,4
  232:6,8
**circle**  5:20 11:8
**circulate**  34:22
  47:23 172:2
  196:16
**circulated**
  172:24
**circulating**
  57:10 211:7
**citizen**  17:12
**city**  2:13
**claims**  33:18
**clarification**
  47:10
**clarify**  69:13,14
**clearly**  11:16
**client**  8:2 18:25
  34:8 39:14
**clients**  42:23
**clinics**  187:12
  187:23 189:9
  189:20 190:8
  192:11,22
  193:21 194:8
  194:20 195:8
  205:20 224:3
**closed**  40:10

**closing**  40:6
**coastal**  1:10
  20:25 28:23
  47:13 67:20
  68:22 69:10,22
  95:23 96:17
  115:7
**collective**  173:8
**collectively**  6:2
  173:3
**college**  17:23
**come**  17:9
**commission**
  234:25
**communicate**
  19:6,24 20:24
  22:16 23:4,16
  24:3,14,25
  25:13 27:9,21
  28:10,22 29:10
  29:22 30:10,22
  31:10,21 32:8
  32:19 33:7
  121:9,19
  229:14
**communicated**
  20:12 21:12,24
  93:23 226:19
**communicati...**
  7:6 8:8 229:10
**companies**  17:2
  37:12,18 38:7
  40:2,4,8,21
  41:8 94:16

**[companies - corporate]** Page 10

98:18 109:4,9
110:2 111:20
112:8 125:13
125:24 128:25
129:12 132:12
132:23 136:15
137:2 139:25
140:11 143:11
143:22 146:24
147:11 150:23
151:20 154:23
155:20 158:23
159:20 162:13
163:9 166:16
167:14 170:16
171:14 183:12
196:5
**company**  1:4,5
1:5,6 6:6 36:8
39:12,23 40:5
40:9,13,15,17
41:13,16,20
42:9,21 71:8
71:12 125:4
126:2 128:16
129:14 132:3
132:25 136:6
137:4 148:10
149:8 152:8
153:7 156:8
157:7 160:8
163:21 164:19
168:2,24
200:22 207:6

228:2,13
**complaint**  35:4
35:20 36:7,18
231:10,12
**complete**  49:9
**computer**  49:9
**conceal**  186:22
191:21 206:6
224:13
**concealing**
206:17 224:24
**concerning**
42:20
**coney**  42:3 58:8
**confident**  1:9
20:13 28:11
46:12,24 67:8
68:21 69:9,21
95:13 96:16
114:21
**connection**  6:3
48:18 49:3
177:10,21
182:2,15 210:8
210:19
**conroy**  2:11
**consulting**
39:12,23,24
40:3,19 41:4
41:11 42:10,19
43:10,21 44:8
44:14 45:11,23
46:11,23 47:11
48:4,19,24

49:3,23 50:10
51:8 52:3
53:21 56:24
57:15 58:2
66:19 67:6,19
68:6,18 110:23
111:19 122:17
172:8 175:16
176:2,23 177:8
177:19 183:23
184:10 185:19
186:8,21
187:10 188:9
189:8 190:6
196:22 198:5
202:3 203:20
204:20 205:18
206:5 207:6,25
208:2,11,12,21
209:7,10,20
210:19 216:7
217:7,8 218:14
219:19 220:7
220:18 221:19
231:14,16,20
232:2,6,7,9
**consulting's**
42:23 178:8
**consumed**
12:16
**contained**
174:7 175:13
178:23 180:6
197:21 211:12

**containing**
172:6,16
**contains**
196:21 198:4
198:25 199:11
**continued**
229:21
**control**  56:23
190:7 191:9
194:19 195:7
**controlled**
103:16 109:4
109:10 110:3
186:10
**controls**  56:12
82:14 97:2
**conversation**
9:9
**convert**  224:2
224:12 225:23
**converted**
196:6 199:22
222:4
**converting**
111:20 112:8
**copies**  172:24
**copy**  6:12,17
7:9
**corp**  196:25
199:23
**corporate**
50:20 51:7
52:3 53:20
56:23 76:23

**[corporate - counsel]**                                    Page 11

| | | | |
|---|---|---|---|
| 77:9,20 78:7 | 51:3,14,23 | 101:11,20 | 135:9,25 |
| 78:19 79:5,16 | 52:10,20 53:6 | 102:5,15,25 | 136:12,23 |
| 80:3,14,25 | 53:16 54:3,13 | 103:12,23 | 137:10,22 |
| 81:13 82:4,14 | 54:24 55:11,22 | 104:10,21 | 138:8,17 139:2 |
| 82:25 83:15 | 56:9,19 57:6 | 105:8,19 106:6 | 139:12,22 |
| 84:3,14 85:3 | 58:22 59:9,20 | 106:17 107:4 | 140:8,18 141:6 |
| 85:14 219:18 | 60:7,18 61:5 | 107:15 108:2 | 141:16 142:2 |
| 221:7 | 61:16 62:3,14 | 108:12,24 | 142:11,21 |
| **correct**   35:21 | 62:25 63:11,22 | 109:16 110:9 | 143:8,19 144:6 |
| 48:14 103:6 | 64:9,20 65:7 | 110:19 111:5 | 144:18 145:4 |
| 104:4 108:6 | 65:18 66:5,16 | 111:15 112:3 | 145:14,24 |
| 109:5 112:20 | 67:3,15 68:3 | 112:15 113:2 | 146:10,21 |
| 113:6 122:17 | 68:15 69:4 | 113:12,23 | 147:8,19 148:7 |
| 123:3 183:13 | 71:19 72:8,19 | 114:8,18 115:4 | 148:17 149:5 |
| 198:6 201:18 | 73:6,17 74:4 | 115:14,23 | 149:14,24 |
| 204:22 210:9 | 74:15 75:2,13 | 116:8,17 117:3 | 150:10,20 |
| 220:8,20 | 75:25 76:18 | 117:13,23 | 151:7,17 152:4 |
| **corresponden...** | 77:5,16 78:3 | 118:9,18 119:4 | 152:15 153:4 |
| 42:8 | 78:14,25 79:12 | 119:14,23 | 153:14,24 |
| **counsel**   7:7 | 79:23 80:10,21 | 120:9,19 121:6 | 154:10,20 |
| 8:20 9:3 14:24 | 81:8,20 82:11 | 121:16 122:3 | 155:7,17 156:4 |
| 20:8,20 21:8 | 82:21 83:8,22 | 122:13,23 | 156:15 157:4 |
| 21:20 22:12,24 | 84:10,22 85:10 | 123:9,19 124:4 | 157:14,24 |
| 23:12,23 24:10 | 85:22 86:12,23 | 124:13,23 | 158:10,20 |
| 24:21 25:9,21 | 87:13,23 88:12 | 125:10,21 | 159:7,17 160:4 |
| 27:16 28:5,17 | 88:23 89:12,22 | 126:8,20 127:6 | 160:15 161:4 |
| 29:5,17 30:5 | 90:11,22 91:9 | 127:15,24 | 161:14,24 |
| 30:17 31:5,16 | 91:20 92:7,19 | 128:11,22 | 162:10,20 |
| 32:3,14 33:2 | 93:7 94:13,23 | 129:9,20 130:7 | 163:6,17 164:3 |
| 33:14 43:6,17 | 95:9,19 96:5 | 130:17 131:2 | 164:16 165:2 |
| 44:4,10,21 | 96:23 97:9,19 | 131:11,22 | 165:12,22 |
| 45:7,19 46:7 | 98:5,15 99:2 | 132:9,20 133:7 | 166:8,24 |
| 46:19 47:7,19 | 99:13,23 100:8 | 133:19 134:5 | 167:11,22 |
| 49:17 50:6,17 | 100:17 101:2 | 134:14,23 | 168:8,21 169:7 |

[counsel - decline]                                                  Page 12

| | | | |
|---|---|---|---|
| 169:17 170:3 | 206:14 207:2 | **customer**  57:25 | 43:8,19 44:6 |
| 170:13,24 | 207:12,22 | 58:4 | 44:12,23 45:9 |
| 171:11,22 | 208:8,18 209:4 | **cv**  1:3 | 45:21 46:9,21 |
| 174:15,24 | 209:17 210:4 | | 47:9,21 49:19 |
| 175:10,22 | 210:15 211:3 | **d** | 50:8,19 51:5 |
| 176:8,19 177:5 | 211:20 212:6 | **daniel**  1:13 | 51:16,25 52:12 |
| 177:16 178:4 | 212:21 213:7 | 14:13 61:9,20 | 52:22 53:8,18 |
| 178:15 179:8 | 213:22 214:8 | 86:16 126:24 | 54:5,15 55:2 |
| 179:17 180:3 | 214:18 215:17 | **date**  6:23 7:8 | 55:13,24 56:11 |
| 180:15,25 | 216:3,15,25 | 17:14 35:10 | 56:21 57:8 |
| 181:12,21 | 217:23 218:9 | 36:13 48:8 | 58:24 59:11,22 |
| 182:9,21 183:8 | 219:4,14,25 | 57:20 172:12 | 60:9,20 61:7 |
| 183:19 184:6 | 220:14 221:2 | 172:22 197:5 | 61:18 62:5,16 |
| 184:17 185:4 | 221:14,25 | 215:4 217:12 | 63:3,13,24 |
| 185:15 186:4 | 222:11,23 | 218:19 233:7 | 64:11,22 65:9 |
| 186:17 187:6 | 223:11,22 | 234:6 | 65:20 66:7,18 |
| 187:18 188:5 | 224:9,21 225:9 | **day**  230:12 | 67:5,17 68:5 |
| 188:17 189:4 | 225:19 226:5 | 234:23 | 68:17 69:6 |
| 189:15 190:2 | 226:16 227:2 | **decided**  58:15 | 71:21 72:10,21 |
| 190:14 191:3 | 227:12,23 | 59:2 83:14 | 73:8,19 74:6 |
| 191:16 192:5 | 228:10,21 | 84:2 | 74:17 75:4,15 |
| 192:17 193:4 | **counsel's**  19:13 | **decides**  83:11 | 76:3,20 77:7 |
| 193:16 194:3 | **count**  9:16 | **declare**  16:7 | 77:18 78:5,16 |
| 194:14 195:2 | **country**  2:12 | **declared**  16:5 | 79:3,14,25 |
| 195:14,25 | 234:4 | **decline**  9:5 | 80:12,23 81:10 |
| 196:12 198:12 | **court**  1:2 4:17 | 20:10,22 21:10 | 81:22 82:13,23 |
| 198:22 199:8 | 11:14 39:21 | 21:22 22:14 | 83:10,24 84:12 |
| 199:18 200:5 | **courtroom**  12:5 | 23:2,14,25 | 84:24 85:12,24 |
| 200:16 201:4 | 12:7 | 24:12,23 25:11 | 86:14,25 87:15 |
| 201:14,24 | **crime**  37:5 | 25:23 27:18 | 87:25 88:14,25 |
| 202:10,20 | **criminal**  37:8 | 28:7,19 29:7 | 89:14,24 90:13 |
| 203:6,16 204:5 | **current**  15:15 | 29:19 30:7,19 | 90:24 91:11,22 |
| 204:17 205:4 | **currently**  6:4 | 31:7,18 32:5 | 92:9,21 93:9 |
| 205:15 206:2 | 38:10,19 40:3 | 32:16 33:4,16 | 94:15,25 95:11 |

**[decline - defendants]** Page 13

| | | | |
|---|---|---|---|
| 95:21 96:7,25 | 130:9,19 131:4 | 164:18 165:4 | 201:16 202:2 |
| 97:11,21 98:7 | 131:13,24 | 165:14,24 | 202:12,22 |
| 98:17 99:4,15 | 132:11,22 | 166:10 167:2 | 203:8,18 204:7 |
| 99:25 100:10 | 133:9,21 134:7 | 167:13,24 | 204:19 205:6 |
| 100:19 101:4 | 134:16,25 | 168:10,23 | 205:17 206:4 |
| 101:13,22 | 135:11 136:3 | 169:9,19 170:5 | 206:16 207:4 |
| 102:7,17 103:3 | 136:14,25 | 170:15 171:2 | 207:14,24 |
| 103:14,25 | 137:12,24 | 171:13,24 | 208:10,20 |
| 104:12,23 | 138:10,19 | 174:17 175:2 | 209:6,19 210:6 |
| 105:10,21 | 139:4,14,24 | 175:12,24 | 210:17 211:5 |
| 106:8,19 107:6 | 140:10,20 | 176:10,21 | 211:22 212:8 |
| 107:17 108:4 | 141:8,18 142:4 | 177:7,18 178:6 | 212:23 213:9 |
| 108:14 109:2 | 142:13,23 | 178:17 179:10 | 213:24 214:10 |
| 109:18 110:11 | 143:10,21 | 179:19 180:5 | 214:20 215:19 |
| 110:21 111:7 | 144:8,20 145:6 | 180:17 181:3 | 216:5,17 217:3 |
| 111:17 112:5 | 145:16 146:2 | 181:14,23 | 217:25 218:11 |
| 112:17 113:4 | 146:12,23 | 182:11,23 | 219:6,16 220:3 |
| 113:14,25 | 147:10,21 | 183:10,21 | 220:16 221:4 |
| 114:10,20 | 148:9,19 149:7 | 184:8,19 185:6 | 221:16 222:3 |
| 115:6,16,25 | 149:16 150:2 | 185:17 186:6 | 222:13,25 |
| 116:10,19 | 150:12,22 | 186:19 187:8 | 223:13,24 |
| 117:5,15,25 | 151:9,19 152:6 | 187:20 188:7 | 224:11,23 |
| 118:11,20 | 152:17 153:6 | 188:19 189:6 | 225:11,21 |
| 119:6,16,25 | 153:16 154:2 | 189:17 190:4 | 226:7,18 227:4 |
| 120:11,21 | 154:12,22 | 190:16 191:5 | 227:14,25 |
| 121:8,18 122:5 | 155:9,19 156:6 | 191:18 192:7 | 228:12,23 |
| 122:15,25 | 156:17 157:6 | 192:19 193:6 | **defendant** |
| 123:11,21 | 157:16 158:2 | 193:18 194:5 | 96:13 190:21 |
| 124:6,15,25 | 158:12,22 | 194:16 195:4 | **defendants** |
| 125:12,23 | 159:9,19 160:6 | 195:16 196:3 | 1:14,15 2:14 |
| 126:10,22 | 160:17 161:6 | 196:14 198:14 | 8:6 35:6 69:11 |
| 127:8,17 128:2 | 161:16 162:2 | 198:24 199:10 | 69:19 76:12 |
| 128:13,24 | 162:12,22 | 199:20 200:7 | 92:25 96:8,11 |
| 129:11,22 | 163:8,19 164:5 | 200:18 201:6 | 97:3,13,23 |

**[defendants - earlier]** Page 14

98:9,20 99:7
103:6,16 104:4
104:15 105:2
105:13,24
106:11,22
107:9,20
108:18 120:23
120:24 121:10
121:21 122:7
126:14 129:25
133:13 137:16
140:24 144:12
147:25 172:7
172:17 175:15
180:8 183:12
185:19,22
186:8,11,21,24
187:10 188:9
188:11,22
189:8 190:6,18
191:7,10,20,23
192:9 193:8,10
193:20 194:18
195:6,19
200:10 204:11
205:9 206:20
210:9,21 223:5
223:16 225:3
227:17 228:15
231:19,22
**defraud**  35:21
**degree**  17:22
17:24 18:2

**deponent**  234:6
**deposit**  178:7
182:24
**deposited**
219:17
**deposition**  1:21
4:14 6:9 7:5,15
14:17 15:5
69:8,18 86:3
88:3 90:2
93:14 148:21
152:19 156:19
160:19 164:7
168:12 229:8
234:6
**derive**  97:22
**derived**  97:12
104:14,25
105:12,23
106:10,21
107:8,19
**description**
231:8
**digits**  17:17
**direction**  59:13
59:24 60:12,23
61:10,21 62:8
62:19 63:5,16
64:3,14,25
65:12,23 66:10
84:15 85:4,16
86:6,17 87:7
87:17 88:6,17
89:6,16 90:5

90:16 91:3,14
91:25 214:12
**discuss**  13:7,10
**discussed**  10:23
**discussion**  8:17
19:20 22:10
173:19 197:18
**display**  6:24
34:23 196:17
**displayed**
174:4
**displaying**  36:4
172:14 178:18
196:18 212:9
214:22
**distribute**
59:12 60:21
61:19 62:17
63:14 64:12
65:10,21 84:13
86:5 87:5 88:5
90:4,25 91:23
225:13 226:9
**distributed**
59:3 84:3
**district**  1:2,2
6:4 89:5
**document**  6:21
7:14 35:3,8,14
36:6,11,14
48:3,6 57:13
57:18 172:6,10
172:16,20
196:20 197:3

214:24 215:2
217:6,10
218:15,17
**documents**
7:19,20,23
14:15 172:24
**doe**  1:13
**dr**  27:9 45:13
76:6 93:16,18
93:21,24 94:3
94:17 114:2
126:13 133:12
137:15 140:23
144:11 147:24
175:3 179:20
226:20 227:6
228:4
**drugs**  12:16
**duly**  5:3,10
233:6

**e**

**e**  2:2,2,16 5:9,9
5:9,9 11:6,6,7,7
18:9,16,19,22
19:5,24 20:14
21:2,14 22:3
22:18 23:6,17
24:4,15 25:3
25:15 44:15
75:7 172:25
197:10 233:2
**earlier**  58:9

[easier - fees]                                          Page 15

easier  10:11
east  16:14,22
eastern  1:2 6:4
education
  17:20
eequities  1:12
effect  4:16 12:7
egor  207:16
electronic  54:7
  56:2 80:3
  81:24 82:3
  229:9
electronics
  17:25
employed
  38:10,12,18,18
  38:20 39:25
  233:11
employees  1:4
  6:6 43:11
  73:22
endorsed
  211:23
endorsements
  212:24 219:7
english  5:4,5
entered  139:15
  140:12 142:24
  143:23 146:13
  147:12
entities  113:6
  113:16 198:5
equities  22:3
  152:9

erickson  1:24
  233:4,15
errata  234:2
esq  2:8,16,24
et  6:6,7
examination
  5:21 231:5
examined  5:12
except  4:10
exchange
  112:18 229:9
exhibit  6:13,22
  7:13 35:2,9
  36:5,12 47:23
  48:2,7 57:10
  57:13,19 172:5
  172:11,15,21
  174:2,2,5,7
  175:14 178:19
  178:20,23
  180:7 196:16
  196:19 197:4
  197:22 198:3
  211:10,12
  212:10 213:13
  214:23 215:3
  217:5,11
  218:13,18
  231:9,10,12,13
  231:15,18,21
  232:2,4,6,8
exhibits  34:22
  172:2 211:7
  231:7

exist  7:24
expert  207:6
  208:2,11
  209:10,20
  210:19 217:8
  218:14 232:7,9
expires  234:25
explain  9:7
  39:9
ezra  40:13
  196:22 198:16
  220:8,19
  222:15,15
  223:25 232:3

f

f  233:2
face  211:13
  212:14 213:16
  215:11,21
  216:9,19
  217:17 218:22
fact  108:15
  183:22
falston  5:19
  11:8
familiar  13:14
  15:22 16:13
  44:24 70:12
  95:2,12,22
  123:12 126:23
  130:10 133:22
  137:25 141:9
  144:21 148:10

152:7 156:7
  160:7 163:20
  167:25 200:21
  201:7 207:5,15
farbarov
  207:16
fargo  51:8 52:4
  57:16 178:8
  231:17
fast  173:23
faster  173:15
  173:17
fault  68:8,19
  92:12,24 99:6
  103:5 108:17
  126:12 129:24
  133:11 137:14
  140:22 144:10
  147:23 185:21
  187:11,23
  189:9,19 190:8
  190:20 192:10
  192:22 193:21
  194:7,20 195:7
  200:9 203:22
  204:10,22
  205:8,20 206:8
  206:19 222:17
  223:4,15 224:3
  224:15 225:2
fbh  25:2 32:20
  120:2
fees  13:18,25
  14:6,13

**[fensterman - fifth]** Page 16

| | | | |
|---|---|---|---|
| **fensterman** | 27:14,17 28:3 | 69:2,5 71:17 | 102:13,16,23 |
| 31:10,21 102:8 | 28:6,15,18 | 71:20 72:6,9 | 103:2,10,13,21 |
| 102:18 107:8 | 29:3,6,15,18 | 72:17,20 73:4 | 103:24 104:8 |
| 107:19 118:22 | 30:3,6,15,18 | 73:7,15,18 | 104:11,19,22 |
| 119:8 141:10 | 31:3,6,14,17,25 | 74:2,5,13,16,24 | 105:6,9,17,20 |
| 141:20 142:15 | 32:4,12,15,24 | 75:3,11,14,23 | 106:4,7,15,18 |
| 143:2,13,24 | 33:3,12,15 | 76:2,16,19 | 107:2,5,13,16 |
| 144:10,22 | 43:3,7,15,18 | 77:3,6,14,17,25 | 107:24 108:3 |
| 145:8,18 146:4 | 44:2,5,11,19,22 | 78:4,12,15,23 | 108:10,13,22 |
| 146:15 147:2 | 45:5,8,17,20 | 79:2,9,13,20,24 | 108:25 109:14 |
| 147:13,23 | 46:5,8,17,20 | 80:8,11,19,22 | 109:17 110:7 |
| **fensterman's** | 47:5,8,17,20 | 81:6,9,18,21 | 110:10,17,20 |
| 64:2,13,24 | 49:15,18 50:4 | 82:9,12,19,22 | 111:3,6,13,16 |
| 65:11 90:15 | 50:7,15,18,25 | 83:6,9,20,23 | 111:25 112:4 |
| 91:2,13,24 | 51:4,12,15,21 | 84:8,11,20,23 | 112:13,16,24 |
| **festerman** | 51:24 52:8,11 | 85:8,11,20,23 | 113:3,10,13,21 |
| 23:17 24:4 | 52:18,21 53:4 | 86:10,13,21,24 | 113:24 114:6,9 |
| **fhj** 25:14 33:8 | 53:7,14,17,25 | 87:11,14,21,24 | 114:16,19 |
| 120:12 168:2 | 54:4,11,14,22 | 88:10,13,21,24 | 115:2,5,12,15 |
| 168:13,14,25 | 54:25 55:9,12 | 89:10,13,20,23 | 115:21,24 |
| 169:10,20 | 55:20,23 56:7 | 90:9,12,20,23 | 116:6,9,15,18 |
| 170:7,17 171:4 | 56:10,17,20 | 91:7,10,18,21 | 116:25 117:4 |
| 171:16 | 57:4,7 58:20 | 92:5,8,17,20 | 117:11,14,21 |
| **fifth** 8:3,22 9:3 | 58:23 59:7,10 | 93:5,8 94:11 | 117:24 118:7 |
| 9:15,15,19,24 | 59:18,21 60:5 | 94:14,21,24 | 118:10,16,19 |
| 10:5,16,24 | 60:8,16,19 | 95:7,10,17,20 | 119:2,5,12,15 |
| 14:20,25 19:2 | 61:3,6,14,17,25 | 96:3,6,21,24 | 119:21,24 |
| 19:10,14 20:6 | 62:4,12,15,23 | 97:7,10,17,20 | 120:7,10,17,20 |
| 20:9,18,21 | 63:2,9,12,20,23 | 98:3,6,13,16,24 | 121:4,7,14,17 |
| 21:6,9,18,21 | 64:7,10,18,21 | 99:3,11,14,21 | 121:25 122:4 |
| 22:7,13,22,25 | 65:5,8,16,19 | 99:24 100:6,9 | 122:11,14,21 |
| 23:10,13,21,24 | 66:3,6,14,17,25 | 100:15,18,24 | 122:24 123:7 |
| 24:8,11,19,22 | 67:4,13,16,25 | 101:3,9,12,18 | 123:10,17,20 |
| 25:7,10,19,22 | 68:4,13,16 | 101:21 102:3,6 | 124:2,5,11,14 |

**[fifth - filed]**                                                     Page 17

| | | | |
|---|---|---|---|
| 124:21,24 | 149:22,25 | 176:6,9,17,20 | 205:2,5,13,16 |
| 125:8,11,19,22 | 150:8,11,18,21 | 177:2,6,14,17 | 205:24 206:3 |
| 126:6,9,18,21 | 151:5,8,15,18 | 178:2,5,13,16 | 206:12,15,24 |
| 127:4,7,13,16 | 152:2,5,13,16 | 179:6,9,15,18 | 207:3,10,13,19 |
| 127:22,25 | 153:2,5,12,15 | 179:25 180:4 | 207:23 208:6,9 |
| 128:9,12,20,23 | 153:22,25 | 180:13,16,23 | 208:16,19 |
| 129:7,10,18,21 | 154:8,11,18,21 | 181:2,10,13,19 | 209:2,5,15,18 |
| 130:5,8,15,18 | 155:5,8,15,18 | 181:22 182:7 | 210:2,5,13,16 |
| 130:24 131:3,9 | 155:25 156:5 | 182:10,19,22 | 210:25 211:4 |
| 131:12,20,23 | 156:13,16 | 183:6,9,17,20 | 211:18,21 |
| 132:7,10,18,21 | 157:2,5,12,15 | 184:4,7,15,18 | 212:4,7,19,22 |
| 133:5,8,17,20 | 157:22,25 | 185:2,5,13,16 | 213:5,8,20,23 |
| 134:3,6,12,15 | 158:8,11,18,21 | 186:2,5,15,18 | 214:6,9,16,19 |
| 134:21,24 | 159:5,8,15,18 | 187:4,7,16,19 | 215:15,18,25 |
| 135:7,10,23 | 160:2,5,13,16 | 188:3,6,15,18 | 216:4,13,16,23 |
| 136:2,10,13,21 | 161:2,5,12,15 | 189:2,5,13,16 | 217:2,21,24 |
| 136:24 137:8 | 161:22,25 | 189:24 190:3 | 218:7,10 219:2 |
| 137:11,20,23 | 162:8,11,18,21 | 190:12,15,25 | 219:5,12,15,23 |
| 138:6,9,15,18 | 163:4,7,15,18 | 191:4,14,17 | 220:2,12,15,24 |
| 138:24 139:3 | 163:25 164:4 | 192:3,6,15,18 | 221:3,12,15,23 |
| 139:10,13,20 | 164:14,17,24 | 193:2,5,14,17 | 222:2,9,12,21 |
| 139:23 140:6,9 | 165:3,10,13,20 | 193:25 194:4 | 222:24 223:9 |
| 140:16,19 | 165:23 166:6,9 | 194:12,15,24 | 223:12,20,23 |
| 141:4,7,14,17 | 166:22,25 | 195:3,12,15,23 | 224:7,10,19,22 |
| 141:24 142:3,9 | 167:9,12,20,23 | 196:2,10,13 | 225:7,10,17,20 |
| 142:12,19,22 | 168:6,9,19,22 | 198:10,13,20 | 226:3,6,14,17 |
| 143:6,9,17,20 | 169:5,8,15,18 | 198:23 199:6,9 | 226:24 227:3 |
| 144:4,7,16,19 | 169:25 170:4 | 199:16,19 | 227:10,13,21 |
| 145:2,5,12,15 | 170:11,14,22 | 200:3,6,14,17 | 227:24 228:8 |
| 145:22,25 | 170:25 171:9 | 201:2,5,12,15 | 228:11,19,22 |
| 146:8,11,19,22 | 171:12,20,23 | 201:22,25 | **file**   37:20 41:15 |
| 147:6,9,17,20 | 174:13,16,22 | 202:8,11,18,21 | **filed**   35:12 36:7 |
| 148:5,8,15,18 | 174:25 175:8 | 203:4,7,13,17 | 37:13,14,16 |
| 149:3,6,12,15 | 175:11,20,23 | 204:3,6,15,18 | 38:7 |

[filing - gmo]                                                    Page 18

| | | | |
|---|---|---|---|
| **filing** 4:6 | **foregoing** | **fraudulent** | 166:17 167:4 |
| **financial** 1:11 | 233:5,8 | 210:20 | 167:16 |
| 1:11,12,13 | **form** 4:10 | **full** 10:12 12:2 | |
| 21:13,25 22:17 | 41:13,16 | 12:3 | **g** |
| 23:5 29:11,23 | **formation** 48:3 | **fund** 185:20 | **garden** 2:13 |
| 30:11,23 41:7 | 231:13 | 190:19 | **geico** 1:5,5,5 |
| 97:12,22 | **formed** 41:20 | **funnel** 186:9 | 6:2 33:22,25 |
| 104:15,25 | 68:7 92:11 | 191:8 203:21 | 34:15 35:4,19 |
| 105:12,23 | **formerly** 1:12 | 222:16 | 36:23 234:5 |
| 106:10,21 | 22:2 152:9 | **funneling** | **general** 1:5 |
| 107:8,19 | **forward** 76:5 | 204:8 223:2 | 39:10 |
| 116:20 117:6 | 86:2 | **further** 4:9,13 | **give** 11:15,25 |
| 117:16 118:2 | **four** 17:16 | 229:18 233:10 | 39:10 |
| 148:11 152:8 | 217:6 | **furtherance** | **given** 10:22 |
| 156:8 160:8 | **frame** 27:19 | 108:16 200:8 | **gmo** 39:24 40:2 |
| **fine** 69:23 | 184:20 185:7 | **fvg** 148:22,23 | 40:19 41:4,11 |
| 197:15 | **frank** 24:15 | 149:8,17 150:3 | 42:9,23 43:10 |
| **finish** 11:24 | 32:8 63:5,15 | 150:14,25 | 43:21 44:8,14 |
| **first** 5:10 12:24 | 89:16 119:17 | 151:11,22 | 45:11,23 46:11 |
| 124:7 127:18 | 138:2 | 152:20,22 | 46:23 47:11 |
| 131:5 134:17 | **fraud** 68:8,20 | 153:8,17 154:3 | 48:4,18,23 |
| 138:20 142:5 | 92:12,24 99:6 | 154:14,25 | 49:3,23 50:10 |
| 145:17 172:3 | 103:5 108:17 | 155:11,22 | 51:7 52:3 |
| 215:5 | 126:12 129:24 | 156:20,22 | 53:21 56:24 |
| **five** 135:13 | 133:11 137:14 | 157:8,17 158:3 | 57:15,25 66:19 |
| **fleyshmakher** | 140:22 144:10 | 158:14,25 | 67:6,18 68:6 |
| 201:8 | 147:23 185:21 | 159:11,22 | 68:18 110:22 |
| **following** | 190:20 200:9 | 160:20,22 | 111:19 122:16 |
| 229:21 | 203:22 204:10 | 161:7,17 162:4 | 172:7 175:16 |
| **follows** 5:7,12 | 204:22 205:8 | 162:14,24 | 176:2,23 177:8 |
| 8:23 | 206:8,19 | 163:11 | 177:19 178:8 |
| **force** 4:16 | 222:17 223:4 | **fvh** 163:21 | 183:23 184:10 |
| **foreclosed** 16:5 | 223:15 224:15 | 164:8,9,19 | 185:19 186:8 |
| 48:22 | 225:2 | 165:5,15 166:2 | 186:21 187:10 |

[gmo - grounds]                                               Page 19

| | | | |
|---|---|---|---|
| 188:9 189:8 | 124:17 125:3 | 29:14 30:2,14 | 91:6,17 92:4 |
| 190:6 196:22 | 125:14,25 | 31:2,13,24 | 92:16 93:4 |
| 198:4 202:3 | 128:4,15 129:2 | 32:11,23 33:11 | 94:10,20 95:6 |
| 203:20 204:20 | 129:13 131:15 | 43:2,14,25 | 95:16 96:2,20 |
| 205:18 206:5 | 132:2,13,24 | 44:18 45:4,16 | 97:6,16 98:2 |
| 207:25 208:12 | 135:3,19 136:5 | 46:4,16 47:4 | 98:12,23 99:10 |
| 208:21 209:7 | 136:16 137:3 | 47:16 49:14 | 99:20 100:5,14 |
| 216:7 217:7 | 150:4 151:11 | 50:3,14,24 | 100:23 101:8 |
| 218:15 219:18 | 151:21 154:4 | 51:11,20 52:7 | 101:17 102:2 |
| 220:7 221:18 | 155:11,21 | 52:17 53:3,13 | 102:12,22 |
| 231:14,16,19 | 158:4 159:11 | 53:24 54:10,21 | 103:9,20 104:7 |
| 232:2,6,9 | 159:21 161:18 | 55:8,19 56:6 | 104:18 105:5 |
| **go**  8:14 11:11 | 162:24 163:10 | 56:16 57:3 | 105:16 106:3 |
| 11:12 19:18 | 165:16 167:4 | 58:19 59:6,17 | 106:14,25 |
| 173:10,12,14 | 167:15 169:21 | 60:4,15 61:2 | 107:12,23 |
| 173:18 197:7 | 171:4,15 | 61:13,24 62:11 | 108:9,21 |
| **going**  6:24 8:12 | 177:10,21 | 62:22 63:8,19 | 109:13 110:6 |
| 11:11 34:21,23 | 182:2,14 | 64:6,17 65:4 | 110:16 111:2 |
| 36:20 47:22 | 184:11 185:9 | 65:15 66:2,13 | 111:12,24 |
| 49:20 58:12 | 202:24 203:10 | 66:24 67:12,24 | 112:12,23 |
| 171:25 172:3 | 209:8,11,21 | 68:12,25 71:16 | 113:9,20 114:5 |
| 173:2,22 | 227:5,16 228:3 | 72:5,16 73:3 | 114:15,25 |
| 196:15,17 | 228:14 | 73:14,25 74:12 | 115:11,20 |
| 200:19 211:9 | **government** | 74:23 75:10,22 | 116:5,14,24 |
| 213:10 220:4 | 1:4 6:5 | 76:15 77:2,13 | 117:10,20 |
| **good**  5:23 | **graduated** | 77:24 78:11,22 | 118:6,15,25 |
| 196:24 199:23 | 17:21 | 79:9,20 80:7 | 119:11,20 |
| **goods**  42:14 | **ground**  14:20 | 80:18 81:5,17 | 120:6,16 121:3 |
| 45:12,24 46:12 | **grounds**  20:5 | 82:8,18 83:5 | 121:13,24 |
| 46:24 47:12 | 20:17 21:5,17 | 83:19 84:7,19 | 122:10,20 |
| 66:20 67:7,20 | 22:6,21 23:9 | 85:7,19 86:9 | 123:6,16,25 |
| 72:24 75:18 | 23:20 24:7,18 | 86:20 87:10,20 | 124:10,20 |
| 76:11 94:2,6 | 25:6,18 27:13 | 88:9,20 89:9 | 125:7,18 126:5 |
| 94:17 98:9,19 | 28:2,14 29:2 | 89:19 90:8,19 | 126:17 127:3 |

[grounds - head]                                                    Page 20

| | | | |
|---|---|---|---|
| 127:12,21 | 161:11,21 | 199:5,15 200:2 | 29:11,23 30:11 |
| 128:8,19 129:6 | 162:7,17 163:3 | 200:13,25 | 30:23 32:20 |
| 129:17 130:4 | 163:14,24 | 201:11,21 | 45:25 66:21 |
| 130:14,23 | 164:13,23 | 202:7,17 203:3 | 68:21 69:9,20 |
| 131:8,19 132:6 | 165:9,19 166:5 | 203:13 204:2 | 95:3 96:16 |
| 132:17 133:4 | 166:21 167:8 | 204:14,25 | 114:12 116:21 |
| 133:16 134:2 | 167:19 168:5 | 205:12,23 | 117:7,17 118:3 |
| 134:11,20 | 168:18 169:4 | 206:11,23 | 120:3 148:11 |
| 135:6,22 136:9 | 169:14,24 | 207:9,19 208:5 | 152:8 156:8 |
| 136:20 137:7 | 170:10,21 | 208:15,25 | 160:8 163:21 |
| 137:19 138:5 | 171:8,19 | 209:14,25 | **guilty**  37:4 |
| 138:14,23 | 174:12,21 | 210:12,24 | **h** |
| 139:9,19 140:5 | 175:7,19 176:5 | 211:17 212:3 | |
| 140:15 141:3 | 176:16 177:2 | 212:18 213:4 | **h**  5:2 |
| 141:13,23 | 177:13,25 | 213:19 214:5 | **hack**  2:11 |
| 142:8,18 143:5 | 178:12 179:5 | 214:15 215:14 | **half**  15:16 |
| 143:16 144:3 | 179:14,24 | 215:24 216:12 | **handwriting** |
| 144:15,25 | 180:12,22 | 216:22 217:20 | 211:13 212:14 |
| 145:11,21 | 181:9,19 182:6 | 218:6,25 | 213:15 215:10 |
| 146:7,18 147:5 | 182:18 183:5 | 219:11,22 | 216:9 217:16 |
| 147:16 148:4 | 183:16 184:3 | 220:11,23 | 218:21 |
| 148:14 149:2 | 184:14,25 | 221:11,22 | **hao**  196:24 |
| 149:11,21 | 185:12,25 | 222:8,20 223:8 | 199:22 |
| 150:7,17 151:4 | 186:14 187:3 | 223:19 224:6 | **happened**  9:7 |
| 151:14,25 | 187:15 188:2 | 224:18 225:6 | **happy**  11:21 |
| 152:12,25 | 188:14,25 | 225:16 226:2 | **harbor**  1:9 6:7 |
| 153:11,21 | 189:12,23 | 226:13,23 | 19:25 27:22 |
| 154:7,17 155:4 | 190:11,24 | 227:9,20 228:7 | 45:24 66:21 |
| 155:14,25 | 191:13 192:2 | 228:18 | 68:20 69:8,20 |
| 156:12,25 | 192:14,25 | **group**  1:9,11 | 95:2 96:15 |
| 157:11,21 | 193:13,24 | 1:12,13,13 6:7 | 114:11 234:5 |
| 158:7,17 159:4 | 194:11,23 | 19:25 21:14 | **head**  11:19 |
| 159:14,25 | 195:11,22 | 22:2,17 23:5 | 42:2 |
| 160:12,25 | 196:9 198:9,19 | 25:2 27:23 | |

[hear - incrimination]                                                        Page 21

| | | | |
|---|---|---|---|
| **hear**  11:21 39:3 | 218:18 | 120:12 198:15 | 61:15 62:2,13 |
| **heard**  40:14 | **identified** | 204:8 205:7 | 62:24 63:10,21 |
| **held**  8:17 19:20 | 35:17 48:12 | 206:17 223:2 | 64:8,19 65:6 |
| 22:10 78:8 | **identities** | 223:14 224:24 | 65:17 66:4,15 |
| 173:19 197:18 | 206:18 | **including**  8:6 | 67:2,14 68:2 |
| **help**  11:11 | **identity**  186:22 | **incorporate** | 68:14 69:3 |
| **hereto**  4:6 | 191:21 206:7 | 70:15,18,25 | 71:18 72:7,18 |
| **hewitt**  2:16 | 224:14,25 | 71:4 | 73:5,16 74:3 |
| 229:20 | **ii**  1:12 22:2 | **incriminate** | 74:14,25 75:12 |
| **high**  17:21 | 29:23 117:7 | 10:19 | 75:24 76:17 |
| **highest**  17:19 | 152:8,20,22 | **incrimination** | 77:4,15 78:2 |
| **hill**  15:23 16:2 | 153:8,17 154:3 | 8:4 9:20,25 | 78:13,24 79:11 |
| 48:17 | 154:14,25 | 10:6,17,25 | 79:22 80:9,20 |
| **home**  5:18 | 155:11,22 | 19:3,15 20:7 | 81:7,19 82:10 |
| **hours**  12:18 | **iii**  1:13 2:16 | 20:19 21:7,19 | 82:20 83:7,21 |
| **house**  16:4 | 22:18 30:11 | 22:8,23 23:11 | 84:9,21 85:9 |
| 48:21 | 117:17 156:9 | 23:22 24:9,20 | 85:21 86:11,22 |
| **howard**  23:17 | 156:20,22 | 25:8,20 27:15 | 87:12,22 88:11 |
| 31:21 64:24 | 157:8,17 158:3 | 28:4,16 29:4 | 88:22 89:11,21 |
| 65:11 91:13,24 | 158:14,25 | 29:16 30:4,16 | 90:10,21 91:8 |
| 102:18 107:18 | 159:11,22 | 31:4,15 32:2 | 91:19 92:6,18 |
| 118:21 144:22 | **important** | 32:13,25 33:13 | 93:6 94:12,22 |
| 145:7,18 146:4 | 11:15 | 43:4,16 44:3 | 95:8,18 96:4 |
| 146:14,25 | **inc.'s**  182:25 | 44:20 45:6,18 | 96:22 97:8,18 |
| 147:12,23 | 221:7 | 46:6,18 47:6 | 98:4,14,25 |
| **huh**  48:11 | **include**  229:22 | 47:18 49:16 | 99:12,22 100:7 |
| **i** | **includes**  109:19 | 50:5,16 51:2 | 100:16,25 |
| **identification** | 110:12,22 | 51:13,22 52:9 | 101:10,19 |
| 6:22 35:9 | 111:8 114:2,11 | 52:19 53:5,15 | 102:4,14,24 |
| 36:12 48:7 | 114:21 115:7 | 54:2,12,23 | 103:11,22 |
| 57:19 172:11 | 116:2,11,20 | 55:10,21 56:8 | 104:9,20 105:7 |
| 172:21 197:4 | 117:6 118:2,12 | 56:18 57:5 | 105:18 106:5 |
| 215:3 217:11 | 118:21 119:7 | 58:21 59:8,19 | 106:16 107:3 |
| | 119:17 120:2 | 60:6,17 61:4 | 107:14,25 |

**[incrimination - individuals]**                                          Page 22

| | | | |
|---|---|---|---|
| 108:11,23 | 142:10,20 | 178:14 179:7 | 213:21 214:7 |
| 109:15 110:8 | 143:7,18 144:5 | 179:16 180:2 | 214:17 215:16 |
| 110:18 111:4 | 144:17 145:3 | 180:14,24 | 216:2,14,24 |
| 111:14 112:2 | 145:13,23 | 181:11,20 | 217:22 218:8 |
| 112:14,25 | 146:9,20 147:7 | 182:8,20 183:7 | 219:3,13,24 |
| 113:11,22 | 147:18 148:6 | 183:18 184:5 | 220:13,25 |
| 114:7,17 115:3 | 148:16 149:4 | 184:16 185:3 | 221:13,24 |
| 115:13,22 | 149:13,23 | 185:14 186:3 | 222:10,22 |
| 116:7,16 117:2 | 150:9,19 151:6 | 186:16 187:5 | 223:10,21 |
| 117:12,22 | 151:16 152:3 | 187:17 188:4 | 224:8,20 225:8 |
| 118:8,17 119:3 | 152:14 153:3 | 188:16 189:3 | 225:18 226:4 |
| 119:13,22 | 153:13,23 | 189:14,25 | 226:15,25 |
| 120:8,18 121:5 | 154:9,19 155:6 | 190:13 191:2 | 227:11,22 |
| 121:15 122:2 | 155:16 156:3 | 191:15 192:4 | 228:9,20 |
| 122:12,22 | 156:14 157:3 | 192:16 193:3 | **indemnity** 1:5 |
| 123:8,18 124:3 | 157:13,23 | 193:15 194:2 | **index** 231:2,3,7 |
| 124:12,22 | 158:9,19 159:6 | 194:13,25 | **indicated** 9:18 |
| 125:9,20 126:7 | 159:16 160:3 | 195:13,24 | 233:7 |
| 126:19 127:5 | 160:14 161:3 | 196:11 198:11 | **indicates** 8:21 |
| 127:14,23 | 161:13,23 | 198:21 199:7 | **individual** |
| 128:10,21 | 162:9,19 163:5 | 199:17 200:4 | 59:14,25 84:16 |
| 129:8,19 130:6 | 163:16 164:2 | 200:15 201:3 | 85:4 123:13 |
| 130:16,25 | 164:15,25 | 201:13,23 | 126:24 130:11 |
| 131:10,21 | 165:11,21 | 202:9,19 203:5 | 133:23 138:2 |
| 132:8,19 133:6 | 166:7,23 | 203:15 204:4 | 141:10 144:22 |
| 133:18 134:4 | 167:10,21 | 204:16 205:3 | **individually** |
| 134:13,22 | 168:7,20 169:6 | 205:14,25 | 173:10 |
| 135:8,24 | 169:16 170:2 | 206:13,25 | **individuals** |
| 136:11,22 | 170:12,23 | 207:11,21 | 103:17 104:14 |
| 137:9,21 138:7 | 171:10,21 | 208:7,17 209:3 | 113:16 186:10 |
| 138:16,25 | 174:14,23 | 209:16 210:3 | 186:23 190:7 |
| 139:11,21 | 175:9,21 176:7 | 210:14 211:2 | 191:9,22 |
| 140:7,17 141:5 | 176:18 177:4 | 211:19 212:5 | 194:19 195:7 |
| 141:15,25 | 177:15 178:3 | 212:20 213:6 | 206:7,18 |

**[individuals - instruct]** Page 23

| | | | |
|---|---|---|---|
| 224:14,25 | 76:14,25 77:12 | 117:9,19 118:5 | 151:13,24 |
| **initially** 7:4 | 77:23 78:10,21 | 118:14,24 | 152:11,24 |
| **instruct** 14:19 | 79:8,19 80:6 | 119:10,19 | 153:10,20 |
| 18:25 19:9 | 80:17 81:4,16 | 120:5,15 121:2 | 154:6,16 155:3 |
| 20:4,16 21:4 | 82:7,17 83:4 | 121:12,23 | 155:13,24 |
| 21:16 22:5,20 | 83:18 84:6,18 | 122:9,19 123:5 | 156:11,24 |
| 23:8,19 24:6 | 85:6,18 86:8 | 123:15,24 | 157:10,20 |
| 24:17 25:5,17 | 86:19 87:9,19 | 124:9,19 125:6 | 158:6,16 159:3 |
| 27:12,25 28:13 | 88:8,19 89:8 | 125:17 126:4 | 159:13,24 |
| 28:25 29:13,25 | 89:18 90:7,18 | 126:16 127:2 | 160:11,24 |
| 30:13,25 31:12 | 91:5,16 92:3 | 127:11,20 | 161:10,20 |
| 31:23 32:10,22 | 92:15 93:3 | 128:7,18 129:5 | 162:6,16 163:2 |
| 33:10 42:25 | 94:9,19 95:5 | 129:16 130:3 | 163:13,23 |
| 43:4,13,24 | 95:15,25 96:19 | 130:13,22 | 164:12,22 |
| 44:17 45:3,15 | 97:5,15,25 | 131:7,18 132:5 | 165:8,18 166:4 |
| 46:3,15 47:3 | 98:11,22 99:9 | 132:16 133:3 | 166:20 167:7 |
| 47:15 49:13 | 99:19 100:4,13 | 133:15,25 | 167:18 168:4 |
| 50:2,13,23 | 100:22 101:7 | 134:10,19 | 168:17 169:3 |
| 51:10,19 52:6 | 101:16,25 | 135:5,21 136:8 | 169:13,23 |
| 52:16 53:2,12 | 102:11,21 | 136:19 137:6 | 170:9,20 171:7 |
| 53:23 54:9,20 | 103:8,19 104:6 | 137:18 138:4 | 171:18 174:11 |
| 55:7,18 56:5 | 104:17 105:4 | 138:13,22 | 174:20 175:6 |
| 56:15 57:2 | 105:15 106:2 | 139:8,18 140:4 | 175:18 176:4 |
| 58:18 59:5,16 | 106:13,24 | 140:14 141:2 | 176:15,25 |
| 60:3,14,25 | 107:11,22 | 141:12,22 | 177:12,24 |
| 61:12,23 62:10 | 108:8,20 | 142:7,17 143:4 | 178:11 179:4 |
| 62:21 63:7,18 | 109:12 110:5 | 143:15 144:2 | 179:13,23 |
| 64:5,16 65:3 | 110:15,25 | 144:14,24 | 180:11,21 |
| 65:14,25 66:12 | 111:11,23 | 145:10,20 | 181:8,18 182:5 |
| 66:23 67:11,23 | 112:11,22 | 146:6,17 147:4 | 182:17 183:4 |
| 68:11,24 71:15 | 113:8,19 114:4 | 147:15 148:3 | 183:15 184:2 |
| 72:4,15 73:2 | 114:14,24 | 148:13,25 | 184:13,24 |
| 73:13,24 74:11 | 115:10,19 | 149:10,20 | 185:11,24 |
| 74:22 75:9,21 | 116:4,13,23 | 150:6,16 151:3 | 186:13 187:2 |

**[instruct - invoke]** Page 24

| | | | |
|---|---|---|---|
| 187:14,25 | 224:17 225:5 | 32:4,15 33:3 | 94:14,24 95:10 |
| 188:13,24 | 225:15,25 | 33:15 43:7,18 | 95:20 96:6,24 |
| 189:11,22 | 226:12,22 | 44:5,11,22 | 97:10,20 98:6 |
| 190:10,23 | 227:8,19 228:6 | 45:8,20 46:8 | 98:16 99:3,14 |
| 191:12,25 | 228:17 | 46:20 47:8,20 | 99:24 100:9,18 |
| 192:13,24 | **instructions** | 49:18 50:7,18 | 101:3,12,21 |
| 193:12,23 | 225:12,22 | 51:4,15,24 | 102:6,16 103:2 |
| 194:10,22 | 226:8 | 52:11,21 53:7 | 103:13,24 |
| 195:10,21 | **insurance** 1:4,5 | 53:17 54:4,14 | 104:11,22 |
| 196:8 198:8,18 | 6:6 36:8 | 54:25 55:12,23 | 105:9,20 106:7 |
| 199:4,14,25 | **interest** 41:8 | 56:10,20 57:7 | 106:18 107:5 |
| 200:12,24 | **interpret** 10:11 | 58:23 59:10,21 | 107:16 108:3 |
| 201:10,20 | **interpreter** 3:3 | 60:8,19 61:6 | 108:13,25 |
| 202:6,16 203:2 | 5:3 6:14,19 | 61:17 62:4,15 | 109:17 110:10 |
| 203:12,25 | 9:11 10:8,13 | 63:2,12,23 | 110:20 111:6 |
| 204:13,24 | 15:24 16:16,20 | 64:10,21 65:8 | 111:16 112:4 |
| 205:11,22 | 33:23 37:25 | 65:19 66:6,17 | 112:16 113:3 |
| 206:10,22 | 38:4,25 39:7 | 67:4,16 68:4 | 113:13,24 |
| 207:8,18 208:4 | 40:22 49:4,7 | 68:16 69:5 | 114:9,19 115:5 |
| 208:14,24 | 94:4 96:12 | 71:20 72:9,20 | 115:15,24 |
| 209:13,24 | 109:23 229:3 | 73:7,18 74:5 | 116:9,18 117:4 |
| 210:11,23 | 230:4,5 | 74:16 75:3,14 | 117:14,24 |
| 211:16 212:2 | **investigation** | 76:2,19 77:6 | 118:10,19 |
| 212:17 213:3 | 37:9 | 77:17 78:4,15 | 119:5,15,24 |
| 213:18 214:4 | **invoices** 176:11 | 79:2,13,24 | 120:10,20 |
| 214:14 215:13 | 181:4 | 80:11,22 81:9 | 121:7,17 122:4 |
| 215:23 216:11 | **invoke** 9:3,14 | 81:21 82:12,22 | 122:14,24 |
| 216:21 217:19 | 20:9,21 21:9 | 83:9,23 84:11 | 123:10,20 |
| 218:5,24 | 21:21 22:13,25 | 84:23 85:11,23 | 124:5,14,24 |
| 219:10,21 | 23:13,24 24:11 | 86:13,24 87:14 | 125:11,22 |
| 220:10,22 | 24:22 25:10,22 | 87:24 88:13,24 | 126:9,21 127:7 |
| 221:10,21 | 27:17 28:6,18 | 89:13,23 90:12 | 127:16,25 |
| 222:7,19 223:7 | 29:6,18 30:6 | 90:23 91:10,21 | 128:12,23 |
| 223:18 224:5 | 30:18 31:6,17 | 92:8,20 93:8 | 129:10,21 |

**[invoke - issued]** Page 25

| | | | |
|---|---|---|---|
| 130:8,18 131:3 | 164:17 165:3 | 201:15,25 | **involving** 68:20 |
| 131:12,23 | 165:13,23 | 202:11,21 | 92:24 99:6 |
| 132:10,21 | 166:9,25 | 203:7,17 204:6 | 103:5 108:17 |
| 133:8,20 134:6 | 167:12,23 | 204:18 205:5 | 120:24 121:20 |
| 134:15,24 | 168:9,22 169:8 | 205:16 206:3 | 122:7 126:13 |
| 135:10 136:2 | 169:18 170:4 | 206:15 207:3 | 129:25 133:12 |
| 136:13,24 | 170:14,25 | 207:13,23 | 137:15 140:23 |
| 137:11,23 | 171:12,23 | 208:9,19 209:5 | 144:11 147:24 |
| 138:9,18 139:3 | 174:16,25 | 209:18 210:5 | 185:21 186:24 |
| 139:13,23 | 175:11,23 | 210:16 211:4 | 190:20 191:23 |
| 140:9,19 141:7 | 176:9,20 177:6 | 211:21 212:7 | 200:9 204:10 |
| 141:17 142:3 | 177:17 178:5 | 212:22 213:8 | 205:9 206:19 |
| 142:12,22 | 178:16 179:9 | 213:23 214:9 | 210:8,20 223:4 |
| 143:9,20 144:7 | 179:18 180:4 | 214:19 215:18 | 223:16 225:2 |
| 144:19 145:5 | 180:16 181:2 | 216:4,16 217:2 | **island** 42:3 |
| 145:15,25 | 181:13,22 | 217:24 218:10 | 58:8 |
| 146:11,22 | 182:10,22 | 219:5,15 220:2 | **issue** 53:9,19 |
| 147:9,20 148:8 | 183:9,20 184:7 | 220:15 221:3 | 54:6 59:23 |
| 148:18 149:6 | 184:18 185:5 | 221:15 222:2 | 60:10 61:8 |
| 149:15,25 | 185:16 186:5 | 222:12,24 | 62:6 63:4,25 |
| 150:11,21 | 186:18 187:7 | 223:12,23 | 64:23 66:8 |
| 151:8,18 152:5 | 187:19 188:6 | 224:10,22 | 79:4,15 80:2 |
| 152:16 153:5 | 188:18 189:5 | 225:10,20 | 85:2,13 86:15 |
| 153:15,25 | 189:16 190:3 | 226:6,17 227:3 | 87:16 88:15 |
| 154:11,21 | 190:15 191:4 | 227:13,24 | 89:15 90:14 |
| 155:8,18 156:5 | 191:17 192:6 | 228:11,22 | 91:12 175:15 |
| 156:16 157:5 | 192:18 193:5 | **invoking** 8:3 | 180:8 214:11 |
| 157:15,25 | 193:17 194:4 | 9:18,23 10:4 | **issued** 37:24 |
| 158:11,21 | 194:15 195:3 | 10:15,23 | 55:15 56:2 |
| 159:8,18 160:5 | 195:15 196:2 | **involved** 35:20 | 58:16 81:12,24 |
| 160:16 161:5 | 196:13 198:13 | 99:5,16 104:2 | 82:3 83:12,15 |
| 161:15,25 | 198:23 199:9 | 113:17 | 175:25 176:22 |
| 162:11,21 | 199:19 200:6 | **involves** 115:17 | 180:18 181:15 |
| 163:7,18 164:4 | 200:17 201:5 | 117:16 | 183:11 185:19 |

186:8,21
187:10 188:9
189:8 190:6,18
191:7,20 192:9
193:8,20
194:18 196:4
198:4,16 199:2
199:12 201:17
202:3 203:19
207:25 208:12
210:7 222:14
**issues** 80:24
**issuing** 111:19
112:7 199:21
**iv** 1:13 23:6
30:23 118:3
160:8,20,22
161:7,17 162:4
162:14,24
163:11

**j**

**january** 7:5
18:21 19:4,23
20:11,23 21:11
21:23 22:15
23:3,15 24:2
24:13,24 25:12
26:12,16,20
27:3,7,20 28:8
28:20 29:8,20
30:8,20 31:8
31:19 32:6,17
33:5 41:5 43:9

43:20 44:7,13
45:10,22 46:10
46:22 49:22
50:10 54:16
55:3,14,25
58:14,25 72:11
72:22 73:9,20
74:7,18 75:5
75:16 76:21
81:11,23 82:2
83:13,25 84:25
183:22 184:9
**jersey** 5:20
11:9 37:22
70:20,23
**joanna** 2:8 5:24
**john** 1:13
**jordan** 24:4
31:10 64:2,13
90:15 91:2
102:8 107:7
119:7 141:10
141:19 142:15
142:25 143:12
143:23 144:10
**junior** 17:23
**jurat** 229:22

**k**

**kaminar** 1:11
2:15 13:25
14:2 88:4
101:14 105:22
116:2 133:23

134:8 135:3,19
136:6,17 137:4
137:14
**kaminar's** 62:7
62:18 87:17
88:6
**kandharov's**
87:6
**kandhorov**
1:13 14:13
87:4 101:5
105:11 118:12
126:24 127:9
128:5,16 129:3
129:14,24
**kandhorov's**
61:9,20 86:16
**kelly** 19:7 27:9
27:9 44:25
45:13 75:19
76:6 93:11,16
93:18,21,24
94:3,17 114:2
126:13 129:25
133:12 137:15
140:23 144:11
147:24 226:20
227:6 228:4
**kelly's** 175:3
179:20
**kickbacks**
189:9,19
193:20 194:7
205:19 224:3

**kind** 38:22 42:5
42:12 229:10
**know** 11:21
13:21,22 14:4
14:8 37:10
39:2 69:12
93:10 123:22
127:9 130:20
134:8 138:11
141:19 145:7
173:23
**knowledge**
37:7 93:17,20
**known** 1:12 6:2
22:2 152:9
**kouperman**
70:13

**l**

**l** 4:2 5:9 11:7
**launder** 68:19
92:23 108:6,16
113:6 122:17
123:3 185:20
190:19
**laundered**
109:8,25
111:18 112:6
**laundering**
68:7 92:11
112:18
**law** 2:19
**lawsuit** 6:3
12:25 13:15

**[lawsuit - management]** Page 27

33:17
**lawsuits** 33:18
**lawyer** 13:6,8
13:12
**learn** 12:24
**legal** 13:17,24
14:5,12
**legitimate**
45:12,24 46:12
46:24 47:12
49:11 66:20
67:7,19 72:13
72:24 75:18
76:8,11 124:17
125:3,14,25
128:4,15 129:2
129:13 131:15
132:2,13,24
135:3,19 136:5
136:16 137:3
149:17 150:4
150:14,24
151:11,21
153:18 154:4
154:14,24
155:11,21
157:18 158:4
158:14,24
159:11,21
161:8,18 162:4
162:14,24
163:10 165:6
165:16 166:2
166:17 167:4

167:15 169:11
169:21 170:7
170:17 171:4
171:15 177:9
177:20 181:25
182:14 183:13
183:24 184:11
184:22 185:9
202:14,24
203:10 208:22
209:8,11,21
227:16 228:3
228:14
**leomax** 35:4
40:10,20 111:8
196:23 199:2
221:7,19
222:15,15
223:25 232:3
**level** 17:19
**lexton** 200:22
201:18 202:4
202:13,23
203:9,20 215:7
216:8
**licenses** 18:6
**liens** 37:24 38:2
38:7
**limited** 8:7
**line** 231:4,8
234:8
**lioudmila**
70:13

**listed** 52:2,13
77:8,19
**lived** 15:14
**llc** 1:11,12,12
1:13,13 21:14
22:2,3 23:6
25:2,14 29:11
29:23 32:20
39:24 41:11
68:6,18 110:23
116:21 117:7
117:17 118:3
120:3 148:11
152:9,9 156:9
160:9 163:21
168:2 200:22
218:15 232:9
234:2
**llcs** 41:4
**llp** 2:4 5:25
**location** 48:18
49:10
**long** 15:14
**look** 173:6
197:11 215:5
217:5,14
218:13
**loudly** 11:16
**luck** 196:24
199:23

**m**

**m** 5:9 11:7

**m.d.** 1:10 19:7
27:10 75:19
93:11
**made** 8:6
**mail** 18:9,16,19
18:22 19:5,24
20:14 21:2,14
22:3,18 23:6
23:17 24:4,15
25:3,15 44:15
75:7 172:25
**mailed** 197:10
**maintained**
43:21 74:8
**make** 26:21
52:23 78:17
**management**
40:16,20,25
69:25 70:6,10
70:16 71:9,13
71:22 72:12,23
73:11,21 74:8
74:19 75:6,17
76:7,10,22
77:10,21 78:7
78:18 79:6,17
80:4,15 81:2
81:14 82:5,15
83:2,16 84:4
84:15 85:3,15
92:10,22
110:13 112:7
123:2 172:18
180:9,19

181:16,24
182:13,25
184:21 185:8
190:18 191:7
191:20 192:9
193:8 194:18
201:17 203:21
204:21 205:19
206:6 215:6
221:6 231:22
**manalapan**
15:23 48:17
**march**  1:17
234:6
**mark**  1:11
13:25 14:2
62:7,18 87:17
133:23
**marked**  6:12
6:21 35:2,8
36:5,11 47:25
48:6 57:18
172:4,10,14,20
174:4 178:19
197:3 212:10
214:23 215:2
217:10 218:17
**marketing**
220:19
**marking**  6:17
57:12
**meaning**  48:21
**meant**  69:15

**medical**  1:9,10
1:10 6:7 19:25
20:13,25 27:22
28:23 45:25
46:13,25 47:13
66:21 67:8,20
68:20,21,22
69:8,9,10,20,21
69:22 95:3,13
95:23 96:15,16
96:17 114:11
114:22 115:8
234:5
**medication**
12:17
**meet**  124:7
127:18 131:5
134:17 138:20
142:5 145:17
**member**  41:3
41:10
**members**
148:23 152:21
156:21 160:21
164:9 168:14
**memory**  12:19
**met**  93:18
**mineola**  234:4
**minute**  8:13
26:4 34:8
135:13 166:12
173:5,18 197:7
**mistaken**  70:21
70:24 71:24

**money**  54:17
59:2,12 60:21
61:19 62:17
63:14 64:12
65:10,21 68:8
80:14 84:2,13
86:5 87:5 88:5
89:5 90:4,25
91:23 92:12
108:6,16 109:8
109:25 111:18
112:6,19,19
113:5 122:17
123:3 185:20
186:9 190:19
191:8 195:18
203:21 204:9
222:16 223:3
225:13,23
**monies**  187:21
188:20 189:18
192:20 194:6
195:5
**morning**  5:23
**move**  85:25
**moving**  76:4

**n**

**n**  2:2 4:2 5:2,9
233:2
**name**  5:14,23
11:4 39:22
57:25 234:5,6

**named**  13:25
14:6,13 19:7
23:17 24:4,15
36:17 44:25
70:13 93:10
123:13 126:24
130:11 133:23
138:2 141:10
144:22 201:8
207:16
**names**  15:9,12
**ncm**  1:3
**need**  9:12 12:10
39:14
**needs**  9:13
**never**  40:14
183:23 184:21
226:19 227:5
227:15
**new**  1:2,25 2:6
2:13,21 5:6,11
5:20 6:5 11:9
37:22 70:20,23
234:2,4
**nod**  11:18
**nonparty**  1:22
2:22
**northfield**  78:8
182:25
**nos**  1:14
**notary**  1:24
4:15 5:6,10
230:17 233:4
234:25

**[noted - objection]**                                                                 Page 29

| | | | |
|---|---|---|---|
| **noted** 230:6 | 58:17 59:4,15 | 106:12,23 | 140:13,25 |
| **notes** 233:9 | 60:2,13,24 | 107:10,21 | 141:11,21 |
| **noticed** 7:5 | 61:11,22 62:9 | 108:7,19 | 142:6,16 143:3 |
| **number** 17:17 | 62:20 63:6,17 | 109:11 110:4 | 143:14,25 |
| 26:10,14 44:9 | 64:4,15 65:2 | 110:14,24 | 144:13,23 |
| 74:20 | 65:13,24 66:11 | 111:10,22 | 145:9,19 146:5 |
| **numbers** 27:5 | 66:22 67:10,22 | 112:10,21 | 146:16 147:3 |
| **numerous** 68:8 | 68:10,23 71:14 | 113:7,18 114:3 | 147:14 148:2 |
| 92:12 113:6,15 | 72:3,14,25 | 114:13,23 | 148:12,24 |
| **ny** 234:4,4 | 73:12,23 74:10 | 115:9,18 116:3 | 149:9,19 150:5 |
| **o** | 74:21 75:8,20 | 116:12,22 | 150:15 151:2 |
| | 76:13,24 77:11 | 117:8,18 118:4 | 151:12,23 |
| **o** 4:2 5:2 233:2 | 77:22 78:9,20 | 118:13,23 | 152:10,23 |
| **oath** 12:5 | 79:7,18 80:5 | 119:9,18 120:4 | 153:9,19 154:5 |
| **objection** 14:18 | 80:16 81:3,15 | 120:14,25 | 154:15 155:2 |
| 18:24 19:8 | 82:6,16 83:3 | 121:11,22 | 155:12,23 |
| 20:3,15 21:3 | 83:17 84:5,17 | 122:8,18 123:4 | 156:10,23 |
| 21:15 22:4,19 | 85:5,17 86:7 | 123:14,23 | 157:9,19 158:5 |
| 23:7,18 24:5 | 86:18 87:8,18 | 124:8,18 125:5 | 158:15 159:2 |
| 24:16 25:4,16 | 88:7,18 89:7 | 125:16 126:3 | 159:12,23 |
| 27:11,24 28:12 | 89:17 90:6,17 | 126:15,25 | 160:10,23 |
| 28:24 29:12,24 | 91:4,15 92:2 | 127:10,19 | 161:9,19 162:5 |
| 30:12,24 31:11 | 92:14 93:2 | 128:6,17 129:4 | 162:15,25 |
| 31:22 32:9,21 | 94:8,18 95:4 | 129:15 130:2 | 163:12,22 |
| 33:9 42:24 | 95:14,24 96:18 | 130:12,21 | 164:11,21 |
| 43:12,23 44:16 | 97:4,14,24 | 131:6,17 132:4 | 165:7,17 166:3 |
| 45:2,14 46:2 | 98:10,21 99:8 | 132:15 133:2 | 166:19 167:6 |
| 46:14 47:2,14 | 99:18 100:3,12 | 133:14,24 | 167:17 168:3 |
| 49:12,25 50:12 | 100:21 101:6 | 134:9,18 135:4 | 168:16 169:2 |
| 50:22 51:9,18 | 101:15,24 | 135:20 136:7 | 169:12,22 |
| 52:5,15,25 | 102:10,20 | 136:18 137:5 | 170:8,19 171:6 |
| 53:11,22 54:8 | 103:7,18 104:5 | 137:17 138:3 | 171:17 174:10 |
| 54:19 55:6,17 | 104:16 105:3 | 138:12,21 | 174:19 175:5 |
| 56:4,14,25 | 105:14,25 | 139:7,17 140:3 | 175:17 176:3 |

[objection - participants]                                                          Page 30

| | | | |
|---|---|---|---|
| 176:14,24 | 212:16 213:2 | **operate** 48:23 | **p.c.** 1:9,10,10 |
| 177:11,23 | 213:17 214:3 | **operating** | 2:11,19 6:7 |
| 178:10 179:3 | 214:13 215:12 | 71:12,23 72:2 | 20:2,14,25 |
| 179:12,22 | 215:22 216:10 | **operation** | 45:25 46:13,25 |
| 180:10,20 | 216:20 217:18 | 104:3 | 47:13 66:21 |
| 181:7,17 182:4 | 218:4,23 219:9 | **opportunity** | 67:9,21 68:21 |
| 182:16 183:3 | 219:20 220:9 | 212:13 | 68:22,22 69:9 |
| 183:14,25 | 220:21 221:9 | **order** 186:22 | 69:10,10,20,21 |
| 184:12,23 | 221:20 222:6 | 191:21 224:13 | 69:22 95:3,13 |
| 185:10,23 | 222:18 223:6 | **own** 15:17,19 | 95:23 96:16,17 |
| 186:12,25 | 223:17 224:4 | 16:25 40:8,12 | 96:17 114:12 |
| 187:13,24 | 224:16 225:4 | 40:20 42:20 | 114:22 115:8 |
| 188:12,23 | 225:14,24 | 70:5 71:2 | **p.m.** 230:6 |
| 189:10,21 | 226:11,21 | 191:9 197:12 | **page** 7:12,18,18 |
| 190:9,22 | 227:7,18 228:5 | 228:2,13 | 35:3 36:6 48:2 |
| 191:11,24 | 228:16 | **owned** 38:8 | 48:10 57:13 |
| 192:12,23 | **objections** 4:10 | 40:17 69:25 | 172:6,16 |
| 193:11,22 | **obtain** 18:2 | 70:6 103:16 | 173:12,12 |
| 194:9,21 195:9 | **office** 2:19 49:8 | 109:4,9 110:2 | 196:20 214:24 |
| 195:20 196:7 | **okay** 6:19 8:11 | 111:20 112:8 | 216:6 217:6 |
| 198:7,17 199:3 | 9:11 14:11,22 | 125:4 126:2 | 218:15,20,21 |
| 199:13,24 | 19:11 34:9 | 128:16 129:14 | 229:21 231:4,8 |
| 200:11,23 | 35:16 36:2 | 132:3,25 136:6 | 231:17 234:8 |
| 201:9,19 202:5 | 37:16 38:4 | 137:4 186:10 | **pages** 231:11 |
| 202:15,25 | 39:7,15 49:7 | 196:5 | 231:12,14,20 |
| 203:11,24 | 58:11 197:9 | **owner** 70:9 | 231:23 232:3,5 |
| 204:12,23 | 199:12 | **ownership** | 232:7,9 |
| 205:10,21 | **old** 2:12 5:20 | 104:3 | **paid** 112:19 |
| 206:9,21 207:7 | 11:8 234:4 | **owns** 96:8,11 | **paperwork** |
| 207:17 208:3 | **olga** 2:19,24 | 96:15 | 41:15 |
| 208:13,23 | **once** 213:12 | | **part** 68:8 92:12 |
| 209:12,23 | **opened** 50:21 | **p** | 103:4 |
| 210:10,22 | 51:8,17 | **p** 2:2,2 4:2 | **participants** |
| 211:15,25 | | | 204:21 205:8 |

**[participants - prepared]** Page 31

223:15
**participate**
126:11 129:23
133:10 137:13
140:21 144:9
147:22
**particularly**
42:19
**parties** 4:6
**partners** 25:14
33:8 120:13
168:2
**party** 233:11
**patient** 187:11
187:22 188:10
188:21 192:10
192:21 193:9
**pay** 187:11,22
188:10,21
189:9,19 190:7
192:10,21
193:9,20 194:7
194:19 195:6
204:21 205:19
224:2
**paying** 13:17
13:24 14:5,12
205:7 223:14
**payments** 8:5,8
8:9 54:7 56:3
58:15 59:23
60:10 61:8
62:6 63:4,25
64:23 66:8

80:3 82:4
83:11,14 85:2
85:13 86:15
87:16 88:15
89:15 90:14
91:12 111:19
111:21 112:7,9
176:13 177:10
177:22 180:8
181:6 182:3,15
183:11 201:18
202:4 203:19
208:2,12 210:7
210:18 222:5
222:14
**pc** 69:10,19
76:12 92:24
96:8,11,12
97:2,13,23
98:9,19 99:6
103:6,15 104:3
104:15 105:2
105:12,23
106:10,21
107:9,20
108:17 120:24
121:21 122:7
126:13 129:25
133:12 137:15
140:23 144:11
147:24 172:7
172:17 175:14
180:7 183:12
185:18,21

186:7,11,20,24
187:9 188:8,10
188:22 189:7
190:5,17,20
191:6,9,19,23
192:8 193:7,9
193:19 194:17
195:5,18
200:10 204:11
205:9 206:20
210:9,20 223:5
223:16 225:3
227:16 228:15
231:19,21
**pending** 6:4
**pennie** 1:24
233:4,15
**person** 13:22
13:25 14:4,6
14:13 19:6
23:17 24:4,15
44:25 70:13
93:10 201:8
207:16
**personal** 9:24
18:8,19 37:14
**phone** 25:24
26:9,14,18,22
27:4,8,21 28:9
28:21 29:9,21
30:9,21 31:9
31:20 32:7,18
33:6 44:9

**phonetic**
207:16
**phrase** 9:13
**plaintiff's** 6:21
35:2,8 36:5,11
47:25 48:6
57:12,18 172:5
172:10,15,20
174:5 175:14
178:19,23
180:7 196:18
197:3,22 198:3
212:10 214:23
215:2 217:5,10
218:17 231:7
**plaintiffs** 1:7
1:23 2:7 6:2
**plaza** 2:5
**pleading** 8:21
**please** 5:13
11:4,21,24
16:21 109:22
**pled** 37:4
**po** 42:3
**point** 228:24
229:4
**portion** 39:20
**possible** 35:13
**preparation**
7:15 14:16
15:5
**prepare** 46:11
**prepared** 12:22

**[present - privilege]** Page 32

| | | | |
|---|---|---|---|
| **present** 3:2 | **prior** 12:13 | 77:3,14,25 | 118:7,16 119:2 |
| 5:18 11:14 | **privilege** 9:19 | 78:12,23 79:10 | 119:12,21 |
| 18:22 19:5,23 | 9:24 10:5,16 | 79:21 80:8,19 | 120:7,17 121:4 |
| 20:12,24 21:12 | 10:24 19:3 | 81:6,18 82:9 | 121:14,25 |
| 21:24 22:16 | 20:6,18 21:6 | 82:19 83:6,20 | 122:11,21 |
| 23:4,16 24:3 | 21:18 22:7,22 | 84:8,20 85:8 | 123:7,17 124:2 |
| 24:14,25 25:13 | 23:10,21 24:8 | 85:20 86:10,21 | 124:11,21 |
| 26:13,17,21 | 24:19 25:7,19 | 87:11,21 88:10 | 125:8,19 126:6 |
| 27:4,8,20 28:9 | 27:14 28:3,15 | 88:21 89:10,20 | 126:18 127:4 |
| 28:21 29:9,21 | 29:3,15 30:3 | 90:9,20 91:7 | 127:13,22 |
| 30:9,21 31:9 | 30:15 31:3,14 | 91:18 92:5,17 | 128:9,20 129:7 |
| 31:20 32:7,18 | 31:25 32:12,24 | 93:5 94:11,21 | 129:18 130:5 |
| 33:6 40:7,21 | 33:12 43:3,15 | 95:7,17 96:3 | 130:15,24 |
| 41:5 42:22 | 44:2,19 45:5 | 96:21 97:7,17 | 131:9,20 132:7 |
| 43:10,21 44:8 | 45:17 46:5,17 | 98:3,13,24 | 132:18 133:5 |
| 44:14 45:11,23 | 47:5,17 49:15 | 99:11,21 100:6 | 133:17 134:3 |
| 46:23 49:23 | 50:4,15,25 | 100:15,24 | 134:12,21 |
| 50:11 54:17 | 51:12,21 52:8 | 101:9,18 102:3 | 135:7,23 |
| 55:4,15 56:2 | 52:18 53:4,14 | 102:13,23 | 136:10,21 |
| 58:15 59:2 | 53:25 54:11,22 | 103:10,21 | 137:8,20 138:6 |
| 72:12,23 73:10 | 55:9,20 56:7 | 104:8,19 105:6 | 138:15,24 |
| 73:21 74:8,19 | 56:17 57:4 | 105:17 106:4 | 139:10,20 |
| 75:6,17 76:22 | 58:20 59:7,18 | 106:15 107:2 | 140:6,16 141:4 |
| 81:12,24 82:3 | 60:5,16 61:3 | 107:13,24 | 141:14,24 |
| 83:14 84:2 | 61:14,25 62:12 | 108:10,22 | 142:9,19 143:6 |
| 85:2 183:23 | 62:23 63:9,20 | 109:14 110:7 | 143:17 144:4 |
| 184:10 | 64:7,18 65:5 | 110:17 111:3 | 144:16 145:2 |
| **previously** | 65:16 66:3,14 | 111:13,25 | 145:12,22 |
| 33:22,25 34:15 | 66:25 67:13,25 | 112:13,24 | 146:8,19 147:6 |
| 34:19 36:22 | 68:13 69:2 | 113:10,21 | 147:17 148:5 |
| 40:12 69:24 | 71:17 72:6,17 | 114:6,16 115:2 | 148:15 149:3 |
| 70:5 211:11 | 73:4,15 74:2 | 115:12,21 | 149:12,22 |
| 212:10,12 | 74:13,24 75:11 | 116:6,15,25 | 150:8,18 151:5 |
| 213:14 | 75:23 76:16 | 117:11,21 | 151:15 152:2 |

**[privilege - purpose]** Page 33

| | | | |
|---|---|---|---|
| 152:13 153:2 | 188:15 189:2 | 224:19 225:7 | 154:3 158:3 |
| 153:12,22 | 189:13,24 | 225:17 226:3 | 161:17 165:15 |
| 154:8,18 155:5 | 190:12,25 | 226:14,24 | 169:20 177:8 |
| 155:15 156:2 | 191:14 192:3 | 227:10,21 | 177:20 181:25 |
| 156:13 157:2 | 192:15 193:2 | 228:8,19 | 182:13 185:8 |
| 157:12,22 | 193:14,25 | **probably**  35:24 | 209:7,11 |
| 158:8,18 159:5 | 194:12,24 | 71:25 | **provided**  75:17 |
| 159:15 160:2 | 195:12,23 | **proceed**  12:22 | 76:8,11 94:2 |
| 160:13 161:2 | 196:10 198:10 | 87:3 88:3 89:3 | 94:17 98:8,19 |
| 161:12,22 | 198:20 199:6 | 90:2 | 124:16 125:2 |
| 162:8,18 163:4 | 199:16 200:3 | **proceeding** | 125:14,25 |
| 163:15,25 | 200:14 201:2 | 16:11 | 128:3,14 129:2 |
| 164:14,24 | 201:12,22 | **proceeds**  68:19 | 129:13 131:14 |
| 165:10,20 | 202:8,18 203:4 | 92:23 | 131:25 132:13 |
| 166:6,22 167:9 | 203:14 204:3 | **process**  48:13 | 132:24 135:2 |
| 167:20 168:6 | 204:15 205:2 | **production** | 135:18 136:4 |
| 168:19 169:5 | 205:13,24 | 7:19 | 136:16 137:3 |
| 169:15,25 | 206:12,24 | **professional** | 151:10,21 |
| 170:11,22 | 207:10,20 | 18:5 | 155:10,21 |
| 171:9,20 | 208:6,16 209:2 | **profited**  122:6 | 159:10,21 |
| 174:13,22 | 209:15 210:2 | 186:23 191:22 | 162:23 163:10 |
| 175:8,20 176:6 | 210:13,25 | 206:7,18 | 167:3,15 171:3 |
| 176:17 177:3 | 211:18 212:4 | 224:14,25 | 171:15 184:10 |
| 177:14 178:2 | 212:19 213:5 | **properties** | 202:23 203:9 |
| 178:13 179:6 | 213:20 214:6 | 15:19 | 209:21 227:5 |
| 179:15,25 | 214:16 215:15 | **property**  15:17 | 227:15 228:3 |
| 180:13,23 | 215:25 216:13 | 16:25 | 228:14 |
| 181:10,20 | 216:23 217:21 | **prosecution** | **public**  1:24 |
| 182:7,19 183:6 | 218:7 219:2,12 | 10:20 | 4:15 5:6,11 |
| 183:17 184:4 | 219:23 220:12 | **provide**  42:14 | 230:17 233:4 |
| 184:15 185:2 | 220:24 221:12 | 42:18 45:11,23 | 234:25 |
| 185:13 186:2 | 221:23 222:9 | 46:11,23 47:11 | **purpose**  8:7 |
| 186:15 187:4 | 222:21 223:9 | 66:20 67:7,19 | 49:11 68:7 |
| 187:16 188:3 | 223:20 224:7 | 72:24 150:3 | 72:13 92:11 |

[purpose - respectfully]                                          Page 34

149:18 153:18
157:18 161:8
165:6 169:11
183:13,24
184:22 202:14
208:22
**purposes** 69:7
86:2 93:14
148:21 152:19
156:19 160:19
164:7 168:12
**pursuant** 1:23
6:9 7:6 8:19

**q**

**question** 4:11
6:15 9:21 10:2
10:10,12 11:2
11:20,25 12:2
12:12,13 13:20
14:10 15:10
34:3,5,13
35:23 38:15
39:9 42:11,17
96:10 109:7,21
109:22
**questions** 8:5
11:19 173:3,7
217:14 229:2,6
229:18,20

**r**

**r** 2:2 5:2 233:2
**rabinovich** 3:3

**radio** 17:25
**radler** 2:4 5:25
**read** 8:22 39:21
109:23
**reask** 11:22
34:12
**reason** 234:8
**reasonably**
10:6,17
**recall** 26:25
34:6,16,20
38:13 41:18,25
58:9 70:17
71:3,6
**receive** 7:9
**received** 13:2
113:5 195:18
203:22 204:9
210:18 223:3
**receiving** 13:4
**recognize**
197:24
**record** 5:14
7:25 8:15,18
8:22 11:5
19:18,21 22:9
22:11 39:19
173:18,20
196:21 197:7
197:17,19
**records** 8:10
14:16 43:22
48:3 74:9
176:12 181:5

231:14
**recruit** 100:11
100:20 101:5
101:14,23
102:9,19
**recruited** 100:2
103:4 108:5
**refer** 69:8 76:5
86:3 87:3 88:4
89:3 90:3
93:15 148:22
152:20 156:20
160:20 164:8
168:13
**referrals**
187:11,22
188:10,21
192:10,21
193:9
**referred** 6:20
35:7 36:10
48:5 57:17
172:9,19 197:2
214:25 217:9
218:16
**referring** 69:19
**refusing** 9:25
**regarding** 8:8
229:10
**related** 8:10
233:11
**relating** 8:5
176:12 181:5
203:22 222:16

**relationship**
139:6 140:2
142:15 143:12
146:4,25
**remember**
41:22
**rendered** 8:9
**repeat** 96:10
109:7
**rephrase** 11:22
**reporter** 5:13
5:17 11:14
12:2 39:21
47:10
**reporting**
234:2
**represent** 5:25
196:20
**requested**
39:20
**requests** 7:19
**reserved** 4:11
**residence** 48:20
**respect** 120:23
121:20 226:9
**respectfully** 9:4
20:10,22 21:10
21:22 22:14
23:2,14,25
24:12,23 25:11
25:23 27:18
28:7,19 29:7
29:19 30:7,19
31:7,18 32:5

**[respectfully - respectfully]**                              Page 35

| | | | |
|---|---|---|---|
| 32:16 33:4,16 | 94:15,25 95:11 | 129:11,22 | 163:8,19 164:5 |
| 43:8,19 44:6 | 95:21 96:7,25 | 130:9,19 131:4 | 164:18 165:4 |
| 44:12,23 45:9 | 97:11,21 98:7 | 131:13,24 | 165:14,24 |
| 45:21 46:9,21 | 98:17 99:4,15 | 132:11,22 | 166:10 167:2 |
| 47:9,21 49:19 | 99:25 100:10 | 133:9,21 134:7 | 167:13,24 |
| 50:8,19 51:5 | 100:19 101:4 | 134:16,25 | 168:10,23 |
| 51:16,25 52:12 | 101:13,22 | 135:11 136:3 | 169:9,19 170:5 |
| 52:22 53:8,18 | 102:7,17 103:3 | 136:14,25 | 170:15 171:2 |
| 54:5,15 55:2 | 103:14,25 | 137:12,24 | 171:13,24 |
| 55:13,24 56:11 | 104:12,23 | 138:10,19 | 174:17 175:2 |
| 56:21 57:8 | 105:10,21 | 139:4,14,24 | 175:12,24 |
| 58:24 59:11,22 | 106:8,19 107:6 | 140:10,20 | 176:10,21 |
| 60:9,20 61:7 | 107:17 108:4 | 141:8,18 142:4 | 177:7,18 178:6 |
| 61:18 62:5,16 | 108:14 109:2 | 142:13,23 | 178:17 179:10 |
| 63:3,13,24 | 109:18 110:11 | 143:10,21 | 179:19 180:5 |
| 64:11,22 65:9 | 110:21 111:7 | 144:8,20 145:6 | 180:17 181:3 |
| 65:20 66:7,18 | 111:17 112:5 | 145:16 146:2 | 181:14,23 |
| 67:5,17 68:5 | 112:17 113:4 | 146:12,23 | 182:11,23 |
| 68:17 69:6 | 113:14,25 | 147:10,21 | 183:10,21 |
| 71:21 72:10,21 | 114:10,20 | 148:9,19 149:7 | 184:8,19 185:6 |
| 73:8,19 74:6 | 115:6,16,25 | 149:16 150:2 | 185:17 186:6 |
| 74:17 75:4,15 | 116:10,19 | 150:12,22 | 186:19 187:8 |
| 76:3,20 77:7 | 117:5,15,25 | 151:9,19 152:6 | 187:20 188:7 |
| 77:18 78:5,16 | 118:11,20 | 152:17 153:6 | 188:19 189:6 |
| 79:3,14,25 | 119:6,16,25 | 153:16 154:2 | 189:17 190:4 |
| 80:12,23 81:10 | 120:11,21 | 154:12,22 | 190:16 191:5 |
| 81:22 82:13,23 | 121:8,18 122:5 | 155:9,19 156:6 | 191:18 192:7 |
| 83:10,24 84:12 | 122:15,25 | 156:17 157:6 | 192:19 193:6 |
| 84:24 85:12,24 | 123:11,21 | 157:16 158:2 | 193:18 194:5 |
| 86:14,25 87:15 | 124:6,15,25 | 158:12,22 | 194:16 195:4 |
| 87:25 88:14,25 | 125:12,23 | 159:9,19 160:6 | 195:16 196:3 |
| 89:14,24 90:13 | 126:10,22 | 160:17 161:6 | 196:14 198:14 |
| 90:24 91:11,22 | 127:8,17 128:2 | 161:16 162:2 | 198:24 199:10 |
| 92:9,21 93:9 | 128:13,24 | 162:12,22 | 199:20 200:7 |

[respectfully - right]                                              Page 36

| | | | |
|---|---|---|---|
| 200:18 201:6 | **retiring** 40:6 | 63:12,23 64:10 | 109:17 110:10 |
| 201:16 202:2 | **review** 7:14 | 64:21 65:8,19 | 110:20 111:6 |
| 202:12,22 | 14:15 174:6 | 66:6,17 67:4 | 111:16 112:4 |
| 203:8,18 204:7 | 178:22 197:8 | 67:16 68:4,16 | 112:16 113:3 |
| 204:19 205:6 | 197:21 212:13 | 69:5 71:20 | 113:13,24 |
| 205:17 206:4 | **reviewed** | 72:9,20 73:7 | 114:9,19 115:5 |
| 206:16 207:4 | 211:11 213:14 | 73:18 74:5,16 | 115:15,24 |
| 207:14,24 | **rider** 7:24 | 75:3,14 76:2 | 116:9,18 117:4 |
| 208:10,20 | **right** 8:4 9:4 | 76:19 77:6,17 | 117:14,24 |
| 209:6,19 210:6 | 14:3,25 19:14 | 78:4,15 79:2 | 118:10,19 |
| 210:17 211:5 | 20:9,21 21:9 | 79:13,24 80:11 | 119:5,15,24 |
| 211:22 212:8 | 21:21 22:13,25 | 80:22 81:9,21 | 120:10,20 |
| 212:23 213:9 | 23:13,24 24:11 | 82:12,22 83:9 | 121:7,17 122:4 |
| 213:24 214:10 | 24:22 25:10,22 | 83:23 84:11,23 | 122:14,24 |
| 214:20 215:19 | 27:17 28:6,18 | 85:11,23 86:13 | 123:10,20 |
| 216:5,17 217:3 | 29:6,18 30:6 | 86:24 87:14,24 | 124:5,14,24 |
| 217:25 218:11 | 30:18 31:6,17 | 88:13,24 89:13 | 125:11,22 |
| 219:6,16 220:3 | 32:4,15 33:3 | 89:23 90:12,23 | 126:9,21 127:7 |
| 220:16 221:4 | 33:15 35:17 | 91:10,21 92:8 | 127:16,25 |
| 221:16 222:3 | 36:18 38:3 | 92:20 93:8 | 128:12,23 |
| 222:13,25 | 43:7,18 44:5 | 94:14,24 95:10 | 129:10,21 |
| 223:13,24 | 44:11,22 45:8 | 95:20 96:6,14 | 130:8,18 131:3 |
| 224:11,23 | 45:20 46:8,20 | 96:24 97:10,20 | 131:12,23 |
| 225:11,21 | 47:8,20 49:6 | 98:6,16 99:3 | 132:10,21 |
| 226:7,18 227:4 | 49:18 50:7,18 | 99:14,24 100:9 | 133:8,20 134:6 |
| 227:14,25 | 51:4,15,24 | 100:18 101:3 | 134:15,24 |
| 228:12,23 | 52:11,21 53:7 | 101:12,21 | 135:10 136:2 |
| **respective** 4:6 | 53:17 54:4,14 | 102:6,16 103:2 | 136:13,24 |
| **response** 9:20 | 54:25 55:12,23 | 103:13,24 | 137:11,23 |
| 10:25 11:19 | 56:10,20 57:7 | 104:11,22 | 138:9,18 139:3 |
| 229:2,6 | 58:5,12,23 | 105:9,20 106:7 | 139:13,23 |
| **responsive** 7:23 | 59:10,21 60:8 | 106:18 107:5 | 140:9,19 141:7 |
| **result** 204:9 | 60:19 61:6,17 | 107:16 108:3 | 141:17 142:3 |
| 223:3 | 62:4,15 63:2 | 108:13,25 | 142:12,22 |

**[right - scheme]**                                                              Page 37

| | | | |
|---|---|---|---|
| 143:9,20 144:7 | 179:18 180:4 | 214:19 215:18 | 76:4 85:25 |
| 144:19 145:5 | 180:16 181:2 | 216:4,16 217:2 | 87:2 88:2 89:2 |
| 145:15,25 | 181:13,22 | 217:24 218:10 | 89:25 93:13 |
| 146:11,22 | 182:10,22 | 219:5,15 220:2 | 94:6 96:14 |
| 147:9,20 148:8 | 183:9,20 184:7 | 220:15 221:3 | 135:14 148:20 |
| 148:18 149:6 | 184:18 185:5 | 221:15 222:2 | 152:18 156:18 |
| 149:15,25 | 185:16 186:5 | 222:12,24 | 160:18 164:6 |
| 150:11,21 | 186:18 187:7 | 223:12,23 | 166:13 168:11 |
| 151:8,18 152:5 | 187:19 188:6 | 224:10,22 | 171:25 172:13 |
| 152:16 153:5 | 188:18 189:5 | 225:10,20 | 172:23 173:9 |
| 153:15,25 | 189:16 190:3 | 226:6,17 227:3 | 173:11,16,21 |
| 154:11,21 | 190:15 191:4 | 227:13,24 | 173:25 196:15 |
| 155:8,18 156:5 | 191:17 192:6 | 228:11,22 | 197:6,10,16 |
| 156:16 157:5 | 192:18 193:5 | **rivkin**  2:4 5:25 | 200:19 211:6 |
| 157:15,25 | 193:17 194:4 | **road**  2:12 | 213:10 214:21 |
| 158:11,21 | 194:15 195:3 | 15:23 16:3 | 217:4 218:12 |
| 159:8,18 160:5 | 195:15 196:2 | 48:17 234:4 | 220:4 229:17 |
| 160:16 161:5 | 196:13 197:16 | **robert**  2:16 | 230:3 231:5 |
| 161:15,25 | 198:13,23 | 19:7 27:9 | **rules**  11:11 |
| 162:11,21 | 199:9,19 200:6 | 44:25 75:18 | **russian**  3:3 5:5 |
| 163:7,18 164:4 | 200:17 201:5 | 93:11 | 5:5 |
| 164:17 165:3 | 201:15,25 | **role**  120:23 | **rxr**  2:5 |
| 165:13,23 | 202:11,21 | **rosenblatt**  2:8 | |
| 166:9,25 | 203:7,17 204:6 | 5:22,24 6:11 | **s** |
| 167:12,23 | 204:18 205:5 | 6:16 8:11,19 | **s**  2:2 4:2,2 5:2,2 |
| 168:9,22 169:8 | 205:16 206:3 | 9:10 10:9 | 5:9,9 11:6,7 |
| 169:18 170:4 | 206:15 207:3 | 14:22 16:2,18 | 234:8 |
| 170:14,25 | 207:13,23 | 16:22 19:11,17 | **saying**  39:2 |
| 171:12,23 | 208:9,19 209:5 | 26:5 34:9,21 | **says**  35:24 |
| 174:16,25 | 209:18 210:5 | 36:3,20 38:3 | **scheme**  35:21 |
| 175:11,23 | 210:16 211:4 | 39:4,15,18 | 68:20 92:24 |
| 176:9,20 177:6 | 211:21 212:7 | 40:24 47:22 | 99:6,17 103:5 |
| 177:17 178:5 | 212:22 213:8 | 49:6,20 57:9 | 108:17 113:17 |
| 178:16 179:9 | 213:23 214:9 | 58:11 69:17 | 120:24 121:20 |

**[scheme - self]** Page 38

| | | | |
|---|---|---|---|
| 122:6 126:12 | **second** 19:18 | 65:17 66:4,15 | 111:14 112:2 |
| 129:24 133:11 | 22:9 | 67:2,14 68:2 | 112:14,25 |
| 137:14 140:22 | **security** 17:17 | 68:14 69:3 | 113:11,22 |
| 144:11 147:24 | **see** 6:25 11:13 | 71:18 72:7,18 | 114:7,17 115:3 |
| 185:21 186:24 | 13:6 36:14 | 73:5,16 74:3 | 115:13,22 |
| 190:20 191:23 | 57:22 215:8 | 74:14,25 75:12 | 116:7,16 117:2 |
| 200:9 204:10 | **seeing** 35:13 | 75:24 76:17 | 117:12,22 |
| 205:8 206:19 | **self** 8:4 9:20,25 | 77:4,15 78:2 | 118:8,17 119:3 |
| 210:8,20 223:4 | 10:6,17,25 | 78:13,24 79:11 | 119:13,22 |
| 223:15 225:2 | 19:3,15 20:7 | 79:22 80:9,20 | 120:8,18 121:5 |
| **schemes** 68:9 | 20:19 21:7,19 | 81:7,19 82:10 | 121:15 122:2 |
| 92:13 203:23 | 22:8,23 23:11 | 82:20 83:7,21 | 122:12,22 |
| 204:22 206:8 | 23:22 24:9,20 | 84:9,21 85:9 | 123:8,18 124:3 |
| 222:17 224:15 | 25:8,20 27:15 | 85:21 86:11,22 | 124:12,22 |
| **school** 17:21 | 28:4,16 29:4 | 87:12,22 88:11 | 125:9,20 126:7 |
| **schwartz** 2:11 | 29:16 30:4,16 | 88:22 89:11,21 | 126:19 127:5 |
| **screen** 6:25 7:2 | 31:4,15 32:2 | 90:10,21 91:8 | 127:14,23 |
| 8:13 34:24 | 32:13,25 33:13 | 91:19 92:6,18 | 128:10,21 |
| 36:4,15,21 | 38:18,20 39:25 | 93:6 94:12,22 | 129:8,19 130:6 |
| 47:24 49:21 | 43:4,16 44:3 | 95:8,18 96:4 | 130:16,25 |
| 57:11 58:13 | 44:20 45:6,18 | 96:22 97:8,18 | 131:10,21 |
| 172:3 174:4 | 46:6,18 47:6 | 98:4,14,25 | 132:8,19 133:6 |
| 196:17,19 | 47:18 49:16 | 99:12,22 100:7 | 133:18 134:4 |
| 200:20 211:9 | 50:5,16 51:2 | 100:16,25 | 134:13,22 |
| 213:11,12 | 51:13,22 52:9 | 101:10,19 | 135:8,24 |
| 214:22 220:5 | 52:19 53:5,15 | 102:4,14,24 | 136:11,22 |
| **scroll** 173:22 | 54:2,12,23 | 103:11,22 | 137:9,21 138:7 |
| 197:13,15 | 55:10,21 56:8 | 104:9,20 105:7 | 138:16,25 |
| 217:13 218:21 | 56:18 57:5 | 105:18 106:5 | 139:11,21 |
| **scrolling** 7:12 | 58:21 59:8,19 | 106:16 107:3 | 140:7,17 141:5 |
| 7:17 48:9 | 60:6,17 61:4 | 107:14,25 | 141:15,25 |
| 216:6 | 61:15 62:2,13 | 108:11,23 | 142:10,20 |
| **sealing** 4:7 | 62:24 63:10,21 | 109:15 110:8 | 143:7,18 144:5 |
| | 64:8,19 65:6 | 110:18 111:4 | 144:17 145:3 |

**[self - sheet]**                                                        Page 39

| | | | |
|---|---|---|---|
| 145:13,23 | 181:11,20 | 217:22 218:8 | 129:13 131:15 |
| 146:9,20 147:7 | 182:8,20 183:7 | 219:3,13,24 | 132:2,13,24 |
| 147:18 148:6 | 183:18 184:5 | 220:13,25 | 135:3,19 136:5 |
| 148:16 149:4 | 184:16 185:3 | 221:13,24 | 136:16 137:3 |
| 149:13,23 | 185:14 186:3 | 222:10,22 | 150:4 151:11 |
| 150:9,19 151:6 | 186:16 187:5 | 223:10,21 | 151:21 154:4 |
| 151:16 152:3 | 187:17 188:4 | 224:8,20 225:8 | 155:11,21 |
| 152:14 153:3 | 188:16 189:3 | 225:18 226:4 | 158:4 159:11 |
| 153:13,23 | 189:14,25 | 226:15,25 | 159:21 161:18 |
| 154:9,19 155:6 | 190:13 191:2 | 227:11,22 | 162:24 163:10 |
| 155:16 156:3 | 191:15 192:4 | 228:9,20 | 165:16 167:4 |
| 156:14 157:3 | 192:16 193:3 | **serve**  72:12 | 167:15 169:21 |
| 157:13,23 | 193:15 194:2 | 149:17 153:17 | 171:4,15 177:9 |
| 158:9,19 159:6 | 194:13,25 | 157:17 161:7 | 177:21 181:25 |
| 159:16 160:3 | 195:13,24 | 165:5 169:10 | 182:14 184:11 |
| 160:14 161:3 | 196:11 198:11 | 202:13 208:21 | 185:9 202:24 |
| 161:13,23 | 198:21 199:7 | **served**  6:10 | 203:10 209:8 |
| 162:9,19 163:5 | 199:17 200:4 | 183:24 184:21 | 209:11,22 |
| 163:16 164:2 | 200:15 201:3 | **service**  48:13 | 227:6,16 228:3 |
| 164:15,25 | 201:13,23 | **services**  1:10 | 228:14 |
| 165:11,21 | 202:9,19 203:5 | 8:9 20:14 | **seva59**  18:12 |
| 166:7,23 | 203:15 204:4 | 28:11 42:15,19 | **several**  109:3 |
| 167:10,21 | 204:16 205:3 | 45:12,24 46:12 | 110:2 |
| 168:7,20 169:6 | 205:14,25 | 46:13,24,25 | **shake**  11:18 |
| 169:16 170:2 | 206:13,25 | 47:12 66:21 | **share**  172:3 |
| 170:12,23 | 207:11,21 | 67:8,8,20 | 211:9 |
| 171:10,21 | 208:7,17 209:3 | 68:21 69:9,21 | **sharing**  8:12 |
| 174:14,23 | 209:16 210:3 | 72:24 75:18 | 36:21 47:24 |
| 175:9,21 176:7 | 210:14 211:2 | 76:11 94:3,5,7 | 49:21 57:11 |
| 176:18 177:4 | 211:19 212:5 | 94:17 95:13 | 58:12 200:20 |
| 177:15 178:3 | 212:20 213:6 | 96:16 98:9,19 | 213:11,12 |
| 178:14 179:7 | 213:21 214:7 | 114:22 124:17 | 220:5 |
| 179:16 180:2 | 214:17 215:16 | 125:3,14,25 | **sheet**  234:2 |
| 180:14,24 | 216:2,14,24 | 128:4,15 129:2 | |

**[showing - sklyut]** Page 40

| | | | |
|---|---|---|---|
| **showing** 34:25 | 46:2,14 47:2 | 97:24 98:10,21 | 132:15 133:2 |
| **signatory** 52:3 | 47:14 49:12,25 | 99:8,18 100:3 | 133:14,24 |
| 52:14 77:20 | 50:12,22 51:9 | 100:12,21 | 134:9,18 135:4 |
| 82:25 | 51:18 52:5,15 | 101:6,15,24 | 135:12,15,20 |
| **signature** 77:9 | 52:25 53:11,22 | 102:10,20 | 136:7,18 137:5 |
| 175:3 179:20 | 54:8,19 55:6 | 103:7,18 104:5 | 137:17 138:3 |
| 213:25 215:20 | 55:17 56:4,14 | 104:16 105:3 | 138:12,21 |
| 216:18 218:2 | 56:25 58:17 | 105:14,25 | 139:7,17 140:3 |
| 233:14 | 59:4,15 60:2 | 106:12,23 | 140:13,25 |
| **signed** 4:14,17 | 60:13,24 61:11 | 107:10,21 | 141:11,21 |
| 174:18 179:11 | 61:22 62:9,20 | 108:7,19 109:6 | 142:6,16 143:3 |
| 212:24 219:7 | 63:6,17 64:4 | 109:11,20 | 143:14,25 |
| **similarly** 221:5 | 64:15 65:2,13 | 110:4,14,24 | 144:13,23 |
| **sitting** 12:6 | 65:24 66:11,22 | 111:10,22 | 145:9,19 146:5 |
| **six** 35:15 | 67:10,22 68:10 | 112:10,21 | 146:16 147:3 |
| **sklyut** 2:19,24 | 68:23 69:14 | 113:7,18 114:3 | 147:14 148:2 |
| 7:25 8:16,24 | 71:14 72:3,14 | 114:13,23 | 148:12,24 |
| 9:2,12 13:19 | 72:25 73:12,23 | 115:9,18 116:3 | 149:9,19 150:5 |
| 14:9,18 18:24 | 74:10,21 75:8 | 116:12,22 | 150:15 151:2 |
| 19:8,19 20:3 | 75:20 76:13,24 | 117:8,18 118:4 | 151:12,23 |
| 20:15 21:3,15 | 77:11,22 78:9 | 118:13,23 | 152:10,23 |
| 22:4,19 23:7 | 78:20 79:7,18 | 119:9,18 120:4 | 153:9,19 154:5 |
| 23:18 24:5,16 | 80:5,16 81:3 | 120:14,25 | 154:15 155:2 |
| 25:4,16 26:3,6 | 81:15 82:6,16 | 121:11,22 | 155:12,23 |
| 26:23 27:11,24 | 83:3,17 84:5 | 122:8,18 123:4 | 156:10,23 |
| 28:12,24 29:12 | 84:17 85:5,17 | 123:14,23 | 157:9,19 158:5 |
| 29:24 30:12,24 | 86:7,18 87:8 | 124:8,18 125:5 | 158:15 159:2 |
| 31:11,22 32:9 | 87:18 88:7,18 | 125:16 126:3 | 159:12,23 |
| 32:21 33:9 | 89:7,17 90:6 | 126:15,25 | 160:10,23 |
| 34:2,7 35:22 | 90:17 91:4,15 | 127:10,19 | 161:9,19 162:5 |
| 37:10 38:14,24 | 92:2,14 93:2 | 128:6,17 129:4 | 162:15,25 |
| 39:8,13 42:16 | 94:8,18 95:4 | 129:15 130:2 | 163:12,22 |
| 42:24 43:12,23 | 95:14,24 96:9 | 130:12,21 | 164:11,21 |
| 44:16 45:2,14 | 96:18 97:4,14 | 131:6,17 132:4 | 165:7,17 166:3 |

166:11,19
167:6,17 168:3
168:16 169:2
169:12,22
170:8,19 171:6
171:17 173:2
173:13,24
174:10,19
175:5,17 176:3
176:14,24
177:11,23
178:10 179:3
179:12,22
180:10,20
181:7,17 182:4
182:16 183:3
183:14,25
184:12,23
185:10,23
186:12,25
187:13,24
188:12,23
189:10,21
190:9,22
191:11,24
192:12,23
193:11,22
194:9,21 195:9
195:20 196:7
197:9,14,17
198:7,17 199:3
199:13,24
200:11,23
201:9,19 202:5

202:15,25
203:11,24
204:12,23
205:10,21
206:9,21 207:7
207:17 208:3
208:13,23
209:12,23
210:10,22
211:15,25
212:16 213:2
213:17 214:3
214:13 215:12
215:22 216:10
216:20 217:18
218:4,23 219:9
219:20 220:9
220:21 221:9
221:20 222:6
222:18 223:6
223:17 224:4
224:16 225:4
225:14,24
226:11,21
227:7,18 228:5
228:16 229:19
230:2
**smoothly** 11:12
**social** 17:17
**sole** 41:10 68:7
70:9
**sorry** 33:23
70:22 96:9
209:9 220:19

**sort** 173:7
**speak** 11:16
39:13
**speaking** 15:3
**specific** 38:17
**spoken** 93:21
**stas** 3:3
**state** 1:25 5:6
5:11,13 8:2
11:4 70:19
**statement** 58:7
**statements**
42:8
**states** 1:2 15:20
17:5,10
**station** 49:9
**status** 16:10
**stenographic**
233:9
**step** 8:25
**stipulated** 4:4,9
4:13
**stop** 8:12 36:21
49:21 58:12
71:22 72:2
200:20 213:11
220:5
**street** 16:14,23
**subject** 10:19
37:8
**subpoena** 1:23
6:9,12,18 7:2,4
7:10 13:3,5,7
231:9

**subscribed**
230:11 234:22
**sued** 33:22,25
34:15,19 36:22
**suggest** 228:25
229:5
**suite** 2:12
16:14,23
**sum** 112:19
**supplies** 35:5
42:20 111:9
**supply** 40:13
42:21 220:8,20
223:25
**sure** 8:16 9:8
19:19 26:5
69:17 70:4
135:14 173:24
**sworn** 4:15,17
5:10 230:11
233:7 234:22

**t**

**t** 4:2,2 5:2,9,9
11:7,7 233:2,2
**take** 6:8 12:2
12:10,11 26:3
135:12 166:11
173:5 197:7
217:14
**taken** 1:22 26:7
34:10 39:16
135:16 166:14

**[talking - tseytelman]**                                    Page 42

| | | | |
|---|---|---|---|
| **talking** 39:6 | **today's** 7:7 | 13:1 14:1,23 | 104:1 105:1 |
| 69:12 | **together** | 15:1 16:1 17:1 | 106:1 107:1 |
| **tax** 37:23 38:2 | 217:15 | 18:1 19:1,12 | 108:1 109:1 |
| 38:6 | **took** 12:5 | 19:22 20:1 | 110:1 111:1 |
| **telephone** | **top** 42:2 | 21:1 22:1 23:1 | 112:1 113:1 |
| 74:20 | **total** 220:6,17 | 24:1 25:1 26:1 | 114:1 115:1 |
| **telling** 6:17 | 221:17 | 27:1 28:1 29:1 | 116:1 117:1 |
| **tend** 10:18 | **transcription** | 30:1 31:1 32:1 | 118:1 119:1 |
| **testified** 5:12 | 233:9 | 33:1 34:1 35:1 | 120:1 121:1 |
| 36:25 69:25 | **transferred** | 35:5,16 36:1,9 | 122:1,16 123:1 |
| 70:5 | 220:6,17 221:5 | 36:17 37:1 | 124:1 125:1 |
| **testify** 12:19 | 221:18 | 38:1 39:1 40:1 | 126:1 127:1 |
| **testimony** | **transfers** 53:20 | 41:1 42:1 43:1 | 128:1 129:1 |
| 13:11 229:11 | 55:15 79:16 | 44:1 45:1 46:1 | 130:1 131:1 |
| 231:3 | 81:12 | 47:1 48:1 49:1 | 132:1 133:1 |
| **thank** 26:6 | **translate** 5:4 | 50:1 51:1 52:1 | 134:1 135:1 |
| 135:15 229:19 | 109:21,22 | 53:1 54:1 55:1 | 136:1 137:1 |
| 230:2,3,5 | **translates** 5:7 | 56:1 57:1 58:1 | 138:1 139:1 |
| **think** 27:2 | **trial** 4:12 | 58:5 59:1 60:1 | 140:1 141:1 |
| 34:17 39:5,5 | **true** 33:21,24 | 61:1 62:1 63:1 | 142:1 143:1 |
| 69:15 70:4 | 34:14,18 51:6 | 64:1 65:1 66:1 | 144:1 145:1 |
| 93:15 173:16 | 56:22 66:19 | 67:1 68:1 69:1 | 146:1 147:1 |
| **third** 40:23 | 67:6,18 78:6 | 70:1 71:1 72:1 | 148:1 149:1 |
| **time** 4:12 6:25 | 82:24 113:15 | 73:1 74:1 75:1 | 150:1 151:1 |
| 12:11 26:8 | 177:19 182:12 | 76:1 77:1 78:1 | 152:1 153:1 |
| 27:19 34:11 | 196:4 233:8 | 79:1 80:1 81:1 | 154:1 155:1 |
| 39:17 48:21 | **truthfully** | 82:1 83:1 84:1 | 156:1 157:1 |
| 71:11 135:17 | 12:20 | 85:1 86:1 87:1 | 158:1 159:1 |
| 166:15 184:20 | **trying** 10:9 | 88:1 89:1 90:1 | 160:1 161:1 |
| 185:7 230:6 | **tseytelman** | 91:1 92:1 93:1 | 162:1 163:1 |
| **today** 7:21 | 1:21 2:23 5:1 | 94:1 95:1 96:1 | 164:1 165:1 |
| 11:12 12:20 | 5:16 6:1 7:1 | 97:1 98:1 99:1 | 166:1 167:1 |
| 13:11 15:6 | 8:1 9:1,17 10:1 | 100:1 101:1 | 168:1 169:1 |
| 228:24 229:4 | 11:1,7 12:1 | 102:1 103:1 | 170:1 171:1 |

**[tseytelman - witness]**                                          Page 43

| | | | |
|---|---|---|---|
| 172:1 173:1,5 | **type** 42:9 71:8 | 48:18 68:18 | 169:10,20 |
| 174:1,3 175:1 | 71:12 149:8 | 92:23 122:16 | 170:7,18 171:5 |
| 176:1 177:1 | 153:7 157:7 | 123:2 187:22 | 171:16 |
| 178:1,21 179:1 | 164:19 168:24 | 188:21 189:19 | |
| 180:1 181:1 | **u** | 192:21 194:7 | **w** |
| 182:1 183:1 | | 195:6 203:21 | **waived** 4:8 |
| 184:1 185:1 | **u** 4:2 | 204:21 205:19 | **want** 10:12 |
| 186:1 187:1 | **uh** 48:11 | 206:6 222:16 | 16:18 173:4,11 |
| 188:1 189:1 | **ukraine** 17:8 | 224:2,12 | 173:13 197:6 |
| 190:1 191:1 | 17:22 18:3 | **using** 109:3,8 | 197:11,12 |
| 192:1 193:1 | **understand** | 109:25 | **wants** 9:14 |
| 194:1 195:1 | 11:20 12:8 | **v** | **way** 93:24 |
| 196:1 197:1,20 | **understood** | | **wells** 51:8 52:4 |
| 198:1 199:1 | 69:16 | **v** 5:2,9 11:6 | 57:15 178:8 |
| 200:1 201:1 | **union** 15:23,24 | 234:5 | 231:17 |
| 202:1 203:1 | 16:2 48:16 | **various** 172:6 | **wire** 53:20 |
| 204:1 205:1 | **uniondale** 2:6 | 172:17 198:5 | 55:15 79:16 |
| 206:1 207:1 | **united** 1:2 | 231:18,21 | 81:12 |
| 208:1 209:1 | 15:20 17:4 | **verbal** 11:15 | **withdraw** |
| 210:1 211:1 | **unlicensed** | **verge** 40:5 | 80:13 |
| 212:1 213:1 | 103:17 104:14 | **veritext** 234:2 | **withdrawals** |
| 214:1 215:1 | 186:9,23 190:7 | **versus** 6:7 | 52:24 78:18 |
| 216:1 217:1 | 191:8,22 | **vision** 1:11,12 | **withdrawn** |
| 218:1 219:1 | 194:19 195:6 | 1:12,13 21:13 | 13:23 18:14,20 |
| 220:1 221:1 | **unsure** 69:11 | 21:25 22:17 | 26:19 42:13 |
| 222:1 223:1 | **use** 27:8,20 | 23:5 25:14 | 54:17 76:9 |
| 224:1 225:1 | 28:9,21 29:9 | 29:11,23 30:11 | 81:25 83:12 |
| 226:1 227:1 | 29:21 30:9,21 | 30:23 33:8 | 209:9 |
| 228:1 229:1 | 31:9,20 32:7 | 116:21 117:7 | **witness** 1:22 |
| 230:10 233:6 | 32:18 33:6 | 117:17 118:3 | 2:22 5:15,19 |
| 234:6,21 | 49:2,10 | 120:12 148:11 | 8:21 14:11,19 |
| **two** 34:22 58:4 | **used** 15:11 | 152:8 156:8 | 19:9 20:4,16 |
| 172:2 211:7 | 18:18 19:5 | 160:8 168:2,13 | 21:4,16 22:5 |
| 214:24 218:15 | 26:2 42:20 | 168:15,25 | 22:20 23:8,19 |

[witness - witness]                                            Page 44

| | | | |
|---|---|---|---|
| 24:6,17 25:5 | 86:19 87:9,19 | 124:9,19 125:6 | 158:6,16 159:3 |
| 25:17 27:12,25 | 88:8,19 89:8 | 125:17 126:4 | 159:13,24 |
| 28:13,25 29:13 | 89:18 90:7,18 | 126:16 127:2 | 160:11,24 |
| 29:25 30:13,25 | 91:5,16 92:3 | 127:11,20 | 161:10,20 |
| 31:12,23 32:10 | 92:15 93:3 | 128:7,18 129:5 | 162:6,16 163:2 |
| 32:22 33:10 | 94:9,19 95:5 | 129:16 130:3 | 163:13,23 |
| 42:25 43:5,13 | 95:15,25 96:19 | 130:13,22 | 164:12,22 |
| 43:24 44:17 | 97:5,15,25 | 131:7,18 132:5 | 165:8,18 166:4 |
| 45:3,15 46:3 | 98:11,22 99:9 | 132:16 133:3 | 166:20 167:7 |
| 46:15 47:3,15 | 99:19 100:4,13 | 133:15,25 | 167:18 168:4 |
| 49:13 50:2,13 | 100:22 101:7 | 134:10,19 | 168:17 169:3 |
| 50:23 51:10,19 | 101:16,25 | 135:5,21 136:8 | 169:13,23 |
| 52:6,16 53:2 | 102:11,21 | 136:19 137:6 | 170:9,20 171:7 |
| 53:12,23 54:9 | 103:8,19 104:6 | 137:18 138:4 | 171:18 174:11 |
| 54:20 55:7,18 | 104:17 105:4 | 138:13,22 | 174:20 175:6 |
| 56:5,15 57:2 | 105:15 106:2 | 139:8,18 140:4 | 175:18 176:4 |
| 58:18 59:5,16 | 106:13,24 | 140:14 141:2 | 176:15,25 |
| 60:3,14,25 | 107:11,22 | 141:12,22 | 177:12,24 |
| 61:12,23 62:10 | 108:8,20 | 142:7,17 143:4 | 178:11 179:4 |
| 62:21 63:7,18 | 109:12 110:5 | 143:15 144:2 | 179:13,23 |
| 64:5,16 65:3 | 110:15,25 | 144:14,24 | 180:11,21 |
| 65:14,25 66:12 | 111:11,23 | 145:10,20 | 181:8,18 182:5 |
| 66:23 67:11,23 | 112:11,22 | 146:6,17 147:4 | 182:17 183:4 |
| 68:11,24 71:15 | 113:8,19 114:4 | 147:15 148:3 | 183:15 184:2 |
| 72:4,15 73:2 | 114:14,24 | 148:13,25 | 184:13,24 |
| 73:13,24 74:11 | 115:10,19 | 149:10,20 | 185:11,24 |
| 74:22 75:9,21 | 116:4,13,23 | 150:6,16 151:3 | 186:13 187:2 |
| 76:14,25 77:12 | 117:9,19 118:5 | 151:13,24 | 187:14,25 |
| 77:23 78:10,21 | 118:14,24 | 152:11,24 | 188:13,24 |
| 79:8,19 80:6 | 119:10,19 | 153:10,20 | 189:11,22 |
| 80:17 81:4,16 | 120:5,15 121:2 | 154:6,16 155:3 | 190:10,23 |
| 82:7,17 83:4 | 121:12,23 | 155:13,24 | 191:12,25 |
| 83:18 84:6,18 | 122:9,19 123:5 | 156:11,24 | 192:13,24 |
| 85:6,18 86:8 | 123:15,24 | 157:10,20 | 193:12,23 |

**[witness - yevsey]** Page 45

| | | | |
|---|---|---|---|
| 194:10,22 | **word** 39:3 | 36:17 37:1 | 124:1 125:1 |
| 195:10,21 | **work** 38:22 | 38:1 39:1 40:1 | 126:1 127:1 |
| 196:8 197:8 | 42:5,12 | 41:1 42:1 43:1 | 128:1 129:1 |
| 198:8,18 199:4 | **working** 40:2 | 44:1 45:1 46:1 | 130:1 131:1 |
| 199:14,25 | **written** 55:4 | 47:1 48:1 49:1 | 132:1 133:1 |
| 200:12,24 | **wrote** 174:9 | 50:1 51:1 52:1 | 134:1 135:1 |
| 201:10,20 | 179:2 | 53:1 54:1 55:1 | 136:1 137:1 |
| 202:6,16 203:2 | **x** | 56:1 57:1 58:1 | 138:1 139:1 |
| 203:12,25 | **x** 1:3,16 | 58:4 59:1 60:1 | 140:1 141:1 |
| 204:13,24 | **y** | 61:1 62:1 63:1 | 142:1 143:1 |
| 205:11,22 | **y** 5:9,9,9 11:6,6 | 64:1 65:1 66:1 | 144:1 145:1 |
| 206:10,22 | 11:7 | 67:1 68:1 69:1 | 146:1 147:1 |
| 207:8,18 208:4 | **yahoo.com.** | 70:1 71:1 72:1 | 148:1 149:1 |
| 208:14,24 | 18:12 | 73:1 74:1 75:1 | 150:1 151:1 |
| 209:13,24 | **yeah** 12:15 | 76:1 77:1 78:1 | 152:1 153:1 |
| 210:11,23 | 36:16 42:18 | 79:1 80:1 81:1 | 154:1 155:1 |
| 211:16 212:2 | 174:8 215:9 | 82:1 83:1 84:1 | 156:1 157:1 |
| 212:17 213:3 | **year** 15:16 | 85:1 86:1 87:1 | 158:1 159:1 |
| 213:18 214:4 | 35:11 | 88:1 89:1 90:1 | 160:1 161:1 |
| 214:14 215:13 | **years** 35:15 | 91:1 92:1 93:1 | 162:1 163:1 |
| 215:23 216:11 | **yevsey** 1:21 | 94:1 95:1 96:1 | 164:1 165:1 |
| 216:21 217:19 | 2:23 5:1,15 6:1 | 97:1 98:1 99:1 | 166:1 167:1 |
| 218:5,24 | 7:1 8:1 9:1 | 100:1 101:1 | 168:1 169:1 |
| 219:10,21 | 10:1 11:1,6 | 102:1 103:1 | 170:1 171:1 |
| 220:10,22 | 12:1 13:1 14:1 | 104:1 105:1 | 172:1 173:1 |
| 221:10,21 | 15:1 16:1 17:1 | 106:1 107:1 | 174:1 175:1 |
| 222:7,19 223:7 | 18:1 19:1 20:1 | 108:1 109:1 | 176:1 177:1 |
| 223:18 224:5 | 21:1 22:1 23:1 | 110:1 111:1 | 178:1 179:1 |
| 224:17 225:5 | 24:1 25:1 26:1 | 112:1 113:1 | 180:1 181:1 |
| 225:15,25 | 27:1 28:1 29:1 | 114:1 115:1 | 182:1 183:1 |
| 226:12,22 | 30:1 31:1 32:1 | 116:1 117:1 | 184:1 185:1 |
| 227:8,19 228:6 | 33:1 34:1 35:1 | 118:1 119:1 | 186:1 187:1 |
| 228:17 233:6 | 35:5,16 36:1 | 120:1 121:1 | 188:1 189:1 |
| | | 122:1 123:1 | 190:1 191:1 |

| | |
|---|---|
| 192:1 193:1 | 123:22 124:17 |
| 194:1 195:1 | 125:4,15 126:2 |
| 196:1 197:1 | 126:12 |
| 198:1 199:1 | **zaitsev's**   60:11 |
| 200:1 201:1 | 60:22 85:15 |
| 202:1 203:1 | 86:6 |
| 204:1 205:1 | |
| 206:1 207:1 | |
| 208:1 209:1 | |
| 210:1 211:1 | |
| 212:1 213:1 | |
| 214:1 215:1 | |
| 216:1 217:1 | |
| 218:1 219:1 | |
| 220:1 221:1 | |
| 222:1 223:1 | |
| 224:1 225:1 | |
| 226:1 227:1 | |
| 228:1 229:1 | |
| 230:10 233:6 | |
| 234:6,21 | |
| **york**   1:2,25 2:6 | |
| 2:13,21 5:7,11 | |
| 6:5 234:2,4 | |
| **yun**   196:24 | |
| 199:22 | |

**z**

**z**   2:20
**zaitsev**   1:10
2:15 13:18
86:4 100:11
104:2,24
115:17 123:13

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| Government Employees Insurance Company, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No.  2:23-cv-09038(NCM)(AYS) |
| Harbor Medical PC, et al. | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Yevsey Tseytelman
8206 Falston Cir 8206
Old Bridge, NJ 08857
_(Name of person to whom this subpoena is directed)_

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Rivkin Radler LLP<br>926 RXR Plaza<br>Uniondale, NY 11556 | Date and Time:<br>1/9/2025 10:00 am |
|---|---|

The deposition will be recorded by this method:        stenographically

☑ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:        See Attached Rider "A"

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/19/2024

_CLERK OF COURT_

OR

_____          /s/ Joanna Rosenblatt
_Signature of Clerk or Deputy Clerk_          _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_     Plaintiffs,
Government Employees Insurance Company, et al.          , who issues or requests this subpoena, are:

Joanna Rosenblatt, 926 RXR Plaza, Uniondale, NY 11556, joanna.rosenblatt@rivkin.com, 516-357-3139

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

**Plf's 1**

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page

2) Civil Action No.   2:23-cv-09038(NCM)(AYS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) For Other Discovery.** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) Command to Produce Materials or Permit Inspection.**
    **(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) Quashing or Modifying a Subpoena.**

    **(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
    **(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
    **(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) Claiming Privilege or Protection.**
    **(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# RIDER "A"

<u>Time Period</u>:  January 1, 2018 to the Present.

<u>Definitions</u>:

The term "GMO" means GMO Consulting LLC and any of its members representatives, employees, agents, successors, and assigns.

The term "AMG" means AMG Management Inc. and any of its members representatives, employees, agents, successors, and assigns.

The term "You" means Yevsey Tseytelman.

The term "Persons/Entities at Issue" means Harbor Medical Group, PC, Confident Medical Services PC, Coastal Medical PC, Alexandr Alexeevich Zaitsev, MD, Mark Kaminar, Anthony Benevenga, Financial Vision Group LLC, Financial Vision Group II LLC f/k/a ADF Equities LLC, Financial Vision Group III LLC, Financial Vision Group IV LLC, Daniel Kandhorov, Robert Kelly, DO.

The term "document" shall be construed to include any written, recorded, or graphic material, or any other means of preserving thought, expression, or communication, whether handwritten, typed, printed, electronically or otherwise created, including telephone slips and logs, diary entries, calendars, reports, correspondence, memoranda, notes, electronic mail, video tapes, video cartridges, audio tapes, electronic recordings of any kind, photographs, computer tapes, computer diskettes and disks, computer hard drives or servers, and any transcriptions and printouts in Your possession, custody or control. A draft or non-identical copy is a separate document within the meaning of this term.

The term "communication" means all paper and electronic form of e-mail, text messages, discussions, conversations, meetings, conferences, telephone conversations, interviews, negotiations, agreements, understandings, cards, letters, correspondence, facsimile transmissions, telegrams, telexes, voicemails, or other forms of written or verbal interchange, however transmitted or stored, including reports, notes, memoranda, lists, summaries, agenda and other records of any communications.

The term "related to" means concerning, referring to, pertaining to, describing, referencing, evidencing, constituting, or substantiating, and shall have the broadest meaning possible consistent with the terms of the Federal Rules of Civil Procedure.

<u>Categories</u>:      For the time period identified above:

1.      All documents concerning ownership, sale or transfer of any ownership, incorporation, formation, or start-up, including any operating agreements of (i) GMO; and/or (ii) AMG.

2.      All documents, contracts, and agreements, including all schedules and attachments, between (i) GMO; (ii) AMG; and/or (iii) You, and any of the Persons/Entities at Issue.

3.      All documents related to or reflecting any goods and/or services provided or performed/utilized by (i) GMO; (ii) AMG; and/or (iii) You in providing any goods and/or services, to, for, or on behalf of any of the Persons/Entities at Issue.

        This request includes, but is not limited to, all applications, bills, invoices, reports, statements, applications, medical reports, requests for payment, direction letters, payment directives, attorney escrow agreements, retainer agreements, and any documents, created by You, or at Your direction, for the benefit of any of the Persons/Entities at Issue.

4.      All written communications between (i) GMO; (ii) AMG; and/or (iii) You related to or concerning any of the Persons/Entities at Issue.

5.      Documents sufficient to identify the total amount of money that (i) GMO; (ii) AMG; and/or (iii) You received from the Persons/Entities at Issue. This request should be deemed to include but not be limited to checks, wire transfers, electronic fund transfers and bank deposits, including distribution of monies to the members of GMO and/or other individuals or entities.

The name, address, e-mail address, and telephone number of the attorney representing Plaintiffs Government Employees Insurance Co., et al., who issues or requests this subpoena, is: Joanna Rosenblatt, Esq., Rivkin Radler LLP, 926 RXR Plaza, Uniondale, New York 11556, (516) 357-3139, Joanna.rosenblatt@rivkin.com.

Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Justin A. Calabrese, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE  COMPANY
and GEICO CASUALTY COMPANY,

                         Plaintiffs,

          -against-

LEOMAX SUPPLIES, INC.,
YEVSEY TSEYTELMAN,
JOHN DOE COMPANIES "1" through "3", and
JOHN DOES "1" through "3"

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:

**Plaintiffs Demand a Trial
by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, referred to hereinafter

as "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as

follows:

EXHIBIT

Plf's 2

## INTRODUCTION

1.    This action seeks to recover more than $405,000.00 that Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent claims seeking payment for durable medical equipment ("DME") and orthotic devices (e.g. cervical collars, lumbar-sacral supports, electronic muscle stimulator units, egg crate mattresses, etc.). These goods purportedly were provided to individuals who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies ("Insureds").

2.    The Defendants' fraudulent conduct includes, but is not limited to:

   (i)    participating in a scheme with various medical offices and their associated physicians and/or chiropractors (hereinafter, "practitioners") to dispense unnecessary durable medical equipment and orthotics pursuant to fraudulent pre-determined protocols;

   (ii)    unilaterally dispensing various forms of DME and orthotics without medical support or justification for the items purportedly dispensed;

   (iii)    submitting with their claims, prescriptions for DME and orthotics they knew were forged or otherwise fraudulent in nature;

   (iv)    intentionally mischaracterizing the nature of the items provided and manipulating the reimbursement formulas associated with the goods so as to claim monies to which they were never entitled; and

   (v)    failing to provide information necessary to substantiate their charges, including failing to appear for an examinations under oath.

3.    In addition, GEICO seeks a declaration that it is not legally obligated to pay more than $245,000.00 in fraudulent claims that have been submitted through Leomax Supplies, Inc. (hereinafter, "Leomax") because:

   (i)    Defendants Leomax and Yevsey Tseytelman ("Tseytelman") made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the DME and orthotic devices they allegedly provided to Insureds in order to obtain from GEICO payment under the New York "No-Fault" laws to which they are not entitled;

2

(ii)     Defendants Leomax and Tseytelman made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were dispensed to Insureds;

(iii)    Defendants Leomax and Tseytelman utilized fraudulent prescriptions to unilaterally dispense to GEICO Insureds unnecessary DME and orthotics that were never specifically prescribed, and which were the byproduct of predetermined prescription protocols;

(iv)     Defendants Leomax and Tseytelman regularly failed and/or refused to adequately provide truthful information regarding the nature, quality and cost of the DME and orthotic devices they purported to have supplied to Insureds; and

(v)      Defendants Leomax and Tseytelman failed and/or refused to adequately respond to GEICO's requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

4.    The Defendants fall into the following categories:

(i)      Defendant Leomax is a New York corporation that purports to purchase DME and orthotic devices from various wholesale DME and orthotic device dealers. Leomax then purportedly dispenses the equipment and orthotics to Insureds while systematically submitting fraudulently inflated claims to GEICO and other New York automobile insurers.

(ii)     Defendant Tseytelman owns and controls Leomax and submitted to GEICO and other New York automobile insurers fraudulently inflated bills seeking reimbursement for DME and orthotics purportedly dispensed by Tseytelman through Leomax.

(Leomax and Tseytelman are hereinafter collectively referred to as the "Retail Defendants").

(iii)    Defendants John Doe Corporations "1" through "3" are New York corporations that supplied inexpensive DME and orthotic devices to the Retail Defendants and provided the Retail Defendants with fraudulently inflated wholesale invoices that were used by the Retail Defendants to support their fraudulent charges.

(iv)     Defendants John Does "1" through "3" are the owners of John Doe Corporations "1" through "3" and entered into agreements with the Retail Defendants to carry out the fraudulent scheme perpetrated against GEICO.

(John Doe Corporations "1" through "3" and John Does "1" through "3" are hereinafter collectively referred to as the "Wholesale Defendants").

3

5.     As discussed below, Defendants at all times have known that the claims for DME and orthotic devices submitted to GEICO were fraudulent because: (i) the equipment was prescribed and dispensed pursuant to fraudulent pre-determined protocols established by the Retail Defendants and laypersons and without regard to its medical necessity or medical utility; (ii) the prescriptions were intentionally written in a vague and generic manner so that the Retail Defendants could dispense the products that yielded the highest rate of financial return; (iii) the manner in which the claims were submitted misrepresented the nature and quality of the DME and orthotic devices that were actually provided; (iv) the charges intentionally were inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; and (v) in many cases, the goods and related services billed to GEICO never were actually provided to the Insureds in the first instance.

6.     As such, the Retail Defendants do not now have – and never had – any right to be compensated for their claims for DME and orthotic devices.  The chart attached hereto as Exhibit "1" sets forth a representative sample of more than one thousand two hundred (1,200) fraudulent claims that have been identified to-date that the Retail Defendants submitted, or caused to be submitted, to GEICO.  The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in July 2017, has continued uninterrupted since that time, and resulted in damage to GEICO of more than $405,000.00.

## THE PARTIES

**I.     Plaintiffs**

7.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is

4

authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    Defendants

8.      Leomax is a New York corporation with its principal place of business in Brooklyn, New York. Pursuant to generic prescriptions generated at various No-Fault medical "mills", Leomax purported to provide patients with various forms of DME and orthotics.

9.      Most of the equipment provided through Leomax however, was inexpensive, poor quality products that are available to the public for a mere fraction of Leomax's charges.

10.     Leomax was incorporated in June 2017 and from July 2017 through June 2018, Leomax and Tseytelman knowingly submitted more than $705,000.00 in fraudulent claims to GEICO.

11.     In addition to submitting the fraudulent claims, Leomax has filed and continues to file costly collection lawsuits and arbitrations against GEICO seeking reimbursement on the fraudulent claims despite having no right to reimbursement.

12.     Defendant Tseytelman is a citizen of the State of New Jersey, a principal, officer and/or director of Leomax and, at all times relevant herein, operated, managed and/or controlled Leomax's activities.

13.     Defendants John Doe Corporations "1" through "3" are New York corporations with their principal places of business in New York. John Doe Corporations "1" through "3" provided the Retail Defendants with the inexpensive DME and orthotics that were in turn ultimately provided by the Retail Defendants to GEICO insureds.

14.     John Doe Corporations "1" through "3" often provided the Retail Defendants with fraudulently inflated wholesale invoices that were in turn used by the Retail Defendants to calculate the fraudulent charges submitted to GEICO for reimbursement.

15.     Defendants John Does "1" through "3" are citizens of the state of New York.  At all relevant times herein, John Does "1" through "3" owned and controlled John Doe Corporations "1" through "3".

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview of the No-Fault Laws and Licensing Statutes**

18.     GEICO underwrites automobile insurance in the State of New York.

19.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (Collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

20.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

21.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a

6

healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

22. Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

23. Similarly, all HCFA 1500 (CMS-1500) Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## II. Regulations Governing Maximum Reimbursement for Durable Medical Equipment and Orthotic Devices

24. DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. Although not always medically necessary, durable medical equipment often dispensed include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve

7

stimulators ("Tens units"), thermophores (electrical moist heating pads), cervical traction units, and whirlpool baths.

25.     Orthotic devices, a subgroup of DME, are instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee orthotics, ankle supports, wrist braces, and the like.

26.     The No-Fault Laws set forth maximum charges that may be submitted by healthcare providers for DME and orthotic devices. One of the primary purposes in limiting the maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME and orthotic device charges. In a June 16, 2004 Opinion Letter, the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and orthotic device charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

(A copy of the June 16, 2004 Opinion Letter is attached as Exhibit "2.")

27.     Effective October 6, 2004, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic devices under the New York State Medicaid program at the time such DME and orthotic devices are provided. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct 6, 2004)).

28.     If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations,

mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct. 6, 2004)).

29.     Pursuant to 12 N.Y.C.R.R. § 442.2 (2011), the language in the Workers' Compensation Fee Schedule as it relates to durable medical states:

> (a) The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided... If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

> (2) the usual and customary price charged to the general public.

30.     Insurers such as GEICO are entitled to receive a proper proof of claim. See 11 N.Y.C.R.R. § 65-3.8(f). To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought. See 11 N.Y.C.R.R. § 65-1.1.

**III.     An Overview of the Defendants' Fraudulent Scheme**

31.     The Defendants perpetrated a scheme through which the Retail Defendants, through Leomax, submitted to GEICO approximately $705,000.00 in fraudulent claims, seeking reimbursement for DME and orthotic devices.

32.     To date, the Retail Defendants have wrongfully obtained more than $405,000.00 from GEICO and there are more than $245,000.00 in additional fraudulent claims that have yet to be adjudicated and remain unpaid.

Case 1:23-cv-02688-NGG-RML Document 1 Filed 07/10/19 Page 298 of 765 PageID #: 3050
Case 1:21-cv-02388-ENV-RML Document 112-04 Filed 12/15/25 Page 10 of 49 PageID #: 3050
PageID #: 3050

33.    The fraudulent scheme perpetrated by the Retail Defendants involves the Retail Defendants, the Wholesale Defendants and the participation of multi-disciplinary No-Fault offices in the New York metropolitan area (hereinafter, the "Clinics") that are the sources of prescriptions for DME and orthotics provided to GEICO Insureds.

34.    Upon information and belief, in coordination with the Wholesale Defendants, the Retail Defendants paid kickbacks to the Clinics which are controlled by unlicensed laypersons and which purport to provide treatment to high volumes of Insureds.

35.    As part of the fraudulent scheme, and in exchange for the kickbacks, the operators/managers of the Clinics caused to be prescribed large amounts of DME and orthotic devices that purportedly were supplied to Insureds by the Retail Defendants.

36.    The prescriptions were never given to the Insureds, but as part of the scheme, they were routed directly to the Retail Defendants to ensure that the Insureds did not fill the prescriptions with legitimate DME/orthotic device retailers.

37.    In exchange for the kickbacks, the clinic operators/managers caused to be prescribed DME and orthotic devices that *were not* covered by the New York State Medicaid fee schedule, thus enabling the Retail Defendants to seek reimbursement on the DME and orthotic devices based on their purported acquisition costs with respect to such goods.

38.    To the extent that the Clinic operators/managers caused to be prescribed DME and orthotic devices that *were* covered by the New York State Medicaid Fee Schedule, they ensured that the prescriptions were written in a generic, non-descript manner, thus enabling the Retail Defendants to: (i) misrepresent the nature and quality of the items intended for the patient and (ii) misrepresent the nature and quality of the items that the Retail Defendants actually dispensed so as to claim entitlement to a higher fee payable.

39.     In order to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Retail Defendants entered into agreements with the Wholesale Defendants whereby – in exchange for a share in the profits of the fraud – the Wholesale Defendants provided the Retail Defendants with low-quality and arguably DME and orthotics that cost mere fractions of the Retail Defendants' true "acquisition cost".

40.     In some instances, these fraudulently inflated wholesale invoices: (i) stated wholesale prices for the DME and orthotic devices that were far in excess of the actual wholesale price of the DME and orthotic devices; and (ii) deliberately omitted any mention of the make and model of the DME and orthotic devices.

41.     To create the illusion that the Retail Defendants actually paid the inflated prices on the wholesale invoices, the Retail Defendants sometimes issued checks to the Wholesale Defendants for the full invoice amounts which could be submitted in support of their claims as proof of payment if requested from GEICO and other New York automobile insurers.

42.     In such instances, the payment methodology was nothing more than a façade however because on some occasions, the Wholesale Defendants converted these checks to cash through various methods, and then regularly paid "rebates" to the Retail Defendants.

43.     Although the Wholesale Defendants kept a portion for themselves, a majority of the payments was used by the Retail Defendants to "purchase" prescriptions from the Clinics (i.e., the kickbacks) and to maintain a steady flow of cash to facilitate the scheme.

44.     On other occasions, the Wholesale Defendants provided multiples of particular products, again diminishing the Retail Defendants' actual costs for the items.  For example, the Wholesale Defendants would supply the Retail Defendants with fraudulently inflated invoices illustrating that Retail Defendants purchased 10 massagers at $100.00 per item – totaling $1,000.00 for the items.  However, the Wholesale Defendants would actually provide the Retail

Defendants with 30 massagers – reducing their actual cost to approximately $30.00 per massager. The Retail Defendants then, in turn, would submit charges of $150.00 per item.

45. Upon information and belief, the Retail Defendants also entered into secret agreements with one or more of the Wholesale Defendants whereby – in exchange for a share in the profits of the fraud – Wholesale Defendants provided the Retail Defendants with arguably counterfeit, low-quality DME at the lowest possible prices which were negotiated by the Retail Defendants.

46. The Retail Defendants then sought from GEICO and other insurers, the maximum reimbursable fee for many of the goods – "kicking back" a portion of the proceeds to one or more of the Wholesale Defendants.

47. The Retail Defendants could afford to rebate to the Wholesale Defendants a portion of the proceeds they retained from GEICO because the difference between their cost for the goods and the maximum reimbursable fee for the items was immense.

48. Upon information and belief, some of the proceeds were used by the Retail Defendants to as kickbacks to the Wholesale Defendants and some were used by the Retail Defendants to "purchase" prescriptions from the Clinics and to maintain a steady flow of cash to facilitate the scheme.

49. In the event that the Retail Defendants did actually purchase DME from the Wholesale Defendants, much of the DME were inexpensive products manufactured in China, then imported, packaged and distributed in New York.

50. In many cases, these products were cheap knock-offs of legitimate products that the Center for Medicare & Medicaid Services ("CMS") have analyzed and assigned a particular Healthcare Common Procedure Coding System Code ("HCPCS Code").

51.     The various wholesale companies ensured that the faux products were manufactured and "branded" with particular HCPCS Codes and imported into the United States for distribution

52.     The Wholesale Defendants then flooded the markets with the substandard devices, and sold the goods to retail companies, including the Retail Defendants.

53.     The Retail Defendants dispensed the goods using what purported to be legitimate HCPCS codes and demanded exorbitant fees for the products.

54.     For example, upon information and belief, the Retail Defendants paid one or more of the Wholesale Defendants approximately $45.00 for back braces which the Wholesale Defendants advertised as being approved for HCPCS Code L0627.

55.     The Retail Defendants then submitted charges of $322.98 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $278.00 per Insured.

56.     Nevertheless, the Retail Defendants systematically represented that the inexpensive DME obtained from the Wholesale Defendants and purportedly dispensed to GEICO Insureds were high-quality and expensive products by submitting charges that far exceeded the true value of the products.

57.     The charges are so outrageous that no reasonable patient would ever pay the exorbitant prices for the substandard devices – had the patients been given the opportunity to choose their own pharmacy or retailer in the first instance.

58.     The Retail Defendants then created and submitted thousands of bills that deliberately omitted any meaningful information regarding the DME and orthotic devices, including the manufacturer, make and model of the DME and orthotic devices that the Retail Defendants purportedly dispensed to Insureds.

59.     The Retail Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the DME and orthotic devices and concealed the fact that: (i) the DME and orthotic devices dispensed by the Retail Defendants, to the extent that they were provided at all, were inexpensive low-quality products that cost a mere fraction of what was represented; (ii) the Retail Defendants, in virtually every instance, charged GEICO and other insurers far more than the maximum permissible amounts for the DME and orthotic devices that were supplied; and (iii) the Retail Defendants frequently billed GEICO and other insurers for DME and orthotic devices they never supplied in the first instance.

60.     To further conceal the scheme, the Retail Defendants also failed to provide GEICO and/or refused to respond to repeated requests made by GEICO seeking information such as meaningful wholesale invoices containing descriptions of goods provided (i.e., make, model and manufacturer), proof of payment and additional information that would be necessary to determine whether the charges submitted by the Retail Defendants were legitimate and the result of bona fide arms-length transactions between the Retail Defendants and the Wholesale Defendants.

61.     The Retail Defendants' fraudulent concealment included their regular and repeated refusal to appear at properly and lawfully-requested examinations under oath necessary to substantiate their charges and the nature of their relationships with the prescribing practitioners.

**IV.     The Retail Defendants' Scheme to Defraud GEICO**

62.     In or around the middle of 2015, Tseytelman initiated his venture by identifying various Clinics that treated high-volumes of No-Fault patients.

63.     Tseytelman knew that if he could become the vendors for these Clinics, the number of prescriptions he could use to support his claims would be limitless.

64. To that end, in exchange for payments from Tseytelman, the Clinic operators/managers directed their associated practitioners to: (i) to systemically prescribe large amounts of virtually identical DME and orthotic devices to Insureds, without regard to the Insureds' symptoms, and (ii) to issue generic prescriptions for DME and orthotic devices, omitting specific descriptions of the devices required so as to permit Tseytelman to unilaterally select what DME or orthotic devices to dispense to Insureds.

65. Nearly every patient who treated at the Clinics was prescribed the same or similar sets of DME and orthotics despite the seriousness of the related accident or the types of injuries sustained by the patients.

66. Although the medical practitioners who evaluated the patients specifically recommended in their reports that particular items be given to the patients, the template prescription forms called other pieces of equipment – some of which were never even considered or contemplated by the practitioners.

67. In some instances, the practitioners associated with the Clinics signed blank prescription forms and provide the forms to the receptionists at the various Clinics who would then transmit the prescriptions to the Retail Defendants to fill.

68. In other instances, the Retail Defendants and the Clinic operators/managers agreed to simply forged the prescriptions to support the claims by using a signature stamp, replicating the practitioners' signatures or by having someone at the Clinic other than the practitioner simply sign the form.

69. The Retail Defendants then paid kickbacks to the Clinic operators/managers for prescriptions that were prepared by the receptionists at the Clinics and transmitted directly to the Retail Defendants to support their claims.

15

70.     By way of example, the Retail Defendants often submitted bills seeking reimbursement for DME and orthotics purportedly prescribed by Sheila Soman, M.D., who purportedly evaluated patients at a Clinic located at 2363 Ralph Avenue, Brooklyn, New York (the "2363 Ralph Avenue Clinic").

71.     Upon information and belief, the 2363 Ralph Avenue Clinic and the entities operating therein were secretly owned and controlled by non-physicians who recruited various medical practitioners to participate in a scheme which involved pre-determined treatment and prescription protocols designed to enrich the layperson operators/managers of the 2363 Ralph Avenue Clinic. Those protocols included the prescription of DME and orthotics.

72.     Consistent with the pre-determined protocols implemented by the layperson operators/managers of the 2363 Ralph Avenue Clinic, nearly every patient that was purportedly evaluated by Soman at the 2363 Ralph Avenue Clinic was prescribed virtually the same DME after initial examinations:

- Water Circulation Unit
- LSO
- Thermophore
- Egg Crate Mattress
- Bed Board
- Cervical Pillow
- Lumbar Cushion

73.     These items were systematically prescribed (or were purportedly prescribed) to nearly every patient, despite differences in injuries, complaints or diagnoses.

74.     The prescriptions were then routed by the operators/managers of the 2363 Ralph Avenue Clinic directly to the Retail Defendants to ensure that the patients themselves never filled the prescriptions at legitimate DME companies.

75.     The Retail Defendants then used the prescriptions to support their inflated charges for inexpensive and sub-standard DME they delivered to the patients – to the extent the DME was delivered in the first instance.

76.     Knowing that magnetic resonance imaging (MRI) studies will almost always show some positive results immediately after soft-tissue injuries, the 2363 Ralph Avenue Clinic operators/managers systematically caused to be generated or otherwise made, referrals for MRIs.

77.     The positive MRI results were then used by the 2363 Ralph Avenue Clinic operators/managers to justify additional treatment and by the Retail Defendants to justify the dispensation of more sophisticated orthotic devices (e.g., back braces, shoulder braces, knee braces) and cervical traction units.

78.     Because they knew that such devices were not necessary and to avoid suspicion that the devices were being prescribed and dispensed in a systematic, egregious manner, the Retail Defendants submitted separate and distinct bills for certain categories of items – despite the fact that the items were designated on a single template prescription form.

79.     Then, after follow-up evaluations, nearly every patient who treated at the 2363 Ralph Avenue Clinic was prescribed the following items:

- EMS Unit
- Massager
- Infrared Heat Lamp
- Whirlpool

80.     The prescriptions were then routed directly by the operators/managers of the 2363 Ralph Avenue Clinic to the Retail Defendants to ensure that the patients themselves never filled the prescriptions at legitimate DME companies.

81. The Retail Defendants then used the prescriptions to support their inflated charges for inexpensive and sub-standard DME and orthotics they delivered to the patients – to the extent the DME was delivered in the first instance.

82. The inflation of charges submitted to GEICO for the inexpensive DME and orthotics was a necessary component of the scheme because the Retail Defendants used their ill-gotten gains to pay kickbacks to the Clinic operators/managers for the prescriptions.

83. Again, because they knew that such devices were not necessary and to avoid suspicion that the devices were being prescribed and dispensed in a systematic, egregious manner, the Retail Defendants submitted separate and distinct bills for certain categories of items – despite the fact that the items were designated on a single template prescription form.

84. These treatment and prescription protocols and the collusive relationships with the Clinic operators/managers were not however, simply limited to the 2363 Ralph Avenue Clinic.

85. To expand their enterprise, the Retail Defendants entered into similar agreements with the operators/managers of various other multi-disciplinary Clinics which also almost exclusively treated No-Fault patients.

86. Despite GEICO's requests for the Retail Defendants to appear at an examination under oath to verify the nature of the equipment, the nature of the charges and the relationships with the Clinic, the Retail Defendants refused to appear because they knew that the disclosure of the information would permit GEICO to identify the true source, cost and quality of the products dispensed and more importantly, identify that manner in which the kickbacks were paid to the Clinics.

**V.    The Retail Defendants' Manipulation of the Prescriptions and Their Fraudulent Billing Scheme**

87.    Not only did the Retail Defendants and the operators/managers of the Clinics agree to design and implement the prescription protocols, but much of the DME and orthotics listed on the prescriptions and dispensed by the Retail Defendants (if at all) contravened each patient's conservative treatment plans thus supporting the fact that the supplies were prescribed pursuant to predetermined protocols established by non-physicians as a means to generate profits.

88.    For example, although the associated physicians/chiropractors purportedly recommended for each patient a course of physical therapy which included stretching and bending to strengthen weakened areas of the back, knee and neck, the prescriptions invariably called for immobilizing devices such as lumbosacral supports, knee supports and cervical collars.  Such devices would never be prescribed by an ordinary physician in a legitimate medical office environment.

89.    To facilitate the scheme (and in exchange for a share in the profits of the scheme and to support the efforts of Tseytelman to negotiate kickback arrangements with the Clinics), one or more of the Wholesale Defendants provided the Retail Defendants with the inexpensive DME.

90.    Upon information and belief, one or more of the Wholesale Defendants also provided the Retail Defendants with purchase invoices which sometimes included inflated prices for the goods.

91.    In the alternative, the invoices simply included discount prices for substandard products.

92.    In some instances, the Retail Defendants mischaracterized the nature of the items they purchased and purportedly dispensed to GEICO Insureds so as to claim reimbursement at a higher payable fee.

93.     In other instances, the Retail Defendants simply purchased the inexpensive orthotics and other devices from various specific wholesale DME and orthotic companies.

94.     Because such items purportedly are assigned a maximum reimbursable fee, the Retail Defendants negotiated with one or more of the Wholesale Defendants to ensure that they could purchase the poor-quality goods at the lowest possible rate.

95.     The Retail Defendants then charged the maximum reimbursable fee for each item which, in the aggregate, resulted in a virtual windfall for the Retail Defendants.

96.     In cases where the New York State Medicaid program has prescribed a fee payable for a given item or a class of items, the Retail Defendants relied on the vague and generic prescriptions issued by the Clinics to misrepresent the nature of the items actually prescribed and furthermore misrepresent the item that the Retail Defendants purportedly dispensed so as to claim entitlement to a higher fee payable.

97.     For example, contemporaneous with initial evaluations the Retail Defendants submitted charges of $322.98 using HCPCS Code L0627 pursuant to prescriptions calling for "LSO" or basic "lumbar back supports".  (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "3".)

98.     The product represented by HCPCS Code L0627 is a *custom-fitted* device with anterior and posterior panels designed to restrict movement – not the elastic back braces generally prescribed immediately after soft-tissue injuries.

99.     These LSOs assigned to HCPCS Code L0627 are far more sophisticated and expensive than basic, flexible elastic LSOs listed on the prescriptions, provided by the Retail Defendants and which have an established fee payable of less than $100.00.

20

100. The Retail Defendants submitted charges of $155.52 using HCPCS Code L0272 pursuant to prescriptions calling for "egg crate" mattresses. (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "4".)

101. The product represented by HCPCS Code L0272 is a thick (5 inches or more) foam/rubber mattress that is designed to be a substitute for an actual mattress, not the thin egg crate mattress overlays that were actually dispensed by the Retail Defendants.

102. In fact, the mattress overlays listed in the prescriptions and actually dispensed by the Retail Defendants are assigned HCPCS Code E0199 and have a reimbursable rate of $19.48.

103. The Retail Defendants submitted charges of $101.85 using HCPCS Code E0274 pursuant to prescriptions calling for "bed boards". (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "4".)

104. The product represented by HCPCS Code E0274 is an over-bed table that is used to eat on while relegated to a hospital (or other) bed, not the thin, folding thin boards designed to use underneath a mattress like those dispensed by the Retail Defendants.

105. In fact, the bed boards listed in the prescriptions and actually dispensed by the Retail Defendants are not assigned an MRA and are reimbursable at the lower of the Retail Defendants' acquisition cost, plus 50%, or the usual and customary price to the general public.

106. The Retail Defendants also billed $371.70 using HCPCS Code E0849 pursuant to prescriptions calling for "cervical traction unit". (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "5".)

107. To the extent the items were actually prescribed and dispensed in the first instance, upon information and belief, the Retail Defendants provided Insureds with inexpensive knock-offs that do not even quality for HCPCS E0849.

108.    The Retail Defendants also billed $494.13 using HCPCS Code L0632 pursuant to prescriptions calling for "LSO APL Control, Custom." (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "6".)

109.    The product assigned to HCPCS Code L0632 is a custom-*fabricated* lumbar orthosis which is made from scratch through molds which fit a single particular patient – not the pre-fabricated devices listed in the prescriptions and dispensed by the Retail Defendants.

110.    Similarly, the Retail Defendants billed $466.92 using HCPCS Code L3674 pursuant to prescriptions calling for "shoulder brace." (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "7".)

111.    The product assigned to HCPCS Code L3674 is a custom-*fabricated* shoulder orthosis which is made from scratch through molds designed for a particular patient – not the pre-fabricated devices listed in the prescriptions and dispensed by the Retail Defendants.

112.    The Retail Defendants submitted charges for various other "custom-fitted" orthotics. (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "8".)

113.    Although the Retail Defendants billed for such "customized" devices, neither Tseytelman nor any representative of Leomax ever fitted many of GEICO's Insureds in the first instance.

114.    The Retail Defendants simply dispensed "one-size fits all" supports with adjustable Velcro straps that were given to them by the Clinic receptionists.

115.    In cases where the New York State Medicaid program *has not* prescribed a fee payable for a given item or a class of items, the Retail Defendants relied on fraudulently inflated wholesale/purchase prices to seek fees higher than what they were legally entitled by charging GEICO 150% of the inflated wholesale price.

22

116.    For example, the Retail Defendants submitted charges of $195.00 for massagers (therefore representing its acquisition cost to be approximately $130.00 per device) without any information regarding the make, model, or manufacturer of the devices. (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "9".)

117.    Retail Defendants likely never paid the Wholesale Defendants more than $20.00 for the inexpensive massaging wands they dispensed to the patients.

118.    In fact, the inexpensive massaging wands the Retail Defendants dispensed to the patients are actually available to the public for less than $30.00.

119.    The Retail Defendants submitted charges of $205.00 for infrared heat lamps (therefore representing its acquisition cost to be approximately $$137.00 per lamp) without any information regarding the make, model, or manufacturer of the devices. (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "9".)

120.    Retail Defendants likely never paid the Wholesale Defendants more than $20.00 for the inexpensive "standing" heat lamps they dispensed to the patients.

121.    In fact, the inexpensive infrared heat lamps dispensed by the Retail Defendants were not "standing" heat lamps at all.

122.    Instead, the heat lamps dispensed by the Retail Defendants were hand-held wands with removable clips that can be fastened to a surface – similar to a "night light" used to read in darkness.

123.    Such devices are readily available to the general public for under $30.00; and

124.    The Retail Defendants submitted charges of $422.00 and $422.81 for water circulation units (therefore representing its acquisition cost to be approximately $281.00 per unit) without any information regarding the make, model, or manufacturer of the devices.

(Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "10".)

125.   Retail Defendants likely never paid the Wholesale Defendants more than $25.00 for the inexpensive water circulation units they dispensed to the patients.

126.   In fact, the water circulation units dispensed by the Retail Defendants were inexpensive water jugs which are readily available to the general public for under $35.00.

127.   The Retail Defendants submitted charges of $409.00 and $415.00 for whirlpools (therefore representing its acquisition cost to be approximately $275.00 per device) without any information regarding the make, model, or manufacturer of the devices.  (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "11".)

128.   Retail Defendants likely never paid the Wholesale Defendants more than $25.00 for the inexpensive "bubble blowers" they dispensed to the patients.

129.   In fact, the whirlpools dispensed by the Retail Defendants were inexpensive air blowers that are readily available to the general public for under $35.00.

130.   Despite the fact that the bills often represented that the devices were delivered in the patients' homes, much of the equipment (if not all) was given to the patients by the receptionists who worked at the respective Clinics -- likely because Tseytelman lives in New Jersey.  For example:

> (i)   Patient CW was purportedly prescribed various devices including a thermophore, LSO, bed board, mattress, cervical pillow, lumbar cushion, cervical collar, EMS Unit, massager and infrared heat lamp (all on initial examination) and was later purportedly prescribed a cold water circulation unit (after a follow-up examination).  Despite the fact that the bills submitted by the Retail Defendants illustrate that the goods were delivered to Patient CW's home, all of the equipment was given to Patient CW at the Clinic, Patient CW was never advised why she was getting the equipment, Patient CW was never instructed on use and was never fitted for any "custom" devices;

(ii)    Patient RC was purportedly prescribed various devices including a thermophore, LSO, bed board, mattress, cervical pillow, lumbar cushion, cervical collar, "custom-fitted" knee brace and water circulation unit (all on initial examination) and was later purportedly prescribed an EMS Unit, massager, infrared heat lamp and whirlpool (after a follow-up examination). Despite the fact that the bills submitted by the Retail Defendants illustrate that the goods were delivered to Patient RC's home, all of the equipment was given in large plastic garbage bags to Patient RC at the Clinic, Patient RC was never advised why she was getting the equipment, Patient RC was never instructed on use and was never fitted for any "custom" devices;

(iii)    Patient AF was purportedly prescribed various devices including a thermophore, LSO, bed board, mattress, cervical pillow, lumbar cushion, cervical collar, "custom-fitted" knee brace, a "custom-fitted" shoulder brace and water circulation unit (all on initial examination) and was later purportedly prescribed an EMS Unit, massager, infrared heat lamp (after a follow-up examination). Despite the fact that the bills submitted by the Retail Defendants illustrate that the goods were delivered to Patient AF's home, all of the equipment was given in large plastic garbage bags to Patient AF at the Clinic, Patient AF was never advised why she was getting the equipment, Patient AF was never instructed on use and was never fitted for any "custom" devices;

(iv)    Patient NN was purportedly prescribed various devices including a thermophore, LSO, bed board, mattress, cervical pillow, car seat, cervical collar, "custom-fitted" knee brace, a "custom-fitted" wrist brace and water circulation unit (all on initial examination) and was later purportedly prescribed an EMS Unit, massager, infrared heat lamp (after a follow-up examination). Despite the fact that the bills submitted by the Retail Defendants illustrate that the goods were delivered to Patient NN's home, all of the equipment was given in large plastic garbage bags to Patient NN at the Clinic, Patient NN was never advised why she was getting the equipment, Patient NN was never instructed on use and was never fitted for any "custom" devices; and

(v)    Patient CL was purportedly prescribed various devices including a cervical traction unit and a "custom-fitted" back brace (after a follow-up examination). Despite the fact that the bills submitted by the Retail Defendants illustrate that the goods were delivered to Patient CL's home, all of the equipment was given in large plastic garbage bags to Patient CL at the Clinic, Patient CL was never advised why she was getting the equipment, Patient CL was never instructed on use and was never fitted for any "custom" devices.

## VI. The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

131. The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and orthotic devices to Insureds, and their actual submission of charges to GEICO.

132. To induce GEICO to promptly pay the charges for the DME and orthotic devices, the Defendants have gone to great lengths to systematically conceal their fraud.

133. Specifically, the Retail Defendants deliberately failed to submit, with their initial submissions wholesale invoices, thereby concealing the amounts that they actually paid for the DME and orthotic devices, the manufacturer, make, model, size, and quality of the goods, and the actual value of the goods in the legitimate marketplace.

134. The Retail Defendants secretly entered into agreements with various Clinics whereby the Clinics provided the Retail Defendants with uniform, generic prescriptions that were used by the Retail Defendants to support their fraudulent claims.

135. The Retail Defendants' fraudulent concealment also is manifest in their failure and refusal to disclose the existence of the kickback arrangements with the Clinics.

136. The Retail Defendants also supported many of their claims with prescriptions that they knew were forged and therefore fraudulent.

137. To the extent that the New York State Medicaid program established fees payable for a given class of DME and orthotic devices, the Retail Defendants knowingly mischaracterized the nature of the items so as to claim reimbursement at a higher fee payable.

138. The Retail Defendants also submitted false delivery receipts in support of their billing that purported to demonstrate that the Retail Defendants actually delivered the products to the Insureds.

139.   In reality, the Retail Defendants delivered the goods, in bulk, to various Clinic representatives who ultimately provided the products some, but not all, of the products to the patient in large black garbage bags with little or no instruction on use and/or safety.

140.   To induce GEICO to promptly pay the fraudulent charges, the Retail Defendants, routinely file expensive and time-consuming litigation against GEICO and other insurers if the fraudulent charges are not promptly paid in full, despite the fact that the Retail Defendants are aware that their billing and claims are fraudulent.

141.   GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days.  The documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause GEICO to justifiably rely on them. As a proximate result, GEICO has incurred damages of more than $405,000.00 based upon the fraudulent charges.

142.   Because of the material misrepresentations and other affirmative acts taken by the Retail Defendants to conceal their fraud from GEICO, GEICO did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

143.   GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claims denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

144.   In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Leomax; (ii) timely issued requests for additional verification with

respect to all of the pending claims for No-Fault Benefits submitted through Leomax, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through Leomax, or else to request additional verification of those claims, has not expired.

### FIRST CAUSE OF ACTION AGAINST LEOMAX
#### (Declaratory Judgment Under 28 U.S.C. § 2201)

145.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 144 of this Complaint as if fully set forth at length herein.

146.    There is an actual case in controversy regarding more than $245,000.00 in fraudulent billing for DME and orthotic devices that allegedly have been provided to GEICO's Insureds.

147.    GEICO contends that Leomax has no right to receive payment for any pending bills they have submitted because:

(i)     Leomax made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the DME and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying Leomax "No-Fault" reimbursement to which Leomax was not entitled;

(ii)    Leomax's charges were and are the byproducts of improper agreements between the Clinics which permitted Leomax to dispense particular products to Insureds despite the fact that those goods were never prescribed for the patients and despite the fact that Tseytelman is not and never has been a licensed medical practitioner;

(iii)   Leomax made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were dispensed to Insureds;

(iv)    Leomax made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were actually prescribed by the treating medical practitioners; and

(iv)    Defendant Leomax failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of

coverage and relieving GEICO of any obligation to pay the fraudulent claims.

148.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     Leomax made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the DME and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying Leomax "No-Fault" reimbursement to which Leomax was not entitled;

(ii)    Leomax's charges were and are the byproducts of improper agreements between the Clinics which permitted Leomax to dispense particular products to Insureds despite the fact that those goods were never prescribed for the patients and despite the fact that Tseytelman is not and never has been a licensed medical practitioner;

(iii)   Leomax made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were dispensed to Insureds;

(iv)    Leomax made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were actually prescribed by the treating medical practitioners; and

(v)     Defendant Leomax failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

## SECOND CAUSE OF ACTION
### Against Tseytelman and Leomax
### (Common Law Fraud)

149.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1

through 148 of this Complaint as if fully set forth at length herein.

150.    Tseytelman and Leomax intentionally and knowingly made false and fraudulent

statements of material fact to GEICO and concealed material facts from GEICO in the course of

their submission of hundreds of fraudulent bills seeking payment for DME and orthotic devices.

151.     The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In almost every claim for DME and orthotic devices for which the New York State Medicaid program has established fees payable, the representation that the goods represented in the billing actually were the goods intended to be provided to Insureds by the prescribing practitioners.

(ii)     In almost every claim, concealment of the fact that the Retail Defendants knowingly provided inexpensive and arguably counterfeit products to Insureds so as to realize profits that far exceeded the profits they would have realized had they dispensed legitimate, quality products.

(iii)    In almost every claim, concealment of the fact that the Retail Defendants actually delivered all of the products to the Insureds when in reality, the Retail Defendants delivered the goods to the Clinic representatives who provided the Insureds with some, not all of the goods.

(iv)     In every claim, concealment of the fact that the DME and orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Tseytelman and Leomax paid kickbacks to the Clinics to induce the Clinics to direct their associated practitioners to: (a) prescribe large amounts of medically unnecessary DME and orthotic devices and (b) write the prescriptions in a generic non-descript manner – both designed to permit Tseytelman and Leomax to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to GEICO and other New York automobile insurers.

(v)      The Retail Defendants failed and/or refused to adequately respond to GEICO's proper requests for additional verification, or in the alternative, provided false and misleading information in an attempt to obtain reimbursement of monies to which they never were entitled.

152.     Tseytelman and Leomax made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws, or that were far in excess of the charges that otherwise would be compensable under the No-Fault Laws.

153.     GEICO justifiably relied on the false and fraudulent representations made by Tseytelman and Leomax, and as a proximate result has incurred damages of more than $405,000.00 based upon the fraudulent charges.

154.     The extensive fraudulent conduct of Tseytelman and Leomax demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

155.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Against Tseytelman and Leomax
### (Unjust Enrichment)

156.     GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 155 of this Complaint as if fully set forth at length herein.

157.     As set forth above, Tseytelman and Leomax engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

158.     When GEICO paid the bills and charges submitted by or on behalf of Leomax for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Tseytelman and Leomax.

159.     Tseytelman and Leomax have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Retail Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

160.     Retention of GEICO's payments by Tseytelman and Leomax violates fundamental principles of justice, equity and good conscience.

161.     By reason of the above, the Tseytelman and Leomax have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $405,000.00.

# FOURTH CAUSE OF ACTION
## Against The Wholesale Defendants
### (Aiding and Abetting Fraud)

162.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 161 of this Complaint as if fully set forth at length herein.

163.    John Doe Corporations "1" through "3" and John Does "1" through "3" knowingly aided and abetted the fraudulent scheme perpetrated on GEICO by the Retail Defendants.

164.    The acts taken by John Doe Corporations "1" through "3" and John Does "1" through "3" in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs in order to support the fraudulent billing submitted to GEICO and other New York automobile insurers through Leomax; (ii) knowingly creating invoices that deliberately omitted the most basic information associated with the DME and orthotic supplies provided, including the manufacturer, make and/or model of the supplies; (iii) converting check payments received from the Retail Defendants into cash, and then returning/rebating the bulk of the cash to the Retail Defendants, to make it appear as if the Retail Defendants actually paid the prices for the DME and orthotic devices as set forth on the fraudulent wholesale invoices; and (iv) knowingly supporting the negotiation and performance of kickback agreements between the Retail Defendants and the Clinics.

165.    The conduct of John Doe Corporations "1" through "3" and John Does "1" through "3" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Corporations "1" through "3" and John Does "1" through "3" was a necessary part of and was critical to the success of the fraudulent schemes because without their actions, there would be no opportunity for the Retail Defendants to obtain fraudulently inflated payments from GEICO and from other New York automobile insurers

166.     John Doe Corporations "1" through "3" and John Does "1" through "3" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for DME and orthotic devices that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

167.     The conduct of John Doe Corporations "1" through "3" and John Does "1" through "3" caused GEICO to pay money based upon the fraudulent charges submitted through Leomax in an amount to be determined at trial, but in no event less than $405,000.00.

168.     The extensive fraudulent conduct of John Doe Corporations "1" through "3" and John Does "1" through "3" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

169.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

170.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE,** Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.     On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Leomax has no right to receive payment for any pending bills submitted to GEICO, totaling an amount believed to exceed $245,000.00;

B.     On the Second Cause of Action against Tseytelman and Leomax, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $405,000.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.     On the Third Cause of Action against Tseytelman and Leomax, more than $405,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper

D.     On the Fourth Cause of Action against the Wholesale Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $405,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
      March 1, 2019

RIVKIN RADLER LLP

By: _____
     Barry I. Levy
     Michael A. Sirignano
     Justin A. Calabrese
926 RXR Plaza
Uniondale, New York 11556-0926
RR File:     005100-02734
Telephone:  (516) 357-3000
Facsimile:   (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*

4109533 v3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------- X

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE NEW JERSEY PROPERTY AND CASUALTY INSURANCE COMPANY, ALLSTATE NORTHBROOK INDEMNITY COMPANY, ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,

                     **Plaintiffs,**

    -against-

RACHIDA AMIROVA, ARSEN DAVYDOV, RAKHMIN DEKHANOV, VALERY A/K/A WALTER GRINBERG, PINCHAS KALANTAROV, ALBERT KATANOV, GABRIEL KOHEN, STANLEY A/K/A STAN LEVIN, ARIK MALAKOV, EFRAYM MASTOV, OKSANA MASTOV, LARYSSA MEDVID, EDUARD MERGOLD, SIMON MIRAKOV, EUGENE A/K/A YEVGENY NEMETS, SERGEY OLEYNIK, YELENA REMARENKO, ALEXANDRE SHADMANOV, LEONID A/K/A LEANID STARKOU, YEVSEY TSEYTELMAN, ROMAN TSOYREF A/K/A RONIHN TSOYREE, JELANI WRAY, PENAY YAGUDAEV, OLEG YEVDOSIN, DMYTRO ZHERLITSYN, EVGENIY ZLATKIS, ALLMED MERCHANDISE & TRADING, INC., CERTIFIED MEDICAL SUPPLY, INC., E.M.A. MEDICAL EQUIPMENT CORP., EXON MEDICAL EQUIPMENT, INC., EXPERT MEDICAL SUPPLIES, INC., EZRA SUPPLY, INC., GE MEDICAL SUPPLIES, INC., GOLDSTAR EQUIPMENT, INC., HEEL TO TOE FOOT CENTER, LLC, LEOMAX SUPPLIES, INC., LONGEVITY MEDICAL SUPPLY, INC., MEDASOURCE, INC., MEDCARE SUPPLY, INC., MEDIGNA, INC., MILFORD SERVICES, INC., MOUNT SINAI MEDICAL SUPPLY, INC., MYRTLE AVENUE TRADING, LLC, MYRTLE DME NYC, INC., OPTIMUS PLUS PRODUCTS CORP., P&D MERCHANDISE CORP., SHEEPSHEAD BAY MEDICAL SUPPLY, INC., SKY OF NY 1, INC., STARK MEDICAL SUPPLY, INC., TOWERS NY, INC., UNIVERSAL SUPPLY DISTRIBUTION CORP., VSEVARS MEDICAL SUPPLY, INC., JOHN DOES 1 THROUGH 20 AND ABC CORPORATIONS 1 THROUGH 20,

                     **Defendants.**

-------------------------------------------------------------------------- X

CIVIL ACTION

No: 19-cv-2354

COMPLAINT

(TRIAL BY JURY DEMANDED

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property & Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property & Casualty Insurance Company (collectively "**Plaintiffs**" or "**Allstate**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants Rachida Amirova, Arsen Davydov, Rakhmin Dekhanov, Valery a/k/a Walter Grinberg, Pinchas Kalantarov, Albert Katanov, Gabriel Kohen, Stanley a/k/a Stan

**EXHIBIT**

Plf's 3

Levin, Arik Malakov, Efraym Mastov, Oksana Mastov, Laryssa Medvid, Eduard Mergold, Simon Mirakov, Eugene a/k/a Yevgeny Nemets, Sergey Oleynik, Yelena Remarenko, Alexandre Shadmanov, Leonid a/k/a Leanid Starkou, Yevsey Tseytelman, Roman Tsoyref a/k/a Ronihn Tsoyree, Jelani Wray, Penay Yagudaev, Oleg Yevdosin, Dmytro Zherlitsyn, Evgeniy Zlatkis, (collectively **"Retail Owners"),** AllMed Merchandise & Trading, Inc., Certified Medical Supply, Inc., E.M.A. Medical Equipment Corp., Exon Medical Equipment, Inc., Expert Medical Supplies, Inc., Ezra Supply, Inc., GE Medical Supplies, Inc., Goldstar Equipment, Inc., Heel to Toe Foot Center, LLC, Leomax Supplies, Inc., Longevity Medical Supply, Inc., Medasource, Inc., Medcare Supply, Inc., Medigna, Inc., Milford Services, Inc., Mount Sinai Medical Supply, Inc., Myrtle Avenue Trading, LLC, Myrtle DME NYC, Inc., Optimus Plus Products Corp., P&D Merchandise Corp., Sheepshead Bay Medical Supply, Inc., Sky of NY 1, Inc., Stark Medical Supply, Inc., Towers NY, Inc., Universal Supply Distribution Corp., Vsevars Medical Supply, Inc. (collectively "**Retailers**"**;** Retail Owners and Retailers are collectively referred to as "**Retail Defendants**"), John Does 1 through 20, (collectively "**Wholesale Owners**"), ABC Corporations 1 through 20 (collectively "**Wholesalers**"; Wholesalers and Wholesale Owners are collectively referred to as "**Wholesale Defendants**"), (collectively the Retail Defendants and Wholesale Defendants are referred to herein as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from at least 2008 and continuing through the date of the filing of this Complaint, Defendants engaged in separate, but fundamentally similar schemes to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2

2.     This action seeks to recover more than $2,100,000.00 that Defendants stole from Plaintiffs through the submission of thousands of false and/or fraudulent insurance claims for durable medical equipment ("DME") and/or orthotic devices. As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses and whirlpools; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes. Such items include, but are not limited to, ankle braces, back braces, cervical collars, knee braces, shoulder braces and hand braces.

3.     At all relevant times mentioned herein, each and every DME and/or orthotic device supplied by the Retailers was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, one or more of the Retail Owners, through their respective Retailers, entered into separate arrangements with one or more of the Wholesale Defendants and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     On information and belief, pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Retailers;

(ii) fabricating and/or falsifying DME prescriptions by:

 (a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME and/or orthotic devices;

(b) duplicating and/or photocopying the HCPs' signatures onto new prescription forms, which the Clinic would then fill in with expensive and unnecessary DME and/or orthotic devices; and

(c) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME and/or orthotic device(s) prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and

(iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

6.      The use of generic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the DME and/or orthotic devices prescribed to the patient, if any items were legitimately prescribed at all; (ii) misrepresent the nature and quality of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, the Retailers routinely provided (or purported to provide) a nearly identical battery of DME and/or orthotic devices to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Claimants" or "No-fault Claimants"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8. On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9. On information and belief, in many instances, the Retail Owners submitted to Plaintiffs, through their respective Retailers, prescription forms which they knew to be fabricated and/or fraudulently altered and/or duplicated, in order to misrepresent the number and/or quality of DME and/or orthotic devices actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10. On information and belief, pursuant to similar agreements, and in exchange for kickbacks and/or other financial compensation, including, but not limited to, a share in the profits of the scheme to defraud, the Wholesale Defendants provided one or more of the Retailers with inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices. Other times, the Wholesale Defendants provided the Retailers with fraudulent wholesale invoices that reflected DME and/or orthotic devices that were never actually provided to Retailers. In fact, irrespective of whether any DME and/or orthotic devices were actually provided to Retailers, the wholesale invoices typically reflected prices that exceeded 10 times the actual prices that the Retailers paid to the Wholesale Defendants and/or were sufficiently generic and devoid of detail to allow the Retailers to seek reimbursement for expensive, complex DME when simple and/or counterfeit DME was provided.

11. On information and belief, in some instances, to create the illusion that the Retailers paid the grossly inflated prices on the wholesale invoices, as more fully alleged in the "Money Laundering Scheme" section below, one or more of the Retailers issued checks to the Wholesale

5

Defendants for the full amounts reflected on the wholesale invoices. The Retailers then used those checks to demonstrate to Plaintiffs, and others, that they had paid the false wholesale invoice amounts. In reality, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned to the Retailers a portion of the profits of the scheme through kickbacks or other financial compensation. These covert cash transactions were facilitated through various clandestine arrangements among the Retailers, the Wholesale Defendants, check brokers, check cashers and/or others unknown to Plaintiffs.

12.    On information and belief, through these transactions, the Retailers were able to surreptitiously obtain cash, which then was used for, among other things, kickbacks to the No-fault Clinics from which the Retailers received fraudulent prescriptions for DME and/or orthotic devices.

13.    On information and belief, in other instances, the Retail Owners, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked items and bill for such items under expensive codes for complex DME when, in fact, the items were cheaply manufactured.

14.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

6

15.     After obtaining the fraudulent prescriptions from the No-fault Clinics and the inflated invoices from the Wholesale Defendants and/or counterfeit DME from the non-party wholesalers and suppliers, the Retail Owners, through their respective Retailers, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the actual amounts they paid for the DME and/or orthotic devices, as well as the nature and quality of the items, and the medical necessity of the purportedly prescribed DME and/or orthotics.

16.     In order to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device, or whether the specific DME and/or orthotic device billed for was medically necessary, the documents submitted to Plaintiffs by the Retail Owners through their respective Retailers in support of their fraudulent claims, including the wholesale invoices, deliberately omitted and/or misrepresented basic information about the DME and/or orthotic devices, including, but not limited to, the manufacturer, make, model, size, features and/or functions of the item and/or included information that was meaningless in determining the kind and quality of any specific DME and/or orthotic device.

17.     On information and belief, the Retail Owners, through their respective Retailers, routinely purchased basic, low-quality and inexpensive items from the Wholesale Defendants or other suppliers, but submitted documents, including, but not limited to, in some instances, inflated wholesale invoices, to insurers, including Plaintiffs, that failed to accurately reflect the actual nature, quality, and purchase price of each item.

18.     On information and belief, in support of their claims for reimbursement, and to facilitate the fraud described herein, the Retail Owners, through their respective Retailers, generated delivery receipts that included a space for the patient's signature to document receipt of each item for which the Retail Owners, through their respective Retailers, billed Plaintiffs.

7

19.     On information and belief, in many instances and pursuant to the agreements between the Retailer Defendants and the No-fault Clinics, patients were directed to sign these delivery receipts upon presenting to the No-fault Clinics, irrespective of whether any DME and/or orthotic devices were provided to the patient at that time. The Retailer Defendants then submitted to Plaintiffs the signed delivery receipts as purported evidence of DME and/or orthotic devices allegedly supplied to a patient, when, in fact, no DME or orthotic device was ever supplied to the patient. On information and belief, in other instances where the patient did not sign the delivery receipt, the Retailers, working with the No-fault Clinics, arranged for the No-fault patient's signature to be forged on the delivery receipt, thereby falsely representing that the patient acknowledged receipt of the billed-for DME and/or orthotic devices.

20.     At all relevant times mentioned herein, Defendants collectively utilized a common fraudulent blueprint as a business plan, sharing common documentation, using the same fraudulent billing codes, using prescriptions from the same No-fault Clinics, with the same battery of DME prescribed to nearly every patient, making the same misrepresentations, and engaging in virtually identical patterns of fraud that were not the product of happenstance, but instead evidence of related and parallel fraudulent billing schemes that trace back to a common genesis and framework.

21.     In order to execute the same fraudulent blueprint, at all relevant times mentioned herein, the Retail Owners, through their respective Retailers, undertook distinctly common actions, including but not limited to one or more of the following: (i) paying kickbacks or other financial compensation to No-fault Clinics in exchange for fraudulent prescriptions of DME and/or orthotic devices; (ii) obtaining prescriptions that were provided pursuant to a predetermined course of treatment as opposed to medical need; (iii) obtaining and submitting to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently

altered/duplicated; (iv) paying fees to the Wholesale Defendants in exchange for fraudulent wholesale invoices that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits; (v) arranging for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery of receipt forms pre-signed by Claimants to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular, and (vi) systematically submitting bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that the Retail Owners, through their respective Retailers, determined should be prescribed by the No-fault Clinics, with virtually every claimant receiving substantially similar DME and/or orthotic devices.

22.     At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, engaged in a fraudulent billing scheme involving the same or similar material misrepresentations and/or omitted material statements in No-fault claims submitted to Plaintiffs for payment. In that regard, each and every bill and supporting documentation submitted by the Retailers contained the same or similar false representations of material facts, including, but not limited to one or more of the following: (i) false and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants; (ii) false and misleading statements as to the amounts the Retailers were entitled to be reimbursed under the No-fault Law; (iii) false and misleading statements that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants; (iv) false and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, which generically described the item(s) in order to conceal the nature, type, and quality of item(s) being prescribed and/or provided; (v) false and misleading wholesale invoices that greatly inflated the true cost and/or quantity of the DME and/or orthotic devices purportedly supplied to No-fault

9

Claimants, and which failed to provide a meaningful description of the DME and/or orthotic devices provided (i.e., make and model) and/or additional information necessary to determine whether the charges submitted are legitimate; and (vi) fabricated, false and misleading prescriptions for DME and/or orthotic devices, concealing the fact that the DME and/or orthotic devices either were not prescribed as alleged, or were prescribed and supplied pursuant to a pre-determined, fraudulent protocol, whereby the Retailers paid kickbacks to No-fault Clinics to induce the No-fault Clinics to provide fraudulent and fabricated prescriptions for large amounts of substantially similar, medically unnecessary DME and/or orthotic devices. On information and belief, all of foregoing was intended to manipulate the payment formulas under the No-fault Law in order to maximize the charges that the Retailers could submit to Plaintiffs and other insurers under the No-fault Law.

23.     By way of further example and not limitation of Defendants' nearly identical parallel schemes to defraud, every Retailer submitted the same type of documentation in support of their claims for reimbursement, including, but not limited to, substantially similar delivery receipts and assignment of benefits forms, many containing the same typos, misspellings and stray marks, and purporting to document the delivery of the same or similar battery of DME and/or orthotic devices. By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims submitted by one or more of the Retailers containing substantially similar delivery receipts and/or assignment of benefits forms that were obviously based on a shared template.

24.     In furtherance of the schemes to defraud alleged herein, Defendants undertook identifiable fraudulent actions pursuant to a common multiple part blueprint under the same

reimbursement system billing for the same DME, following the same billing protocol, using the same billing codes and making the same multiple misrepresentations.

25.     By way of further example and not limitation that Defendants engaged in a common, uniform scheme to defraud, nearly all of the Retail Defendants submitted bills to Plaintiffs for reimbursement using the same types of codes that were not recognized by, or otherwise listed in, the relevant New York State Medicaid fee schedule ("phantom codes") in effect at the time the Retailers purported to supply the listed items to patients. By billing under the same phantom codes for the same items, the Retailers charged Plaintiffs inflated amounts for cheap DME, materially misrepresenting the amounts that they were entitled to receive, and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for reimbursement. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the Retailers submitted fraudulent bills for Non-Fee Schedule items with phantom codes, often using the same phantom codes for the same items.

26.     The use of identical, non-existent product codes to bill for the same items across multiple Retailers cannot be the result of coincidence, but rather, indicates the use of a common blueprint and parallel scheme to defraud.

27.     In addition to utilizing the same phantom codes for the same items, the Retail Defendants engaged in other types of billing fraud that were identical in scope. For example, nearly all of the Retailers, as identified further below, routinely submitted bills to Plaintiffs for "eggcrate mattresses" (a Non-Fee Schedule item), which is nothing more than a thin, foam mattress *pad*, using code E0272, which is a Fee Schedule code reserved for a "Foam Rubber Mattress"; and/or code E0184, which is a Fee Schedule code reserved for a "Dry Pressure Mattress." By selecting

an existing fee schedule code for a *mattress* that the foregoing Retailers did not actually provide, the identified Retailers materially misrepresented the amounts they were entitled to receive and further deceived Plaintiffs in paying amounts in excess of what the No-fault Law would have otherwise allowed for reimbursement, in exactly the same way.

28. On information and belief, in these and in other ways set forth herein, the Defendants engaged in a pattern of similar and/or concerted conduct to defraud insurers in general, and Plaintiffs in particular.

29. In carrying out the scheme to defraud, Defendants stole in excess of $2,100,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq*. (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

30. Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York. Claimants can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

31. As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for DME and/or orthotic devices that were never provided, not provided as billed or, if provided, were of inferior quality relative to what was represented to have been provided in the bills submitted to Plaintiffs, and/or were otherwise

medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Claimants received substantially similar DME and/or orthotic devices. Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs to the Retailers for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

32.     The Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for their services, the Retailers accepted (and continue to accept) assignments of benefits from Claimants and submitted (and continue to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

33.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., the Retailers submitted (and continue to submit) bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

34.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Retailers contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

35.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

36.      Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

37.     Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Claimants under the No-fault law. 11 N.Y.C.R.R. § 68.1.

38.     Effective July 11, 2007, the WCB established a fee schedule for DME and orthotic devices, which adopts the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"). 12 N.Y.C.R.R. § 442.2(a). The Fee Schedule was, and is, in effect at all relevant times mentioned herein.

39.     With respect to items that are not on the Fee Schedule (hereinafter "Non-Fee Schedule" items ), the regulations further provide:

> [I]f the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance

14

> costs or any sales tax) to the provider plus 50%; or (2) the usual and
> customary price charged to the general public.

*Id.*

40.    Accordingly, at all relevant times mentioned herein, providers of DME are entitled to reimbursement in the amounts set forth in the Fee Schedule. For Non-Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1.; 12 N.Y.C.R.R. § 442.2(a).

41.    Pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

42.    Moreover, to be eligible for reimbursement under the No-fault law, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

43.    At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by the Retail Owners, through their respective Retailers, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME and/or orthotic devices. To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the proper reimbursement amount, if reimbursable at all, was a mere fraction of the amount they charged Plaintiffs, and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

15

44. At all times relevant herein, the Defendants exploited the No-fault Law through the utilization of various deceptive and identical billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule ("Fee Schedule items" and "Non-Fee Schedule items," respectively) purportedly provided to Claimants.

45. As set forth in the "Non-Fee Schedule Scheme to Defraud" below, nearly all the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein the Retailers misrepresented that (i) the DME and/or orthotic devices purportedly provided were reimbursable under the relevant Fee Schedule in existence at the time, when, in fact, the Retailers were utilizing codes that were not recognized by, or otherwise listed in, the relevant Fee Schedule ("phantom codes"); (ii) the charges reflected on the Retailers' bills were in accordance with 12 N.Y.C.R.R. § 442.2, when, in fact, the charges were grossly inflated; and/or (iii) the DME and/or orthotic devices purportedly provided were reimbursable pursuant to the Fee Schedule, when they were not. In doing so, the Retail Owners identified in the "Non-Fee Schedule Scheme to Defraud" section below, through their respective Retailers, deliberately misrepresented the amounts that they were entitled to receive under the No-fault Law.

46. In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Owners, through their respective Retailers, also routinely submitted fraudulent bills to Plaintiffs for DME and/or orthotic devices that were never provided, including, but not limited to, expensive custom-fabricated or custom-fit DME and/or orthotic devices.

47. On information and belief, the Retailers and Wholesalers alike were created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

16

48.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided No-fault Claimants with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

49.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud – although that would be troubling enough – rather, they adopted identical fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity. Every facet of Defendants' operations, from securing fraudulent prescriptions for DME and/or orthotic devices pursuant to a predetermined course of treatment, to obtaining inflated wholesale invoices for inexpensive, low quality items, to generating bills that contained codes not recognized under the Fee Schedule in existence at the time, or that misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided, was carried out for the purpose of committing fraud.

50.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices. In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Retail Defendants' No-fault claims because the Retail Owners, through the Retailers, submitted (1) false and fraudulent insurance claims to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent

17

insurance claims to Plaintiffs for DME and/or orthotic devices the Retail Defendants never actually supplied to No-fault Claimants. Such claims continue to be submitted by and/or in the name of the Retailers and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

51. By way of example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of unpaid No-fault claims, which exceed $2.4 million in total, that form the basis of Plaintiffs' request for declaratory relief. Said spreadsheet is grouped by Retailer, claim number, date of service and the amount billed.

## NATURE OF THE ACTION

52. This action is brought pursuant to:

    i)    The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

    ii)    New York State common law; and

    iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

53. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for DME and/or orthotic devices they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

54. Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of the Retailers' unpaid No-fault claims because:

    i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and

    ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

55.    As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $2,100,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## **THE PARTIES**

**A.**    **Plaintiffs**

56.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

57.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

58.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

59.    Plaintiff Allstate New Jersey Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

60.     Plaintiff Allstate Northbrook Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

61.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

62.     Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.      The Individual Retail Owner Defendants**

63.     Rachida Amirova ("Amirova"), is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer Milford Services, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

64.     Arsen Davidov ("Davidov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Mount Sinai Medical Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

65.     Rakhmin Dekhanov ("Dekhanov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Myrtle Avenue Trading, LLC, and, at all times relevant herein, operated, managed, and/or controlled its activities.

66.     Valery a/k/a Walter Grinberg ("Grinberg") is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer Medcare Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

67.     Pinchas Kalantarov ("Kalantarov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Heel to Toe Foot Center, LLC, and, at all times relevant herein, operated, managed, and/or controlled its activities.

68.     Albert Katanov ("Katanov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Allmed Merchandise & Trading, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

69.     Gabriel Kohen ("Kohen") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Goldstar Equipment, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

70.     Stanley a/k/a Stan Levin ("Levin") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Medasource, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

71.     Laryssa Medvid ("Medvid") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Medigna, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

72.     Arik Malakov ("Malakov") is a natural person residing in the State of New York, is a corporate officer of Towers NY Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

73.     Efraym Mastov ("E. Mastov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailers E.M.A. Medical Equipment Corp. and Myrtle DME NYC, Inc., and, at all times relevant herein, operated, managed, and/or controlled their activities.

74. Oksana Mastov ("O. Mastov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Expert Medical Supplies, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

75. Eduard Mergold ("Mergold") is a natural person residing in the State of New York, is a principal, officer, and/or director of Retailer GE Medical Supplies, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

76. Simon Mirakov ("Mirakov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Sky of NY 1 Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

77. Eugene a/k/a Yevgeny Nemets ("Nemets") is a natural person residing in the State of New York, is the principal, officer, and/or director of Longevity Medical Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

78. Sergey Oleynik ("Oleynik") is a natural person residing in the State of New York, a principal, officer, and/or director of Retailer GE Medical Supplies, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

79. Yelena Remarenko ("Remarenko") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Optimus Plus Products Corp., and, at all times relevant herein, operated, managed, and/or controlled its activities.

80. Alexandre Shadmanov ("Shadmanov") is a natural person residing in the State of New York, a principal, officer, and/or director of Retailer Milford Services, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

81. Leonid a/k/a Leanid Starkou ("Starkou") is a natural person residing in the State of New York, is the principal, officer, and/or director of Sheepshead Bay Medical Supply Inc. and

Stark Medical Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled their activities.

82.    Yevsey Tseytelman ("Tseytelman") is a natural person residing in the State of New Jersey, is the principal, officer, and/or director of Retailer Leomax Supplies Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

83.    Roman Tsoyref a/k/a Ronihn Tsoyree ("Tsoyref") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Universal Supply Distribution Corp., and, at all times relevant herein, operated, managed, and/or controlled its activities.

84.    Jelani Wray ("Wray") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Certified Medical Supply, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

85.    Penay Yagudaev ("Yagudaev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer P&D Merchandise Corp., and, at all times relevant herein, operated, managed, and/or controlled its activities.

86.    Oleg Yevdosin ("Yevdosin") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Exon Medical Equipment, Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

87.    Dmytro Zherlitsyn ("Zherlitsyn") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Vsevars Medical Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

88.     Evgeniy Zlatkis ("Zlatkis") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Ezra Supply Inc., and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.**          **The Retailer Defendants**

89.     AllMed Merchandise & Trading, Inc. ("AllMed Merchandise & Trading") was incorporated on October 23, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 58-56 Fresh Pond Road, Maspeth, New York 11378, is operated, managed, and/or controlled by Defendant Katanov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

90.     Certified Medical Supply, Inc. ("Certified Medical Supply") was incorporated on September 19, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 5002 Kings Highway, Brooklyn, New York 11234, is operated, managed, and/or controlled by Defendant Wray and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

91.     E.M.A. Medical Equipment Corp. ("E.M.A. Medical Equipment") was incorporated on March 9, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 71-28 163rd Street, Fresh Meadows, New York 11365. E.M.A. Medical Equipment is operated, managed, and/or controlled by Defendant E. Mastov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

92.     Exon Medical Equipment, Inc. ("Exon Medical Equipment") was incorporated on September 1, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1702 Avenue Z, Suite 101, Brooklyn, New York 11235. Exon Medical Equipment is operated, managed, and/or controlled by Defendant Yevdosin and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

93.     Expert Medical Supplies, Inc. ("Expert Medical Supplies") was incorporated on February 6, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 129-02 Liberty Avenue, Store #6, Richmond Hill, New York 11419. Expert Medical Supplies is operated, managed, and/or controlled by Defendant O. Mastov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

94.     Ezra Supply, Inc. ("Ezra Supply") was incorporated on October 24, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 136-17 Hillside Avenue, Kew Gardens, New York 11418. Ezra Supply is operated, managed, and/or controlled by Defendant Zlatkis and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

95.     GE Medical Supplies, Inc. ("GE Medical Supplies") was incorporated on July 11, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2486 65th Street, Brooklyn, New York 11204. GE Medical Supplies is operated, managed, and/or controlled by Defendants Mergold and

25

Oleynik, and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

96.    Goldstar Equipment, Inc. ("Goldstar Equipment") was incorporated on July 13, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 87-58 Bay 16th Street, Brooklyn, New York 11216. Goldstar Equipment is operated, managed, and/or controlled by Defendant Kohen and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

97.    Heel to Toe Foot Center, LLC ("Heel to Toe Foot Center") was incorporated on March 31, 2006, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 3555 East Tremont Avenue, Bronx, New York 10465. Heel to Toe Foot Center is operated, managed, and/or controlled by Defendant Kalantarov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

98.    Leomax Supplies, Inc. ("Leomax Supplies") was incorporated on June 9, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2661 Coney Island Avenue, Brooklyn, New York 11223. Leomax Supplies is operated, managed, and/or controlled by Defendant Tseytelman and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

99.    Longevity Medical Supply, Inc. ("Longevity Medical Supply") was incorporated on August 31, 2010, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 7323 20th Avenue,

Brooklyn, New York 11204. Longevity Medical Supply is operated, managed, and/or controlled by Defendant Nemets and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

100.   Medasource, Inc. ("Medasource") was incorporated on February 1, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2500 65th Street, Suite 102, Brooklyn, NY 11204. Medasource is operated, managed, and/or controlled by Defendant Levin and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

101.   Medcare Supply, Inc. ("Medcare Supply") was incorporated on August 20, 2008, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 161 Kings Highway, Suite 1, Brooklyn, New York 11223. Medcare Supply is operated, managed, and/or controlled by Defendant Grinberg and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

102.   Medigna, Inc. ("Medigna") was incorporated on January 11, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 622 Avenue X, Brooklyn, New York 11235. Medigna is operated, managed, and/or controlled by Defendant Medvid and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

103.   Milford Services, Inc. ("Milford Services") was incorporated on January 28, 2011, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1708 East 35th Street, Brooklyn, New York

11234. Milford Services is operated, managed, and/or controlled by Defendants Amirova and Shadmanov, and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

104.   Mount Sinai Medical Supply, Inc. ("Mount Sinai Medical Supply") was incorporated on April 25, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 80-10 162 Street, Jamaica, New York 11332. Mount Sinai Medical Supply is operated, managed, and/or controlled by Defendant Davydov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

105.   Myrtle Avenue Trading, LLC ("Myrtle Avenue Trading") was incorporated on March 16, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 76-11 Myrtle Avenue, Glendale, New York 11385. Myrtle Avenue Trading is operated, managed, and/or controlled by Defendant Dekhanov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

106.   Myrtle DME NYC, Inc. ("Myrtle DME NYC") was incorporated on November 8, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 116-11 Myrtle Avenue, Richmond Hill, New York 11418. Myrtle DME NYC is operated, managed, and/or controlled by Defendant Mastov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

107.   Optimus Plus Products Corp. ("Optimus Plus Products") was incorporated on April 3, 2017, and purports to be a retail DME supply company, authorized to do business in the State

of New York, with its principal place of business located at 1820 Avenue M, Suite 648, Brooklyn, New York 11230. Optimus Plus Products is operated, managed, and/or controlled by Defendant Remarenko and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

108.    P&D Merchandise Corp. ("P&D Merchandise") was incorporated on May 2, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 66-18 99th Street, Rego Park, New York 11374. P&D Merchandise is operated, managed, and/or controlled by Defendant Yagudaev and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

109.    Sheepshead Bay Medical Supply, Inc. ("Sheepshead Bay Medical Supply") was incorporated on October 31, 2016, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2626 East 14th Street, Suite 207, Brooklyn, New York 11235. Sheepshead Bay Medical Supply is operated, managed, and/or controlled by Defendant Starkou and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

110.    Sky of NY 1, Inc. ("Sky of NY 1") was incorporated on June 8, 2016 and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 9018 138th Place, Jamaica, New York 11435. Sky of NY 1 is operated, managed, and/or controlled by Defendant Mirakov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

111.    Stark Medical Supply, Inc. ("Stark Medical Supply") was incorporated on March 16, 2017, and purports to be a retail DME supply company, authorized to do business in the State

of New York, with its principal place of business located at 2626 East 14th Street, Brooklyn, New York 11235. Stark Medical Supply is operated, managed, and/or controlled by Defendant Starkou and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

112.  Towers NY, Inc. ("Towers NY") was incorporated on May 26, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 141-04 Rockaway Blvd, Jamaica, New York 11436. Towers NY is operated, managed, and/or controlled by Defendant Malakov and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

113.  Universal Supply Distribution Corp. ("Universal Supply Distribution") was incorporated on February 14, 2017, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 1601 Voorhies Avenue, Brooklyn, New York 11235. Universal Supply Distribution is operated, managed, and/or controlled by Defendant Tsoyref and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

114.  Vsevars Medical Supply, Inc. ("Vsevars Medical Supply") was incorporated on September 11, 2014, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 2167 East 21st Street, Suite 230, Brooklyn, New York 11229. Vsevars Medical Supply is operated, managed, and/or controlled by Defendant Zherlitsyn and submitted fraudulent claims to Plaintiffs seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**D.**     **The John Doe Defendants**

115.     On information and belief, John Does 1 through 20 are the principals, officers, and/or directors of the ABC Corporations 1 through 20. On information and belief, John Doe Defendants 1 through 20, through the ABC Corporations 1 through 20, entered into kickback and/or other financial compensation agreements with the Retailers to provide inexpensive DME and/or orthotic devices and fraudulent wholesale invoices that enabled the Retailers to fraudulently bill Plaintiffs. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.**     **The ABC Corporations**

116.     On information and belief, the ABC Corporations 1 through 20 are corporations that purport to be wholesale DME supply companies that supply the Retailers with basic, inexpensive DME and/or orthotic devices, coupled with fraudulent wholesale invoices that greatly inflate the true cost and/or quantity of the DME and/or orthotic devices actually provided to the Retailers. These wholesale invoices: (i) misrepresent the wholesale prices for the DME and/or orthotic devices purportedly provided; and (ii) intentionally omit any model number, make, manufacturer or other identifiable information so that the Retailers can, in turn, submit the fraudulent wholesale invoices to insurers, including Plaintiffs, in support of their fraudulent claims for reimbursement. These ABC Corporations 1 through 20 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

117.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

118.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

119.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

120.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

121.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

122.    Plaintiffs underwrite automobile insurance in New York State.

123.    As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

124.    On information and belief, the Retailers are ostensibly DME supply companies that bill for medical supplies provided to, among others, individuals covered under the No-fault Law. In exchange for their services, the Retailers accept assignments of benefits from the Claimants covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

125.     To process and verify the claims submitted by the Retailers, Plaintiffs required, and the Retailers submitted, prescriptions and other documents relating to the DME and/or orthotic devices allegedly supplied to No-fault claimants for which the Retailers were seeking reimbursement from Plaintiffs.

126.     In nearly all instances, the prescriptions submitted in support of the Retailers' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

127.     In certain instances, one or more of the Retailer Defendants also submitted wholesale invoices to Plaintiffs in support of their claims for reimbursement, which reflected inflated prices well in excess of what the Retailers actually paid, if anything, for the DME and/or orthotic devices purportedly purchased from the Wholesaler.

128.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process the Retailers' claims within 30 days of receipt of proof of claim.

129.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by the Retailers in support of their claims, and paid the Retailers based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

130.     The No-fault law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendant of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a). For DME and orthotic devices, the Worker's Compensation Board

has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2.

131.    With respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

(1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

(2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2.

132.    On information and belief, the Retailers were created as the centerpieces of elaborate schemes to fraudulently bill No-fault insurance carriers for DME and/or orthotic devices that were never provided, were not provided as billed or, if provided, were either of inferior quality relative to what was included in the bills submitted to Plaintiffs, and/or were otherwise medically unnecessary and provided pursuant to a predetermined course of treatment in which virtually all No-fault Claimants received the same or similar battery of DME and/or orthotic devices.

133.    The DME and/or orthotic devices that the Retailers purported to provide, and for which they billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury. Instead, the Retail Owners, through their respective Retailers, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

134.    On information and belief, the Retail Owners created and controlled the Retailers, which were part of separate, but substantially similar well-organized illegal enterprises that engaged in fundamentally similar, systematic and pervasive fraudulent practices that distinguished them from legitimate providers of DME and/or orthotic devices. The components of each enterprise followed practices that were part of a racketeering scheme dictated by the Retail Owners, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the nature, quality and cost of DME and/or orthotic devices purportedly provided to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided to No-fault claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, misrepresented the wholesale costs and/or usual and customary price of the Non-fee Schedule items purportedly supplied to No-fault Claimants;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices to Plaintiffs as part of their proof of claim, which systematically failed to provide a meaningful description of the DME and/or orthotic devices purportedly provided (*i.e.*, make and model) and/or additional information that is necessary to determine whether the charges submitted are legitimate;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted wholesale invoices to Plaintiffs containing generic item descriptions, concealing the manufacturer, make, model, size and quality of the DME and/or orthotic devices purportedly supplied;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted bills to Plaintiffs reflecting prices far in excess of those actually paid, concealing that the items actually supplied were far less expensive than the amounts indicated in the wholesale invoice for any particular item;

35

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, submitted prescriptions, bills, and delivery receipts to Plaintiffs for DME and/or orthotic devices that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, concealed the fact that the prescription forms submitted in support of their claims for reimbursement were fabricated and/or fraudulently altered/duplicated in order to maximize reimbursement regardless of medical necessity;

- Unlike legitimate retail DME companies, the Retailers, through their Retail Owners and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, arranged for the generic language on the prescription forms in order to unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Allstate in particular;

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, arranged to have prescriptions for DME and/or orthotic devices delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers;

- Unlike legitimate retail DME companies, the Retailers claimed to conduct their daily operations from locations that in some cases had no signage or that were shuttered with no indication that any business was conducted at that location; and/or

- Unlike legitimate retail DME companies, the Retail Owners, through their respective Retailers, entered into illicit relationships with the Wholesale Defendants, which, in exchange for kickbacks and/or a fee, provided the Retailers with wholesale invoices that fraudulently inflated the price, quantity and/or item(s) provided, with the payments relating to such wholesale invoices, in some instances, actually serving as the vehicle through which Defendants laundered the money back to the Retail Owners through the use of check cashing establishments.

36

135.   In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Claimant.

136.   The members of each enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises. By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, the Retail Owners engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their Health Care Practitioners ("HCPs") prescribed large amounts of virtually identical DME and/or orthotic devices to their patient population, and/or (ii) fabricate and/or fraudulently alter/duplicate prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone;

- Entered into kickback or other financial arrangements with No-fault Clinics to ensure that the prescriptions provided were sufficiently generic so that the Retailers could unilaterally determine the DME and/or orthotic devices to be provided to patients and billed to insurers, in general, and Plaintiffs in particular;

- Entered into kickback or other financial arrangements with one or more of the Wholesale Defendants so that they would provide inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Submitted or caused to be submitted, on behalf of the Retailers, numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to many Claimants;

- Submitted or caused to be submitted, on behalf of the Retailers, prescription forms in support of requests for payment for DME and/or orthotic devices, which they knew to be fabricated and/or fraudulently altered/duplicated;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

137.     By way of further example and not limitation, in furtherance of their scheme to defraud, the Wholesale Owners, through the Defendant Wholesalers:

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide inexpensive DME and/or orthotic devices, coupled with wholesale invoices that grossly inflated the cost and/or quantity of the DME and/or orthotic devices reflected therein;

- Entered into kickback arrangements with the Retail Owners, through their respective Retailers, to provide wholesale invoices that were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone; and/or

- Prepared or caused to be prepared fraudulent wholesale invoices and sent them to the Retailers, knowing that the Retailers, in turn, would submit them to insurers in support of fraudulent claims for reimbursement.

138.     By way of further example, in furtherance of the scheme to defraud alleged herein, the Defendant Wholesalers:

- Provided inexpensive DME and/or orthotic devices, along with fraudulent wholesale invoices that grossly inflated the amounts the Retailers paid for the DME and/or orthotic devices;

- Provided generic, non-descript wholesale invoices that deliberately omitted the make, model and/or manufacturer of the DME and/or orthotic devices to ensure that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the item alone;

- Provided the essential means through which the Retail Owners were able to submit fraudulent bills to Plaintiffs for reimbursement of Non-Fee Schedule DME and/or orthotic devices under the No-fault Law;

- Knew or should have known that the inflated costs and/or quantities of the DME and/or orthotic devices reflected in the wholesale invoices they provided were materially misrepresented in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

38

- Knew or should have known that the generic, non-descript wholesale invoices they provided were used to materially misrepresent the nature, cost and quality of the DME and/or orthotic devices reflected in the bills submitted by the Retail Owners, through their respective Retailers, to insurers;

- Converted the checks they received from the Retailers to cash and returned to the Retailers a portion of the profits of the scheme through kickbacks or other financial compensation;

- Were oftentimes shell corporations, with no discernable, formal corporate structure or physical office space; and/or

- Claimed to conduct their daily operations from locations with no signage or that were shuttered with no indication that any business was conducted at that location.

139.    At all relevant times mentioned herein, the Wholesale Owners, either directly or through others acting under and pursuant to their direction, instruction and control, caused fraudulent wholesale invoices to be provided to the Retailers, which they knew or should have known would be used by the Retailers in furtherance of the scheme to defraud alleged herein.

140.    At all relevant times mentioned herein, the fraudulent wholesale invoices issued by the Wholesale Defendants provided the essential means by which the Retail Owners, through their respective Retailers, were able to further the scheme to defraud alleged in this Complaint.

141.    At all relevant times mentioned herein, the Wholesale Owners knew or should have known that the fraudulent wholesale invoices that were provided to the Retailers through the Wholesalers would be used by the Retailers to obtain payment from insurers, in general, and Plaintiffs, in particular, in connection with fraudulent claims.

142.    At all relevant times mentioned herein, the Retail Owners knew that the wholesale invoices provided by the Wholesale Defendants were fraudulent in that they misstated the price, quantity and quality of the DME and/or orthotic devices purportedly sold to the Retailers.

143.    At all relevant times mentioned herein, the Retail Owners, through their respective Retailers, directly or through others acting under and pursuant to their direction, instruction and

39

control, submitted or caused to be submitted the fraudulent wholesale invoices provided by the Wholesale Defendants to Plaintiffs, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

144.    At all relevant times mentioned herein, the Retail Owners and Wholesale Defendants, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

145.    On information and belief, beginning in 2008 and continuing until the present day, Defendants and others not named in the Complaint have engaged in systematic fraudulent billing schemes based upon the alleged provision of DME and/or orthotic devices to No-fault Claimants.

146.    The Retail Owners incorporated, owned and/or controlled their respective Retailers for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

147.    On information and belief, each of the Retailers, through their respective Retail Owners, engaged in virtually identical and parallel schemes to defraud, wherein the Retail Owners: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and submitted to insurers, in general, and Plaintiffs, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered/duplicated; (iv) obtained fraudulently inflated wholesale invoices from the Wholesale Defendants that the Retailers, in turn, would use to substantiate bogus claims for reimbursement of No-fault benefits and/or purchased counterfeit DME and/or orthotic devices from non-party

wholesalers; (v) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Claimants on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (vi) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for DME and/or orthotic devices that were purportedly provided to Claimants based on medical necessity when, in fact, the Retail Owners, through their respective Retailers, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Claimant receiving a substantially similar battery of DME and/or orthotic devices.

148.    Each DME enterprise alleged in this Complaint carried out its scheme to defraud though substantially similar means.

149.    With the DME Retailers in place, Defendants devised and carried out fundamentally identical schemes to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive DME and/or orthotic devices that were never provided, or if provided, were provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, and further, were inexpensive items of inferior quality that cost a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

150.    Regardless of whether a No-fault Claimant was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a No-fault Claimant's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, would issue a prescription for a

standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary.

151.    Such prescriptions are issued for virtually every No-fault Claimant, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

152.    As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with the Retailers, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to the Retailers by: (i) causing their Health Care Practitioners ("HCPs") to write DME prescriptions in accordance with a pre-determined protocol; (ii) fabricating and/or falsifying DME prescriptions by photocopying or duplicating the HCPs' signatures onto new, blank prescription forms, or altering the prescriptions, and filling in the prescription with expensive and unnecessary DME and/or orthotic devices; and/or (iii) ensuring that the prescriptions were sufficiently generic so that the nature, quality and cost of any DME and/or orthotic device could not be verified based on the description of the prescribed item alone.

153.    In furtherance of the scheme to defraud alleged herein, the prescriptions for DME and/or orthotic devices from the No-fault Clinics were forged by the mangers, owners and/or controllers of the Clinic. By way of example and not limitation, Exhibits "5," "6," and "7" in the accompanying Compendium of Exhibits are affidavits executed by three physicians, Azu Ajudua, M.D. ("Ajudua") and Barry Dublin, M.D. ("Dublin") in connection with an action captioned *Government Employees Insurance Co. v. Champ Medical Supply, Inc.*, Docket No. 16-cv-04823 (NG)(SMG) (E.D.N.Y. Aug. 29, 2016), and Shaikh Ahmed, M.D. ("Ahmed"), in connection with an action captioned *Government Employees Insurance Co. v. Lenex Services,* Docket No. 16-cv-

06030 (LDH)(CLP) (E.D.N.Y. Oct. 31, 2016) in which the physicians acknowledge the fraudulent

nature of the prescriptions that were generated by the No-fault Clinics, including the following:

- The purported signatures on the prescription forms submitted to insurers by DME retailers to support their claims are fraudulent, in that they are mere photocopies of the physicians' original signatures, affixed to bogus prescription forms;

- The physicians never prescribed much of the DME that appear on prescription forms with the physicians' signatures, which the DME retailers submitted to insurers in support of claims for reimbursement;

- Prescriptions for one or two DME which were written by the physicians were fraudulently altered, with as many as five to six additional DME added to the original prescription, by someone other than the physician;

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were basic, inexpensive items, not the sophisticated and expensive items the DME retailers purportedly provided, and for which the DME retailers submitted bills and sought reimbursement; and

- The types of equipment the physicians did prescribe for their patients (to the extent they prescribed any DME) were inexpensive, flexible DME and/or orthotics intended to supplement a physical therapy regimen, whereas the devices the DME retailers purportedly provided, and billed for, were expensive, rigid items that would impede the prescribed physical therapy routine.

154. On information and belief, in furtherance of the scheme to defraud alleged herein,

the use of multiple prescriptions bearing identical signatures is not an isolated incident unique to

any one Retailer; rather, multiple Retailers submitted prescriptions to insurers, in general, and

Plaintiffs, in particular, bearing the *same* identical HCP signatures, further evidencing a common

source, blueprint, mechanism, and plan. By way of example and not limitation, Exhibit "8" in the

attached Compendium of Exhibits is a representative sample of prescription forms submitted by

Retailer Defendants Expert Medical Supplies, Ezra Supply, GE Medical Supply, Leomax Supplies,

Longevity Medical Supply, Milford Services, Myrtle Avenue Trading, Myrtle DME NYC,

Sheepshead Bay Medical Supply, and Stark Medical Supply, in support of claims for

reimbursement to Plaintiffs, wherein the HCP signatures on the prescriptions appear to be duplicated and/or photocopied.

155.    In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the No-fault Claimants directly with the prescriptions for DME and/or orthotic devices. Instead, these prescriptions were given directly to the Retailers to eliminate the possibility that the No-fault Claimant(s) would fill the prescription(s) with a legitimate retailer of DME and/or orthotic devices.

156.    In addition to arranging for fraudulent prescriptions, in exchange for kickbacks and/or other financial compensation agreements with the Retailers, one or more No-fault Clinics operating in the New York metropolitan area often directed their HCPs to prescribe DME and/or orthotic devices that are not included in the Fee Schedule, such as bed boards, car seats, EMS Units, infrared heat lamps, hot/cold packs, massagers and whirlpools; and ensured that the prescriptions issued were generic and non-descript, omitting any detailed description of the items to be supplied to the No-fault Claimants.

157.    Similarly, as part of the kickback and/or other financial compensation agreement with the No-fault Clinics, the No-fault Clinics routinely provided the Retailers with generic, non-descript prescriptions for certain Fee Schedule Items, such as back braces, knee braces, shoulder braces, ankle braces, elbow supports, cervical traction units, cervical collars, and lumbar cushions, which the Retailers then used to unilaterally determine the DME provided to Claimants in purported fulfillment of the generic prescriptions, in order to bill for the most expensive type of DME and/or orthotic device and maximize reimbursement from insurers, in general, and Plaintiffs, in particular.

158.    By submitting a generic, non-descript prescription, devoid of any detail, in support of their claims for reimbursement, the Retailers were provided the means through which they misrepresented the nature, quality and cost of the DME and/or orthotic devices allegedly prescribed and provided to No-fault Claimants.

159.    By way of example and not limitation, on information and belief, when a HCP issued a prescription for a "cervical collar," the HCP intended for the Claimant to receive a basic, inexpensive, circular foam collar, which carries a maximum reimbursement rate of $6.80 under the Fee Schedule, using HCPCS Code L0120. Instead, one or more of the Retailers would purport to provide a complex, expensive, hard plastic collar with multiple posts and with occipital and mandibular supports, by billing for such items under HCPCS Code L0180, which carries a maximum reimbursement rate of $233.00.

160.    Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the No-fault Claimants would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

161.    In some instances, the Retailers forged or caused to be forged the No-fault Claimant's signature on the delivery receipt.

162.    In every instance, in furtherance of the scheme to defraud alleged herein, the delivery receipts describe the DME and/or orthotic devices in the same generic, non-descript manner as the prescriptions, claim forms, and wholesale invoices submitted by the Retailers in support of their claims for reimbursement.

163. In furtherance of the scheme to defraud alleged herein, the delivery receipts submitted by the Retailers to Plaintiffs routinely misrepresented the DME and/or orthotic devices provided.

164. On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retail Owners, through the Retailers, purchased inexpensive DME and/or orthotic devices from wholesalers not named as defendants herein that were counterfeit or knockoffs of trademarked items made by other manufacturers. At all relevant times mentioned herein, the Retailers knew that they could purchase the counterfeit items at a fraction of the cost of the actual, trademarked.

165. On information and belief, in furtherance of the scheme to defraud alleged herein, the Retailers purchased the cheap DME and/or orthotic devices in bulk and routinely mispresented the nature, quality and cost of the items in order to fraudulently obtain and maximize their reimbursement far in excess of the amounts they were entitled to receive under the No-fault Law.

166. In other instances, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers entered into agreements with one or more of the Wholesale Defendants whereby the Wholesale Defendants supplied the Retailers with invoices that were used to document false, inflated and outrageous wholesale costs, which one or more of the Retailers then submitted to insurers, in general, and Plaintiffs, in particular, as part of their proof of claim.

167. In furtherance of the scheme to defraud alleged herein, the wholesale invoices provided by the Wholesale Defendants to the Retailers included artificially high prices that exceeded the actual wholesale price of the DME and/or orthotic devices reflected therein.

168.    To the extent the Retailers provided any DME and/or orthotic devices to No-fault Claimants, the DME and/or orthotic devices were inexpensive items that were materially misrepresented in the wholesale invoices received from the Wholesale Defendants.

169.    The wholesale invoices provided by the Wholesale Defendants to the Retailers reflected grossly inflated prices, in excess of 10 times the actual prices that the Retailers paid for the DME and/or orthotic devices when they were actually provided.

170.    In furtherance of the scheme to defraud alleged herein, each of the wholesale invoices provided by the Wholesale Defendants to the Retailers intentionally omitted the make, model, or manufacturer of the DME and/or orthotic devices reflected in the invoice, thereby ensuring that the nature and quality of the item that was supposedly provided could not be verified based on the wholesale invoice alone.

171.    In some instances, on information and belief, the DME and/or orthotic devices reflected in the wholesale invoices provided by the Wholesale Defendants to the Retailers were never actually provided to the Retailers; rather, the Wholesale Defendants created and provided the wholesale invoices to the Retailers to create the illusion of a sale.

172.    On information and belief, the wholesale invoices were provided to one or more of the Retailers to camouflage the conversion of the Retailers' checks payable to the Wholesale Defendants, which the Wholesale Defendants cashed at check cashing establishments or through other means.

173.    On information and belief, one or more of the Retailers would issue checks to the Wholesale Defendants for the full amount of the inflated wholesale invoice. The Wholesale Defendants would then convert the checks to cash through check cashing establishments, or by

other means, and would return a substantial portion of the money to the Retailers, keeping a portion of the profits of the scheme for themselves.

174.    On information and belief, in furtherance of the scheme to defraud alleged herein, one or more of the Retailers requested that the Wholesale Defendants have their checks cashed on their corporate accounts to fraudulently demonstrate to insurers, such as Plaintiffs, that they paid for the wholesale items when, in fact, they did not.

175.    In furtherance of the scheme to defraud alleged herein, one or more of the Retailers routinely submitted fraudulent documents, including, but not limited to, claim forms, prescriptions, delivery receipts, and wholesale invoices that materially misrepresented the nature, quality and cost of the DME and/or orthotic devices purportedly provided to No-fault Claimants.

176.    The Wholesale Defendants and No-fault Clinics provided the means through which the Defendants were able to execute their scheme to defraud.

177.    In every instance, the wholesale invoices and prescriptions were provided with the knowledge that they would be submitted to insurers, in general, and Plaintiffs, in particular, to obtain reimbursement under the No-fault Law in excess of the actual permissible charge for the DME and/or orthotic devices purportedly provided.

178.    In furtherance of the scheme to defraud alleged herein, the Retailers routinely submitted fraudulent bills seeking the maximum possible amount of reimbursement under the No-fault law for expensive DME and/or orthotic devices that were never actually provided or not provided as billed and/or, if provided, provided pursuant to a predetermined course of treatment, without regard to medical necessity.

179.    In many cases, the Retailers never actually provided the DME for which they billed Plaintiffs.

48

180. In furtherance of the scheme to defraud alleged herein, like the wholesale invoices, the Retailers' bills intentionally omitted the make, model and manufacturer of the DME and/or orthotic devices purportedly provided to No-fault Claimants in order to conceal the fact that the DME and/or orthotic devices purportedly provided were inexpensive and of poor quality, to the extent they were provided at all.

181. In furtherance of the scheme to defraud alleged herein, upon receiving the wholesale invoices from the Wholesale Defendants and/or other suppliers, the Retailers, as a matter of pattern and practice, generated and submitted bills to Plaintiffs knowingly misrepresenting the type, quality, and cost of DME and/or orthotic devices purportedly purchased from the Wholesalers and provided to Claimants.

182. By way of example and not limitation, and as set forth in the "Non-Fee Schedule Scheme to Defraud" section below, nearly all the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule items wherein the Retailers misrepresented that: (i) certain DME and/or orthotic devices were reimbursable under the relevant Fee Schedule in existence at the time when, in fact, the Retailers were utilizing the exact same phantom codes for which there was no published fee schedule; (ii) the charges reflected on the Retailers' bills for Non-Fee Schedule items were the lesser of their acquisition costs or the usual and customary prices charged to the general public; and/or (iii) the Fee Schedule codes and descriptions contained in the Retailers' bills corresponded with the equipment purportedly provided.

183. In addition, as set forth in the "Fee Schedule Scheme to Defraud" section below, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills to Plaintiffs (i) in support of expensive custom-fabricated DME and/or orthotic devices, such as

49

LSOs, knee, shoulder, and hand braces that were never provided; (ii) in support of expensive DME and/or orthotic devices that required a customized fitting that they never performed; and/or (iii) which sought reimbursement rates under expensive fee schedule codes for DME and/or orthotic devices that the Retailer never actually provided.

184.    In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, virtually every bill submitted by the Retailers deliberately obscured all identifying information relating to the billed-for DME and/or orthotic devices so as to prevent Plaintiffs from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME and/or orthotic device was medically necessary.

185.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, such as LSOs, knee, shoulder, and hand braces that were never provided. In other instances, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive DME and/or orthotic devices that required a custom fitting and/or adjustment which they never performed. By way of example and not limitation, Exhibit "9" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims in which one or more of the Retail Owners, through their respective Retailers, billed for expensive custom fabricated DME and/or orthotic devices that were never provided. In addition, Exhibit "10" in the accompanying Compendium of Exhibits is a representative sample of claims in which one or more of the Retail Owners, through their respective Retailers, billed for supports and/or braces that required fittings and adjustments which they never performed.

186.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## THE NON-FEE SCHEDULE SCHEME TO DEFRAUD

**1.     Fraudulent Billing Under Phantom Codes Not Recognized in the Fee Schedule**

187.     In furtherance of the scheme to defraud alleged herein, one or more of the Retail Owners, through their respective Retailers, including, but not limited to, AllMed Merchandise & Trading, E.M.A. Medical Equipment, Expert Medical Supplies, Ezra Supply, Heel to Toe Foot Center, Leomax Supplies, Longevity Medical Supply, Medasource, Medigna, Millford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, Optimus Plus Products, P&D Merchandise, Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, Towers NY, Universal Supply Distribution, and Vsevars Medical Supply, routinely submitted bills for Non-Fee Schedule items, wherein they misrepresented that those items were reimbursable under the Fee Schedule when, in fact, they were utilizing exact same phantom codes for the same items that were not listed on the relevant Fee Schedule in existence at the time. *See* Exhibit "2."

188.     By way of example and not limitation one or more of the Retail Owners, through their respective Retailers, including, but not limited to E.M.A. Medical Equipment, Expert Medical Supplies, Ezra Supply, Leomax Supplies, Longevity Medical Supply, Medasource, Medigna, Millford Services, Mount Sinai Medical Supply, Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, and Universal Supply Distribution, routinely submitted bills to Plaintiffs for "Heat Lamp, with stand, includes bulb, or infrared element" using phantom code E0205**,**

respectively, which are not recognized in the Fee Schedule, in amounts ranging from $55.00 to $420.24, notwithstanding that, to the extent any DME was provided, the infrared heat lamps purportedly provided were actually cheap, hand held heat lamps, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $20.00. Exhibit "11" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs wherein the above listed Retailers submitted fraudulent bills for a heat lamp unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

189.    By billing under the same phantom codes for the heat lamp units one or more of the Retail Owners, through their respective Retailers, billed and were paid far more than what they would have otherwise have been entitled to receive, if anything, under the No-fault Law.

190.    By way of further example and not limitation, one or more of the Retail Owners, through their respective Retailers, including, but not limited to Ezra Supply, Leomax Supplies, Longevity Medical Supply, Medasource, and Optimus Plus Products, routinely submitted bills to Plaintiffs for "portable (overtub type)" "whirlpools," using phantom code E1300, which was not recognized under the relevant Fee Schedule in existence at the time, in amounts ranging from $100.00 to $498.11, notwithstanding that, to the extent anything was provided, the whirlpools are inexpensive "jet spas," for which the usual and customary price charged to the general public is no more than $40.00. Exhibit "12" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs wherein the above-listed Retailers submitted fraudulent bills for whirlpools using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

191.    By billing under the same phantom code for the whirlpools, one or more of the Retail Owners through their respective Retailers, billed and were paid far more than they would have otherwise have been entitled to receive, if anything, under the No-fault Law.

192.    Separate and apart from billing for the same heat lamps and whirlpools under the same phantom codes not recognized under the Fee Schedule, one or more of the Retail Owners, through their respective Retailers, routinely submitted bills for other Non-Fee Schedule items using the same phantom codes in which they materially misrepresented that the items were reimbursable under the relevant Fee Schedule in existence at the time and the amount they were entitled to receive. By way of example and not limitation:

- The Retail Owners, through their respective Retailers, including but not limited to Expert Medical Supplies, Ezra Supply, Longevity Medical Supply, Medigna, Mount Sinai Medical Supply, Optimus Plus Products, Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, Towers NY, and Universal Supply Distribution, routinely submitted bills to Plaintiffs for "Water Circulating Heat Pad with Pump" units using phantom code E0217, in amounts ranging from $125.00 to $488.00 notwithstanding that, to the extent anything was provided, the water circulating units were cheap aqua relief systems reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $200.00. Exhibit "13" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for a water circulation unit using a phantom code not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Longevity Medical Supply, Medasource, Medigna, Milford Services, Optimus Plus Products, Sheepshead Bay Medical Supply, Stark Medical Supply, and Vsevars Medical Supply, routinely submitted bills to Plaintiffs for TENS/EMS units and/or EMS Units with accessory kits, using phantom codes E0744, E0745, and E0762, in amounts ranging from $100.00 to $535.26 notwithstanding that, to the extent anything was provided, the stimulator units are actually cheap "digital therapy machines" and/or TENS/EMS units, reimbursable, if at all, as Non-Fee Schedule items, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "14" in

53

the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for stimulator units using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to Milford Services, Optimus Plus Products, Towers NY, and Vsevars Medical Supply, routinely submitted bills to Plaintiffs for "TENS/EMS Placement Belts" and/or "TENS Unit Belts" in amounts ranging from $66.00 to $318.34 using phantom code E0731, notwithstanding that, to the extent any DME was provided, the belts were thin cloth wraps lacking electrode pads, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $15.00. Exhibit "15" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for EMS/TENS placement belts using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- The Retail Owners, through their respective Retailers, including but not limited to P&D Merchandise, Sheepshead Bay Medical Supply, and Stark Medical Supply, routinely submitted bills to Plaintiffs for "Bed Boards" in amounts ranging from $51.00 to $101.85 using phantom code E0273, notwithstanding that, to the extent any DME was provided, the bed board purportedly supplied was an inexpensive, thin piece of foldable cardboard or other material, reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $30.00. Exhibit "16" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for bed boards using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

- Kalantarov, through Heel to Toe Foot Center, routinely submitted bills to Plaintiffs for continuous passive motion machines ("CPM machines") in amounts ranging from $105.00 to $3,150.00 using phantom codes E0935 and E0936, notwithstanding that, to the extent any DME was provided, the amounts charged far exceeded the amounts they were allowed to submit for reimbursement. Exhibit "17" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for CPM machines using the same phantom codes not recognized under the relevant Fee Schedule in existence at the time.

54

193. By submitting to Plaintiffs bills that contained the exact same phantom codes not recognized under the relevant Fee Schedule in existence at the time, the Retail Owners, through their respective Retailers, deliberately misrepresented that their bills reflected either a reimbursement amount set by the Fee Schedule, or alternatively that their bills reflected the lesser of their acquisition cost plus 50%, or the usual and customary price for the public, when in reality, to the extent anything was provided, the items did not have a Fee Schedule code and the Retail Owners, through their respective Retailers, were entitled to receive only a fraction of the amount reflected in their bills.

194. Consequently, by submitting to Plaintiffs bills that contained the exact same phantom codes not recognized under the relevant Fee Schedule in existence at the time for the same items, the Retail Owners, through their respective Retailers, uniformly, deliberately and materially misrepresented the amounts that they were entitled to receive and deceived Plaintiffs, among others, into paying many times over what the No-fault Law would have otherwise allowed for medically necessary DME and/or orthotic devices.

195. In addition to containing phantom codes that are not recognized under the relevant Fee Schedule in existence at the time, the Retailers' bills routinely contained grossly inflated charges, supported by fraudulent wholesale invoices, where any wholesale invoices were supplied at all, for DME and/or orthotic devices that were inexpensive and of poor quality.

**2.      Fraudulent Billing Using Code 1399 for Miscellaneous DME Items**

196. In furtherance of the scheme to defraud alleged herein, many of the Retail Owners, through their respective Retailers, including, but not limited to, E.M.A. Medical Equipment, Expert Medical Supplies, Ezra Supply, Leomax Supplies, Longevity Medical Supply, Medasource, Medigna, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME

NYC, Optimus Plus Products, P&D Merchandise, Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, Towers NY, Universal Supply Distribution, and Vsevars Medical Supply Inc, routinely submitted bills for Non-Fee Schedule items using Fee Schedule code E1399, and in some instances codes A4649 and A9999, which are reserved for miscellaneous items, and in doing so, they fraudulently misrepresented the nature and quality of the billed-for DME and/or orthotic devices and their acquisition costs. Exhibit "18" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for Non-Fee Schedule items using Fee Schedule Code E1399.

197.    By way of example and not limitation, the Retail Owners, through their respective Retailers, including E.M.A. Medical Equipment, Expert Medical Supplies, Ezra Supply, Leomax Supplies, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Optimus Plus Products, P&D Merchandise, Sky of NY 1, Towers NY, Universal Supply Distribution, and Vsevars Medical Supply, routinely submitted bills to Plaintiffs for massagers using code E1399, in amounts ranging from $80.00 to $283.50, falsely representing that the amount billed is the lesser of the usual and customary price charged to the general public or the Retailer's acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the massagers were simple, hand-held massagers for which the usual and customary price charged to the general public did not exceed $30.00. Exhibit "19" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for massagers using Fee Schedule Code E1399.

198.    By way of further example and not limitation:

- The Retail Owners, through their respective Retailers, including, but not limited to, E.M.A. Medical Equipment, Medasource, Medigna, Mount Sinai Medical Supply, Towers NY, and Universal Supply Distribution, routinely submitted bills to Plaintiffs for hydrotherapy

whirlpools using codes E1399 and/or A9999, in amounts ranging from $211.50 to $479.99, falsely representing that this amount was the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the whirlpools are inexpensive "jet spas," reimbursable, if at all, as a Non-Fee Schedule item, for which the usual and customary price charged to the general public is no more than $40.00. Exhibit "20" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for hydrotherapy whirlpools using Fee Schedule Codes E1399 and/or A9999.

- The Retail Owners, through their respective Retailers, including, but not limited to, Expert Medical Supplies, Longevity Medical Supply, Mount Sinai Medical Supply, and Sky of NY 1, routinely submitted bills to Plaintiffs for lumbar and/or general use cushions using codes E1399 and/or A4649 in amounts ranging from $27.04 to $55.29, falsely representing that these amounts were the lesser of the usual and customary prices charged to the public or the Retailers' acquisition cost plus 50%, when, on information and belief, to the extent anything was provided, the lumbar cushions purportedly supplied were inexpensive cushions for which the usual and customary price charged to the general public is not more than $16.00. Exhibit "21" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which the above listed Retailers submitted fraudulent bills for lumbar and/or general use cushions using Fee Schedule Codes E1399 and/or A4649.

## 3.    Fraudulent Billing of Non-Fee Schedule Items under Fee Schedule Codes

199.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for Non-Fee Schedule Items using codes reserved for Fee Schedule Items in order to maximize the fraudulent charges they could submit to Plaintiffs, despite the fact that they never provided the billed-for items. By way of example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AllMed Merchandise & Trading, Exon Medical Equipment, Expert Medical Supplies, Ezra Supply, Longevity Medical Supply, Medasource, Medigna, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Optimus Plus Products, P&D Merchandise,

57

Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, Towers NY, and Universal Supply Distribution, routinely submitted bills to Plaintiffs for "egg crate mattresses," a Non-Fee Schedule Item which is nothing more than a thin, foam mattress *pad*, using the Fee Schedule code E0272, which is reserved for a "Foam Rubber Mattress," reimbursable in the maximum amount ranging from $97.50 to $155.67 (depending on the year the DME was provided), and/or Fee Schedule code E0184, which is reserved for a "Dry Pressure Mattress," reimbursable in the maximum amount of $153.13.

200. The Retailers never provided a Foam Rubber mattress to any No-fault Claimant.

201. The Retailers never provided a Dry Pressure Mattress to any No-fault Claimant.

202. To the extent any DME and/or orthotic device was provided, the Retailers provided simple bubble mattress pads, which they described as "egg crate mattresses," for which the usual and customary price charged to the general public did not exceed $25.00.

203. By submitting bills using codes E0272 and/or E0184, the Retail Owners, through their respective Retailers, materially misrepresented that they provided Foam Rubber or Dry Pressure mattresses, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts far greater than what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "22" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for egg crate mattresses by billing for the Non-Fee Schedule DME under a Fee Schedule code.

204. By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to Expert Medical Supplies, Ezra Supply, Medasource, Medigna, Mount Sinai Medical Supply, Myrtle Avenue Trading, Optimus Plus

Products, Sky of NY 1, Towers NY, and Universal Supply Distribution, routinely submitted bills to Plaintiffs for "bed boards," which is a Non-Fee Schedule item, using Fee Schedule code E0274, which is reserved for an Overbed Table—an item that is customarily used in conjunction with a hospital bed—reimbursable in the maximum amount of $101.85.

205.    The Retailers never provided an Overbed Table to any No-fault Claimant.

206.    To the extent any DME and/or orthotic device was provided, the Retailers provided inexpensive, thin pieces of foldable cardboard or other material, which they described as "bed boards," for which the usual and customary price charged to the general public did not exceed $30.00.

207.    By submitting bills using code E0274, the Retail Owners, through their respective Retailers, materially misrepresented that they provided Overbed Tables, when they did not, and also materially misrepresented that the item purportedly provided was a Fee Schedule item, seeking reimbursement in amounts far greater than what would otherwise have been a permissible charge for the Non-Fee Schedule item. Exhibit "23" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs in which one or more of the Retailers submitted fraudulent bills for bed boards by billing for the non-Fee Schedule DME under a Fee Schedule code.

## FEE SCHEDULE SCHEME TO DEFRAUD

**1.    Fraudulent Billing for Custom Fabricated or Custom Fit DME and/or Orthotic Devices.**

208.    The term "custom-made" and/or "custom-fabricated" as used in the New York State Medicaid Fee Schedule refers to any DME, orthopedic footwear, orthotics or prosthetics fabricated solely for a particular person from mainly raw materials that cannot be readily changed to conform

to another person's needs. *See* Durable Medical Equipment, Orthotics, Prosthetics and Supplies Policy Guidelines, New York State Department of Health (Jul. 1, 2016), at 3.

209.    Raw materials are used to create custom-made DME, orthopedic footwear, orthotics or prosthetics based on a particular person's measurements, tracings and patterns. *Id.*

210.    To bill under any Fee Schedule code reserved for custom-made DME and/or orthotic devices, a retailer is required to measure the recipient of the items and fabricate the custom-made item based on those measurements. *Id.*

211.    In furtherance of the scheme to defraud, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive custom fabricated DME and/or orthotic devices, despite the fact that, to the extent anything was provided, the DME and/or orthotic devices were cheap, one-size-fits-all items that were not custom fabricated to the Claimants' measurements.

212.    In addition to submitting bills for custom fabricated devices that were never provided, the Retail Owners, through their respective Retailers, routinely submitted fraudulent bills in support of expensive pre-fabricated DME and/or orthotic devices that required a fitting and adjustment in which the device has been trimmed, bent, molded, assembled, adjusted, modified, or otherwise customized to fit a specific patient by an individual with expertise, which they never provided. *See id.* at 3, *see also* Durable Medical Equipment, Orthotics, Procedure Codes and Coverage Guidelines, New York State Department of Health (Sep. 1, 2018), at 120.

213.    In furtherance of the scheme to defraud, the Retailers routinely include measurement sheets with the bills submitted to Plaintiffs in an effort to create the illusion that a customized fitting was conducted for the Claimant in connection with providing the custom fabricated or pre-fabricated item.

214.    On information and belief, the measurements were, in many cases, never performed and/or unnecessary as the fabrication or fitting required under the Fee Schedule code was never done.

215.    On information and belief, the Retailers created and included the measurement sheets with their bill submissions for the purpose of creating a fraudulent justification for billing under Fee Schedule codes with expensive reimbursement rates when, in fact, the requirements for reimbursement under such codes were never met. By way of example and not limitation, Defendants AllMed Merchandise & Trading, Certified Medical Supply, E.M.A. Medical Equipment, Exon Medical Equipment, Expert Medical Supplies, Ezra Supply, GE Medical Supplies, Goldstar Equipment, Heel to Toe Foot Center, Longevity Medical Supply, Medasource, Medcare Supply, Medigna, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, Optimus Plus Products, P&D Merchandise, Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, Towers NY, and Universal Supply Distribution routinely bill under codes requiring a customized fitting, but never perform any customization.

216.    By way of example and not limitation, under the relevant Fee Schedule in existence at the time, the permissible charges for lumbosacral orthoses ("LSOs") range from $43.27, under code L0625 for basic, prefabricated LSOs that require a customized fitting, to $1,150.00 under code L0632 for more complex LSOs that are custom fabricated.

217.    In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for LSOs, the Retail Owners, through their respective Retailers, including but not limited to Certified Medical Supply, Ezra Supply, Optimus Plus Products, Sky of NY 1, Universal Supply Distribution, and Vsevars Medical Supply, routinely submitted fraudulent bills for LSOs using codes L0629, L0632,

61

and/or L0634, which are reserved for more complex custom fabricated DME and/or orthotic devices, which they did not provide. Exhibit "24" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for LSOs using codes L0629, L0632, and/or L0634.

218.    By billing LSOs under codes L0629, L0632, and/or L0634, the Retail Owners, through their respective Retailers, falsely represented that they measured and/or customized the DME and/or orthotic device for the No-fault Claimant, when they did not, and/or that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimants' measurements, tracings and patterns, which they did not.

219.    Separate and apart from billing for custom fabricated LSOs, the Retail Owners, through their respective Retailers, including but not limited to AllMed Merchandise & Trading, Certified Medical Supply, E.M.A. Medical Equipment, Expert Medical Supplies, GE Medical Supplies, Goldstar Equipment, Heel to Toe Foot Center, Longevity Medical Supply, Medasource, Medigna, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, P&D Merchandise, Sheepshead Bay Medical Supply, Stark Medical Supply, Towers NY, and Universal Supply Distribution, routinely submitted bills for LSOs using codes reserved for prefabricated DME and/or orthotic devices that require a customized fitting, including, but not limited to, L0627, L0630, L0631, L0633, and/or L0637, notwithstanding that a customized fitting was never performed. Exhibit "25" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for LSOs using codes L0627, L0630, L0631, L0633, and/or L0637.

220. To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all LSOs for which no customized fitting was ever performed.

221. Under the relevant Fee Schedule in existence at the time, the permissible charges for knee braces range from $65.00, under code L1830, for a prefabricated knee brace that requires a customized fitting, to $1,107.70, under code L1844, for more complex models that are custom fabricated.

222. The Retail Owners, through their respective Retailers, including but not limited to E.M.A. Medical Equipment, Exon Medical Equipment, Expert Medical Supplies, GE Medical Supplies, Heel to Toe Foot Center, Longevity Medical Supply, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, Optimus Plus Products, P&D Merchandise, Sheepshead Bay Medical Supply, Stark Medical Supply, and Universal Supply Distribution, routinely submitted bills for knee braces using codes L1810, L1820, L1831, L1832, and/or L1844, which are reserved for prefabricated DME and/or orthotic devices that require a customized fitting, which was never performed, or for custom fabricated knee braces that were never supplied. By way of example and not limitation, Exhibit "26" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for knee braces using codes L1810, L1820, L1831, L1832, and/or L1844.

223. To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all knee braces, which were not custom made to the Claimants' measurements and for which no customized fitting was ever performed.

224.     Under the relevant Fee Schedule in existence at the time, the permissible charges for a shoulder support range from $40.00, under code L3650, for a prefabricated shoulder support that requires a customized fitting, to $896.92, under code L3674, for more complex custom fabricated DME and/or orthotic devices.

225.     In furtherance of the scheme to defraud, and to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including but not limited to Leomax Supplies, Optimus Plus Products, and Universal Supply Distribution, routinely submitted fraudulent bills for shoulder supports using code L3674, which is reserved for more complex custom fabricated DME and/or orthotic devices, which were not provided. Exhibit "27" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for shoulder supports using code L3674.

226.     By billing shoulder supports under codes L3674, the Retail Owners, through their respective Retailers, falsely represented that they measured and/or customized the DME and/or orthotic device for the No-fault Claimant, when they did not; and/or that they fabricated the DME and/or orthotic device solely for a particular No-fault Claimant from mainly raw materials based on the No-fault Claimant's measurements, tracings and patterns, which they did not do.

227.     Separate and apart from billing for custom fabricated shoulder supports, to ensure they received the maximum reimbursement permitted under the relevant Fee Schedule in existence at the time for shoulder supports, the Retail Owners, through their respective Retailers, including but not limited to E.M.A. Medical Equipment, Goldstar Equipment, Longevity Medical Supply, Mount Sinai Medical Supply, and Myrtle Avenue Trading, routinely submitted fraudulent bills for

64

shoulder supports using codes L3960 and/or L3962 notwithstanding that a customized fitting was never performed. Exhibit "28" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for shoulder supports using codes L3960 and/or L3962.

228.    To the extent any DME and/or orthotic devices were provided, the Retail Owners, through their respective Retailers, provided cheap, one-size-fits-all shoulder supports for which no customized fitting was ever performed.

## 2.    Fraudulent Billing of Cervical Traction Units

229.    The Retailers, including but not limited to AllMed Merchandise & Trading, E.M.A. Medical Equipment, Expert Medical Supplies, Ezra Supply, GE Medical Supplies, Goldstar Equipment, Heel to Toe Foot Center, Longevity Medical Supply, Medigna, Milford Services, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, Optimus Plus Products, Sheepshead Bay Medical Supply, Stark Medical Supply, and Towers NY, routinely submitted fraudulent bills to Plaintiffs for cervical traction units under Fee Schedule Codes E0855 and/or E0849.

230.    On information and belief, the cervical traction units purportedly provided by the Retailers are inexpensive replicas or knockoffs of a trademarked cervical traction unit (the "Posture Pump") manufactured and sold by Posture Pro, Inc., and/or other suppliers, with a wholesale price that is a fraction of the cost associated with the authentic device. By way of example and not limitation, Exhibit "29" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where the Retailers submitted fraudulent bills for a cervical traction device.

231.    In particular, the cervical traction units provided by Retailers AllMed Merchandise & Trading, E.M.A. Medical Equipment, Expert Medical Supplies, GE Medical Supplies, Longevity Medical Supply, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, and Sheepshead Bay Medical Supply are replicas or "knockoffs" of the Posture Pump, which were sold and distributed to the Retailers by Comfortland Medical. Inc. ("Comfortland"), under the brand name Comfortmax Cervical Hometrac.

232.    On or about August 15, 2013, Comfortland was sued for patent infringement of the Posture Pump in the matter of *Posture Pro, Inc. v. Comfortland Medical, Inc.*, 13-cv-1252 (JVS) (AN) (hereinafter the "Comfortland Action"), for distributing a knockoff of the Posture Pump cervical traction unit under its Comfortmax Cervical Hometrac brand, which was of inferior quality to the Posture Pump model and which infringed upon the patent held by Posture Pro.

233.    Retailers AllMed Merchandise & Trading, E.M.A. Medical Equipment, Expert Medical Supplies, GE Medical Supplies, Longevity Medical Supply, Mount Sinai Medical Supply, Myrtle Avenue Trading, Myrtle DME NYC, and Sheepshead Bay Medical Supply purchased the Comfortmax or similar unit from Comfortland, and continue to supply the knockoff device(s) and bill insurers, including Plaintiffs. By way of example and not limitation, Exhibit "30" in the accompanying Compendium of Exhibits is a representative sample of claims submitted to one or more Plaintiffs where the above listed Retailers submitted fraudulent bills for Comfortmax cervical traction devices.

234.    On information and belief, to the extent the Retailers provided a cervical traction unit purportedly trademarked and/or manufactured by Posture Pro, the legitimate acquisition cost of such item is $65.00.

235.    In each of the foregoing bills in Exhibits "29" and "30," to the extent anything was supplied to No-fault Claimants at all, the Retailers provided basic, inexpensive cervical traction units pursuant to a predetermined course of treatment, regardless of medical necessity and misrepresented the nature, quality and cost of the items in each of the bills submitted to Plaintiffs.

236.    By billing cervical traction units under codes E0855 and E0849, the Retail Owners, through their respective Retailers, falsely represented that they provided expensive, medically necessary cervical traction units when in actuality they provided cheap, inexpensive items that in many cases were replicas or knockoffs of trademarked items.

## 3.    Fraudulent Billing for DME and/or Orthotic Devices Not Provided

237.    In furtherance of the scheme to defraud alleged herein, the Retail Owners, through their respective Retailers, routinely submitted bills to Plaintiffs for DME and/or orthotic devices that were never provided.

238.    By way of example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to AllMed Merchandise & Trading, Exon Medical Equipment, Expert Medical Supplies, Ezra Supply, Longevity Medical Supply, Medasource, Mount Sinai Medical Supply, Myrtle Avenue Trading, P&D Merchandise, Sheepshead Bay Medical Supply, Sky of NY 1, Stark Medical Supply, and Towers NY, and Universal Supply Distribution, routinely submitted bills to Plaintiffs for cervical collars under codes L0172, L0174, and L0180 in amounts up to and including $466.00, which were not provided as billed, if any were provided at all. By way of example and not limitation, Exhibit "31" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for cervical collars under codes L0172, L0174, and/or L0180 in amounts ranging from $75.00 to $466.00.

239.     Under the relevant Fee Schedule in existence at the time, the permissible charges for cervical collars range from $6.80, under code L0120 for basic, flexible, foam collars, to $322.50, under code L0200, for more complex cervical collars with occipital and mandibular supports meant for patients with severe neck injuries.

240.     To the extent any DME and/or orthotic device was provided, the Retail Owners, through their respective Retailers, provided basic, inexpensive collars that were not medically necessary, inappropriate for the patient and not prescribed by the physician, which should have been billed, if at all, for $6.80 under code L0120.

241.     By billing for cheap, inexpensive foam cervical collars under codes L0172, L0174, and L0180, the Retail Owners, through their respective Retailers, falsely represented that they provided semi-rigid, thermoplastic, two-piece collars, and/or other complex, medically necessary collars, when they did not.

242.     By way of further example and not limitation, the Retail Owners, through their respective Retailers, including but not limited to Medasource, Medigna, Milford Services, Myrtle Avenue Trading, Optimus Plus Products, Sheepshead Bay Medical Supply, and Stark Medical Supply, routinely submitted fraudulent bills to Plaintiffs seeking reimbursement for "lumbar cushions" using codes E2602, E2611, and E2612 in amounts up to and including $609.75, which they did not provide as billed, if anything was provided at all. Exhibit "32" in the accompanying Compendium of Exhibits is a representative sample of claims paid by one or more Plaintiffs where one or more of the Retailers submitted fraudulent bills for lumbar cushions under codes E2602, E2611, and E2612 in amounts ranging from $107.95 to $609.75.

243.     Under the relevant Fee Schedule in existence at the time, codes E2602, E2611, and E2612 are reserved for DME satisfying the description of "Wheelchair Back Cushion,"

68

"Wheelchair Seat Cushion," and/or other wheelchair accessories, and are specifically reserved for support used in connection with a wheelchair.

244. None of the No-fault Claimants who purportedly received a lumbar cushion or replacement cushion cover from one or more of the Retailers, billed under codes E2602, E2611, and E2612 was wheelchair bound.

245. To the extent any DME and/or orthotic device was provided, the lumbar cushions were not specialized wheelchair cushions, but rather simple back cushions for use in any chair that would otherwise be reimbursable under code E0190 at $22.04.

246. By billing lumbar cushions under codes E2602, E2611, and E2612, the Retail Owners, through their respective Retailers, falsely represented that they provided specialized wheelchair cushions and/or covers, when they did not.

## MONEY LAUNDERING SCHEME

247. Defendants knew that the money paid by insurers, in general, and Plaintiffs, in particular, to the Retailers represented the proceeds and profits of their unlawful activity.

248. To ensure that they would ultimately receive their ill-gotten gains, on information and belief, one or more of the Defendants engaged in a complex check cashing and/or money laundering scheme in furtherance of the scheme to defraud.

249. These covert transactions were facilitated through various clandestine arrangements among one or more of the Retail Defendants, Wholesale Defendants, check brokers (who acted as intermediaries between the check cashers and the Retail and Wholesale Defendants in order to conceal the true beneficiaries of the transactions) and check cashers.

250. As described herein, on information and belief, the Defendant Retailers and Defendant Wholesalers generated significant amounts of cash through transactions with check

69

cashers and/or other financial arrangements. This cash was used to facilitate, among other things: (i) the secret cash kickback arrangements between the Defendant Retailers and Wholesale Defendants that were essential to foster the illusion that the Retailers actually paid the inflated amounts for DME and/or orthotic devices reflected on the wholesale invoices; (ii) the secret cash kickback arrangements between the Defendant Retailers and No-fault Clinics, which were necessary to induce the clinics to supply the Defendant Retailers with prescriptions for bogus DME and/or orthotic devices; and (iii) the Defendant Retailers' and Defendant Wholesalers' transactions, which were intentionally disguised as business expenses in order evade corporate tax liabilities through false deductions and/or the under reporting of income, thereby maximizing the Defendants' profits from, and enhancing their incentives to continue, the fraudulent activities described herein.

251.    As part of the scheme, one or more of the Defendants routinely presented numerous checks to check cashers that were structured in amounts slightly under the $10,000 floor that would have triggered compulsory reporting to the government. These checks were: (i) payable to entities that maintained bank accounts, but had no apparent business or lawful purpose; (ii) payable to fictitious payees intended to conceal the true beneficiaries of the transactions; and/or (iii) presented by "brokers" who acted as intermediaries between the check cashers, Retailers and Wholesale Defendants in order to conceal the true beneficiaries of the transactions.

252.    On information and belief, in exchange for a nominal fee, nearly all of the cash generated by the check cashing transactions involving the Wholesale Defendants was returned to the Retailers. In particular, in furtherance of the scheme to defraud, to create the illusion that the Retailers paid the grossly inflated prices on the invoices provided by the Wholesale Defendants, the Retailers issued checks to the Wholesale Defendants, among others, for the full amounts

reflected on the wholesale invoice(s). The Retailers used those checks to demonstrate to Plaintiffs, and others, that they paid the false wholesale invoice amounts and used the returned cash to pay kickbacks to, among others, the clinics that issued fraudulent and/or forged prescriptions for DME.

253.    In reality, on information and belief, the Wholesale Defendants converted the checks they received from the Retailers to cash and secretly returned cash to the Retailers a portion of the profits of the scheme through kickbacks or other financial compensation.

254.    Through these transactions, the Retailers were able to surreptitiously obtain cash, which in turn would be used to, among other things, pay kickbacks to the No-fault Clinics in exchange for prescriptions of DME and/or orthotic devices, and to the Wholesale Defendants in exchange for inflated wholesale invoices, thereby maintaining a symbiotic relationship necessary to facilitate the scheme to defraud.

## DISCOVERY OF THE FRAUD

255.    To induce Plaintiffs to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- The Retail Owners, through their respective Retailers, routinely and deliberately: (i) failed to submit wholesale invoices with their initial bill submissions, thereby concealing the amounts that the Retailers actually paid for any DME and/or orthotic devices, the manufacturer, make, model, size and quality of the goods, and the actual value of the goods in a legitimate marketplace; or (ii) submitted fraudulent wholesale invoices from one or more of the Wholesale Defendants, reflecting prices far in excess of those actually paid by the Retailers, to the extent necessary to support the fraudulent charges;

- With respect to Fee Schedule Items, the Retail Owners, through their respective Retailers, routinely misrepresented in the bills submitted to Plaintiffs that they provided more expensive items from the middle or top end of the Fee Schedule, rather than the inexpensive, basic items that actually were supplied;

- The Retail Owners, through their respective Retailers, submitted false delivery receipts in support of their bills that purported to demonstrate the No-fault Claimants' receipt of the DME and/or orthotic devices, when, in actuality, the delivery receipts were routinely blank at the time the No-fault Claimants signed them, or, in some instances, they contained forged signatures;

- The Retail Owners, through their respective Retailers, systematically failed and/or refused to provide Plaintiffs with a meaningful description of the DME and/or orthotic devices (*i.e.*, make and model) purportedly provided to Claimants, and/or additional information necessary to determine whether the charges submitted by the Retailers were legitimate.

256. Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $2,100,000.00 based upon the fraudulent bill submissions.

257. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS KATANOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

258. The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

259.    At all times relevant herein, AllMed Merchandise & Trading was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

260.    From, in or about February 2, 2018 through the date of the filing of this Complaint, Defendant Katanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the AllMed Merchandise & Trading enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

261.    At all relevant times mentioned herein, Defendant Katanov together with others unknown to Plaintiffs, exerted control over and directed the operations of the AllMed Merchandise & Trading enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

262.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint.

One or more of the ABC Corporations furnished documents that Defendant Katanov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

263.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

264.    The racketeering acts set forth herein were carried out on a continued basis for more than a ten-month period, were related and similar and were committed as part of the ongoing scheme of Defendants Katanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

265.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as AllMed Merchandise & Trading continues to pursue collection on the fraudulent billing to the present day.

266.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Katanov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the AllMed Merchandise & Trading enterprise based upon materially false and misleading information.

267. Through the AllMed Merchandise & Trading enterprise, Defendant Katanov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Katanov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Katanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the AllMed Merchandise & Trading enterprise through the filing of this Complaint.

268. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Katanov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

269. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

270. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

271. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $9,000, the exact amount to be determined at trial.

272.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Katanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS ALLMED MERCHANDISE & TRADING AND KATANOV

### (Common Law Fraud)

273.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

274.    Defendants AllMed Merchandise & Trading and Katanov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

275.    On information and belief, each and every bill and supporting documentation submitted by Defendants AllMed Merchandise & Trading and Katanov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

276.    On information and belief, Defendants AllMed Merchandise & Trading and Katanov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of

76

material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts AllMed Merchandise & Trading was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Katanov, through AllMed Merchandise & Trading, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Katanov, through AllMed Merchandise & Trading, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

277. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant AllMed Merchandise & Trading's claims under the No-fault Law. Specific examples of the billing

fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

278.    Defendants AllMed Merchandise & Trading and Katanov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

279.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants AllMed Merchandise & Trading and Katanov.

280.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant AllMed Merchandise & Trading's claims for No-fault insurance benefits submitted in connection therewith.

281.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants AllMed Merchandise & Trading and Katanov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

282.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ALLMED MERCHANDISE AND TRADING AND KATANOV

### (Unjust Enrichment)

283.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

284.     By reason of their wrongdoing, Defendants AllMed Merchandise & Trading and Katanov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

285.     Plaintiffs are therefore entitled to restitution from Defendants AllMed Merchandise & Trading and Katanov in the amount by which they have been unjustly enriched.

286.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

287.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

79

288.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants AllMed Merchandise & Trading and Katanov.

289.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants AllMed Merchandise & Trading and Katanov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants AllMed Merchandise & Trading and Katanov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Katanov, through AllMed Merchandise & Trading, to AllMed Merchandise & Trading to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through AllMed Merchandise & Trading; and (v) knowingly supporting the negotiation and performance of kickback agreements between Katanov, through AllMed Merchandise & Trading, and the No-fault Clinics.

290.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in

furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants AllMed Merchandise & Trading and Katanov to obtain fraudulently inflated payments from Plaintiffs, among others.

291.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

292.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property & Casualty Insurance Company to pay money based upon the fraudulent charges submitted through AllMed Merchandise & Trading in an amount to be determined at trial, but in no event less than $10,000.00.

293.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

294.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

# FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS WRAY, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

295.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

296.    At all times relevant herein, Certified Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

297.    From, in or about September 19, 2016 through the date of the filing of this Complaint, Defendant Wray, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Certified Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

298.    At all relevant times mentioned herein, Defendant Wray, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Certified Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

82

299.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Wray required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

300.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

301.    The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Wray, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

302.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Certified Medical Supply continues to pursue collection on the fraudulent billing to the present day.

303.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Wray, with the knowledge and intent

83

of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Certified Medical Supply enterprise based upon materially false and misleading information.

304. Through the Certified Medical Supply enterprise, Defendant Wray submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Wray, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Wray, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Certified Medical Supply enterprise through the filing of this Complaint.

305. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Wray in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

306. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

307. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

308.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $12,000.00, the exact amount to be determined at trial.

309.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Wray, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS CERTIFIED MEDICAL SUPPLY AND WRAY

### (Common Law Fraud)

310.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

311.    Defendants Certified Medical Supply and Wray made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

312.    On information and belief, each and every bill and supporting documentation submitted by Defendants Certified Medical Supply and Wray to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended

to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

313.  On information and belief, Defendants Certified Medical Supply and Wray intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Certified Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Wray, through Certified Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Wray through

Certified Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

314.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Certified Medical Supply claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

315.    Defendants Certified Medical Supply and Wray knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

316.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Certified Medical Supply and Wray.

317.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Certified Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

318.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Certified Medical Supply and Wray evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

319.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as

yet to be determined, but believed to be in excess of $13,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS CERTIFIED MEDICAL SUPPLY AND WRAY

### (Unjust Enrichment)

320.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

321.    By reason of their wrongdoing, Defendants Certified Medical Supply and Wray have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

322.    Plaintiffs are therefore entitled to restitution from Defendants Certified Medical Supply and Wray in the amount by which it has been unjustly enriched.

323.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $13,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

324.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

325.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Certified Medical Supply and Wray.

326.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Certified Medical Supply and Wray purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Certified Medical Supply and Wray could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Wray through Certified Medical Supply to Certified Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Certified

89

Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Wray through Certified Medical Supply and the No-fault Clinics.

327.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Certified Medical Supply and Wray to obtain fraudulently inflated payments from Plaintiffs, among others.

328.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

329.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Certified Medical Supply in an amount to be determined at trial, but in no event less than $13,000.00.

330.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

90

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

331.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

## NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS E. MASTOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

332.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

333.    At all times relevant herein, E.M.A. Medical Equipment was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

334.    From, in or about March 9, 2016 through the date of the filing of this Complaint, Defendant E. Mastov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the E.M.A. Medical Equipment enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

335.    At all relevant times mentioned herein, Defendant E. Mastov together with others unknown to Plaintiffs, exerted control over and directed the operations of the E.M.A. Medical Equipment enterprise and utilized that control to conduct the pattern of racketeering activities that

consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

336.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant E. Mastov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

337.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

338.     The racketeering acts set forth herein were carried out on a continued basis for more than a two-and-a-half-year period, were related and similar and were committed as part of the ongoing scheme of Defendants E. Mastov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

92

339.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as E. Mastov continues to pursue collection on the fraudulent billing to the present day.

340.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant E. Mastov with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the E.M.A. Medical Equipment enterprise based upon materially false and misleading information.

341.     Through the E.M.A. Medical Equipment enterprise, Defendant E. Mastov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant E. Mastov, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants E. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the E.M.A. Medical Equipment enterprise through the filing of this Complaint.

342.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant E. Mastov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

343.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

344.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

345.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $80,000.00, the exact amount to be determined at trial.

346.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### TENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MASTOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

347.     The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

348.     At all times relevant herein, Myrtle DME NYC was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

94

349.    From, in or about November 8, 2017 through the date of the filing of this Complaint, Defendant E. Mastov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Myrtle DME NYC enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

350.    At all relevant times mentioned herein, Defendant E. Mastov together with others unknown to Plaintiffs, exerted control over and directed the operations of the Myrtle DME NYC enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

351.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant E. Mastov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

352.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

353.    The racketeering acts set forth herein were carried out on a continued basis for almost a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants E. Mastov, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

354.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Mastov continues to pursue collection on the fraudulent billing to the present day.

355.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant E. Mastov with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Myrtle DME NYC enterprise based upon materially false and misleading information.

356.    Through the Myrtle DME NYC enterprise, Defendant E. Mastov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant E. Mastov, well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of

those activities, Defendants E. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Myrtle DME NYC enterprise through the filing of this Complaint.

357. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant E. Mastov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

358. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

359. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

360. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $25,000.00, the exact amount to be determined at trial.

361. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants E. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

# ELEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS E.M.A. MEDICAL EQUIPMENT, MYRTLE DME NYC AND E. MASTOV

### (Common Law Fraud)

362.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

363.    Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

364.    On information and belief, each and every bill and supporting documentation submitted by Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

365.    On information and belief, Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

98

- False and misleading statements as to the amounts E.M.A. Medical Equipment and Myrtle DME NYC were entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Mastov, through E.M.A. Medical Equipment and Myrtle DME NYC paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant E. Mastov, through E.M.A. Medical Equipment and Myrtle DME NYC, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

366.  The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants E.M.A. Medical Equipment and Myrtle DME NYC's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

367. Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

368. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov.

369. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendants E.M.A. Medical Equipment and Myrtle DME NYC's claims for No-fault insurance benefits submitted in connection therewith.

370. Furthermore, the far reaching pattern of fraudulent conduct by Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

371. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $113,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWELFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS E.M.A. MEDICAL EQUIPMENT, MYRTLE DME NYC AND E. MASTOV

### (Unjust Enrichment)

372.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

373.    By reason of their wrongdoing, Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

374.    Plaintiffs are therefore entitled to restitution from Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov in the amount by which they have been unjustly enriched.

375.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $113,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

# THIRTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

376.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

377.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov.

378.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant E. Mastov, through E.M.A. Medical Equipment and Myrtle DME NYC, to E.M.A. Medical Equipment and Myrtle DME NYC to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the

102

amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through E.M.A. Medical Equipment and Myrtle DME NYC and (v) knowingly supporting the negotiation and performance of kickback agreements between E. Mastov through E.M.A. Medical Equipment and Myrtle DME NYC, and the No-fault Clinics.

379. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants E.M.A. Medical Equipment, Myrtle DME NYC and E. Mastov to obtain fraudulently inflated payments from Plaintiffs, among others.

380. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

381. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through E.M.A. Medical Equipment and Myrtle DME NYC in an amount to be determined at trial, but in no event less than $113,000.00.

382. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

383. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FOURTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS YEVDOSIN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

384. The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

385. At all times relevant herein, Exon Medical Equipment was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

386. From, in or about September 1, 2011 through the date of the filing of this Complaint, Defendant Yevdosin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Exon Medical Equipment enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

387.  At all relevant times mentioned herein, Defendant Yevdosin, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Exon Medical Equipment enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

388.  On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Yevdosin required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

389.  On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

390.  The racketeering acts set forth herein were carried out on a continued basis for more than a seven-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Yevdosin, one or more of the ABC Corporations 1 through 20 and one or

more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

391.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Exon Medical Equipment continues to pursue collection on the fraudulent billing to the present day.

392.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Yevdosin, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Exon Medical Equipment enterprise based upon materially false and misleading information.

393.    Through the Exon Medical Equipment enterprise, Defendant Yevdosin submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Yevdosin, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Yevdosin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Exon Medical Equipment enterprise through the filing of this Complaint.

394.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Yevdosin,

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

395.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

396.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

397.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $41,000.00, the exact amount to be determined at trial.

398.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Yevdosin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EXON MEDICAL EQUIPMENT AND YEVDOSIN

## (Common Law Fraud)

399.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

400.    Defendants Exon Medical Equipment and Yevdosin made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance, and Allstate Property and Casualty Insurance Company for payment.

401.    On information and belief, each and every bill and supporting documentation submitted by Defendants Exon Medical Equipment and Yevdosin to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

402.    On information and belief, Defendants Exon Medical Equipment and Yevdosin intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Exon Medical Equipment was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendants Yevdosin through Exon Medical Equipment, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Yevdosin through Exon Medical Equipment to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

403. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Exon Medical Equipment's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

404. Defendants Exon Medical Equipment and Yevdosin knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

405. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Exon Medical Equipment and Yevdosin.

406. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Exon Medical Equipment's claims for No-fault insurance benefits submitted in connection therewith.

407. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Exon Medical Equipment and Yevdosin evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

408. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $42,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EXON MEDICAL EQUIPMENT AND YEVDOSIN

## (Unjust Enrichment)

409. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

410. By reason of their wrongdoing, Defendants Exon Medical Equipment and Yevdosin have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

411. Plaintiffs are therefore entitled to restitution from Defendants Exon Medical Equipment and Yevdosin in the amount by which they have been unjustly enriched.

412.     By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $42,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SEVENTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

#### (Aiding and Abetting)

413.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

414.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Exon Medical Equipment and Yevdosin.

415.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Exon Medical Equipment and Yevdosin purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Exon Medical Equipment and Yevdosin could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking

back a portion of the amounts paid by Defendant Yevdosin, through Exon Medical Equipment to Exon Medical Equipment to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Exon Medical Equipment; and (v) knowingly supporting the negotiation and performance of kickback agreements between Yevdosin through Exon Medical Equipment and the No-fault Clinics.

416.　On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Exon Medical Equipment and Yevdosin to obtain fraudulently inflated payments from Plaintiffs, among others.

417.　On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

418.　On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty

Insurance Company to pay money based upon the fraudulent charges submitted through Exon Medical Equipment in an amount to be determined at trial, but in no event less than $42,000.00.

419.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

420.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## EIGHTEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS O. MASTOV ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

421.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

422.    At all times relevant herein, Expert Medical Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

423.    From, in or about February 6, 2017 through the date of the filing of this Complaint, Defendant O. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Expert Medical Supplies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the

Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

424.    At all relevant times mentioned herein, Defendant O. Mastov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

425.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant O. Mastov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

426.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

114

## The Pattern of Racketeering Activity
### (Racketeering Acts)

427. The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half period, were related and similar and were committed as part of the ongoing scheme of Defendants O. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

428. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Expert Medical Supplies continues to pursue collection on the fraudulent billing to the present day.

429. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant O. Mastov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Expert Medical Supplies enterprise based upon materially false and misleading information.

430. Through the Expert Medical Supplies enterprise, Defendant O. Mastov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant O. Mastov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants O. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts

115

of mail fraud, extending from the formation of the Expert Medical Supplies enterprise through the filing of this Complaint.

431.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant O. Mastov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

432.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

433.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

434.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company, have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $47,000.00, the exact amount to be determined at trial.

435.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants O. Mastov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINETEENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EXPERT MEDICAL SUPPLIES AND MASTOV

### (Common Law Fraud)

436.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

437.    Defendants Expert Medical Supplies and O. Mastov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

438.    On information and belief, each and every bill and supporting documentation submitted by Defendants Expert Medical Supplies and O. Mastov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

439.    On information and belief, Defendants Expert Medical Supplies and O. Mastov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Expert Medical Supplies was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant O. Mastov, through Expert Medical Supplies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant O. Mastov, through Expert Medical Supplies, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

440.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Expert Medical Supplies' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

441.    Defendants Expert Medical Supplies and O. Mastov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

118

442.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Expert Medical Supplies and O. Mastov.

443.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Expert Medical Supplies' claims for No-fault insurance benefits submitted in connection therewith.

444.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Expert Medical Supplies and O. Mastov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

445.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $49,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EXPERT MEDICAL SUPPLIES AND O. MASTOV

### (Unjust Enrichment)

446.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

447.     By reason of their wrongdoing, Defendants Expert Medical Supplies and O. Mastov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

448. Plaintiffs are therefore entitled to restitution from Defendants Expert Medical Supplies and O. Mastov in the amount by which it has been unjustly enriched.

449. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $49,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTY- FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

450. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

451. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Expert Medical Supplies and O. Mastov.

452. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Expert Medical Supplies and O. Mastov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Expert Medical Supplies and O. Mastov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants O. Mastov, through Expert Medical Supplies, to Expert Medical Supplies to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Expert Medical Supplies; and (v) knowingly supporting the negotiation and performance of kickback agreements between O. Mastov through Expert Medical Supplies and the No-fault Clinics.

453. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Expert Medical Supplies and O. Mastov to obtain fraudulently inflated payments from Plaintiffs, among others.

454.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

455.     On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Expert Medical Supplies in an amount to be determined at trial, but in no event less than $49,000.00.

456.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

457.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## TWENTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS ZLATKIS, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

458.     The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

459.     At all times relevant herein, Ezra Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

460.     From, in or about October 24, 2017 through the date of the filing of this Complaint, Defendant Zlatkis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Ezra Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

461.     At all relevant times mentioned herein, Defendant Zlatkis, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Ezra Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

462.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Zlatkis required, in

123

furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

463.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

464.     The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Zlatkis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

465.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Ezra Supply continues to pursue collection on the fraudulent billing to the present day.

466.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Zlatkis, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Ezra Supply enterprise based upon materially false and misleading information.

124

467.    Through the Ezra Supply enterprise, Defendant Zlatkis submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Zlatkis, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Zlatkis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Ezra Supply enterprise through the filing of this Complaint.

468.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Zlatkis, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

469.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

470.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

471.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $15,000.00, the exact amount to be determined at trial.

472.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Zlatkis, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1

through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## TWENTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS EZRA SUPPLY AND ZLATKIS

### (Common Law Fraud)

473.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

474.    Defendants Ezra Supply and Zlatkis made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company for payment.

475.    On information and belief, each and every bill and supporting documentation submitted by Defendants Ezra Supply and Zlatkis to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

476.    On information and belief, Defendants Ezra Supply and Zlatkis intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Ezra Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Zlatkis, through Ezra Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Zlatkis, through Ezra Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

477. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Ezra Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

478. Defendants Ezra Supply and Zlatkis knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

479. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Ezra Supply and Zlatkis.

480. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Ezra Supply's claims for No-fault insurance benefits submitted in connection therewith.

481. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Ezra Supply and Zlatkis evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

482. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $18,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTY- FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS EZRA SUPPLY AND ZLATKIS

### (Unjust Enrichment)

483. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

484. By reason of their wrongdoing, Defendants Ezra Supply and Zlatkis have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Indemnity Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

485.     Plaintiffs are therefore entitled to restitution from Defendants Ezra Supply and Zlatkis in the amount by which it has been unjustly enriched.

486.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $18,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTY- FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

487.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

488.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company by Defendants Ezra Supply and Zlatkis.

489.     On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Ezra Supply and Zlatkis purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Ezra Supply and Zlatkis could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Zlatkis, through Ezra Supply, to Ezra Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Ezra Supply and (v) knowingly supporting the negotiation and performance of kickback agreements between Zlatkis through Ezra Supply and the No-fault Clinics.

490.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Ezra Supply and Zlatkis to obtain fraudulently inflated payments from Plaintiffs, among others.

491.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

492.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Indemnity Company to pay money based upon the fraudulent charges submitted through Ezra Supply in an amount to be determined at trial, but in no event less than $18,000.00.

493.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

494.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

## TWENTY- SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS OLEYNIK, MERGOLD, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

495.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

496.    At all times relevant herein, GE Medical Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

497.    From, in or about July 11, 2016 through the date of the filing of this Complaint, Defendants Oleynik, Mergold, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the enterprise

through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

498.    At all relevant times mentioned herein, Defendants Oleynik and Mergold, together with others unknown to Plaintiffs, exerted control over and directed the operations of the GE Medical Supplies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

499.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendants Oleynik and Mergold required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

500.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
## (Racketeering Acts)

501.  The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Oleynik and Mergold, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

502.  On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as GE Medical Supplies continues to pursue collection on the fraudulent billing to the present day.

503.  As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Oleynik and Mergold, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the GE Medical Supplies enterprise based upon materially false and misleading information.

504.  Through the GE Medical Supplies enterprise, Defendants Oleynik and Mergold submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendants Oleynik and Mergold, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Oleynik and Mergold, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous

series of predicate acts of mail fraud, extending from the formation of the GE Medical Supplies enterprise through the filing of this Complaint.

505.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Oleynik and Mergold, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

506.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

507.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

508.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $9,900.00, the exact amount to be determined at trial.

509.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Oleynik and Mergold, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

134

## TWENTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS OLEYNIK, MERGOLD AND GE MEDICAL SUPPLIES

### (Common Law Fraud)

510.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

511.    Defendants GE Medical Supplies, Oleynik and Mergold made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

512.    On information and belief, each and every bill and supporting documentation submitted by Defendants GE Medical Supplies, Oleynik and Mergold to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

513.    On information and belief, Defendants GE Medical Supplies, Oleynik and Mergold intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts GE Medical Supplies was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendants Oleynik and Mergold, through GE Medical Supplies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendants Oleynik and Mergold, through GE Medical Supplies, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

514.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant GE Medical Supplies' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

515.    Defendants GE Medical Supplies, Oleynik and Mergold knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

516.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants GE Medical Supplies, Oleynik and Mergold.

517.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant GE Medical Supplies' claims for No-fault insurance benefits submitted in connection therewith.

518.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants GE Medical Supplies, Oleynik and Mergold evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

519.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $11,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## TWENTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS GE MEDICAL SUPPLIES, OLEYNIK, AND MERGOLD

### (Unjust Enrichment)

520.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

521.     By reason of their wrongdoing, Defendants GE Medical Supplies, Oleynik and Mergold have been unjustly enriched, in that they have, directly and/or indirectly, received moneys

from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

522.    Plaintiffs are therefore entitled to restitution from Defendants GE Medical Supplies, Oleynik and Mergold in the amount by which they has been unjustly enriched.

523.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $11,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTY-NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

524.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

525.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants GE Medical Supplies, Oleynik and Mergold.

526.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in

138

furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants GE Medical Supplies, Oleynik and Mergold purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants GE Medical Supplies, Oleynik and Mergold could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Oleynik and Mergold, through GE Medical Supplies, to GE Medical Supplies to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through GE Medical Supplies; and (v) knowingly supporting the negotiation and performance of kickback agreements between Oleynik and Mergold through GE Medical Supplies and the No-fault Clinics.

527. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants GE Medical Supplies, Oleynik and Mergold to obtain fraudulently inflated payments from Plaintiffs, among others.

528. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or

orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

529.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through GE Medical Supplies in an amount to be determined at trial, but in no event less than $11,000.00.

530.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

531.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## THIRTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS KOHEN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

532.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

533.    At all times relevant herein, Goldstar Equipment was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

534. From, in or about April 25, 2014, through the date of the filing of this Complaint, Defendant Kohen, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Goldstar Equipment enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

535. At all relevant times mentioned herein, Defendant Kohen, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Goldstar Equipment enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company and that were based, in part, on the utilization of fraudulent wholesale invoices.

536. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Kohen required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

537. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

538.    The racketeering acts set forth herein were carried out on a continued basis for more than a four-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Kohen, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

539.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Goldstar Equipment continues to pursue collection on the fraudulent billing to the present day.

540.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Kohen, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Goldstar Equipment enterprise based upon materially false and misleading information.

541.    Through the Goldstar Equipment enterprise, Defendant Kohen submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Kohen, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities,

Defendants Kohen, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Goldstar Equipment enterprise through the filing of this Complaint.

542.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Kohen, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

543.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

544.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

545.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $16,000.00, the exact amount to be determined at trial.

546.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Kohen, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRTY-FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS GOLDSTAR EQUIPMENT AND KOHEN

### (Common Law Fraud)

547.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

548.    Defendants Goldstar Equipment and Kohen made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

549.    On information and belief, each and every bill and supporting documentation submitted by Defendants Goldstar Equipment and Kohen to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

550.    On information and belief, Defendants Goldstar Equipment and Kohen intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Goldstar Equipment was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Kohen, through Goldstar Equipment, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Kohen, through Goldstar Equipment, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

551. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Goldstar Equipment's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

552. Defendants Goldstar Equipment and Kohen knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

145

553.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Goldstar Equipment and Kohen.

554.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Goldstar Equipment's claims for No-fault insurance benefits submitted in connection therewith.

555.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Goldstar Equipment and Kohen evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

556.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $18,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY- SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS GOLDSTAR EQUIPMENT AND KOHEN

### (Unjust Enrichment)

557.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

558.    By reason of their wrongdoing, Defendants Goldstar Equipment and Kohen have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

559. Plaintiffs are therefore entitled to restitution from Defendants Goldstar Equipment and Kohen in the amount by which they have been unjustly enriched.

560. By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $18,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## THIRTY- THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

561. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

562. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Goldstar Equipment and Kohen.

563. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants

Goldstar Equipment and Kohen purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Goldstar Equipment and Kohen could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Kohen, through Goldstar Equipment, to Goldstar Equipment to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Goldstar Equipment; and (v) knowingly supporting the negotiation and performance of kickback agreements between Kohen through Goldstar Equipment and the No-fault Clinics.

564.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Goldstar Equipment and Kohen to obtain fraudulently inflated payments from Plaintiffs, among others.

565.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

566.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused

148

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Goldstar Equipment in an amount to be determined at trial, but in no event less than $18,000.00.

567.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

568.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## THIRTY- FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS KALANTAROV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

569.   The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

570.   At all times relevant herein, Heel to Toe Foot Center was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

571.   From, in or about June 26, 2013 through the date of the filing of this Complaint, Defendant Kalantarov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Heel to Toe Foot Center enterprise through a pattern of racketeering activity, including the numerous acts of

mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

572. At all relevant times mentioned herein, Defendant Kalantarov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Heel to Toe Foot Center enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

573. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Kalantarov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

574. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
## (Racketeering Acts)

575.     The racketeering acts set forth herein were carried out on a continued basis for more than a five-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Kalantarov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

576.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Heel to Toe Foot Center continues to pursue collection on the fraudulent billing to the present day.

577.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Kalantarov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Heel to Toe Foot Center enterprise based upon materially false and misleading information.

578.     Through the Heel to Toe Foot Center enterprise, Defendant Kalantarov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Kalantarov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Kalantarov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts

of mail fraud, extending from the formation of the Heel to Toe Foot Center enterprise through the filing of this Complaint.

579.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Kalantarov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

580.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

581.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

582.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $95,000.00, the exact amount to be determined at trial.

583.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Kalantarov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS HEEL TO TOE FOOT CENTER AND KALANTAROV

### (Common Law Fraud)

584. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

585. Defendants Heel to Toe Foot Center and Kalantarov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

586. On information and belief, each and every bill and supporting documentation submitted by Defendants Heel to Toe Foot Center and Kalantarov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

587. On information and belief, Defendants Heel to Toe Foot Center and Kalantarov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Heel to Toe Foot Center was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Kalantarov, through Heel to Toe Foot Center, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Kalantarov, through Heel to Toe Foot Center, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

588.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Heel to Toe Foot Center's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

589.     Defendants Heel to Toe Foot Center and Kalantarov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

154

590.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Heel to Toe Foot Center and Kalantarov.

591.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Heel to Toe Foot Center's claims for No-fault insurance benefits submitted in connection therewith.

592.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Heel to Toe Foot Center and Kalantarov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

593.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $95,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRTY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS HEEL TO TOE FOOT CENTER AND KALANTAROV

### (Unjust Enrichment)

594.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

595.    By reason of their wrongdoing, Defendants Heel to Toe Foot Center and Kalantarov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

596.    Plaintiffs are therefore entitled to restitution from Defendants Heel to Toe Foot Center and Kalantarov in the amount by which it has been unjustly enriched.

597.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $95,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## THIRTY-SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

598.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

599.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company, by Defendants Heel to Toe Foot Center and Kalantarov.

600.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices

that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Heel to Toe Foot Center and Kalantarov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Heel to Toe Foot Center and Kalantarov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Kalantarov, through Heel to Toe Foot Center, to Heel to Toe Foot Center to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Heel to Toe Foot Center; and (v) knowingly supporting the negotiation and performance of kickback agreements between Kalantarov through Heel to Toe Foot Center and the No-fault Clinics.

601.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Heel to Toe Foot Center and Kalantarov to obtain fraudulently inflated payments from Plaintiffs, among others.

602.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or

orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

603. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Heel to Toe Foot Center LLC in an amount to be determined at trial, but in no event less than $95,000.00.

604. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

605. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## THIRTY-EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS TSEYTELMAN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

606. The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

607. At all times relevant herein, Leomax Supplies was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

158

608.     From, in or about June 9, 2017 through the date of the filing of this Complaint, Defendant Tseytelman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Leomax Supplies enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

609.     At all relevant times mentioned herein, Defendant Tseytelman, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Leomax Supplies enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

610.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Tseytelman required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

159

611. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

612. The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Tseytelman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

613. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Leomax Supplies continues to pursue collection on the fraudulent billing to the present day.

614. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Tseytelman, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 11 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Leomax Supplies enterprise based upon materially false and misleading information.

615. Through the Leomax Supplies enterprise, Defendant Tseytelman submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and

supporting documents that were sent by Defendant Tseytelman, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Tseytelman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Leomax Supplies enterprise through the filing of this Complaint.

616.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Tseytelman, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

617.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

618.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

619.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs has been damaged in the aggregate amount presently in excess of $9,000.00, the exact amount to be determined at trial.

620.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Tseytelman, one or more of the ABC Corporations 1 through 20 and one or more of the John Does

1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## THIRTY-NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LEOMAX SUPPLIES AND TSEYTELMAN

### (Common Law Fraud)

621. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

622. Defendants Leomax Supplies and Tseytelman made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

623. On information and belief, each and every bill and supporting documentation submitted by Defendants Leomax Supplies and Tseytelman to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

624. On information and belief, Defendants Leomax Supplies and Tseytelman intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

162

- False and misleading statements as to the amounts Leomax Supplies was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Tseytelman, through Leomax Supplies, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Tseytelman, through Leomax Supplies, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

625.     The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Leomax Supplies' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

626.     Defendants Leomax Supplies and Tseytelman knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

627.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Leomax Supplies and Tseytelman.

628.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Leomax Supplies' claims for No-fault insurance benefits submitted in connection therewith.

629.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Leomax Supplies and Tseytelman evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

630.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $9,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FORTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LEOMAX SUPPLIES AND TSEYTELMAN

### (Unjust Enrichment)

631.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

632.     By reason of their wrongdoing, Defendants Leomax Supplies and Tseytelman have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate

Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

633.    Plaintiffs are therefore entitled to restitution from Defendants Leomax Supplies and Tseytelman in the amount by which it has been unjustly enriched.

634.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $9,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FORTY- FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

635.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

636.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Leomax Supplies and Tseytelman.

637.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Leomax Supplies and Tseytelman purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Leomax Supplies and Tseytelman could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Tseytelman, through Leomax Supplies, to Leomax Supplies to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Leomax Supplies; and (v) knowingly supporting the negotiation and performance of kickback agreements between Tseytelman through Leomax Supplies and the No-fault Clinics.

638. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Leomax Supplies and Tseytelman to obtain fraudulently inflated payments from Plaintiffs, among others.

639. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

640. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Defendant Leomax Supplies in an amount to be determined at trial, but in no event less than $9,000.00

641. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

642. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### FORTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS NEMETS, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

643. The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

644. At all times relevant herein, Longevity Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

645. From, in or about May 21, 2015 through the date of the filing of this Complaint, Defendant Nemets, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 1 through 20, knowingly conducted and participated in the affairs of the enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

646.    At all relevant times mentioned herein, Defendant Nemets, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Longevity Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

647.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Nemets required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

648.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

649.    The racketeering acts set forth herein were carried out on a continued basis for more than a three-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Nemets, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

650.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Longevity Medical Supply continues to pursue collection on the fraudulent billing to the present day.

651.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Nemets, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Longevity Medical Supply enterprise based upon materially false and misleading information.

652.    Through the Longevity Medical Supply enterprise, Defendant Nemets submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant Nemets, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of

those activities, Defendants Nemets, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Longevity Medical Supply enterprise through the filing of this Complaint.

653. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Nemets, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

654. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

655. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

656. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $266,000.00, the exact amount to be determined at trial.

657. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Nemets, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FORTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS LONGEVITY MEDICAL SUPPLY AND NEMETS

### (Common Law Fraud)

658.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

659.    Defendants Longevity Medical Supply and Nemets made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

660.    On information and belief, each and every bill and supporting documentation submitted by Defendants Longevity Medical Supply and Nemets to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

661.    On information and belief, Defendants Longevity Medical Supply and Nemets intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Longevity Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Nemets, through Longevity Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Nemets, through Longevity Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

662.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Longevity Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

663.    Defendants Longevity Medical Supply and Nemets knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

664.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Longevity Medical Supply and Nemets.

665.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Longevity Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

666.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Longevity Medical Supply and Nemets evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

667.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $266,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FORTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS LONGEVITY MEDICAL SUPPLY AND NEMETS

### (Unjust Enrichment)

668.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

669.     By reason of their wrongdoing, Defendants Longevity Medical Supply and Nemets have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from

173

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

670.    Plaintiffs are therefore entitled to restitution from Defendants Longevity Medical Supply and Nemets in the amount by which it has been unjustly enriched.

671.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $266,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FORTY-FIFTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

**(Aiding and Abetting)**

672.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

673.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Longevity Medical Supply and Nemets.

674. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Longevity Medical Supply and Nemets purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Longevity Medical Supply and Nemets could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Nemets, through Longevity Medical Supply, to Longevity Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Longevity Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Nemets through Longevity Medical Supply and the No-fault Clinics.

675. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Longevity Medical Supply and Nemets to obtain fraudulently inflated payments from Plaintiffs, among others.

676. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the

fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

677.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Longevity Medical Supply in an amount to be determined at trial, but in no event less than $266,000.00.

678.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

679.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FORTY- SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS LEVIN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

680.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

176

## THE RICO ENTERPRISE

681.    At all times relevant herein, Medasource was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

682.    From, in or about February 1, 2016 through the date of the filing of this Complaint, Defendant Levin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Medasource enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

683.    At all relevant times mentioned herein, Defendant Levin, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Medasource enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

684.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint.

One or more of the ABC Corporations furnished documents that Defendant Levin required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

685. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

686. The racketeering acts set forth herein were carried out on a continued basis for more than a two-and-a-half-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Levin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

687. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Medasource continues to pursue collection on the fraudulent billing to the present day.

688. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Levin, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Medasource enterprise based upon materially false and misleading information.

178

689.     Through the Medasource enterprise, Defendant Levin submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Levin, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Levin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Medasource enterprise through the filing of this Complaint.

690.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Levin, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

691.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

692.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

693.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company has been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $10,000.00, the exact amount to be determined at trial.

694.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Levin, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FORTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDASOURCE AND LEVIN

### (Common Law Fraud)

695.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

696.     Defendants Medasource and Levin made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

697.     On information and belief, each and every bill and supporting documentation submitted by Defendants Medasource and Levin to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

698.     On information and belief, Defendants Medasource and Levin intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

180

- False and misleading statements as to the amounts Medasource was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Levin, through Medasource, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Levin, through Medasource, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

699. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Medasource's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

700. Defendants Medasource and Levin knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

701.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Medasource and Levin.

702.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Medasource's claims for No-fault insurance benefits submitted in connection therewith.

703.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Medasource and Levin evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

704.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FORTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDASOURCE AND LEVIN

### (Unjust Enrichment)

705.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

706.     By reason of their wrongdoing, Defendants Medasource and Levin have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property

and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

707.    Plaintiffs are therefore entitled to restitution from Defendants Medasource and Levin in the amount by which it has been unjustly enriched.

708.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FORTY- NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

709.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

710.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Medasource and Levin.

711.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices,

including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Medasource and Levin purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Medasource and Levin could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Levin, through Medasource, to Medasource to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Medasource; and (v) knowingly supporting the negotiation and performance of kickback agreements between Levin through Medasource and the No-fault Clinics.

712.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Medasource and Levin to obtain fraudulently inflated payments from Plaintiffs, among others.

713.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

714.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Medasource in an amount to be determined at trial, but in no event less than $10,000.00.

715.     On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

716.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FIFTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS GRINBERG, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

717.     The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

718.     At all times relevant herein, Medcare Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

719.     From, in or about August 20, 2008 through the date of the filing of this Complaint, Defendant Grinberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Medcare Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail

fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

720.     At all relevant times mentioned herein, Defendant Grinberg, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Medcare Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

721.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Grinberg required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

722.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
## (Racketeering Acts)

723.    The racketeering acts set forth herein were carried out on a continued basis for more than a ten-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Grinberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

724.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Medcare Supply continues to pursue collection on the fraudulent billing to the present day.

725.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Grinberg, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 11 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Medcare Supply enterprise based upon materially false and misleading information.

726.    Through the Medcare Supply enterprise, Defendant Grinberg submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendant Grinberg, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Grinberg, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Medcare Supply enterprise through the filing of this Complaint.

727.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Grinberg, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

728.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

729.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

730.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $363,000.00, the exact amount to be determined at trial.

731.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Grinberg, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTY- FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDCARE SUPPLY AND GRINBERG

## (Common Law Fraud)

732.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

733.   Defendants Medcare Supply and Grinberg made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

734.   On information and belief, each and every bill and supporting documentation submitted by Defendants Medcare Supply and Grinberg to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

735.   On information and belief, Defendants Medcare Supply and Grinberg intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Medcare Supply was entitled to be reimbursed under the No-fault Law;

189

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Grinberg, through Medcare Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Grinberg, through Medcare Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

736. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Medcare Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

737. Defendants Medcare Supply and Grinberg knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

738.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Medcare Supply and Grinberg.

739.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendants Medcare Supply's claims for No-fault insurance benefits submitted in connection therewith.

740.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Medcare Supply and Grinberg evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

741.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $376,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTY-SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDCARE SUPPLY AND GRINBERG

### (Unjust Enrichment)

742.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

743.     By reason of their wrongdoing, Defendants Medcare Supply and Grinberg have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

744.     Plaintiffs are therefore entitled to restitution from Defendants Medcare Supply and Grinberg in the amount by which it has been unjustly enriched.

745.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $376,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

### FIFTY-THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

746.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

747.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and

abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Medcare Supply and Grinberg.

748.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Medcare Supply and Grinberg purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Medcare Supply and Grinberg could mail fraudulent bills to Plaintiff and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Grinberg, through Medcare Supply, to Medcare Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Medcare Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Grinberg through Medcare Supply and the No-fault Clinics.

749.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no

opportunity for Defendants Medcare Supply and Grinberg to obtain fraudulently inflated payments from Plaintiffs, among others.

750. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

751. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Medcare Supply in an amount to be determined at trial, but in no event less than $376,000.00.

752. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

753. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

**FIFTY-FOURTH CLAIM FOR RELIEF**

**AGAINST DEFENDANTS MEDVID, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20**

**(RICO, pursuant to 18 U.S.C. § 1962(c))**

754.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

755.    At all times relevant herein, Medigna was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

756.    From, in or about November 11, 2017 through the date of the filing of this Complaint, Defendant Medvid, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Medigna enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

757.    At all relevant times mentioned herein, Defendant Medvid, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Medigna enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

758.     On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Medvid required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

759.     On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

760.     The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Medvid, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

761.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Medigna continues to pursue collection on the fraudulent billing to the present day.

762.     As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Medvid, with the knowledge and

intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Medigna enterprise based upon materially false and misleading information.

763. Through the Medigna enterprise, Defendant Medvid submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Medvid, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Medvid, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Medigna enterprise through the filing of this Complaint.

764. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Medvid, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

765. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

766. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

767.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $16,000, the exact amount to be determined at trial.

768.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Medvid, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTY-FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDIGNA AND MEDVID

## (Common Law Fraud)

769.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

770.    Defendants Medigna and Medvid made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

771.    On information and belief, each and every bill and supporting documentation submitted by Defendants Medigna and Medvid to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault

Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

772. On information and belief, Defendants Medigna and Medvid intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Medigna was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Medvid, through Medigna, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Medvid, through Medigna, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

773. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Medigna's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

774. Defendants Medigna and Medvid knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

775. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Medigna and Medvid.

776. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Medigna's claims for No-fault insurance benefits submitted in connection therewith.

777. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Medigna and Medvid evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

778. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $17,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## FIFTY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDIGNA AND MEDVID

### (Unjust Enrichment)

779.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

780.     By reason of their wrongdoing, Defendants Medigna and Medvid have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

781.     Plaintiffs are therefore entitled to restitution from Defendants Medigna and Medvid in the amount by which it has been unjustly enriched.

782.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $17,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FIFTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

783. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

784. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Medigna and Medvid.

785. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Medigna and Medvid purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Medigna and Medvid could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Medvid, through Medigna, to Medigna to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff,

among others, through Medigna; and (v) knowingly supporting the negotiation and performance of kickback agreements between Medvid through Medigna and the No-fault Clinics.

786. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Medigna and Medvid to obtain fraudulently inflated payments from Plaintiffs, among others.

787. On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

788. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Medigna in an amount to be determined at trial, but in no event less than $17,000.00.

789. On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

790.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## FIFTY-EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS AMIROVA, SHADMANOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

791.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

792.    At all times relevant herein, Milford Services was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

793.    From, in or about January 28, 2011 through the date of the filing of this Complaint, Defendants Amirova and Shadmanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Milford Services enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

794.    At all relevant times mentioned herein, Defendants Amirova and Shadmanov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Milford Services enterprise and utilized that control to conduct the pattern of racketeering activities

that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company, that were based, in part, on the utilization of fraudulent wholesale invoices.

795.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendants Amirova and Shadmanov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

796.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

797.    The racketeering acts set forth herein were carried out on a continued basis for more than a seven-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Amirova and Shadmanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

798.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Milford Services continues to pursue collection on the fraudulent billing to the present day.

799.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendants Amirova and Shadmanov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Milford Services enterprise based upon materially false and misleading information.

800.    Through the Milford Services enterprise, Defendants Amirova and Shadmanov submitted hundreds of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to hundreds of No-fault Claimants. The bills and supporting documents that were sent by Defendants Amirova and Shadmanov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Amirova and Shadmanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Milford Services enterprise through the filing of this Complaint.

801.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendants Amirova and Shadmanov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

802.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

803.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

804.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $132,000.00, the exact amount to be determined at trial.

805.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Amirova and Shadmanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### FIFTY- NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MILFORD SERVICES, AMIROVA AND SHADMANOV

### (Common Law Fraud)

806.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

807.     Defendants Milford Services, Amirova and Shadmanov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity

Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

808.    On information and belief, each and every bill and supporting documentation submitted by Defendants Milford Services, Amirova and Shadmanov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

809.    On information and belief, Defendants Milford Services, Amirova and Shadmanov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Milford Services was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendants Amirova and Shadmanov, through Milford Services, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendants Amirova and Shadmanov, through Milford Services, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

810.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Milford Services' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

811.   Defendants Milford Services, Amirova and Shadmanov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

812.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Milford Services, Amirova and Shadmanov.

813.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, it would not have paid the Defendant Milford Services' claims for No-fault insurance benefits submitted in connection therewith.

814. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Milford Services, Amirova and Shadmanov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

815. By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $135,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MILFORD SERVICES, AMIROVA AND SHADMANOV

### (Unjust Enrichment)

816. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

817. By reason of their wrongdoing, Defendants Milford Services, Amirova and Shadmanov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

818. Plaintiffs are therefore entitled to restitution from Defendants Milford Services, Amirova and Shadmanov in the amount by which it has been unjustly enriched.

819.  By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $135,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTY- FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

820.  The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

821.  On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Milford Services, Amirova and Shadmanov.

822.  On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Milford Services, Amirova and Shadmanov purportedly provided to No-fault Claimants; (ii)

211

knowingly providing the fraudulent wholesale invoices so that Defendants Milford Services, Amirova and Shadmanov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendants Amirova and Shadmanov, through Milford Services, to Milford Services to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Milford Services; and (v) knowingly supporting the negotiation and performance of kickback agreements between Amirova and Shadmanov through Milford Services and the No-fault Clinics.

823.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Milford Services, Amirova and Shadmanov to obtain fraudulently inflated payments from Plaintiffs, among others.

824.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

825.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate

Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty

Insurance Company to pay money based upon the fraudulent charges submitted through Milford

Services in an amount to be determined at trial, but in no event less than $135,000.00.

826.     On information and belief, the Wholesale Defendants' (one or more of the ABC

Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles

Plaintiffs to recover punitive damages.

827.     By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive

damages, plus interest, costs and other relief the Court deems just.

### SIXTY- SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS DAVYDOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

828.     The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as

though fully set forth herein.

### THE RICO ENTERPRISE

829.     At all times relevant herein, Mount Sinai Medical Supply was an "enterprise"

engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18

U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

830.     From, in or about April 25, 2017 through the date of the filing of this Complaint,

Defendants Davydov, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 1 through 20, knowingly conducted and participated in the affairs of the Mount Sinai

Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts

of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

831. At all relevant times mentioned herein, Defendant Davydov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Mount Sinai Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Northbrook Indemnity Company that were based, in part, on the utilization of fraudulent wholesale invoices.

832. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Davydov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

833. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

214

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

834.    The racketeering acts set forth herein were carried out on a continued basis for more than a year-and-a-half period, were related and similar and were committed as part of the ongoing scheme of Defendants Davydov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

835.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Mount Sinai Medical Supply continues to pursue collection on the fraudulent billing to the present day.

836.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Davydov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 11 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Mount Sinai Medical Supply enterprise based upon materially false and misleading information.

837.    Through the Mount Sinai Medical Supply enterprise, Defendant Davydov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Davydov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Davydov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail

fraud, extending from the formation of the Mount Sinai Medical Supply enterprise through the filing of this Complaint.

838.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Davydov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

839.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

840.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

841.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Northbrook Indemnity Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $24,000.00, the exact amount to be determined at trial.

842.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Davydov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTY- THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS MOUNT SINAI MEDICAL SUPPLY AND DAVYDOV

### (Common Law Fraud)

843.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

844.    Defendants Mount Sinai Medical Supply and Davydov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

845.    On information and belief, each and every bill and supporting documentation submitted by Defendants Mount Sinai Medical Supply and Davydov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

846.    On information and belief, Defendants Mount Sinai Medical Supply and Davydov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Mount Sinai Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Davydov, through Mount Sinai Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Davydov, through Mount Sinai Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

847. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Mount Sinai Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

848. Defendants Mount Sinai Medical Supply and Davydov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

849.     Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Mount Sinai Medical Supply and Davydov.

850.     Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Mount Sinai Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

851.     Furthermore, the far reaching pattern of fraudulent conduct by Defendants Mount Sinai Medical Supply and Davydov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

852.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $28,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTY-FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS MOUNT SINAI MEDICAL SUPPLY AND DAVYDOV

### (Unjust Enrichment)

853.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

854.     By reason of their wrongdoing, Defendants Mount Sinai Medical Supply and Davydov have been unjustly enriched, in that they have, directly and/or indirectly, received

moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

855.     Plaintiffs are therefore entitled to restitution from Defendants Mount Sinai Medical Supply and Davydov in the amount by which it has been unjustly enriched.

856.     By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $28,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTY-FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

#### (Aiding and Abetting)

857.     The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

858.     On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Mount Sinai Medical Supply and Davydov.

859. On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Mount Sinai Medical Supply and Davydov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Mount Sinai Medical Supply and Davydov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Davydov, through Mount Sinai Medical Supply, to Mount Sinai Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Mount Sinai Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Davydov through Mount Sinai Medical Supply and the No-fault Clinics.

860. On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Mount Sinai Medical Supply and Davydov to obtain fraudulently inflated payments from Plaintiffs, among others.

861.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

862.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Mount Sinai Medical Supply in an amount to be determined at trial, but in no event less than $28,000.00.

863.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

864.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### SIXTY- SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS DEKHANOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

865.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

866. At all times relevant herein, Myrtle Avenue Trading was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

867. From, in or about March 16, 2017 through the date of the filing of this Complaint, Defendant Dekhanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Myrtle Avenue Trading enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

868. At all relevant times mentioned herein, Defendant Dekhanov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Myrtle Avenue Trading enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

869. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Dekhanov required, in

223

furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

870.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

871.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Dekhanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

872.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Myrtle Avenue Trading continues to pursue collection on the fraudulent billing to the present day.

873.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Dekhanov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Myrtle Avenue Trading enterprise based upon materially false and misleading information.

874.     Through the Myrtle Avenue Trading enterprise, Defendant Dekhanov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Dekhanov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Dekhanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Myrtle Avenue Trading enterprise through the filing of this Complaint.

875.     A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Dekhanov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

876.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

877.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

878.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $58,000.00, the exact amount to be determined at trial.

879.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Dekhanov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SIXTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MYRTLE AVENUE TRADING AND DEKHANOV

### (Common Law Fraud)

880.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

881.    Defendants Myrtle Avenue Trading and Dekhanov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

882.    On information and belief, each and every bill and supporting documentation submitted by Defendants Myrtle Avenue Trading and Dekhanov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

883.    On information and belief, Defendants Myrtle Avenue Trading and Dekhanov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts,

226

including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Myrtle Avenue Trading was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Dekhanov, through Myrtle Avenue Trading, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Dekhanov, through Myrtle Avenue Trading, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

884. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Myrtle Avenue Trading's claims under the No-fault Law. Specific examples of the billing fraud

alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

885.   Defendants Myrtle Avenue Trading and Dekhanov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

886.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Myrtle Avenue Trading and Dekhanov.

887.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Myrtle Avenue Trading's claims for No-fault insurance benefits submitted in connection therewith.

888.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Myrtle Avenue Trading and Dekhanov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

889.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $60,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTY- EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MYRTLE AVENUE TRADING AND DEKHANOV

## (Unjust Enrichment)

890.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

891.    By reason of their wrongdoing, Defendants Myrtle Avenue Trading and Dekhanov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

892.    Plaintiffs are therefore entitled to restitution from Defendants Myrtle Avenue Trading and Dekhanov in the amount by which it has been unjustly enriched.

893.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $60,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTY-NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

894.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

895.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Myrtle Avenue Trading and Dekhanov.

896.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Myrtle Avenue Trading and Dekhanov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Myrtle Avenue Trading and Dekhanov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Dekhanov, through Myrtle Avenue Trading, to Myrtle Avenue Trading, to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in

230

order to support the fraudulent billing submitted to Plaintiffs, among others, through Myrtle Avenue Trading; and (v) knowingly supporting the negotiation and performance of kickback agreements between Dekhanov through Myrtle Avenue Trading and the No-fault Clinics.

897.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Myrtle Avenue Trading and Dekhanov to obtain fraudulently inflated payments from Plaintiffs, among others.

898.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

899.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Myrtle Avenue Trading in an amount to be determined at trial, but in no event less than $60,000.00.

900.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

901. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

### SEVENTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANTS REMARENKO, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

902. The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

903. At all times relevant herein, Optimus Plus Products was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

904. From, in or about April 3, 2017 through the date of the filing of this Complaint, Defendants Remarenko, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Optimus Plus Products enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

905. At all relevant times mentioned herein, Defendant Remarenko, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Optimus Plus Products enterprise and utilized that control to conduct the pattern of racketeering activities that

consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

906.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Remarenko required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

907.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

908.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Remarenko, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

909. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Optimus Plus Products continues to pursue collection on the fraudulent billing to the present day.

910. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Remarenko, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 11 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Optimus Plus Products enterprise based upon materially false and misleading information.

911. Through the Optimus Plus Products enterprise, Defendant Remarenko submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Remarenko, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Remarenko, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Optimus Plus Products enterprise through the filing of this Complaint.

912. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Remarenko, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

913. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

914. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

915. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in its business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $52,000.00, the exact amount to be determined at trial.

916. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Remarenko, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTY-FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANTS OPTIMUS PLUS PRODUCTS AND REMARENKO

### (Common Law Fraud)

917. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

918. Defendants Optimus Plus Products and Remarenko made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

919. On information and belief, each and every bill and supporting documentation submitted by Defendants Optimus Plus Products and Remarenko to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

920. On information and belief, Defendants Optimus Plus Products and Remarenko intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Optimus Plus Products was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed

and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Remarenko, through Optimus Plus Products, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Remarenko, through Optimus Plus Products, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

921. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Optimus Plus Products' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

922. Defendants Optimus Plus Products and Remarenko knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

923. Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Optimus Plus Products and Remarenko.

924. Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Optimus Plus Products' claims for No-fault insurance benefits submitted in connection therewith.

925. Furthermore, the far reaching pattern of fraudulent conduct by Defendants Optimus Plus Products and Remarenko evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

926.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $56,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTY- SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS OPTIMUS PLUS PRODUCTS AND REMARENKO

### (Unjust Enrichment)

927.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

928.    By reason of their wrongdoing, Defendants Optimus Plus Products and Remarenko have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

929.    Plaintiffs are therefore entitled to restitution from Defendants Optimus Plus Products and Remarenko in the amount by which it has been unjustly enriched.

930.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $56,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SEVENTY- THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

931.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

932.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Optimus Plus Products and Remarenko.

933.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Optimus Plus Products and Remarenko purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Optimus Plus Products and Remarenko could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Remarenko, through Optimus Plus Products, to Optimus Plus Products to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through

239

Optimus Plus Products; and (v) knowingly supporting the negotiation and performance of kickback agreements between Remarenko through Optimus Plus Products and the No-fault Clinics.

934.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Optimus Plus Products and Remarenko to obtain fraudulently inflated payments from Plaintiff, among others.

935.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

936.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Optimus Plus Products in an amount to be determined at trial, but in no event less than $56,000.00.

937.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent

240

conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

938. By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTY- FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS YAGUDAEV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

939. The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

940. At all times relevant herein, P & D Merchandise was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

941. From, in or about May 2, 2017 through the date of the filing of this Complaint, Defendant Yagudaev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the P & D Merchandise enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

942. At all relevant times mentioned herein, Defendant Yagudaev, together with others unknown to Plaintiffs, exerted control over and directed the operations of the P & D Merchandise enterprise and utilized that control to conduct the pattern of racketeering activities that consisted

of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

943.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Yagudaev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

944.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

945.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Yagudaev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

242

946. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as P & D Merchandise continues to pursue collection on the fraudulent billing to the present day.

947. As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Yagudaev, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the P & D Merchandise enterprise based upon materially false and misleading information.

948. Through the P & D Merchandise enterprise, Defendant Yagudaev submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Yagudaev, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Yagudaev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the P & D Merchandise enterprise through the filing of this Complaint.

949. A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Yagudaev, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

950. Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

951. Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

952. By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $10,000.00, the exact amount to be determined at trial.

953. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Yagudaev, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTY- FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS P & D MERCHANDISE AND YAGUDAEV

### (Common Law Fraud)

954. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

955. Defendants P & D Merchandise and Yagudaev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company for payment.

956. On information and belief, each and every bill and supporting documentation submitted by Defendants P & D Merchandise and Yagudaev to Plaintiffs set forth false and

fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

957. On information and belief, Defendants P & D Merchandise and Yagudaev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts P & D Merchandise was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Yagudaev, through P & D Merchandise, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically

unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Yagudaev, through P & D Merchandise, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

958.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant P & D Merchandise's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

959.    Defendants P & D Merchandise and Yagudaev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

960.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants P & D Merchandise and Yagudaev.

961.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant P & D Merchandise's claims for No-fault insurance benefits submitted in connection therewith.

962.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants P & D Merchandise and Yagudaev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

963.    By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of

$10,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SEVENTY- SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS P & D MERCHANDISE AND YAGUDAEV

### (Unjust Enrichment)

964. The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

965. By reason of their wrongdoing, Defendants P & D Merchandise and Yagudaev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

966. Plaintiffs are therefore entitled to restitution from Defendants P & D Merchandise and Yagudaev in the amount by which it has been unjustly enriched.

967. By reason of the foregoing, Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SEVENTY- SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

968.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

969.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company by Defendants P & D Merchandise and Yagudaev.

970.    On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants P & D Merchandise and Yagudaev purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants P & D Merchandise and Yagudaev could mail fraudulent bills to Plaintiff and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Yagudaev, through P & D Merchandise, to P & D Merchandise to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through P & D Merchandise; and (v)

248

knowingly supporting the negotiation and performance of kickback agreements between Yagudaev through P & D Merchandise and the No-fault Clinics.

971.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants P & D Merchandise and Yagudaev to obtain fraudulently inflated payments from Plaintiffs, among others.

972.    On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

973.    On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through P & D Merchandise in an amount to be determined at trial, but in no event less than $10,000.00.

974.    On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

975.    By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## SEVENTY- EIGHTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS STARKOU, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

976.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

977.    At all times relevant herein, Sheepshead Bay Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

978.    From, in or about October 31, 2016 through the date of the filing of this Complaint, Defendant Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Sheepshead Bay Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

979.    At all relevant times mentioned herein, Defendant Starkou, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Sheepshead Bay Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty

Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

980. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Starkou required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

981. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

982. The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

983. On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Sheepshead Bay Medical Supply continues to pursue collection on the fraudulent billing to the present day.

984.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Starkou, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Sheepshead Bay Medical Supply enterprise based upon materially false and misleading information.

985.    Through the Sheepshead Bay Medical Supply enterprise, Defendant Starkou submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Starkou, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Sheepshead Bay Medical Supply enterprise through the filing of this Complaint.

986.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Starkou, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

987.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

988.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

989.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $32,000.00, the exact amount to be determined at trial.

990.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTY- NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS STARKOU, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

991.    The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

992.    At all times relevant herein, Stark Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

993.    From, in or about March 16, 2017 through the date of the filing of this Complaint, Defendant Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the

John Does 1 through 20, knowingly conducted and participated in the affairs of the Stark Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

994.    At all relevant times mentioned herein, Defendant Starkou, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Stark Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

995.    On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Starkou required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

996.    On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one

or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

997.    The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

998.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Stark Medical Supply continues to pursue collection on the fraudulent billing to the present day.

999.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Starkou, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Stark Medical Supply enterprise based upon materially false and misleading information.

1000.    Through the Stark Medical Supply enterprise, Defendant Starkou submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Starkou, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of

255

those activities, Defendants Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Stark Medical Supply enterprise through the filing of this Complaint.

1001.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Starkou, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1002.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1003.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

1004.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $9,000.00, the exact amount to be determined at trial.

1005.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Starkou, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

# EIGHTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SHEEPSHEAD BAY MEDICAL SUPPLY, STARK MEDICAL SUPPLY AND STARKOU

### (Common Law Fraud)

1006.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1007.   Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1008.   On information and belief, each and every bill and supporting documentation submitted by Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1009.   On information and belief, Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

257

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Sheepshead Bay Medical Supply and Stark Medical Supply were entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Starkou, through Sheepshead Bay Medical Supply and Stark Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Starkou, through Sheepshead Bay Medical Supply and Stark Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1010. The foregoing was intended to deceive and mislead Plaintiffs into paying Defendants Sheepshead Bay Medical Supply and Stark Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1011.   Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1012.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou.

1013.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Sheepshead Bay Medical Supply and Stark Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

1014.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1015.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $46,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY- FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS SHEEPSHEAD BAY MEDICAL SUPPLY, STARK MEDICAL SUPPLY AND STARKOU

### (Unjust Enrichment)

1016.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1017.   By reason of their wrongdoing, Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1018.   Plaintiffs are therefore entitled to restitution from Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou in the amount by which they have been unjustly enriched.

1019.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $46,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTY- SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1020.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1021.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou.

1022.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Starkou, through Sheepshead Bay Medical Supply and Stark Medical Supply, to Sheepshead Bay Medical Supply and Stark Medical Supply to create the impression of an actual sale in furtherance of the

money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Sheepshead Bay Medical Supply and Stark Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Starkou through Sheepshead Bay Medical Supply and Stark Medical Supply, and the No-fault Clinics.

1023.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Sheepshead Bay Medical Supply, Stark Medical Supply and Starkou to obtain fraudulently inflated payments from Plaintiffs, among others.

1024.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1025.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate New Jersey Property and Casualty Insurance Company, Allstate Northbrook Indemnity Company, and Allstate Property and Casualty Insurance Company to pay

money based upon the fraudulent charges submitted through Sheepshead Bay Medical Supply and Stark Medical Supply in an amount to be determined at trial, but in no event less than $46,000.00.

1026.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1027.   By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## EIGHTY- THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS MIRAKOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

1028.   The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

1029.   At all times relevant herein, Sky of NY 1 was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1030.   From, in or about June 8, 2016 through the date of the filing of this Complaint, Defendant Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Sky of NY 1 enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix

263

and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1031.  At all relevant times mentioned herein, Defendant Mirakov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Sky of NY 1 enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1032.  On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Mirakov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1033.  On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1034.  The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme

of Defendants Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1035.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Sky of NY 1 continues to pursue collection on the fraudulent billing to the present day.

1036.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Mirakov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Sky of NY 1 enterprise based upon materially false and misleading information.

1037.   Through the Sky of NY 1 enterprise, Defendant Mirakov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Mirakov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Sky of NY 1 enterprise through the filing of this Complaint.

1038.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Mirakov,

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1039.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1040.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

1041.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company and Allstate Fire and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $8,000.00, the exact amount to be determined at trial.

1042.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Mirakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### EIGHTY- FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS SKY OF NY 1 AND MIRAKOV

### (Common Law Fraud)

1043.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1044.   Defendants Sky of NY 1 and Mirakov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance

266

Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company for payment.

1045.  On information and belief, each and every bill and supporting documentation submitted by Defendants Sky of NY 1 and Mirakov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1046.  On information and belief, Defendants Sky of NY 1 and Mirakov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Sky of NY 1 was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- • False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Mirakov, through Sky of NY 1, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Mirakov, through Sky of NY 1, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1047.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Sky of NY 1's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1048.   Defendants Sky of NY 1 and Mirakov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1049.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Sky of NY 1 and Mirakov.

1050.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Sky of NY 1's claims for No-fault insurance benefits submitted in connection therewith.

1051.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Sky of NY 1 and Mirakov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

268

1052.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY- FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS SKY OF NY 1 AND MIRAKOV

### (Unjust Enrichment)

1053.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1054.   By reason of their wrongdoing, Defendants Sky of NY 1 and Mirakov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1055.   Plaintiffs are therefore entitled to restitution from Defendants Sky of NY 1 and Mirakov in the amount by which they have been unjustly enriched.

1056.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $10,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## EIGHTY- SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1057.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1058.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company by Defendants Sky of NY 1 and Mirakov.

1059.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Sky of NY 1 and Mirakov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Sky of NY 1 and Mirakov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Mirakov, through Sky of NY 1, to Mirakov to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiff, among others, through Sky of NY 1; and (v) knowingly supporting the negotiation and

270

performance of kickback agreements between Mirakov through Sky of NY 1 and the No-fault Clinics.

1060.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Sky of NY 1 and Mirakov to obtain fraudulently inflated payments from Plaintiffs, among others.

1061.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1062.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Sky of NY 1 in an amount to be determined at trial, but in no event less than $10,000.00.

1063.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1064.  By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## EIGHTY-SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS MALAKOV, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1065.  The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

1066.  At all times relevant herein, Towers NY was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1067.  From, in or about May 26, 2017 through the date of the filing of this Complaint, Defendant Malakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Towers NY enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1068.  At all relevant times mentioned herein, Defendant Malakov together with others unknown to Plaintiffs, exerted control over and directed the operations of the Towers NY enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company and Allstate

Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1069.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Malakov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1070.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

## The Pattern of Racketeering Activity
### (Racketeering Acts)

1071.   The racketeering acts set forth herein were carried out on a continued basis for more than a one-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Malakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1072.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Towers NY continues to pursue collection on the fraudulent billing to the present day.

1073.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Malakov, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Towers NY enterprise based upon materially false and misleading information.

1074.   Through the Towers NY enterprise, Defendant Malakov submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Malakov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Malakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Towers NY enterprise through the filing of this Complaint.

1075.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Malakov, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1076.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1077.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

1078.  By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $14,000.00, the exact amount to be determined at trial.

1079.  Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Malakov, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### EIGHTY- EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS TOWERS NY AND MALAKOV

### (Common Law Fraud)

1080.  The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1081.  Defendants Towers NY and Malakov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

1082.  On information and belief, each and every bill and supporting documentation submitted by Defendants Towers NY and Malakov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-

fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1083. On information and belief, Defendants Towers NY and Malakov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Towers NY was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Malakov, through Towers NY, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Malakov, through Towers NY, to

manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1084.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Tower NY's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1085.   Defendants Towers NY and Malakov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1086.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Towers NY and Malakov.

1087.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Tower NY's claims for No-fault insurance benefits submitted in connection therewith.

1088.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Towers NY and Malakov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1089.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to

be in excess of $15,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTY- NINTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS TOWERS NY AND MALAKOV

## (Unjust Enrichment)

1090.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1091.   By reason of their wrongdoing, Defendants Towers NY and Malakov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1092.   Plaintiffs are therefore entitled to restitution from Defendants Towers NY and Malakov in the amount by which it has been unjustly enriched.

1093.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $15,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETIETH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1094.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1095.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Towers NY and Malakov.

1096.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Towers NY and Malakov purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Towers NY and Malakov could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Malakov, through Towers NY, to Towers NY and Malakov to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Towers NY; and (v) knowingly supporting the

negotiation and performance of kickback agreements between Malakov, through Towers NY, and the No-fault Clinics.

1097.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Towers NY and Malakov to obtain fraudulently inflated payments from Plaintiffs, among others.

1098.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1099.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate New Jersey Property and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Towers NY in an amount to be determined at trial, but in no event less than $15,000.00.

1100.   On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1101.  By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just.

## NINETY- FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS TSOYREF, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

## (RICO, pursuant to 18 U.S.C. § 1962(c))

1102.  The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

1103.  At all times relevant herein, Universal Supply Distribution was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1104.  From, in or about February 14, 2017 through the date of the filing of this Complaint, Defendant Tsoyref, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Universal Supply Distribution enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

1105.  At all relevant times mentioned herein, Defendant Tsoyref, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Universal Supply Distribution enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty

Insurance Company, and Allstate Property and Casualty Insurance Company that were based, in part, on the utilization of fraudulent wholesale invoices.

1106.   On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Tsoyref required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1107.   On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1108.   The racketeering acts set forth herein were carried out on a continued basis for more than a two-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Tsoyref, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1109.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Universal Supply Distribution continues to pursue collection on the fraudulent billing to the present day.

1110.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Tsoyref, with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to Universal Supply Distribution enterprise based upon materially false and misleading information.

1111.   Through the Universal Supply Distribution enterprise, Defendant Tsoyref submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Tsoyref, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Tsoyref, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Universal Supply Distribution enterprise through the filing of this Complaint.

1112.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Tsoyref in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1113.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1114.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

1115.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and Plaintiffs have been damaged in the aggregate amount presently in excess of $29,000.00, the exact amount to be determined at trial.

1116.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover from Defendants Tsoyref, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## NINETY- SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANTS UNIVERSAL SUPPLY DISTRIBUTION AND TSOYREF

### (Common Law Fraud)

1117.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1118.   Defendants Universal Supply Distribution and Tsoyref made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

1119.   On information and belief, each and every bill and supporting documentation submitted by Defendants Universal Supply Distribution and Tsoyref to Plaintiffs set forth false and

fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1120. On information and belief, Defendants Universal Supply Distribution and Tsoyref intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Universal Supply Distribution was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Tsoyref, through Universal Supply Distribution, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially

similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Tsoyref through Universal Supply Distribution, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1121.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Universal Supply Distribution's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1122.   Defendants Universal Supply Distribution and Tsoyref knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1123.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Universal Supply Distribution and Tsoyref.

1124.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Universal Supply Distribution's claims for No-fault insurance benefits submitted in connection therewith.

1125.   Furthermore, the far reaching pattern of fraudulent conduct by Defendants Universal Supply Distribution and Tsoyref evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1126.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have

sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $29,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINETY- THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS UNIVERSAL SUPPLY DISTRIBUTION AND TSOYREF

## (Unjust Enrichment)

1127.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1128.   By reason of their wrongdoing, Defendants Universal Supply Distribution and Tsoyref have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1129.   Plaintiffs are therefore entitled to restitution from Defendants Universal Supply Distribution and Tsoyref in the amount by which it has been unjustly enriched.

1130.   By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $29,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1131.  The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1132.  On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Universal Supply Distribution and Tsoyref.

1133.  On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Universal Supply Distribution and Tsoyref purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Defendants Universal Supply Distribution and Tsoyref could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Tsoyref through Universal Supply Distribution to Universal Supply Distribution to create the impression of an actual sale in furtherance of the money laundering scheme; (iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others,

288

through Universal Supply Distribution; and (v) knowingly supporting the negotiation and performance of kickback agreements between Tsoyref through Universal Supply Distribution and the No-fault Clinics.

1134.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Universal Supply Distribution and Tsoyref to obtain fraudulently inflated payments from Plaintiffs, among others.

1135.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1136.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges submitted through Universal Supply Distribution in an amount to be determined at trial, but in no event less than $29,000.00.

1137.  On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1138.  By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

## NINETY- FIFTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS ZHERLITSYN, ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (RICO, pursuant to 18 U.S.C. § 1962(c))

1139.  The allegations of paragraphs 1 through 257 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

1140.  At all times relevant herein, Vsevars Medical Supply was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

1141.  From, in or about September 11, 2014 through the date of the filing of this Complaint, Defendant Zherlitsyn, one or more of the ABC Corporations 1 through 20, and one or more of the John Does 1 through 20, knowingly conducted and participated in the affairs of the Vsevars Medical Supply enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

290

1142. At all relevant times mentioned herein, Defendant Zherlitsyn together with others unknown to Plaintiffs, exerted control over and directed the operations of the Vsevars Medical Supply enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff Allstate Insurance Company that was based, in part, on the utilization of fraudulent wholesale invoices.

1143. On information and belief, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 participated in the scheme by providing inexpensive DME and/or orthotic devices, to the extent any such items were in fact provided, as well as bogus documentation, along with fraudulent wholesale invoices that grossly inflated the purported cost of the DME and/or orthotic devices to facilitate the fraudulent billing alleged in the Complaint. One or more of the ABC Corporations furnished documents that Defendant Zherlitsyn required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims, including fictitious wholesale invoices for medical supplies.

1144. On information and belief, it was both foreseeable and the intended consequence that the wholesale invoices provided by one or more of the John Does 1 through 20, through one or more of the ABC Corporations 1 through 20, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

### The Pattern of Racketeering Activity
### (Racketeering Acts)

1145. The racketeering acts set forth herein were carried out on a continued basis for more than a four-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Zherlitsyn, one or more of the ABC Corporations 1 through 20, and one or more of

the John Does 1 through 20 to fraudulently bill for DME and/or orthotic devices to defraud insurers, and, if not stopped, such acts will continue into the future.

1146.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Zherlitsyn continues to pursue collection on the fraudulent billing to the present day.

1147.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Zherlitsyn with the knowledge and intent of one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Vsevars Medical Supply enterprise based upon materially false and misleading information.

1148.   Through the Vsevars Medical Supply enterprise, Defendant Zherlitsyn submitted numerous of fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous of No-fault Claimants. The bills and supporting documents that were sent by Defendant Zherlitsyn, well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Zherlitsyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of Vsevars Medical Supply enterprise through the filing of this Complaint.

1149.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Zherlitsyn

in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

1150.   Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

1151.   Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

1152.   By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff Allstate Insurance Company has been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $3,000.00, the exact amount to be determined at trial.

1153.   Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Zherlitsyn, one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

### NINETY- SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS VSEVARS MEDICAL SUPPLY AND ZHERLITSYN

### (Common Law Fraud)

1154.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1155. Defendants Vsevars Medical Supply and Zherlitsyn made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company for payment.

1156.  On information and belief, each and every bill and supporting documentation submitted by Defendants Vsevars Medical Supply and Zherlitsyn to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME and/or orthotic devices that they purportedly supplied to No-fault Claimants. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the No-fault Claimants and the consumer public.

1157.  On information and belief, Defendants Vsevars Medical Supply and Zherlitsyn intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality and cost of the DME and/or orthotic devices purportedly supplied to No-fault Claimants;

- False and misleading statements as to the amounts Vsevars Medical Supply was entitled to be reimbursed under the No-fault Law;

- With respect to Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs that the DME and/or orthotic devices allegedly supplied were in fact the items supplied to the No-fault Claimants;

- With respect to Non-Fee Schedule items, false and misleading statements in the bills and supporting documentation submitted to Plaintiffs misrepresenting that the charges for the DME and/or orthotic devices did not exceed the lesser of the actual wholesale cost of the medical equipment to the provider, plus 50%; or the usual and customary price charged to the public;

- False and misleading prescriptions for the DME and/or orthotic devices purportedly supplied to No-fault Claimants, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME and/or orthotic devices, concealing the fact that (a) the DME and/or orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Zherlitsyn, through Vsevars Medical Supply, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME and/or orthotic devices; (b) DME and/or orthotic devices not covered by the New York State Fee Schedule; and (c) DME and/or orthotic devices that could be generically described on the prescriptions, all of which was designed to permit Defendant Zherlitsyn through Vsevars Medical Supply, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

1158.   The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Vsevars Medical Supply's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

1159.   Defendants Vsevars Medical Supply and Zherlitsyn knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

1160.   Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Vsevars Medical Supply and Zherlitsyn.

1161.   Had Plaintiffs known of the fraudulent content of the bills, prescriptions and delivery receipts, they would not have paid the Defendant Vsevars Medical Supply's claims for No-fault insurance benefits submitted in connection therewith.

1162.    Furthermore, the far reaching pattern of fraudulent conduct by Defendants Vsevars Medical Supply and Zherlitsyn evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

1163.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $6,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## NINETY- SEVENTH CLAIM FOR RELIEF

## AGAINST DEFENDANTS VSEVARS MEDICAL SUPPLY AND ZHERLITSYN

### (Unjust Enrichment)

1164.    The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1165.    By reason of their wrongdoing, Defendants Vsevars Medical Supply and Zherlitsyn have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

1166.    Plaintiffs are therefore entitled to restitution from Defendants Vsevars Medical Supply and Zherlitsyn in the amount by which it has been unjustly enriched.

1167.    By reason of the foregoing, Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have

sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $6,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## NINETY- EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANTS ABC CORPORATIONS 1 THROUGH 20 AND JOHN DOES 1 THROUGH 20

### (Aiding and Abetting)

1168.   The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1169.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) knowingly aided and abetted the fraudulent scheme perpetrated on Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company by Defendants Vsevars Medical Supply and Zherlitsyn.

1170.   On information and belief, the acts taken by the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme include: (i) knowingly creating fraudulent wholesale invoices that deliberately omit any meaningful information regarding the DME and/or orthotic devices, including the manufacturer, make and model of the DME and/or orthotic devices that Defendants Vsevars Medical Supply and Zherlitsyn purportedly provided to No-fault Claimants; (ii) knowingly providing the fraudulent wholesale invoices so that Vsevars Medical Supply and Zherlitsyn could mail fraudulent bills to Plaintiffs and other insurers; (iii) kicking back a portion of the amounts paid by Defendant Zherlitsyn through Vsevars Medical Supply to Vsevars Medical Supply to create the impression of an actual sale in furtherance of the money laundering scheme;

(iv) knowingly creating fraudulent wholesale invoices by intentionally inflating the amounts represented to constitute the wholesale costs and/or quantities of DME and/or orthotic devices in order to support the fraudulent billing submitted to Plaintiffs, among others, through Vsevars Medical Supply; and (v) knowingly supporting the negotiation and performance of kickback agreements between Zherlitsyn through Vsevars Medical Supply and the No-fault Clinics.

1171.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) in furtherance of the fraudulent scheme is significant and material, is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Defendants Vsevars Medical Supply and Zherlitsyn to obtain fraudulently inflated payments from Plaintiffs, among others.

1172.   On information and belief, the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) aided and abetted the fraudulent scheme in a calculated effort to induce Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company into paying charges for DME and/or orthotic devices that were not compensable under the No-fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

1173.   On information and belief, the conduct of the Wholesale Defendants (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) caused Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company to pay money based upon the fraudulent charges

submitted through Vsevars Medical Supply in an amount to be determined at trial, but in no event less than $6,000.00.

1174.  On information and belief, the Wholesale Defendants' (one or more of the ABC Corporations 1 through 20 and one or more of the John Does 1 through 20) extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Plaintiffs to recover punitive damages.

1175.  By reason of the foregoing, Plaintiffs are entitled to compensatory and punitive damages, plus interest, costs and other relief the Court deems just

### NINETY- NINTH CLAIM FOR RELIEF

### AGAINST ALL RETAIL DEFENDANTS

### (Declaratory Judgment under 28 U.S.C. § 2201)

1176.  The allegations of paragraphs 1 through 257 are hereby repeated and realleged as though fully set forth herein.

1177.   At all relevant times mentioned herein, each and every bill mailed by the Retail Owners, through their respective Retailers, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and New York State Medicaid Fee Schedule by materially misrepresenting the DME and/or orthotic devices provided, if provided at all, as well as the cost and quality of the billed for DME and/or orthotic devices.

1178.  To the extent the DME and/or orthotic devices were provided at all, each item was a basic, low-quality piece of medical equipment for which the Retailers' wholesale cost was a mere fraction of the amount they charged Plaintiffs and/or was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

1179.   At all times relevant herein, the Retail Defendants exploited the No-fault Law and New York State Medicaid Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the nature, quality and cost of items that both are and are not listed on the relevant fee schedule purportedly provided to Claimants.

1180.   In view of the Retail Defendants submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills they have submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs;

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and/or orthotic devices that they never supplied to No-fault Claimants.

1181.   As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed, which they never supplied to No-fault Claimants, in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Retail Defendants' No-fault claims.

300

1182.   Plaintiffs have no adequate remedy at law.

1183.   The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages in an amount in excess of $2,100,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs and reasonable attorneys' fees on the First, Fifth, Ninth, Tenth, Fourteenth, Eighteenth, Twenty-Second, Twenty-Sixth, Thirtieth, Thirty-Fourth, Thirty-Eighth, Forty-Second, Forty-Sixth, Fiftieth, Fifty-Fourth, Fifty-Eighth, Sixty-Second, Sixty-Sixth, Seventieth, Seventy-Fourth, Seventy-Eighth, Seventy-Ninth, Eighty-Third, Eighty-Seventh, Ninety-First, and Ninety-Fifth Claims for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second, Sixth, Eleventh, Fifteenth, Nineteenth, Twenty-Third, Twenty-Seventh, Thirty-First, Thirty-Fifth, Thirty-Ninth, Forty-Third, Forty-Seventh, Fifty-First, Fifty-Fifth, Fifty-Ninth, Sixty-Third, Sixty-Seventh, Seventy-First, Seventy-Fifth, Eightieth, Eighty-Fourth, Eighty-Eighth, Ninety-Second, and Ninety-Sixth Claims for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third, Seventh, Twelfth, Sixteenth, Twentieth, Twenty-Fourth, Twenty-Eighth, Thirty-Second, Thirty-Sixth, Fortieth, Forty-Fourth, Forty-

301

Eighth, Fifty-Second, Fifty-Sixth, Sixtieth, Sixty-Fourth, Sixty-Eighth, Seventy-Second, Seventy-Sixth, Eighty-First, Eighty-Fifth, Eighty-Ninth, Ninety-Third, and Ninety-Seventh Claims for Relief, together with prejudgment interest;

vi)     Compensatory and punitive damages on the Fourth, Eighth, Thirteenth, Seventeenth, Twenty-First, Twenty-Fifth, Twenty-Ninth, Thirty-Third, Thirty-Seventh, Forty-First, Forty-Fifth, Forty-Ninth, Fifty-Third, Fifty-Seventh, Sixty-First, Sixty-Fifth, Sixty-Ninth, Seventy-Third, Seventy-Seventh, Eighty-Second, Eighty-Sixth, Ninetieth, Ninety-Fourth, and Ninety-Eighth Claims for Relief, together with prejudgment interest;

vii)     Declaratory relief on the Ninety-Ninth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants and the amounts they were entitled to be reimbursed in order to manipulate the payment formulas under the No-fault Law and New York State Medicaid Fee Schedule in their claims submissions and obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (ii) The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs about the DME and/or orthotic devices purportedly supplied to No-fault Claimants by submitting claims for DME and/or orthotic devices that they never supplied to No-fault Claimants; and

viii)     Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated: New York, New York,
     April 23, 2019

                                Morrison Mahoney LLP

                         By: /s/ James A. McKenney
                            Robert A. Stern, Esq.
                            Daniel S. Marvin, Esq.
                            James A. McKenney, Esq.
                            Lee Pinzow, Esq.
                            Attorneys for Plaintiffs
                            Wall Street Plaza
                            88 Pine Street, Suite 1900
                            New York, New York 10005
                            (212) 825-1212

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 045016█████

```
Status Report For:     GMO CONSULTING LLC
Report Date:           3/19/2025
Confirmation Number:   250783647934
```

**IDENTIFICATION NUMBER, ENTITY TYPE AND STATUS INFORMATION**

```
Business ID Number:    045016████
Business Type:         DOMESTIC LIMITED LIABILITY COMPANY
Status:                REVOKED FOR NOT FILING ANNUAL REPORT FOR 2
                       CONSECUTIVE YEARS
Original Filing Date:  04/25/2017
Stock Amount:          N/A
Home Jurisdiction:     NJ
Status Change Date:    NOT APPLICABLE
```

**REVOCATION/SUSPENSION INFORMATION**

```
DOR Suspension Start   11-16-2023
Date:
DOR Suspension End     N/A
Date:
Tax Suspension Start   N/A
Date:
Tax Suspension End     N/A
Date:
```

**ANNUAL REPORT INFORMATION**

```
Annual Report Month:   APRIL
Last Annual Report     07/12/2019
Filed:
Year:                  2019
```

**AGENT/SERVICE OF PROCESS (SOP)INFORMATION**

```
Agent:                 YEVSEY TSEYTELMAN
Agent/SOP Address:     199 UNION HILL RD ,MANALAPAN,NJ,07726
Address Status:        DELIVERABLE
Main Business Address: 199 UNION HILL RD ,MANALAPAN,NJ,07726
Principal Business     N/A
Address:
```

**ASSOCIATED NAMES**

```
Associated Name:       N/A
Type:                  N/A
```

**EXHIBIT**

Plf's 4

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 045016█████

## PRINCIPALS

Following are the most recently reported officers/directors (corporations),
managers/members/managing members (LLCs), general partners (LPs), trustees/officers
(non-profits).

| | |
|---|---|
| Title: | OTHER |
| Name: | YEVSEY TSEYTELMAN, |
| Address: | 199 UNION HILL RD  ,MANALAPAN,NJ 07726 |

## FILING HISTORY -- CORPORATIONS, LIMITED LIABILITY COMPANIES, LIMITED PARTNERSHIPS AND LIMITED LIABILITY PARTNERSHIPS

To order copies of any of the filings below, return to the service page,
https://www.njportal.com/dor/businessRecords/ and follow the instructions for obtaining
copies. Please note that trade names are filed initially with the County Clerk(s) and
are not available through this service. Contact the Division for instructions on how to
order Trade Mark documents.

Charter Documents for Corporations, LLCs, LPs and LLPs

| | |
|---|---|
| Original Filing (Certificate) Date: | 2017 |

Changes and Amendments to the Original Certificate:

| Filing Type | Year Filed |
|---|---|
| REVOKED FOR FAILURE TO PAY ANNUAL REPORTS | 2023 |

Note:
Copies of some of the charter documents above, particularly those filed before August
1988 and recently filed documents (filed less than 20 work days from the current date),
may not be available for online download.

• For older filings, contact the Division for instructions on how to order.

New Jersey Business Gateway
Business Entity Information and Records Service
Business Id : 045016████

- For recent filings, allow 20 work days from the estimated filing date, revisit the
  service center at https://www.njportal.com/dor/businessRecords/ periodically,
  search for the business again and build a current list of its filings. Repeat this
  procedure until the document shows on the list of documents available for download.

The Division cannot provide information on filing requests that are in process. Only
officially filed documents are available for download.

**NEW JERSEY DEPARTMENT OF THE TREASURY**
**DIVISION OF REVENUE AND ENTERPRISE SERVICES**

## CERTIFICATE OF FORMATION

### GMO CONSULTING LLC
### 045016█████

The above-named DOMESTIC LIMITED LIABILITY COMPANY was duly filed in accordance with New Jersey State Law on 04/25/2017 and was assigned identification number 045016█████. Following are the articles that constitute its original certificate.

1. **Name:**
   GMO CONSULTING LLC

2. **Registered Agent:**
   YEVSEY TSEYTELMAN

3. **Registered Office:**
   199 UNION HILL RD
   MANALAPAN, NEW JERSEY 07726

4. **Business Purpose:**
   CONSULTING FOR MEDICAL PRACTICES

5. **Effective Date of this Filing is:**
   04/25/2017

6. **Members/Managers:**
   YEVSEY TSEYTELMAN
   199 UNION HILL RD
   MANALAPAN, NEW JERSEY 07726

7. **Main Business Address:**
   199 UNION HILL RD
   MANALAPAN, NEW JERSEY 07726

**Signatures:**

YEVSEY TSEYTELMAN
AUTHORIZED REPRESENTATIVE

*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal 25th day of April, 2017*

*Ford M. Scudder*
*State Treasurer*

Certificate Number : 4032457028
Verify this certificate online at
https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

Page 1 of 1

# Business Account Application



| Bank Name: | Branch Name: |
|---|---|
| WELLS FARGO BANK, N.A. | MANALAPAN GORDONS CORNER |

| Banker Name: | Officer/Portfolio Number: | Date: |
|---|---|---|
| ILYA BINDER | CM715 | 09/28/2018 |

| Banker Phone: | Branch Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 732/409-7041 | 08744 | 0067606 | J2189-010 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only    [ ] New Deposit Account(s) and Business Credit Card

| Account 1 Product Name: | Purpose of Account 1 : |
|---|---|
| Wells Fargo Business Choice Checking | General Operating Account |

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 347 | DDA | ███████7062 | $2,700.00 | CACK |

| New Account Kit: | Checking/Savings Bonus Offer Available: |
|---|---|
| ████████ | NO |

## Related Customer Information

| Customer 1 Name: |
|---|
| GMO CONSULTING LLC |

| Enterprise Customer Number (ECN): | Account Relationship: |
|---|---|
| ████████ | Sole Owner |

| Customer 2 Name: |
|---|
| YEVSEY TSEYTELMAN |

| Enterprise Customer Number (ECN): | Account Relationship: |
|---|---|
| ████████ | Signer |

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: |
|---|---|
| GMO CONSULTING LLC | 2661 CONEY ISLAND AVE |
| | Address Line 2: |
| | STE 7 |
| | City: BROOKLYN / State: NY |
| | ZIP/Postal Code: 11223-5502 / Country: US |



2W02-001116376960-01



EXHIBIT

Plf's 5

REDE Page 35 of 1240

**CONFIDENT MEDICAL SERVICES PC**
35 ACKERMAN AVE.
CLIFTON, NJ 07011-1501

55-233/212

103

DATE 11.05.18

PAY TO THE ORDER OF _GMO Consulting LLC_ | $ 44000 ⁰⁰/₁₀₀

_Forty Four Thousand_ ⁰⁰/₁₀₀ ———  DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO _____

_Robert Kelly_

⑆021202337⑆   ▮▮▮▮▮▮▮▮   1771"0103

ENDORSE HERE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
□ CHECK HERE AFTER MOBILE OR REMOTE DEPOSIT

2489146824

REQUEST 00000000009302756    44000.00
20181106 000002489146824+
ACCT▮▮▮▮▮▮1771+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**EXHIBIT**

Plf's 6

**Wells Fargo Bank eDeposit Credit Copy**

| | |
|---|---|
| **Transaction Date and Time:** | **03/25/2019 04:34  PM EDT** |
| **Customer Name(s)** | **GMO CONSULTING LLC** |

**Account Address**

| | | |
|---|---|---|
| **Cash In:** | **$** | **0.00** |
| **Less Cash:** | **$** | **0.00** |
| **Total Checks Amount:** | **$** | **9,745.00** |
| **Credit Serial Number** | | **0841634301** |
| **Deposit Total** | | **$9,745.00** |
| **Credited account number** | | ▇7062 |
| **Customer or Teller initiated** | | **C** |
| **Customer confirmed on Pin Pad** | | **Y** |
| **CB, AU, Sequence Num** | | **03 0067606 0033** |

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**

6044288646

**Electronically generated image**

REQUEST 00000000009302756    9745.00
20190325 000006044288646+
ACCT▇▇▇▇▇7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**CONFIDENT MEDICAL SERVICES PC**
35 ACKERMAN AVE.
CLIFTON, NJ 07011-1501

55-233/212

186

DATE 03, 24, 19

PAY TO THE
ORDER OF    GMO    LLC                    $ 6500 00

Sixty Five hundred                        DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

Robert Kelly

MEMO

⑈021202337⑈          1771⑈0186

REQUEST 00000000009302756    6500.00
20190325 000006044288644+
ACCT ▆▆▆▆▆▆1771+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**Wells Fargo Bank eDeposit Credit Copy**

| | |
|---|---|
| **Transaction Date and Time:** | 02/21/2019 09:41  AM EST |
| **Customer Name(s)** | GMO CONSULTING LLC |

**Account Address**

| | | |
|---|---|---|
| **Cash In:** | $ | 0.00 |
| **Less Cash:** | $ | 0.00 |
| **Total Checks Amount:** | $ | 23,464.00 |
| **Credit Serial Number** | | 0520941171 |
| **Deposit Total** | | |
| **Credited account number** | ▮▮▮7062 | |
| **Customer or Teller initiated** | C | |
| **Customer confirmed on Pin Pad** | Y | |
| **CB, AU, Sequence Num** | 04 0067606 0006 | |

$23,464.00

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**

2487164347

**Electronically generated image**

REQUEST 00000000009302756     23464.00
20190221 000002487164347+
ACCT▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

55-233/212

405

**HARBOR MEDICAL GROUP PA**

DATE 02/19/19

PAY TO THE ORDER OF  GMO  LLC  $ 23464 ²²

Twenty Three Thousand & Four xaudeed & sixty Four DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

Robert Kelly  NP

MEMO

⑆021202337⑆  ███  5200⑈0405

REQUEST 0000000009302756    23464.00
20190221 000002487164346+
ACCT███████5200+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**Wells Fargo Bank eDeposit Credit Copy**

| | | |
|---|---|---|
| Transaction Date and Time: | 03/06/2019 03:12 PM EST | |
| Customer Name(s) | GMO CONSULTING LLC | |

**Account Address**

| | | | |
|---|---|---|---|
| Cash In: | $ | 0.00 | |
| Less Cash: | $ | 0.00 | |
| Total Checks Amount: | $ | 16,700.00 | |
| Credit Serial Number | | 0651512091 | |
| **Deposit Total** | | | $16,700.00 |
| Credited account number | ▮7062 | | |
| Customer or Teller initiated | T | | |
| Customer confirmed on Pin Pad | Y | | |
| CB, AU, Sequence Num | 05 0067606 0104 | | |

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**

2489145920

**Electronically generated image**

REQUEST 00000000009302756   16700.00
20190306 000002489145920+
ACCT ▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

55-233/212

**414**

**HARBOR MEDICAL GROUP PA**

DATE 03.05.19

PAY TO THE ORDER OF _G M D LLC_                           $ 16700

_Sixty Thousand & Seven Hundred_ —                        DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO                                      _Robert Kelly_  MP

⑈021202337⑈        ▇▇▇▇        5200 m 0414

2489145917

REQUEST 00000000009302756    16700.00
20190306 000002489145917+
ACCT ▇▇▇▇▇25200+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**Wells Fargo Bank eDeposit Credit Copy**

Transaction Date and Time:    12/28/2018 11:17 AM EST
Customer Name(s)              GMO CONSULTING LLC


Account Address

Cash In:                      $         0.00
Less Cash:                    $         0.00
Total Checks Amount:          $     55,000.00
Credit Serial Number                3621116561
Deposit Total                                                    $55,000.00
Credited account number       ████7062
Customer or Teller initiated  C
Customer confirmed on Pin Pad Y
CB, AU, Sequence Num          03 0067606 0034

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**


6044282604


**Electronically generated image**


REQUEST 00000000009302756    55000.00
20181228 000006044282604+
ACCT████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**HARBOR MEDICAL GROUP PA**

3890

1-2/210

DATE 12.26.18

PAY TO THE ORDER OF _GMO consulting LLC_    $ 55000.00

_FIFTY FIVE Thousand 00/xx_    DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

Robert Kelly    MP

⑆021000021⑆    5200 3890

6044282601

REQUEST 00000000009302756    55000.00
20181228 000006044282601+
ACCT 000000000000000+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**Wells Fargo Bank eDeposit Credit Copy**

| | |
|---|---|
| Transaction Date and Time: | 12/11/2018 09:23 AM EST |
| Customer Name(s) | GMO CONSULTING LLC |

**Account Address**

| | | |
|---|---|---|
| Cash In: | $ | 0.00 |
| Less Cash: | $ | 0.00 |
| Total Checks Amount: | $ | 40,000.00 |
| Credit Serial Number | | 3450922291 |

**Deposit Total**                                                      $40,000.00

| | |
|---|---|
| Credited account number | ▮7062 |
| Customer or Teller initiated | C |
| Customer confirmed on Pin Pad | Y |
| CB, AU, Sequence Num | 03 0067606 0005 |

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**

6044281070

Electronically generated image

REQUEST 00000000009302756    40000.00
20181211 000006044281070+
ACCT▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**HARBOR MEDICAL GROUP PA**

4716

1-2/210

DATE 12.10.18

PAY TO THE ORDER OF _GmO consulting LLC_    $ 40000 00/xx

_Forty Trousand_    DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

_Robert Kelly_    MP

⑈021000021⑈    5200⑈4716

504428 1067

ENDORSE HERE

CHECK HERE AFTER MOBILE OR REMOTE DEPOSIT

DATE

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

REQUEST 0000000009302756    40000.00
20181211 000006044281067+
ACCT 000000000000000+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**Wells Fargo Bank eDeposit Credit Copy**

| | |
|---|---|
| Transaction Date and Time: | 02/14/2019 09:30 AM EST |
| Customer Name(s) | GMO CONSULTING LLC |

**Account Address**

| | | |
|---|---|---|
| Cash In: | $ | 0.00 |
| Less Cash: | $ | 0.00 |
| Total Checks Amount: | $ | 23,464.00 |
| Credit Serial Number | | 0450930141 |
| **Deposit Total** | | |
| Credited account number | ████7062 | |
| Customer or Teller initiated | C | |
| Customer confirmed on Pin Pad | Y | |
| CB, AU, Sequence Num | 03 0067606 0009 | |

$23,464.00

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**

6044285726

**Electronically generated image**

REQUEST 00000000009302756    23464.00
20190214 000006044285726+
ACCT ████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

HARBOR MEDICAL GROUP PA

4730

1-2/210

DATE 02.13.19

PAY TO THE
ORDER OF    GMO    LLC    $ 23464

Twenty Tree Thousand & four hundred & sixty four DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

Robert Kelly NP

⑆021000021⑆    5200⑆4730

6044285724

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE

CHECK HERE AFTER MOBILE OR REMOTE DEPOSIT

DATE

ENDORSE HERE

REQUEST 0000000009302756    23464.00
20190214 000006044285725+
ACCT⬛⬛⬛⬛⬛5200+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**Wells Fargo Bank eDeposit Credit Copy**

| | | |
|---|---|---|
| Transaction Date and Time: | 02/19/2019 09:47  AM EST | |
| Customer Name(s) | GMO CONSULTING LLC | |

**Account Address**

| | | | |
|---|---|---|---|
| Cash In: | $ | 0.00 | |
| Less Cash: | $ | 0.00 | |
| Total Checks Amount: | $ | 17,991.00 | |
| Credit Serial Number | | 0500947241 | |
| **Deposit Total** | | | **$17,991.00** |
| Credited account number | █████7062 | | |
| Customer or Teller initiated | T | | |
| Customer confirmed on Pin Pad | Y | | |
| CB, AU, Sequence Num | 05 0067606 0102 | | |

**Wells Fargo Bank, N.A.**
**Electronically Generated Image**

2489141465

**Electronically generated image**

REQUEST 00000000009302756    17991.00
20190219 000002489141465+
ACCT███████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**HARBOR MEDICAL GROUP PA**

4731

1-2/210

DATE 02.15.19

PAY TO THE ORDER OF  G m O LLC                          $ 17991

seventyn Trousand 1 nine xandred Pninty one DOLLARS

**CHASE** ◆
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

Robert Kelly    MP

⑆0 2 ⑆0000 2 ⑆⑆    5 2 0 0 ⑆ 4 7 3 1

ENDORSE HERE

REQUEST 00000000009302756    17991.00
20190219 000002489141462+
ACCT ████████5200+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

5/15/24, 8:17 AM                                              Html Report





| | |
|---|---|
| Account Number | ⬛1771 |
| OF6 | 0 |
| Amount | $57,000.00 |
| Trans | 0 |
| Post Date | 20181113 |
| Routing Number | 021202337 |
| Sequence | 30196646 |
| Serial | 102 |



EXHIBIT

Plf's 7



**Northfield** Bank    CHECKING DEPOSIT    CASH ▶

Date 11.01.18

Name  A M G  Inc.

Address

EB
NOV 0 1 18
40·4008

ACCOUNT NUMBER
0·908

SUB TOTAL

LESS CASH RECEIVED ▶

NET DEPOSIT  57000.00

⑆530010007⑆    009

| | |
|---|---|
| Account Number | 0908 |
| OF6 | 0 |
| Amount | $57,000.00 |
| Trans | 9 |
| Post Date | 20181101 |
| Routing Number | 530010007 |
| Sequence | 33305403 |
| Serial | 0 |



-BranchName=East Brunswick BranchBr=40-BusDt=11/01/18-TirID=4008-1



**CONFIDENT MEDICAL SERVICES PC**
35 ACKERMAN AVE.
CLIFTON, NJ 07011-1501

55-233/212                    105

DATE 10.30.18

PAY TO THE ORDER OF  A M G  Inc.    $ 57000 00/xx

F/F+Y  Seven  Thousand  00/xx    DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

Robert Kelly    MP

⑆021202337⑆    1771⑈0105

| | |
|---|---|
| Account Number | 1771 |
| OF6 | 0 |
| Amount | $57,000.00 |
| Trans | 0 |
| Post Date | 20181101 |
| Routing Number | 021202337 |
| Sequence | 33305404 |
| Serial | 105 |



| Account Number | 1771 |
| OF6 | 0 |
| Amount | $20,000.00 |
| Trans | 0 |
| Post Date | 20181123 |
| Routing Number | 021202337 |
| Sequence | 885232641 |
| Serial | 113 |





| Account Number | 0908 |
| OF6 | 0 |
| Amount | $52,975.00 |
| Trans | 9 |
| Post Date | 20181130 |
| Routing Number | 226071457 |
| Sequence | 33308659 |
| Serial | 0 |



CONFIDENT MEDICAL SERVICES PC
35 ACKERMAN AVE.
CLIFTON, NJ 07011-1501

55-233/212

115

DATE 11.29.18

PAY TO THE ORDER OF *AMG management Inc.* | $ 50000 ⁰⁰/₁₀₀

*Fifty Thousand* ⁰⁰/₁₀₀ DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

*Robert Kelly*

⑆021202337⑆ 1771 0115

| Account Number | 1771 |
| OF6 | 0 |
| Amount | $50,000.00 |
| Trans | 0 |
| Post Date | 20181130 |
| Routing Number | 021202337 |
| Sequence | 33308660 |
| Serial | 115 |











| | |
|---|---|
| Account Number | 1771 |
| OF6 | 0 |
| Amount | $17,145.00 |
| Trans | 0 |
| Post Date | 20190219 |
| Routing Number | 021202337 |
| Sequence | 33316950 |
| Serial | 144 |

CONFIDENT MEDICAL SERVICES PC
35 ACKERMAN AVE.
CLIFTON, NJ 07011-1501

55-233/212        144

DATE 02.14.19

PAY TO THE ORDER OF  AMG INC.        $ 17145

Seventyn Trousand & One xandred e Forty Five DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

Robert Kelly

MEMO

⑆021202337⑆        1771⑈0144





-BranchName=East Brunswick BranchBr=40-BusDt=02/02/19-TlrID=4007-

-BranchName=East Brunswick BranchBr=40-BusDt=02/02/19-TlrID=4007-1



**CONFIDENT MEDICAL SERVICES PC**
35 ACKERMAN AVE.
CLIFTON, NJ 07011-1501

55-233/212

147

DATE 01 / 31 / 19

PAY TO THE ORDER OF _A M G Inc._ $ 16 752

Sixty a Trausand & Seven Hundred & Fifty two

**CHASE** ◯
JPMorgan Chase Bank, N.A.
www.Chase.com

_Robert Kelly_ VP

MEMO

⑆021202337⑆ ⬛⬛⬛ 771⑈0147

| | |
|---|---|
| Account Number | ⬛1771 |
| OF6 | 0 |
| Amount | $16,752.00 |
| Trans | 0 |
| Post Date | 20190204 |
| Routing Number | 021202337 |
| Sequence | 33315749 |
| Serial | 147 |



-BranchName=East Brunswick BranchBr=40-BusDt=02/02/19-TlrID=4007-

-BranchName=East Brunswick BranchBr=40-BusDt=02/02/19-TlrID=4007-1



| | |
|---|---|
| Account Number | 1771 |
| OF6 | 0 |
| Amount | $11,700.00 |
| Trans | 0 |
| Post Date | 20190325 |
| Routing Number | 021202337 |
| Sequence | 873027273 |
| Serial | 174 |





| | |
|---|---|
| Account Number | 0908 |
| OF6 | 0 |
| Amount | $1,275.00 |
| Trans | 9 |
| Post Date | 20190325 |
| Routing Number | 530010007 |
| Sequence | 885246369 |
| Serial | 0 |



**HARBOR MEDICAL GROUP PA**

55-233/212

**401**

DATE 02.14.19

PAY TO THE ORDER OF A M G Inc. $ 18202

eighteen Thousand Two hundred Two DOLLARS

**CHASE**
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

Robert Kelly

⑈021202337⑈ 5200⑈0401

| | |
|---|---|
| Account Number | 5200 |
| OF6 | 0 |
| Amount | $18,202.00 |
| Trans | 0 |
| Post Date | 20190219 |
| Routing Number | 021202337 |
| Sequence | 33316951 |
| Serial | 401 |



BranchName=East Brunswick BranchBr=40-BusDt=02/19/19-TlrID=4008-1

40-4008

FEB 19 19

EB

-BranchName=East Brunswick BranchBr=40-BusDt=02/19/19-TlrID=4008-1

ENDORSE HERE





| | |
|---|---|
| Account Number | 5200 |
| OF6 | 0 |
| Amount | $16,975.00 |
| Trans | 0 |
| Post Date | 20190306 |
| Routing Number | 021202337 |
| Sequence | 885244299 |
| Serial | 413 |





| | |
|---|---|
| Account Number | 0908 |
| OF6 | 0 |
| Amount | $550.00 |
| Trans | 9 |
| Post Date | 20190308 |
| Routing Number | 530010007 |
| Sequence | 885244572 |
| Serial | 0 |



| | |
|---|---|
| Account Number | 5200 |
| OF6 | 0 |
| Amount | $40,000.00 |
| Trans | 0 |
| Post Date | 20181211 |
| Routing Number | 021000021 |
| Sequence | 33309813 |
| Serial | 4714 |





| | |
|---|---|
| Account Number | 0908 |
| OF6 | 0 |
| Amount | $1,100.00 |
| Trans | 9 |
| Post Date | 20181214 |
| Routing Number | 226071457 |
| Sequence | 885235169 |
| Serial | 0 |

REDE Page 2 of 794



1101

55-2/212 8744

**GMO CONSULTING LLC**

10.12.18    Date

Pay to the Order of  EZRA Inc.    $ 3750 00/xx

Thurty Seven hundred & FIFTy 00/xx  Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For

⑆021200025⑆  7062⑈ 01101

PAY TO THE ORDER OF
THE "CFOR DEPOSIT ONLY
ROUT# 06 CB-Hao Yun .1# 538168
FOR DEPCtCB-Hao Yun
HAO YUN c109341977c CORP TELLE
LICENSED CASHER OF CHECKS
FEE: $75.00  AMT: $3,750.00
10/15/2018

REQUEST 00000000009302755     3750.00
20181016 000008227648814+
ACCT ████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

EXHIBIT

Plf's 8

REDE Page 4 of 794

**GMO CONSULTING LLC**

1104

55-2/212 8744

Date: 10.17.18.

Pay to the Order of: _Leomax Inc._     $ 3565 00/xx

_Twenty Five hundred & Sixty five 00/xx_     Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ ▇▇▇▇ 062⑆ 01104

PAY TO THE ORDER OF
THE CFOR DEPOSIT ON
ROUT# 06▇▇▇▇▇ ▇▇▇
FOR DEP▇ TCB-Hao Yun
HAO YUN ▇▇▇ 7278 8168
LICENSED CASHIER OF CHECKS
FEE: $71.30  AMT: $3,565.00
10/18/2018

REQUEST 0000000009302755    3565.00
20181019 000008228081923+
ACCT▇▇▇▇▇▇▇7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1109

55-2/212 8744

Date _10-23-18_

Pay to the Order of _Leona x Inc_    $ 2675 ²²

_Twenty six hundred & Seventy five_ Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ████ 7062⑈ 01109

---

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT;FOR DEPOSIT ONL
FOR DEPCTCB-Hao Yun
HAO YUN █████ 2934 CORP TELLEI
LICENSED CASHIER OF CHECKS
FEE: $53.50  AMT: $2,675.00
10/24/2018

8168

---

REQUEST 00000000009302755    2675.00
20181024 000008228654299+
ACCT████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1107

55-2/212 8744

10.22.18

Date

Pay to the Order of ___EZRO Inc.___    $ 3725.00

___Twenty Seven uandred & Twenty Five___    Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈  7062⑈ 01107

---

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT# FOR DEPOSIT ONL
FOR DEPCTGR Hao Yun
HAO YUN C
2935  CORP TELLEI
LICENSED              R OF CHECKS
FEE: $74.50  AMT: $3,725.00
10/24/2018

8168

REQUEST 00000000009302755    3725.00
20181024 000008228654300+
ACCT████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1112

55-2/212 8744

10. 29. 18
Date

Pay to the Order of _Leomax Inc._____ $ 2655 00/xx

_Twenty Six Hundred & Fifty Five_ ——————— Dollars

**WELLS FARGO** Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ 7062⑈ 01112

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT, FOR DEPOSIT ON
FOR DEP...
HAO YUN ...o Yun
LICENSED CASHIER OF CHECKS
FEE: $53.10  AMT: $2,655.00
10/29/2018

REQUEST 00000000009302755    2655.00
20181030 000008424951029+
███████████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1111

55-2/212 8744

Date 10.26.18

Pay to the Order of  E Z R A  Inc.    $ 2774 $\frac{00}{xx}$

Twenty Seven hundred & Seventy Four———  Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑁021200025⑁    ⑆7062⑆ 01111

PAY TO THE ORDER OF
THE CFOR DEPOSIT ON
ROUT# 06...
FOR DEPO... Hao Yun
HAO YUN
2353: CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $55.48  AMT: $2,774.00
10/29/2018

REQUEST 00000000009302755    2774.00
20181030 000008424951030+
███████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1113

55-2/212 8744

Date 10.30.18.

Pay to the Order of _Lesmax Inc_ $ 2275 00

_Twenty Two hundred & Seventy Five_ Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ 7062⑈ 01113

PAY TO THE ORDER OF
THE Commercial Bank
ROUT FOR DEPOSIT ON
FOR DEPOSIT Hao Yun
HAO YUN              4767C CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $45.50  AMT: $2,275.00
10/31/2018

8168

REQUEST 00000000009302755    2275.00
20181101 000008826758002+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1115

55-2/212 8744

Date: 11.05.18

Pay to the Order of: *Leomax Inc*          $ 3675 00/100

*Twesty Six Handred & Seventy Five* Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For: _____

⑆021200025⑆ ⬛⬛⬛⬛ 7062⑈ 01115

*[Back of check, rotated:]*
PAY TO THE ORDER OF
THE CASHIER'S BANK
ROUT⁕ V⁕⁕⁕⁕⁕⁕⁕⁕
FOR DEP⁕ CB Hao Yun
HAO YUN ⬛ 06571 CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $73.50  AMT: $3,675.00
11/05/2018

REQUEST 00000000009302755    3675.00
20181106 000008726020447+
⬛⬛⬛⬛⬛ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1118

55-2/212 8744

11.08.18
Date

Pay to the Order of _EZRa Inc._    $ 2900.00

_Twenty nine hundred_    Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ▮▮▮▮ 7062⑈ 01118

PAY TO THE ORDER OF
THE CFOR DEPOSIT ONLY
ROUT# 06...
FOR DEPC...
HAO YUN
LICENSED CASHER OF CHECKS
FEE: $58.00  AMT: $2,900.00
11/08/2018
0304 CORP TELLE
8168

REQUEST 00000000009302755    2900.00
20181109 000008827823219+
▮▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO CONSULTING LLC

1120

55-2/212 8744

11. 15. 18

Date

Pay to the Order of _Leomax Inc_                $ 2747 ⁰⁰/₁₀₀

_Twenty Seven xandeed & Forty Seven_            Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ 7062⑈ 01120

PAY TO THE ORDER OF
THE COMMERCIAL BANK
FOR DEPOSIT ONLY
ROUT# 0212(0025) 41-1*
FOR DEP... ...o Yun
HAO YUN
14191 141c9 CORP TELLE
LICENSED CASHER OF CHECKS
FEE: $54.94 AMT: $2,747.00
11/15/2018

8168

REQUEST 00000000009302755    2747.00
20181116 000008625686660+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1121**

55-2/212 8744

**GMO CONSULTING LLC**

11.15.18
Date

Pay to the Order of _EZRa Inc_                          $ 3475.00

_Thesty Four handred & Seventy five_                    Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈  [REDACTED]  ⑈062⑈  01121

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROC DEP ACCT#
FOR DEPOSIT ONLY
HAO YUN TCB-Hao YunⅭORP. TELLER
LICENSED (110176264) CHECKS
FEE: $69.50  AMT: $3,475.00
11/16/2018

REQUEST 00000000009302755    3475.00
20181119 000008828833987+
[REDACTED]7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1122

55-2/212 8744

11.20.18

Date

Pay to the Order of ___Leomax Inc___    $ 3475 ⁰⁰

_Twenty Four Hundred & Seventy Five_    Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For ___

⑆021200025⑆ ▉ 7062⑈ 01122

PAY TO THE ORDER OF
THE CFOR DEPOSIT ON
ROUT# 06...
FOR DEPO...
HAO YUN ...3268; CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $69.50  AMT: $3,475.00
11/21/2018

REQUEST 00000000009302755    3475.00
20181123 000008829366787+
▉▉▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1124

55-2/212 8744

*11.26.18*
Date

Pay to the Order of *Leomax Inc*                    $ *3700*$\frac{00}{}$

*Twenty Seven Hundred*                               Dollars

WELLS FARGO   Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆   7062⑈ 01124

PAY TO THE ORDER OF Inc
THE CFOR DEPOSIT ON
ROUT# U01 20125 01...
FOR DEPC TCB-Hao Yun
HAO YUN   8680; CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $74.00   AMT: $3,700.00
11/27/2018
8168

REQUEST 00000000009302755    3700.00
20181128 000008728399515+
▆▆▆▆▆▆▆▆7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1129**
55-2/212 8744

**GMO CONSULTING LLC**

11.30.18
Date

Pay to the Order of _Leomax Inc._     $ 3970.²²

_Twenty nine handred & seventy_ ⁰⁰ₓ₂    Dollars

Photo
Safe
Deposit®
Details on back

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____    MP

⑈021200025⑈  ▉▉▉▉▉  706 2⑈  01129

PAY TO THE ORDER OF
THE COMMERCIAL BANK
FOR DEPOSIT ON
ROUT+ 021/2101 A...
FOR DEP... FOR Hao Yun
HAO YUN            7545C CORP TELLE
LICENSED CASHER OF CHECKS
FEE: $79.40  AMT: $3,970.00
12/03/2018

REQUEST 00000000009302755    3970.00
20181204 000008627599347+
▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1131

55-2/212 8744

Date: 12.04.18

Pay to the Order of _Ezra inc._    $ 2970.00

Twenty nine hundred & Seventy — Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ▇▇▇▇ 7062⑈ 01131

PAY TO THE ORDER OF
THE CFOR DEPOSIT ONL
ROUT# 06_____
FOR DEPO TCB-Hao Yun
HAO YUN O____318c CORP TELLE
LICENSED CASHER OF CHECKS
FEE: $59.40  AMT: $2,970.00
12/05/2018

REQUEST 00000000009302755    2970.00
20181206 000008820913702+
▇▇▇▇▇▇▇▇7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1132

55-2/212 8744

Date 12.07.18

Pay to the Order of _EZRA Inc._                $ 3450 $\frac{00}{00}$

_Twenty Four Handred & Fifty_ $\frac{00}{00}$ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆0 2 1 2 0 0 0 2 5⑆ ⬛⬛⬛⬛ 7 0 6 2⑈ 0 1 1 3 2

PAY TO THE ORDER OF
THE CFOR DEPOSIT ON
ROUT# UO
FOR DEPOT CB: Hao Yun
HAO YUN                    933( CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $69.00 AMT: $3,450.00
12/10/2018

REQUEST 00000000009302755   3450.00
20181211 000008326219014+
⬛⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1137

55-2/212-8744

Date 12.12.18

Pay to the Order of __Leomax Inc__    $ 2970.00

__Twenty nine hundred & Seventy _____ Dollars.

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆0212000 25⑆ [redacted] 7062⑆ 0 1137

PAY TO THE ORDER OF
THE C FOR DEPOSIT ONLY
ROUT# U[...]
FOR DEP JCB-Hao Yun
HAO YUN [redacted]
LICENSED CASHIER OF CHECKS
FEE: $59.40  AMT: $2,970.00
12/12/2018

515 CORP  TELLE
8168

REQUEST 00000000009302755    2970.00
20181213 000008223932713+
[redacted]7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1142

55-2/212 8744

12.14.18

Date

Pay to the Order of _Leomax Inc._                    $ 3740 00/xx

_Twenty Seven nandeed & Forty 00/xx_                    Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆  706 2⑈ 01142

PAY TO THE ORDER OF
THE CFOR DEPOSIT ONLY
ROUT# 021200025...#...1#
FOR DEP CTCB-Hao Yun
HAO YUN 9577: CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $74.80 AMT: $3,740.00
12/17/2018

8168

REQUEST 00000000009302755    3740.00
20181218 000008822253453+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1144

55-2/212-8744

Date 12/18/18

Pay to the Order of _Leomax Inc._  $ 2770.00

_Twenty Seven hundred & seventy 00/xx_ Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

:021200025: 7062 01144

PAY TO THE ORDER OF
THE C FOR DEPOSIT ON
ROUT# U0... .......
B168
FOR DEP: TCB-Hao Yun
HAO YUN        0429( CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $55.40  AMT: $2,770.00
12/19/2018

REQUEST 00000000009302755    2770.00
20181220 000008420560004+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1148

55-2/212 8744

12.22.18

Date

Pay to the Order of _Leomax Inc._    $ 3970 ²⁄₁₀₀

_Twenty nine Hundred & Twenty —_    Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____    MP

⑆021200025⑆    706 2⑈ 0 1148

PAY TO THE ORDER OF
THE ___ FOR DEPOSIT ON
ROUT# ___
FOR DEP. CB Hao Yun
HAO YUN ___ 2194: CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $79.40 AMT: $3,970.00
12/24/2018

REQUEST 00000000009302755    3970.00
20181226 000008421190318+
_____7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1154

55-2/212 8744

Date: 12.31.18

Pay to the Order of _Leomax Inc._    $ 3950.00

_Twenty nine hundred & Fifty_ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈    ⑈706 2⑈  01154

PAY TO THE ORDER OF
THE C/FOR DEPOSIT ONLY
ROUT# 06...
FOR DEPO...
HAO YUN
LICENSED CASHER OF CHECKS
FEE: $79.00  AMT: $3,950.00
01/02/2019
#8168
...7850. CORP TELLE...

REQUEST 00000000009302755    3950.00
20190103 000008226109209+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1155

55-2/212 8744

01.02.19
Date

Pay to the Order of _E Z R A  Inc._____ $ 2770 00/100

_Twenty Seven hundred & Seventy_____ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ▮▮▮▮ 7062⑈ 01155

PAY TO THE ORDER OF
THE C FOR DEPOSIT ONLY
ROUT# 06
FOR DEP
HAO YUN      8745 CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $55.40 AMT: $2,770.00
01/07/2019

REQUEST 00000000009302755    2770.00
20190108 000008529693976+
▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1156

55-2/212 8744

Date 01.10.19

Pay to the Order of _Leomax Inc._    $ 4700.00

_Forty Seven Hundred_    Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ [████] 7062⑈ 01156

PAY TO THE ORDER OF
THE C FOR DEPOSIT ONL
ROUT# U0.. .... ....1#
FOR DEPC. CR.Hao Yun
HAO YUN O.... 2648; CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $94.00  AMT: $4,700.00
01/14/2019

8168

REQUEST 0000000009302755    4700.00
20190115 000008825252579+
[████] 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1161

55-2/212 8744

01. 15. 19

Date

Pay to the Order of___ EZRA Inc.                    | $ 2670.00

Twenty six xandred & Seventy ———                    Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For ___

⑆021200025⑆    ⬛⬛⬛    7062⑈  01161

PAY TO THE ORDER OF
THE C FOR DEPOSIT ONL
ROUT# 021210711#
FOR DEP ICB Hao Yun
HAO YUN
⬛8824( CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $53.40  AMT: $2,670.00
01/16/2019

8168

REQUEST 00000000009302755    2670.00
20190117 000008423841911+
⬛⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1164

55-2/212 8744

Date 01.21.19

Pay to the Order of _Leomax Inc_    $ 3970.⁰⁰

_Twenty nine hundred & seventy_ —————— Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ▮▮▮▮ 7062⑈ 01164

PAY TO THE ORDER OF
THE FOR DEPOSIT ONLY
ROUT# 00
FOR/DEP CB-Hao Yun
HAO YUN
8940C CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $79.40  AMT: $3,970.00
01/23/2019

3168

REQUEST 00000000009302755    3970.00
20190124 000008623220897+
▮▮▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1168

55-2/212 8744

Date 01.23.19

Pay to the Order of _ EZRO   inc._ | $ 2970 ⁰⁰/₁₀₀

_Twenty  nine  hundred & Seventy Za_ —————— Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ ▮▮▮▮▮ 7062⑈ 01168

PAY TO THE ORDER OF
THE CFOR DEPOSIT ON
ROUT# 06... 
FOR DEP...
HAO YUN ...Hao Yun ...
LICENSED CASHER OF CHECKS
FEE: $59.40  AMT: $2,970.00
01/24/2019

REQUEST 00000000009302755    2970.00
20190125 000008521610165+
▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1170**

55-2/212 8744

GMO CONSULTING LLC

Date _01.24.19_

Pay to the Order of _EZla  Inc._    $ 3775 ⁷⁵⁄₁₀₀

_Twenty Seven xandeed & Seventy Rive_ ⁷⁵⁄₁₀₀ Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ████ 706 2⑈ 01170

PAY TO THE ORDER OF
THE CFOR DEPOSIT ONLY
ROUT# U0TCB-Hao Yun
FOR DEPCTCB-Hao Yun
HAO YUN G          3592; CORP TELLE
LICENSED CASHER OF CHECKS
FEE: $75.50  AMT: $3,775.00
01/28/2019

8168

REQUEST 0000000009302755    3775.00
20190129 000008623593252+
████████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

1171

**GMO CONSULTING LLC**

55-2/212 8744

Date: 01.27.69

Pay to the Order of: _Leomax Inc._        $ 2475 ⁰⁰

_Twenty Five Hundred & Seventy Five_        Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For____

⑆021200025⑆        7062⑈ 01171

PAY TO THE ORDER OF
THE CFOR DEPOSIT ONLY
ROUT# 001
FOR DEP TCB-Hao Yun
HAO YUN
3196 CORP TELLE 8168
LICENSED CASHER OF CHECKS
FEE: $49.50 AMT: $2,475.00
01/30/2019

REQUEST 00000000009302755    2475.00
20190131 000008322022543+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1172

55-2/212 8744

01.32.19

Date

Pay to the Order of _Leomax Inc_   $ 3675 00/xx

_Twesty Six xardeed & Seventy Five_ _____ Dollars

**WELLS FARGO** Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆   ⬛⬛⬛  706 2⑈ 01172

PAY TO THE ORDER OF
THE C [FOR DEPOSIT ONL]
ROUT#:
FOR DEPC
HAO YUN
2711: CORP TELLE
LICENSED CASHIER OF CHECKS
FEE: $73.50   AMT: $3,675.00
02/04/2019

REQUEST 00000000009302755   3675.00
20190205 000008229681038+
⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1175

55-2/212 8744

02. 05. 19

Date

Pay to the Order of _ EZRA    Inc.    | $ 2790²²

Twenty Swen xanded & ninty ²²    Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆    706 2⑈ 0 1175

PAY TO THE ORDER OF
THE CFOR DEPOSIT ONLY
ROUT# 06-...
FOR DEPO...
HAO YUN    6323...
LICENSED CASHER OF CHECKS
FEE: $55.80  AMT: $2,790.00
02/07/2019
CORP TELLE...
#3168

REQUEST 00000000009302755    2790.00
20190208 000008523243440+
_____7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1179

55-2/212 8744

Date 02.07.19

Pay to the Order of *Leomax Inc.* $ 3900 ²⁰

*Twenty nine hundred* ⁰⁰⁄₁₀₀ Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ⬛ 7062⑈ 01179

PAY TO THE ORDER OF
THE C FOR DEPOSIT ONLY
ROUT
FOR DEP
HAO YUN          Hao Yun
LICENSED CASHIER OF CHECKS
FEE: $78.00   AMT: $3,900.00
02/11/2019

8168

1193( CORP TELLE

REQUEST 00000000009302755    3900.00
20190212 000008220471338+
⬛ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1185**

55-2/212 8744

**GMO CONSULTING LLC**

02.19.19
Date

Pay to the Order of _Leomax Inc._    $ 3940 00/xx

_Twenty nine hundred & forty_ 00/xx    Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For

⑈021200025⑈  ████  7062⑆ 0 1185

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT#FOR DEPOSIT ONLY
FOR DEP Hao Yun ...
HAO YUN 7109 CORP TELLER
LICENSED 7109 CORP TELLER
FEE: $78.80  AMT: $3,940.00
02/21/2019  CHECKS
████  8168

REQUEST 00000000009302755    3940.00
20190222 000008221580965+
████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

**1189**

55-2/212 8744

02.22.19
Date

Pay to the Order of _Leonax Inc_    $ 3475 00

_Twenty Fair hundred & Seventy Five_    Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆  7062⑈ 01189

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT. FOR DEPOSIT ONLY
FOR DEPT
HAO YUN G
8721; CORP TELLEI
LICENSED
FEE: $69.50  AMT: $3,475.00
02/25/2019

REQUEST 00000000009302755    3475.00
20190226 000008829833380+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1198

55-2/212 8744

Date 03 06 19

Pay to the Order of _EZRA Inc_    $ 3960 00

_Twenty nine hundred & sixty_    Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆  ▮▮▮▮7062⑈ 01198

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT#FOR DEPOSIT ONLY
FOR DEP CTGB Hao Yun
HAO YUN
LICENSED CASHER OF TELLER
CORP
FEE: $79.20  AMT: $3,960.00
03/07/2019

REQUEST 00000000009302755    3960.00
20190308 000008526082478+
▮▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1200

55-2/212-8744

Date 03·08·19

Pay to the Order of _Ezra Inc_     $ 4830 00/xx

FORty Six handed & Seventy 00/xx ———— Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈02₁2000 25⑈    70·6 2⑈  0₁·200

---

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT#FOR DEPOSIT ONLY⋮38168
FOR DEPO⋮TCB Hao Yun
HAO YUN ◼◼◼◼ CORP TELLER
LICENSED ◼◼◼◼◼ 7689· CHECKS
FEE: $93.40  AMT: $4,670.00
03/11/2019

Ezra Inc.

---

REQUEST 00000000009302755    4670.00
20190312 000008223670577+
◼◼◼◼◼◼◼◼◼◼◼7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1051

55-2/212 8744

03.13.19 Date

Pay to the Order of _EZRA INO_                    $ 2675.00

_Twenty six hundred & Seventy Five_    Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆  706 2⑈ 01051

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT#FOR DEPOSIT ONLY:38168
FOR DEP-TCB-Hao Yun
HAO YUN 0    TCB CORP TELLER
LICENSED    7151; CHECKS
FEE: $53.50  AMT: $2,675.00
03/14/2019

REQUEST 00000000009302755    2675.00
20190315 000008628419143+
                    7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1059

55-2/212 8744

Pay to the Order of _____ E z R a  Inc _____ $ 1975 00/cc

_nrtyn nondred & seventy five 00/xx_ Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈0 2 1 2 0 0 0 2 5⑈  ▉ 7 0 6 2 ▉  0 1 0 5 9

PAY TO THE ORDER OF
THE COMMERCIAL BANK 38168
ROUT# FOR DEPOSIT ONLY;
FOR DEPT
HAO YUN Hao Yun
5728; CORP TELLER
LICENSED CASHIER OF CHECKS
FEE: $39.50  AMT: $1,975.00
04/05/2019

REQUEST 00000000009302755    1975.00
20190408 000008621074947+
▉▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

**1060**

55-2/212 8744

Date ~4.07.19

Pay to the Order of _OK billing_   $ 3000

_three thousand_ _____ Dollars

WELLS FARGO   Wells Fargo Bank N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆   ⑈7062⑈ 01060

PAY TO THE ORDER OF
REPUBLIC BANK
ROUTING # 071001380
FOR DEPOSIT ONLY
BLAKE CORP
LICENSED CASHIER OF CHECKS
ACCT. # 333
04/10/2019 12:09:07 PM

REQUEST 00000000009302755   3000.00
20190411 000008621664215+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1065
55-2/212 6744

Date _25 07, 19_

Pay to the Order of _PK Billing inc._  | $ 295.00

_Two hundred ninty five_  Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑂02⑂200025⑂   706 2⑂  0⑂065

REQUEST 00000000009302755    295.00
20190509 000008726137653+
████████████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

1074

**GMO CONSULTING LLC**

55-2/212 8744

OS - 30, 19
Date

Pay to the Order of ___ EZRA Ins. ___ $ 3775 00/xx

Twenty Seven Hundred & Seventy Five ___ Dollars

WELLS FARGO   Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For ___

⑆021200025⑆ ▓▓▓▓ 7062⑈ 01074

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT# FOR DEPOSIT ONLY 38168
FOR DEPIT CR Hao Yun
HAO YUN 2890 CORP TELLER
LICENSED CASHIER OF CHECKS
FEE: $75.50  AMT: $3,775.00
06/03/2019

REQUEST 00000000009302755   3775.00
20190604 000008728840078+
▓▓▓▓▓▓▓▓7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1079
55-2/212 8744

06.10.19 Date

Pay to the Order of _Leomax   Inc_          $ 3,475.00

_Twetty Four hundred & Seventy Five_                Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ █████████ 7062⑈ 01079

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUT# FOR DEPOSIT ONLY 38168
FOR DEPCTCB-Hao Yun
HAO YUN ███████8008 CORP TELLER
LICENSED CASHIER OF CHECKS
FEE: $69.50 AMT: $3,475.00
06/14/2019

REQUEST 00000000009302755    3475.00
20190617 000008327205226+
█████████████7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1092

55-2/212 8744

07.08.19
Date

Pay to the Order of: _Leomax Inc._    $ 3775

_Twenty Seven Hundred & Twenty five_    Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑊021200025⑊   7062⑊ 01092

PAY TO THE ORDER OF
THE COMMERCIAL BANK
ROUTE FOR DEPOSIT ONLY J38168
FOR DEPT CB-Hao Yun
HAO YUN
6419, CORP TELLER
LICENSED CASHIER OF CHECKS
FEE: $75.50  AMT: $3,775.00
07/09/2019

REQUEST 00000000009302755    3775.00
20190710 000008824316544+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1100

55-2/212 8744

07.31.19
Date

Pay to the Order of _Leomax Inc._     | $ 2964 00/100

_Twenty nine hundred & Sixty Four_     Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆    7062⑈ 01100

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $59.28 AMT: $2,964.00
DATE: 08/01/2019 11:36:44 AM
8173

REQUEST 0000000009302755    2964.00
20190802 000008228933746+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1220

55-2/212 8744

Date **09.13.19**

Pay to the Order of __EZRA Inc.__     $ 1775 ⁰⁰/₁₀₀

__Seventyn Handred & Seventy Five__ Dollars

WELLS FARGO

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ 7062⑈ 01220

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $35.50 AMT: $1,775.00
DATE: 09/16/2019 10:34:09 AM

8173

REQUEST 00000000009302755    1775.00
20190917 000008420273576+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1226

55-2/212 8744

10. 31  19
Date

Pay to the Order of _Leomax * Inc._____ | $ 2775 ⁰⁰

_Twenty Seven Handred & Seventy Five_____ Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆    7062⑈ 01226

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $55.50 AMT: $2,775.00
DATE: 11/01/2019 11:09:53 AM
FOR DEPOSIT ONLY

8173

REQUEST 00000000009302755    2775.00
20191104 000008623287746+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1233

55-2/212 6744

Date: 11. 26. 19

Pay to the Order of _EZRa Inc,_ $ 3775

_Twenty Seven xandRed & Seventy Five_ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

Photo
Safe
Deposit®
Details on back

For _____

⑈021200025⑈ 7062⑈ 01233

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
18TH AVE CHECK CASHING
FOR DEPOSIT ONLY
LICENSED CASHER OF CHECKS
FEE: $75.50 AMT: $3,775.00
DATE: 11/27/2019 09:54:30 AM

3173

REQUEST 00000000009302755    3775.00
20191129 000008626169174+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1244

55-2/212 8744

12, 16 - 19
Date

Pay to the Order of _____ EZRA Inc. _____ | $ 2775 ≈

Twenty Seven xundred & Seventy Five _____ Dollars

Photo Safe Deposit® Details on back

**WELLS FARGO** Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ▇▇▇▇ 7062⑈ 01244

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $55.50 AMT: $2,775.00
DATE: 12/17/2019 10:42:34 AM
3173

REQUEST 00000000009302755    2775.00
20191218 000008124767371+
▇▇▇▇▇▇▇7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1246

55-2/212-8744

Date: 12.19.19

Pay to the Order of: *Leomax Inc*                    $ 1975 00

*Ninetyn xundred & Seventy Five* Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For: _____

⑆021200025⑆ 7062⑈ 01246

---

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $39.50 AMT: $1,975.00
DATE: 12/20/2019 11:28:47 AM

8173

*Leomax*

---

REQUEST 00000000009302755    1975.00
20191223 000008223496023+
███████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1249**

55-2/212 8744

**GMO CONSULTING LLC**

01.12.2020
Date

Pay to the Order of _Leonax Inc_ | $ 2775 $\frac{00}{xx}$

_Twenty seven hundred & seventy five_ Dollars

Phone
Safe
Deposit
Details on back

WELLS
FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

:021200025: ███████ 7062 01249

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $58.28 AMT: $2,775.00
DATE: 01/14/2020 12:32:30 PM
8173

PAY TO THE ORDER OF
REPUBLIC BANK
Rout# 071001180 Acct# ████ 8167
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
Fee: $58.28 Amt: $2,775.00
Date: 01/14/20 12:30 PM

REQUEST 00000000009302755    2775.00
20200115 000008621234465+
████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

1305
55-2/212 8744

**GMO CONSULTING LLC**

01. 20. 2020
Date

Pay to the Order of _Leomax Inc_    $ 1775.00

_Seventh Hundred & Seventy Five_    Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For

⑈021200025⑈  ▉  7062⑈  01305

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $37.28 AMT: $1,775.00
DATE: 01/21/2020 10:36:19 AM
8173

REQUEST 00000000009302755    1775.00
20200122 000008621810562+
▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1313

65-2/212 8744

Date: 02.25.20

Pay to the Order of _Leomax Inc._ | $ 3975 00/xx

_Twenty nine hundred & Seventy nine_ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ ▉7062⑈ 01313

---

PAY TO THE ORDER OF Inc.
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $83.48 AMT: $3,975.00
DATE: 02/27/2020 10:30:13 AM
3173

---

REQUEST 00000000009302755    3975.00
20200228 000008625258315+
▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1315

55-2/212 8744

03. 17. 20
Date

Pay to the Order of _____ EZRA m _____ $ 1950⁰⁰

nintyn hanated & FIFTY ⁰⁰/₀₀ _____ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ 7062⑈ 01315

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $40.95 AMT: $1,950.00
DATE: 03/18/2020 10:11:25 AM
8173

REQUEST 00000000009302755    1950.00
20200319 000008829823698+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1330

55-2/212 8744

05. 01. 20

Date

Pay to the Order of _Leomax Inc._  $ 1775 °⁰/₁₀₀

_Seventyn xandred & Seventy Five_ — Dollars

Photo
Safe
Deposit®
Details on back

WELLS
FARGO

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

:021200025: [redacted] 7062 01330

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
18TH AVE CHECK CASHING
FOR DEPOSIT ONLY
LICENSED CASHER OF CHECKS
FEE: $37.28 AMT: $1,775.00
DATE: 05/05/2020 12:13:12 PM

REQUEST 00000000009302755    1775.00
20200506 000008722307330+
[redacted] 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1339**

55-2/212 8744

**GMO CONSULTING LLC**

Date: 7-10,20

Pay to the Order of: EZRa                    $ 4338 00

Forty Thre Hundred Thirty eight                    Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____                    NP

⑆021200025⑆  ⬛⬛⬛⬛ 7062⑈ 01339

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $91.10 AMT: $4,338.00
DATE: 07/14/2020 03:36:52 PM
8173

REQUEST 00000000009302755    4338.00
20200715 000008429275134+
⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

REDE Page 373 of 794

**GMO CONSULTING LLC**

1341

55-2/212 8744

07. 27. 20
Date

Pay to the Order of _Leomax Ino_____ $ 1750 ⁰⁰/xx

_Seventh_ _hundred_ _FIfTY_ ⁰⁰/xx ___ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈  7062⑈ 01341

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
18TH AVE CHECK CASHING
FOR DEPOSIT ONLY
LICENSED CASHER OF CHECKS
FEE: $36.75 AMT: $1,750.00
DATE: 07/29/2020 09:50:54 AM

8173

REQUEST 00000000009302755    1750.00
20200730 000008527042023+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

1343

56-2/212 8744

GMO CONSULTING LLC

08. 10. 20
Date

Pay to the Order of _____ E Z R a  I n c _____ | $ 2175

Twenty One xandRed & Seventy five Dollars

Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ ▉▉▉▉ 7062⑈ 01343

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $45.68 AMT: $2,175.00
DATE: 08/12/2020 09:53:37 AM
8173

REQUEST 00000000009302755    2175.00
20200813 000008225206571+
▉▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

1325
55-2/212 8744

GMO CONSULTING LLC

10.18.20
Date

Pay to the Order of _Levina x Inc_  $ 2350.00

Twenty Three Kundred & Fifty —————— Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆  7062⑈ 01325

PAY TO THE ORDER OF JLX
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $49.35 AMT: $2,350.00
DATE: 10/20/2020 09:48:00 AM
8173

REQUEST 00000000009302755    2350.00
20201021 000008427798758+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1350

55-2/212 8744

12. 20. 20
Date

Pay to the Order of _____ E Z R A   Inc _____ $ 4400 00/xx

FORTY FOUR Hundred _____ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆    7062⑈ 01350

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $92.40 AMT: $4,400.00
DATE: 12/22/2020 10:53:55 AM

8173

REQUEST 00000000009302755    4400.00
20201223 000008823690322+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

002

55-2/212

12.26. 20 20

Pay to the Order of _Leomax Inc._    $ 3750 00/100

_Twenty Seven Handred & Fifty Et_ Dollars

Wells Fargo Bank, N.A.

For

⑆021200025⑆     706 2⑈ 000 2

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $78.75 AMT: $3,750.00
DATE: 12/28/2020 10:18:49 AM
8173

REQUEST 00000000009302755    3750.00
20201229 000008520088244+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

009
55-2/212

02. 08. 2021

Pay to the Order of _Leomax Inc._    $ 4775 00

_Forty Seven hundred & Seventy Five_ Dollars

Wells Fargo Bank , N.A.

For _____

⑈021200025⑈    ████    7062⑈ 0009

---

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $100.28 AMT: $4,775.00
DATE: 02/09/2021 09:50:58 AM
████ 8173

---

REQUEST 00000000009302755    4775.00
20210210 000008827860586+
████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

042
55-2/212

06.14, 20 21

Pay to the
Order of    _Loomax    Inc._    $ 2750 ⁰⁰/₁₀₀

_Twenty seven hundred Fifty_ cen/xx    Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆  ███████ 7062⑆ 0042

REQUEST 00000000009302755    2750.00
20210617 000008428472222+
███████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

REDE Page 483 of 794

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

045

55-2/212

06.30 2021

Pay to the
Order of   EZRA Inc.                    $ 4500 00/100

Forty Five Hundred 00/100 ——————  Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  ■■■■  7062⑈ 0045

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $94.50 AMT: $4,500.00
DATE: 07/01/2021 09:00:37 AM
8173

REQUEST 00000000009302755   4500.00
20210702 000008326583736+
■■■■■■■■■■7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

163
55-2/212

09.30. 20 21

Pay to the
Order of    E Z R a    Inc.    $6775.00

Sixty seven hundred & seventy five    Dollars

Security
Features
Details on
Back

Wells Fargo Bank , N.A.

For

⑆021200025⑆  ⬛⬛⬛  7062⑈ 0163

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $142.28 AMT: $6,775.00
DATE: 10/04/2021 10:15:22 AM

REQUEST 00000000009302755    6775.00
20211005 000008427560642+
⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

166

55-2/212

10. 01. 20 21.

Pay to the Order of _Leomax Inc._    $ 4770 00/xx

Forty seven hundred & seventy — Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ 7062⑈ 0166

PAY TO THE ORDER OR
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $100.17 AMT: $4,770.00
DATE: 10/07/2021 09:23:37 AM

8173

REQUEST 00000000009302755    4770.00
20211008 000008427937803+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

170

65-2/212

N. 10.21  20 21

Pay to the
Order of        EZRa  inc.        $ 6770 00/xx

Sixty seven hundred & seventy.  Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  ■■■■  7062⑈ 0170

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $142.17 AMT: $6,770.00
DATE: 10/12/2021 11:05:33 AM
3173

REQUEST 00000000009302755    6770.00
20211013 000008625960536+
■■■■■■■■■7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

173

55-2/212

10.17 20 21

Pay to the
Order of  EZRa Inc.  $ 3675 00/xx

Twenty Six nandRed & Seventy five Dollars

Wells Fargo Bank , N.A.

For

⑈021200025⑈ ■■■ 7062⑈ 0175

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $77.18 AMT: $3,675.00
DATE: 10/19/2021 01:15:09 PM

8173

REQUEST 00000000009302755   3675.00
20211020 000008727698766+
■■■■■■■■■7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

172

55-2/212

10.17. 2021

Pay to the
Order of    *Leomax, Inc.*    $ 6770 00/xx

*Sixty seven hundred & seventy —* Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ 7062⑈ 0172

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $142.17 AMT: $6,770.00
DATE: 10/19/2021 01:14:33 PM
8173

REQUEST 00000000009302755    6770.00
20211020 000008727698764+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

175

55-2/212

10. 26. 20 21

Pay to the
Order of  EZRA inc  $ 5770 00

Fifty Seven Hundred & Seventy  Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ 7062⑈ 0175

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $121.17 AMT: $5,770.00
DATE: 10/28/2021 12:10:39 PM

REQUEST 00000000009302755    5770.00
20211029 000008526576764+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

177
96-2/212

11.01 20 21

Pay to the
Order of  *Lomax Inc*   $ 4640

*Forty six hundred & forty —*  Dollars

Wells Fargo Bank , N.A.

For

⑈021200025⑈  7062⑈ 0177

PAY TO THE ORDER OF X
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $97.44 AMT: $4,640.00
DATE: 11/03/2021 11:09:54 AM
8173

REQUEST 00000000009302755    4640.00
20211104 000008627950934+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

179

55-2/212

11.08, 20 21.

Pay to the Order of  *Leomax Inc.*  $ 3650

Twenty six hundred & Fifty —  Dollars

Wells Fargo Bank , N.A.

For

⑈021200025⑈   7062⑆ 0179

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $76.65 AMT: $3,650.00
DATE: 11/08/2021 10:11:08 AM

8173

REQUEST 00000000009302755    3650.00
20211109 000008327128391+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

180

55-2/212

11. 15.   20 21

Pay to the Order of  EZRA  Inc.    $ 5474 00/22

FIFTY FoUr  hundred & seventy FoUr   Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆  ▓▓▓▓▓  7062⑈  0180

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $114.95 AMT: $5,474.00
DATE: 11/16/2021 09:05:12 AM

REQUEST 00000000009302755    5474.00
20211117 000008821510932+
▓▓▓▓▓▓▓▓7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

573

55-2/212

11.22. 20 21

Pay to the
Order of       *Leomax Inc.*          $ 7746 00/xx

*Seventy Seven Hundred & Forty Six*          Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ ▉▉▉ 7062⑈ 0573

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $162.67 AMT: $7,746.00
DATE: 11/23/2021 09:40:21 AM

8173

REQUEST 00000000009302755    7746.00
20211124 000008127375327+
▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**576**

55-2/212

11. 27. 2021

Pay to the Order of    EZRa Inc.    $ 5775 00/xx

Fifty Seven handeed & leventy Five    Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆    7062⑈ 0576

SCROLL

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $121.28 AMT: $5,775.00
DATE: 11/29/2021 10:11:33 AM
8173

REQUEST 00000000009302755    5775.00
20211130 000008721068250+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**578**

55-2/212

12.07. 2021

Pay to the Order of  *EZRA Inc*  $ 7567 00

*Seventy Five hundred & Sixty Seven* Dollars

Wells Fargo Bank, N.A.

For

⑆021200025⑆ ███ 7062⑆ 0578

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $158.91 AMT: $7,567.00
DATE: 12/07/2021 09:58:34 AM

8173

REQUEST 00000000009302755    7567.00
20211208 000008529819250+
███████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

583

55-2/212

12. 10. 20 21

Pay to the Order of    EZRA Inc.    $ 4460 00

Forty Four Hundred & Sixty    Dollars

Wells Fargo Bank , N.A.

For

⑈021200025⑈ 7062⑈ 0583

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $93.66 AMT: $4,460.00
DATE: 12/10/2021 09:40:13 AM

8173

REQUEST 0000000009302755    4460.00
20211213 000008329954528+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

587

55-2/212

12.12 2021

Pay to the Order of *Leomax Inc*    $ 4675 00

*Forty six hundred & Seventy Five* Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ 7062⑆ 0587

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $98.18 AMT: $4,675.00
DATE: 12/13/2021 03:07:07 PM

3173

REQUEST 00000000009302755    4675.00
20211214 000008227670256+
　　　　　　　　　　7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

589
65-2/212

12. 15.    20 21

Pay to the Order of    E Z R A    Inc    $ 6570

Sixty Five Hundred & Seventy ———— Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ ⬛⬛⬛⬛⬛ 7062⑈ 0589

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $137.97 AMT: $6,570.00
DATE: 12/16/2021 10:12:13 AM
8173

REQUEST 00000000009302755    6570.00
20211217 000008423432375+
⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

593
55-2/212

12.21    20 21

Pay to the
Order of    Leomax inc    $ 2745 00/xx

twenty seven kand Red & Forty Five    Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  ⬛⬛⬛  7062⑈  0593

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $57.65 AMT: $2,745.00
DATE: 12/21/2021 10:13:08 AM
⬛⬛8173

REQUEST 00000000009302755    2745.00
20211222 000008521010407+
⬛⬛⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**600**
55-2/212

*12. 28.* 20 *21.*

Pay to the
Order of *Leomax Inc.,*                    $ *7695 00/xx*

*Seventy six uandred 1 ninty FNk —*                    Dollars

Security
Features
Details on
Back.

Wells Fargo Bank , N.A.

For _____                    MP

⑆021200025⑆  ███████  7062⑈ 0600  ⑆

SCROLL

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $161.60 AMT: $7,695.00
DATE: 12/29/2021 09:42:55 AM
8173

REQUEST 00000000009302755    7695.00
20211230 000008622658678+
████████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

546

55-2/212

01. 03. 20 22

Pay to the
Order of   *Leomax Inc.*                            $ 5850 00/xx

*Fifty eight hundred & fifty*                   Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆  ███████  7062⑈ 0546

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $122.85 AMT: $5,850.00
DATE: 01/04/2022 10:46:54 AM

REQUEST 00000000009302755    5850.00
20220105 000008825412199+
███████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**549**
55-2/212

Pay to the Order of    E Z R A  Inc    $ 7647 00/xx

01.10. 2022

Seventy six hundred & Forty seven    Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  ▉▉▉▉  7062⑈ 0549

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $160.59 AMT: $7,647.00
DATE: 01/10/2022 09:35:09 AM

8173

REQUEST 00000000009302755    7647.00
20220111 000008425502498+
▉▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

551
55-2/212

01.10    20 22

Pay to the
Order of    *Leomax Inc.*    $ 2,770 00/100

*Twenty Seven Hundred & Seventy*    Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆ ▮▮▮▮ 7062⑆ 0551

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $58.17 AMT: $2,770.00
DATE: 01/13/2022 09:14:59 AM

8173

REQUEST 00000000009302755    2770.00
20220114 000008826148697+
▮▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

555

55-2/212

01. 17. 20 22

Pay to the Order of _EZRO Inc_   $ 3750 00/xx

_Twenty Seven hundred & Fifty_ ——— Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆ ███████ 7062⑈ 0555

---

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $78.75 AMT: $3,750.00
DATE: 01/18/2022 01:17:27 PM
████ 8173

---

REQUEST 00000000009302755    3750.00
20220119 000008523467348+
████████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

557

55-2/212

01.18   20 22

Pay to the Order of _Leomax Inc._    $ 5774 00/22

Fifty Seven hundred & Seventy four    Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆    7062⑈ 0557

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $121.25 AMT: $5,774.00
DATE: 01/19/2022 03:44:35 PM

REQUEST 00000000009302755    5774.00
20220120 000008725372194+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

558
55-2/212

Pay to the Order of _____ EZRA inc. _____ | $ 7469 00/xx

Seventy Four hundred & Sixty nine ____ Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆ ███████ 7062⑈ 0558

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $156.85 AMT: $7,469.00
DATE: 01/24/2022 09:43:59 AM
█████ 3173

REQUEST 00000000009302755    7469.00
20220125 000008826880883+
██████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**561**

55-2/212

02.02. 20 22

Pay to the Order of  *Leonax Inc*                    $ 3675 00/xx

*Twenty six hundred & Seventy Five* Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆ ▓▓▓▓▓ 7062⑈ 0561

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $77.18 AMT: $3,675.00
DATE: 02/02/2022 01:10:28 PM

8173

REQUEST 00000000009302755    3675.00
20220203 000008324417485+
▓▓▓▓▓▓▓7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

562

55-2/212

02. 03. 20 22

Pay to the
Order of  *Leomax Inc*                                          | $ 5574 00/xx

*Fifty Five xandred & seventy Four*                            Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆ ▇▇▇▇ 7062⑈ 0562

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $117.05 AMT: $5,574.00
DATE: 02/07/2022 10:57:57 AM
8173

REQUEST 00000000009302755    5574.00
20220208 000008525207493+
▇▇▇▇▇▇▇7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

565

55-2/212

02, 08 20 22

Pay to the Order of  EZRA  inc.  $ 5500.00

FIFty Five randred—  Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  706 2⑈ 0565

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $115.50 AMT: $5,500.00
DATE: 02/10/2022 09:56:27 AM

8173

REQUEST 00000000009302755    5500.00
20220211 000008123956682+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

568
55-2/212

02, 11.  20 22

Pay to the
Order of  *Leomax Inc.*  $ 7565 00/100

Seventy Five Hundred & Sixty Five ——— Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  ⬛  7062⑈ 0568

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $158.87 AMT: $7,565.00
DATE: 02/15/2022 09:23:48 AM

8173

REQUEST 00000000009302755    7565.00
20220216 000008222832878+
⬛ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

097

55-2/212

02.22.22

Pay to the Order of  EZRA  Inc.    $ 4674

Fotty six hundred & seventy four  Dollars

Wells Fargo Bank, N.A.

For

⑆021200025⑆  706 2⑆ 0097

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $98.15 AMT: $4,674.00
DATE: 02/23/2022 10:40:04 AM
8173

REQUEST 00000000009302755    4674.00
20220224 000008429421567+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

101

56-2/212

02. 27. 20 22

Pay to the
Order of    *Leomax Inc.*    | $ 6440 00

*Sixty Four Haundred & Forty* ———————— Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆  ▮▮▮▮▮ 7062⑈ 0101

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 07100180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $135.24 AMT: $6,440.00
DATE: 03/01/2022 10:09:54 AM

8173

REQUEST 00000000009302755    6440.00
20220302 000008326641093+
▮▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

103

55-2/212

03, 12 2022

Pay to the Order of *EZRa Inc.*   $6794 00

*Sixty Seven Xandred & ninty Four* Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆   7062⑈ 0103

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $142.67 AMT: $6,794.00
DATE: 03/23/2022 11:05:41 AM
8173

REQUEST 00000000009302755   6794.00
20220324 000008720617307+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**106**
55-2/212

Pay to the Order of  *Leomax Inc.*  $ 5740.00

*Fifty seven Xundred & Forty* ———— Dollars

Security
Features
Details on
Back.

Wells Fargo Bank , N.A.

For _____

⑈021200025⑈ ⬛ 7062⑈ 0106

REQUEST 00000000009302755    5740.00
20220329 000008629766076+
⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**114**
55-2/212

04, u.  20 22

Pay to the
Order of  EZRa Inc.  $6454 00/100

Sixty Four Kandred & FiFty Four  Dollars

Wells Fargo Bank , N.A.

For

⑆021200025⑆  7062⑈  0114

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $135.53 AMT: $6,454.00
DATE: 04/12/2022 04:24:25 PM

REQUEST 00000000009302755    6454.00
20220413 000008227386091+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**119**

55-2/212

09.29 2022

Pay to the
Order of  *Leomax Inc*                    $ 5575 00

*Fifty Five hundred & Seventy Five*   Dollars

Wells Fargo Bank , N.A.

For _____

:021200025: 7062 0119

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $117.08 AMT: $5,575.00
DATE: 05/02/2022 09:40:13 AM

8173

REQUEST 00000000009302755    5575.00
20220503 000008824842076+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

511
55-2/212

05.09. 20 22

Pay to the
Order of   *Leomax   Inc.*                    $ 5740 00/xx

*Fifty   Seven   hundred & Forty* ———  Dollars

Wells Fargo Bank , N.A.

For _____

⑈021200025⑈  ▉▉▉  7062⑈  0511

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $120.54 AMT: $5,740.00
DATE: 05/10/2022 10:04:43 AM
8173

REQUEST 00000000009302755    5740.00
20220511 000008724725750+
▉▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC.
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

539

55-2/212

08.22. 20 22

Pay to the Order of _____ Leomax Inc. _____ | $ 4755 00/xx

Forty seven Handred & fifty Five Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆ ▇▇▇▇ 7062⑆ 0539

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $118.88 AMT: $4,755.00
DATE: 08/23/2022 12:34:15 PM
▇▇8173

Leomax Inc.

REQUEST 00000000009302755    4755.00
20220824 000008423898530+
▇▇▇▇▇▇▇7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

451
65-2/212

10. 05. 20 22

Pay to the
Order of _Leo max   Inc._                    $ 3775 00

_Tuerty Seven vanhed & Seventy Five_                    Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆ ███████ 7062⑈ 0451

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $94.38 AMT: $3,775.00
DATE: 10/06/2022 10:47:39 AM
8173

REQUEST 00000000009302755    3775.00
20221007 000008122847146+
███████████ 7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

244
55-2/212

11. 07. 20 22

Pay to the Order of   EZRa Inc                    | $ 3770 00/xx

TeRRy Seven handRed & Seventy ___ Dollars

Wells Fargo Bank , N.A.

For _____

:021200025:  ▮▮▮▮  7062  0244

'SCROLL'

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $94.25 AMT: $3,770.00
DATE: 11/07/2022 12:15:28 PM
▮▮▮8173

REQUEST 00000000009302755    3770.00
20221108 000008728805028+
▮▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**304**
55-2/212

25, 09 20 23

Pay to the
Order of _Leomax Inc._                    $ 8700 00

_Eighte leven xandred_ —                  Dollars

Wells Fargo Bank , N.A.

For _____

⑆021200025⑆    7062⑈ 0304

PAY TO THE ORDER OF
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHIER OF CHECKS
FEE: $217.50 AMT: $8,700.00
DATE: 09/26/2023 02:28:10 PM
8173

REQUEST 00000000009302755    8700.00
20230927 000008129205585+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

GMO Consulting LLC
2661 Coney Island Ave Ste 7
Brooklyn, NY 11223

**307**

55-2/212

12-04. 20 23

Pay to the Order of ___ *Leomax Inc.* ___ $ 2000 ½

*Two Trousand* ___ Dollars

Wells Fargo Bank , N.A.

For ___

⑆021200025⑆ ▉ 7062⑈ 0307

PAY TO THE ORDER OF X
REPUBLIC BANK
ROUT# 071001180 ACCT#
FOR DEPOSIT ONLY
18TH AVE CHECK CASHING
LICENSED CASHER OF CHECKS
FEE: $50.00 AMT: $2,000.00
DATE: 12/05/2023 09:24:05 AM

REQUEST 00000000009302755    2000.00
20231206 000008124057487+
▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**AMG MANAGEMENT INC.**

1362

1-7145/2260
62

Date 01/18/19

PAY to the Order of  Lexton, LLC                            $ 22000

Twenty-two thousand & 00/xx ————— Dollars

**Northfield** Bank

618 Brighton Beach Ave.
Brooklyn, NY 11235
www.eNorthfield.com

For _____

⑆226071457⑆  0908⑈ 01362

ENDORSE HERE
X  Lexton, LLC

0908

REQUEST 00000000009302758    22000.00
20190116 000002684773727+
⬛⬛⬛⬛⬛0908+
REQUESTOR U491620
29456243  05/24/2024 Research 29494904 HOGAN HISTORICAL: 000000000106180915601

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

EXHIBIT
Plf's 9



**GMO CONSULTING LLC**

1160

55-2/212 8744

Date: 01/14/19

Pay to the Order of: Lexton, LLC    $ 22,000.00

Twenty-two thousand $00/100 ————— Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈ ▉▉▉7062⑈ 01160

ENDORSE HERE
X Lexton, LLC
7252

☐ CHECK HERE IF MOBILE OR REMOTE DEPOSIT

REQUEST 00000000009302758    22000.00
20190116 000002684773728+
▉▉▉▉▉7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494904 HOGAN HISTORICAL: 0000000000106180915601

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

REDE Page 130 of 794

**GMO CONSULTING LLC**

1063

55-2/212 8744

4/15/19

Pay to the Order of _Xpert consulting corp._ | $ 766 ⁰⁰/₁₀₀

_Seven hundred sixty six_ ___ ⁰⁰/₁₀₀ Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ 7062⑈ 01063

>221272031<
**Investors Bank #424**
**2019-04-16**
**0424585064**
**Batch 178192837**

ENDORSE HERE
X
Xpert copss corp.

☐ CHECK HERE IF MOBILE OR REMOTE DEPOSIT
AT

REQUEST 00000000009302755    766.00
20190416 000008825450398+
7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**EXHIBIT**
Plf's 10

**GMO CONSULTING LLC**

1064

55-2/212 8744

4.29.19
Date

Pay to the Order of Xpert consulting corp                $ 295 00

two hundred ninety five                                   Dollars

WELLS FARGO    Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑈021200025⑈  ⬛⬛⬛  7062⑈ 01064

>221272031<
Investors Bank #424
2019-04-29
0424026938
Batch 179508044

☐ CHECK HERE IF MOBILE OR REMOTE DEPOSIT

ENDORSE HERE

REQUEST 00000000009302755    295.00
20190429 000008724856374+
⬛⬛⬛⬛⬛⬛7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**1203**

55-2/212 8744

**GMO CONSULTING LLC**

08, 06, 19
Date

Pay to the Order of _Xpeet Consulting_                    $ 2940 00/100

_Twenty nine hundred & FORTY_ 00/100                      Dollars

Photo
Safe
Deposit®
Details on back

**WELLS FARGO** Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆   ███████  7062⑈  01203

>221272031<
**Investors Bank #424**
**2019-08-06**
0424988046
Batch 190626422

☐ CHECK BOX FOR MOBILE/REMOTE DEPOSIT
WRITE NAME OF FINANCIAL INSTITUTION ON LINE ABOVE

ENDORSE HERE
X _Xpeet Cons Corp_
424 3

REQUEST 00000000009302755    2940.00
20190806 000008522717466+
████████████      7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**GMO CONSULTING LLC**

1204

55-2/212 8744

08, 07, 19
Date

Pay to the Order of   XRezt ConsuLTiag   $ 5000 ⁰⁰

Five Trousand ⁰⁰/₁₀₀ —————   Dollars

WELLS FARGO
Wells Fargo Bank, N.A.
New Jersey
wellsfargo.com

For _____

⑆021200025⑆ ▮▮▮▮▮ 7062⑈ 01204

>221272031<
Investors Bank #424
2019-08-07
0424388738
Batch 190734949

☐ CHECK BOX FOR MOBILE/REMOTE DEPOSIT
WRITE NAME OF FINANCIAL INSTITUTION ON LINE ABOVE

ENDORSE HERE
X

REQUEST 00000000009302755    5000.00
20190807 000008522846916+
▮▮▮▮▮▮▮7062+
REQUESTOR U491620
29456243  05/24/2024 Research 29494912

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

REDE Page 236 of 1240



REQUEST 00000000009302756    2685.00
20190716 000002686670608+
▉▉▉▉▉4793+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201

**EXHIBIT**
Plf's 11



REQUEST 0000000009302756    1736.00
20190716 000002686670609+
█████████4793+
REQUESTOR U491620
29456243  05/24/2024 Research 29494913

Summons and Subpoenas Department
D1111-016
Charlotte NC 28201